BERNSTEIN LITOWITZ BERGER
   & GROSSMANN LLP
BLAIR A. NICHOLAS   (Bar No. 178428)
(blairn@blbglaw.com)
MATTHEW P. SIBEN   (Bar No. 223279)
(matthews@blbglaw.com)
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel:   (858) 793-0070
Fax:   (858) 793-0323

BERMAN DeVALERIO PEASE TABACCO
BURT & PUCILLO
JOSEPH J. TABACCO, JR. (Bar No. 75484)
(jtabacco@bermanesq.com)
NICOLE LAVALLEE (Bar No. 165755)
(nlavallee@bermanesq.com)
JULIE J. BAI (Bar No. 227047)
(jbai@bermanesq.com)
425 California Street, Suite 2100
San Francisco, CA 94104-2205
Tel:   (415) 433-3200
Fax:   (415) 433-6382

*Attorneys for Co-Lead Plaintiffs General Retirement
System of the City of Detroit and Massachusetts
Laborers' Pension Fund*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE INTERNATIONAL RECTIFIER CORPORATION SECURITIES LITIGATION | Case No. CV 07-02544-JFW (VBKx)<br><br>CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>DEMAND FOR JURY TRIAL |

# TABLE OF CONTENTS

Page

I.  INTRODUCTION ........................................................................... 1

II.  JURISDICTION AND VENUE ...................................................... 6

III.  THE PARTIES .............................................................................. 6

IV.  DEFENDANTS' FRAUDULENT SCHEME .................................. 9

    A.  International Rectifier Reports False And Misleading Earnings By Recognizing Revenue On Fabricated And/Or Premature Shipments . 11

    B.  International Rectifier Inflates Its Cash Levels And Misrepresents The Poor Quality Of Its Earnings By Selling Fictitious Accounts Receivables ............................................................................... 19

    C.  Defendants Manipulate Reported Margins, Operating Expenses And Pro Forma Earnings By Including Ordinary Operating Costs In Restructuring Costs ............................................................... 22

    D.  Defendants Overstate Net Income In Violation Of Tax Laws By Illegally Transferring Income From Higher Tax Jurisdictions To Lower Tax Jurisdictions ....................................................... 27

    E.  International Rectifier Reports False And Misleading Cash Flow From Operations By Incorrectly Classifying Tax Benefits .............. 30

    F.  Defendants Conceal Their Fraudulent Conduct ............................... 34

V.  CLASS PERIOD DISCLOSURES ................................................ 35

    A.  Defendants' False And Misleading Statements Prior To The First Partial Disclosure Of The Fraudulent Scheme ................................... 35

    B.  The First Partial Disclosure Of The Fraudulent Scheme And Defendants' Continuing False And Misleading Statements ............. 101

    C.  The Second Partial Disclosure Of The Fraudulent Scheme And Defendants' Continuing False And Misleading Statements ............. 125

VI.  POST-CLASS PERIOD EVENTS ............................................... 131

VII.  DEFENDANTS' INSIDER SELLING AND OTHER MOTIVES TO COMMIT FRAUD ...................................................................... 145

VIII.  LOSS CAUSATION .................................................................. 163

IX.  IRF AND ITS SUBSIDIARIES OPERATED AS A SINGLE UNIT ........ 166

X.  NO SAFE HARBOR .................................................................. 173

XI.    PRESUMPTION OF RELIANCE ................................................................173

XII.   CLASS ACTION ALLEGATIONS............................................................175

XIII.  CLAIMS FOR RELIEF.............................................................................177

Court-appointed Lead Plaintiffs, the General Retirement System of the City of Detroit and Massachusetts Laborers' Pension Fund ("Lead Plaintiffs"), bring this federal securities law class action on behalf of themselves and all other persons and entities (other than defendants and their affiliates, as specified below) who purchased or acquired the publicly traded securities of International Rectifier Corporation ("International Rectifier" or the "Company" or "IRF") between July 31, 2003 and August 29, 2007 (the "Class Period"), and who were damaged by the conduct asserted herein.

I.    <u>INTRODUCTION</u>

1.    International Rectifier, according to its filings with the Securities and Exchange Commission ("SEC"), is a designer, manufacturer and marketer of power management product devices that use power semiconductors.    The Company's products are used in a variety of end applications, including computers, communications networking, consumer electronics, energy-efficient appliances, lighting, satellites, launch vehicles, aircraft and automotive diesel injection.

2.    As described below, defendant International Rectifier, together with its former Chief Executive Officer Alexander Lidow ("Alex Lidow"), former Chief Financial Officer Michael P. McGee ("McGee"), former Executive Vice President, Global Sales and Marketing Robert Grant ("Grant"), former Vice President, International Rectifier Automotive Products Ivo Jurek ("Jurek") and Vice President, International Rectifier's Japan Subsidiary Fumihide Esaka ("Esaka") (collectively, the "Officer Defendants") systematically and repeatedly manipulated the Company's publicly reported financial statements in violation of Generally Accepted Accounting Principles ("GAAP") and Section 10(b) of the Securities Exchange Act of 1934.

3.    Defendants' fraudulent scheme to maintain and/or artificially inflate the price of IRF's securities was not merely limited to a few technical or isolated

violations of accounting rules.  Rather, defendants committed clear and obvious wrongdoing with an intent to deceive.  Among other things, as detailed herein, defendants created fictitious purchase orders, kept two sets of books, cheated on the Company's taxes, buried everyday operating costs in restructuring charges and recorded earnings on bogus shipments of product that merely sat in tractor trailers in the Company's parking lots.

4.     The Company's Audit Committee of the Board of Directors has hired independent investigators and outside legal counsel to conduct an investigation into defendants' manipulations of the Company's reported financial results (the "Investigation").  The Investigation, which, as of September 30, 2007, has cost the Company approximately $23 million, is ongoing.

5.     While the Audit Committee's Investigation is ongoing, its findings released to date admit the Company's publicly issued financial statements during the Class Period were materially false and misleading.

6.     For instance, the Company disclosed its Japan subsidiary "circumvented established controls," created "fictitious customer purchase orders" and made bogus shipments of products to recognize revenue improperly.

7.     According to former employees of the Company, as detailed herein, defendants were keenly aware of the Japan subsidiary's conduct.  Indeed, defendants in the Company's California offices directed the Japan subsidiary's activities.

8.     Moreover, according to former employees in a position to know, bogus product shipments were not limited to the Company's Japan subsidiary – a fact which defendants knew.  IRF's Tijuana factory would load product on tractor trailers as if it was being shipped to a customer when, in fact, the product would remain on the trailer in IRF's parking lot or would be sent to a warehouse to be stored until a real customer placed a real order for the product.  IRF employees

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. CV 07-02544-JFW (VBKx)

1  half-joked (internally) that, when the Company met financial forecasts at the end of

2  financial quarters, it was because the "parking lot was full of trailers."

3      9.    The Company also entered into purported "sales" of the fictitious

4  accounts receivables it created.  These purported sales artificially inflated the

5  Company's reported cash balances and disguised the poor quality of the

6  Company's earnings by removing old, uncollectable accounts receivables from the

7  Company's balance sheet and replacing them with cash as if the accounts had

8  actually been paid off.

9      10.   As the Company admitted in a November 13, 2007 disclosure, "the

10  Company found that certain fictitious customer invoices were sold as part of the

11  Japan subsidiary's accounts receivable financing facilities.   These accounts

12  receivable sales were in an aggregate amount of up to $23 million per quarter in

13  the Company's fiscal years 2006 and 2007. . . .  The Company plans to reflect

14  these sales . . . as short-term debt . . . ."  In the end, the Company is obligated to

15  repay purchasers of the Company's fictitious accounts receivables.  In sum, the

16  Company borrowed money from third parties so the Company could make

17  payments on fake accounts that the Company created to falsify the Company's

18  reported earnings.  Notably, all of these fictitious accounts created in the Japan

19  subsidiary became so confusing that, according to the Investigation, the Company

20  created a separate set of books to track the real sales versus the fictitious sales.

21      11.   In addition to recording fictitious sales, the Company misled investors

22  by falsely accounting for its ordinary operating costs.  By way of background,

23  throughout the Class Period investors were keenly monitoring the Company's

24  publicly reported gross margins, which is a measurement of a company's

25  manufacturing and distribution efficiency during the production process.  Gross

26  margins are simply revenues minus the cost of goods sold.  Reducing ordinary

27  operating costs reduces the cost of goods sold and increases a company's margins.

28

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. CV 07-02544-JFW (VBKx)

At risk of oversimplifying, greater gross margins equate to greater profitability and investors tend to pay more for businesses that have higher efficiency ratings.

12.    The Company's stock price was closely linked to its reported gross margins.  Indeed, according to Citigroup's analyst covering the Company:  "Our view has been that the IRF investment case has centered primarily on gross margin expansion . . . ."  Wachovia's analyst similarly stated:  "We expect gross margin (GM) expansion to emerge as the key investment theme in IR in 2006."

13.    As the Company has now admitted, throughout the Class Period defendants reduced reported operating costs (and therefore inflated margins) by improperly characterizing ordinary operating expenses as unusual, one-time restructuring costs.  The Company disclosed:  "The Company has determined that certain of [the] amounts previously included in the Company's financial statements for fiscal 2003 to fiscal 2007 as 'Impairment of assets, restructuring, severance and other charges' should properly have been classified in other line items of the income statement or disclosed in a different manner in the Company's footnotes."  The Company further disclosed these manipulations were in excess of $50 million.

14.    According to former employees of the Company, this was not an accidental mischaracterization but defendants' purposeful effort to increase gross margins to meet projections.

15.    In addition to the aforementioned accounting manipulations, during the Class Period International Rectifier cheated on its taxes and has since been forced to pay $74 million in back taxes and interest to federal and state tax authorities (the amount of potential liabilities to foreign governments, if any, has not yet been disclosed).  The Company has admitted its unpaid tax liabilities were material to the Company's reported income in fiscal years 2004-2007.  Indeed, this $74 million payment represents approximately 22% of the net income the Company reported from 2004-2006.

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. CV 07-02544-JFW (VBKx)

16.    As the Investigation uncovered, the Company underpaid taxes by improperly shifting the recognition of earnings from high-tax jurisdictions to low-tax jurisdictions.  As explained herein, this issue was governed by the Company's "transfer pricing methodology."  According to former IRF employees, decisions concerning the Company's transfer pricing methodology were made by defendant McGee.

17.    While the Company has yet to restate its financial results for these disclosed irregularities, the Company's disclosures are an admission of wrongdoing.  Noted market columnist Herb Greenberg concisely characterized the Company's revelations as "like reading a text on how to lie, cheat and steal from shareholders."

18.    The Investigation's findings of massive "accounting irregularities" in the Company's financial statements caused the Company's directors to institute a wholesale "house-cleaning."  No longer would the Company's internal auditors report to the Company's management – now the internal audit function reports directly to the Audit Committee of the Board of Directors and the Company's general counsel.

19.    In addition, the Board of Directors terminated the employment of the Company's longtime senior officers who ran the Company during the Class Period. Former Chief Executive Officer ("CEO"), Alex Lidow, initially took a leave of absence the day before the Company made major revelations of the fraud on August 31, 2007.  Approximately one month later, the same day the Company announced its revised internal controls systems, IRF announced Alex Lidow resigned "[a]t the Company's request."   Alex Lidow was forced out of the Company his father founded and for which he had been CEO for twelve years.  In addition, the Company has announced that defendant McGee, who had been the Company's Chief Financial Officer ("CFO") for 17 years, "was terminated by the

1  company's Board of Directors[,]" that defendant Grant resigned, and that the
2  Company had placed "certain key Japanese management team members on
3  administrative leave and remove[ed] them from daily operations."

4      20.   Defendants' scheme artificially inflated the price of the Company's
5  securities.  As a result of the multiple disclosures concerning the true financial
6  condition of the Company and/or defendants' conduct, the artificial inflation in the
7  Company's securities prices was removed and plaintiffs were damaged.

8  II.   JURISDICTION AND VENUE

9      21.   This action arises under Sections 10(b) and 20(a) of the Securities
10 Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a), and the
11 rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17
12 C.F.R. §240.10b-5 ("Rule 10b-5").

13     22.   This Court has jurisdiction over the subject matter of this action
14 pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1331
15 because this is a civil action arising under the laws of the United States.

16     23.   Venue is proper in this district pursuant to Section 27 of the Exchange
17 Act, 15 U.S.C. §78aa.  At all relevant times, IRF maintained its headquarters and
18 principal place of business in this District.  Many of the acts and transactions that
19 constitute the violations of law complained of herein, including the dissemination
20 to the public of untrue statements of material facts, occurred in this District.

21     24.   In connection with the acts alleged in the Complaint, defendants,
22 directly or indirectly, used the means and instrumentalities of interstate commerce,
23 including, but not limited to, the United States mails, interstate telephone
24 communications and the facilities of national securities exchanges.

25 III.  THE PARTIES

26     25.   Plaintiff the General Retirement System of the City of Detroit
27 purchased shares of common stock of International Rectifier during the Class

28

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. CV 07-02544-JFW (VBKx)

Period as set forth in the attached certification and suffered damages as a result of the violations of the federal securities laws pled herein.  The General Retirement System of the City of Detroit is a public pension fund with approximately $3.3 billion of net assets (as of 12/31/07) held in trust for the benefit of the employees of the City of Detroit, Michigan.

26.     Plaintiff the Massachusetts Laborers' Pension Fund purchased shares of common stock of International Rectifier during the Class Period as set forth in the attached certification and suffered damages as a result of the violations of the federal securities laws pled herein.

27.     Defendant, International Rectifier, headquartered in El Segundo, California, engages in the design, manufacture and marketing of power products. The Company's products are used in a variety of electronic devices including computers, appliances, automobiles and consumer electronics.

28.     Defendant, Eric Lidow ("Eric Lidow") is the founder of the Company and was at all relevant times Chairman of the Board.  In this capacity, and as detailed herein, Eric Lidow signed certain of the Company's false and misleading filings with the SEC (including the 2003 through 2006 Form 10-Ks).  Eric Lidow served as CEO of the Company until March 1995 and is the father of the former CEO.  According to the Company's 2006 proxy statement which was filed with the SEC on October 18, 2006 (the "2006 Proxy Statement"), Eric Lidow was the fifth largest stock holder in the Company, owning approximately 3.1 percent of all outstanding shares as of September 22, 2006.  Eric Lidow is not alleged to have participated in the fraudulent scheme but is named only for violations of §20(a) of the Securities Exchange Act of 1934.

29.     Defendant, Alexander Lidow ("Alex Lidow") was at all relevant times CEO and a director of the Company.  In this capacity, and as detailed herein, Alex Lidow signed certain of the Company's false and misleading filings with the SEC

(including the 2003 through 2006 Form 10-Ks and the Company's Form 10-Qs), participated in drafting and/or approved the Company's false and misleading press releases, met with analysts and the media to discuss the Company, and participated in the Company's conference calls with analysts and investors.  Alex Lidow is a son of Eric Lidow.  According to the Company's 2006 Proxy Statement, Alex Lidow was the sixth largest stock holder in the Company, owning approximately 2.9 percent of all outstanding shares as of September 22, 2006.  This 2006 Proxy Statement also identified him as the most highly compensated executive at the Company during Fiscal 2005 and 2006. As detailed further herein, Alex Lidow was asked to and did resign from the Company after the Class Period.

30.   Defendant, Michael P. McGee ("McGee") was at all relevant times the Company's CFO and an Executive Vice President.  McGee served as the Company's CFO from 1993 until his employment at IRF was terminated on July 2, 2007.  According to the Company's 2006 Proxy Statement, McGee was one of the Company's top six highly compensated executives during 2004, 2005 and 2006.  McGee signed certain of the Company's false and misleading filings with the SEC (including the 2003 through 2006 Form 10-Ks and the Company's Form 10-Qs), participated in drafting and/or approved the Company's false and misleading press releases, met with analysts and the media to discuss the Company, and participated in the Company's conference calls with analysts and investors.  From June 2000 to June 2005, McGee also served as Chairman of Nihon Inter Electronics Corporation ("Nihon"), a publicly-held Japanese corporation that IRF helped found in 1957 and in which IRF held a significant number of shares (17.5% at year-end 2005).  From June 2000 to June 2003, McGee was also Co-CEO of Nihon.

31.   Defendant, Robert Grant ("Grant") was, during the Class Period, Executive Vice President, Global Sales and Marketing and considered by the Company to be one of its Executive Officers.  Indeed, according to the Company's

2006 Proxy Statement, Grant was one of the Company's top six highly compensated executives in Fiscal 2004 (highest paid), 2005 (second highest paid) and 2006 (second highest paid).   On July 1, 2007, according to IRF, Grant "resigned" from the Company.

32.    Defendant, Ivo Jurek ("Jurek") was, during the Class Period, Vice President, International Rectifier Automotive Products.  As detailed herein, Jurek was responsible for meeting sales and margins forecasts for the Company's entire automotive division.

33.    Defendant, Fumihide "Humi" Esaka ("Esaka") was, during the Class Period, Vice President of IRF's Japan subsidiary.  As detailed further herein, Esaka, with the authorization and knowledge of the other defendants, knowingly manipulated the Japan subsidiary's financial results, which all defendants knew were consolidated with the Company's financial results and reported to the investing public.

34.    As set forth *infra* at §IX, the Company's subsidiaries all operated under the control of the Company's California headquarters.

IV.   DEFENDANTS' FRAUDULENT SCHEME

35.    GAAP are those principles recognized by the accounting profession as conventions, rules and procedures necessary to define accounting practices at a particular time.  The SEC has the statutory authority for the promulgation of GAAP for public companies and has delegated that authority to the Financial Accounting Standards Board ("FASB").   The Financial Accounting Standards Board issues concept statements, which are the fundamental building blocks of GAAP.  SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) provides that financial statements filed with the SEC that are not presented in accordance with GAAP will be presumed to be misleading, despite footnotes or other disclosures.

36.     Throughout the Class Period, the Company issued financial statements that were materially misstated and not presented in accordance with GAAP.   As explained further herein, defendants manipulated the Company's reported financial results by (i) creating fictitious purchase orders and recognizing revenue for bogus shipments of product; (ii) selling fictitious accounts receivables; (iii) categorizing ordinary operating expenses as one-time restructuring costs; (iv) underreporting the Company's taxes and exposing the Company to recourse by governmental agencies; and (v) incorrectly recording tax benefits from the exercise of stock options as cash flow from operations rather than cash flow from financing.

37.     Defendants Alex Lidow and McGee also repeatedly signed sworn certifications regarding the accuracy of the Company's financial statements and the adequacy of the Company's internal controls, which were materially misleading as these sworn certifications failed to reveal defendants' knowledge of IRF's violations of GAAP.

38.     In addition to reporting financial statements not in accordance with GAAP, as required by the SEC, defendants also caused IRF to issue "pro forma" financial results that were false and misleading as detailed further herein.

39.     In sum, as part of defendants' fraudulent scheme, they intentionally and/or recklessly misled class members regarding, *inter alia*, the Company's (a) compliance with GAAP and the accuracy of the Company's financial results (including, but not limited to its revenue figures, earnings figures, cash levels, gross margins, ordinary operating expenses and income figures); (b) the quality of the Company's internal controls; and (c) the fact that the Company had failed to properly report its tax liabilities and would be subject to additional tax expenses and possible penalties.

40.     As a result of the Company's Investigation of defendants' accounting improprieties, beginning on April 9, 2007, the Company disclosed that the Audit

Committee of the Company's Board of Directors has determined investors should no longer rely on Company's financial statements for its fiscal quarters ended September 30, 2003 through December 31, 2006 and for its fiscal years ended June 30, 2004 through June 30, 2006.   However, the Company's Investigation is ongoing.

A. **International Rectifier Reports False And Misleading Earnings By Recognizing Revenue On Fabricated And/Or Premature Shipments**

41.   Throughout the Class Period, defendants knew or recklessly disregarded that the Company falsified its reported revenues and earnings by recording as sales the premature and/or bogus shipment of product that was being sent to sit in a warehouse or in a tractor trailer without any intention that a customer receive it presently.

42.   Throughout the Class Period, the Company represented that:

In accordance with Staff Accounting Bulletin No. 104 ["SAB No. 104"], "Revenue Recognition", the Company recognizes revenue when the evidence of an arrangement exists, pricing is fixed and determinable, collection is reasonably assured and delivery or performance of services has occurred.   The Company recognizes the majority of revenues upon shipment for product sales to all customers, including distributors, with provisions for estimated returns and allowances recorded at the time of shipment.

*See*, *e.g.*, the Company's Form 10-K for fiscal year 2006.

43.    SAB No. 104 states that revenue generally is realized or realizable and earned when all of the following criteria are met: (i) persuasive evidence of an arrangement exists; (ii) delivery has occurred or services have been rendered; (iii) the seller's price to the buyer is fixed or determinable; and (iv) collectability is

reasonably assured.  In regards to the fictitious sales, the Company violated all four requirements as set forth by SAB No. 104.  At the time the Company recorded these fictitious sales: (i) there was no persuasive evidence that an arrangement existed; (ii) no delivery had occurred; (iii) there was no fixed or determinable price to the buyer; and (iv) there was no reasonable assurance of collectability.

44.    In fact, the Company has recently admitted that it, among other things, created "fictitious purchase orders" and a second set of books to monitor such fake sales, as well as "sold" product to distributors with an understanding that the product would be taken back.  Then, the Company improperly recognized revenue on such shipments.  For example, the Company admitted in an August 31, 2007 SEC filing that it had been falsely reporting revenues and earnings through a scheme to ship products to fulfill "fictitious" customer orders:

> The Company's Japan subsidiary *circumvented* established controls and processes to record false or premature sales *by creating fictitious customer purchase orders* in the existing control system. These orders were diverted by the customer service function when the shipments arrived in Japan at the Company's freight forwarder and then redirected to multiple third party warehouses that were not reflected on the Company's books ("off-books warehouses").  This inventory was stored in the off-books warehouses until the Japan subsidiary could either re-sell the product to another customer or when the customer, in whose name the order had been entered, placed a bona fide order for such products.  When the Japan subsidiary received an actual customer purchase order, the order was initially fulfilled from inventory in the off-books warehouses.  *The customer service personnel created an off-books access database to assist with managing the fulfillment of the orders through the off-books*

*warehouses.* If a real order could not be filled through the off-books warehouses, then the Japan subsidiary would place the order through the Company's normal purchase order system. Part of the cash received from customers for actual accounts receivable was applied to fictitious accounts receivable. In addition, *sales management entered into a number of arrangements at quarter ends with certain distributors to take excess product on verbal terms that included extended payment terms and/or an understanding that product would be taken back at the distributor's request*.[1]

45. In addition to identifying improper revenue recognition at the Company's Japan subsidiary, the Company disclosed in its November 13, 2007 SEC filing that the Investigation would seek to "identify practices similar to those in Japan at other Company locations . . . ."

46. The recognition of revenue at the time of the bogus shipments violated the Company's accounting policy which purported to comply with the SEC's SAB No. 104 "Revenue Recognition."

47. As set forth below, according to former employees of IRF, practices similar to those employed at the IRF Japan subsidiary could be found at the Company's other locations (including IRF's Tijuana factory). According to the Company's former employees, defendants knew and/or were deliberately reckless in disregarding the fact that the Company was improperly recognizing revenue in violation of GAAP.

48. Confidential Witness Number 1 ("CW1") was a Vice President of Automotive Systems Product Development at IRF who worked at the Company's El Segundo, CA headquarters from February 2001 until April or May 2005, and

---

[1] All emphasis added unless otherwise noted.

had responsibilities in several of IRF's international divisions.  CW1 reported to defendant Jurek, who reported to defendants Alex Lidow and Grant.

49.    According to CW1, defendant Jurek was responsible for meeting the sales forecasts and profit margins for the Company's automotive division – but these forecasts were set by defendants Grant and Alex Lidow.  According to CW1, Jurek told CW1 that defendants Jurek, Grant and Esaka would regularly meet forecasted numbers for the Japan subsidiary by authorizing bogus shipments of product.  At the end of fiscal quarters, pursuant to Jurek, Grant and Esaka's authorization, IRF would load product on tractor trailers as if it was being shipped to a customer when, in fact, Jurek, Grant and Esaka knew the product would remain on the trailer in IRF's parking lot or would be sent to a warehouse to be stored until a real customer placed a real order for the product.  According to CW1, the Company recognized revenue at the time of the bogus shipments.   By recognizing revenue at the time of the bogus shipments, the Company violated both its own accounting policy and SAB No. 104.

50.    According to CW1, Jurek, Grant and Esaka would meet regularly. Jurek traveled to Japan once a month and Grant traveled there once a quarter. Esaka would attend sales meetings in El Segundo once a month.

51.    According to CW1, it was a poorly kept secret within the Company that IRF made such false shipments so the Company could improperly book revenue.  Indeed, CW1 confirmed that it was a Company-wide practice not limited to the Japan subsidiary.  For instance, according to CW1, this practice occurred at the Company's Tijuana facility.  According to CW1, IRF employees half-joked (internally) that, when the Company met financial forecasts at the end of financial quarters, it was because the "parking lot was full of trailers."

52.    According to CW1, IRF defendants not only knew about the improper shipments but had access to internal Company reports that would confirm that the

Company was shipping product before any customer had bought the product.  IRF maintained an internal database system called Vision.  Vision provided a detailed analysis of the Company's customer orders including:  (i) a global sales forecast; (ii) sales forecasts for each subsidiary; (iii) production forecasts; (iv) actual production data; (v) inventory levels; (vi) shipments; (vii) early shipments; and (viii) customer orders.  According to CW1, shipments made either prematurely or without a purchase order would show up on the Vision system as shipments without a corresponding customer order.  CW1's description of the Vision system is corroborated by other former employees of IRF, including Confidential Witness Number 2 ("CW2") a former Customer Service Manager for North America who worked at IRF from 2001 to December 2006, and reported to Lauren Haughey.

53.    According to Confidential Witness Number 3 ("CW3") described *infra*, the Vision system was custom-designed software created for IRF by Anderson Consulting in 1995.  According to CW3, defendants Alex Lidow and McGee utilized the Vision system to review revenue information on, at least, a daily basis and more often at the end of quarters.  According to CW3, sales for the previous day were available on the Vision system the first thing in the morning each day.  Alex Lidow and McGee, according to CW3, arrived at the office around 6 a.m. and could immediately view the previous day's sales.  According to CW3, Alex Lidow and McGee also received daily reports with revenue information from the current day.

54.    Confidential Witness Number 4 ("CW4") was a unit manager and then Director of Corporate Sales Operations at IRF's corporate headquarters from December 2001 to July 2005.  CW4 reported to Linda King, the Vice President of Business Management.  CW4's division used forecasts from various Company divisions to advise the Company's factories on how much product to build, who should receive the product, and how much the Company should charge for its

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. CV 07-02544-JFW (VBKx)

products.  CW4 was responsible for worldwide profit and loss statements for 17 product lines at IRF, amounting to revenues of approximately $50 million per quarter.

55.    According to CW4, the Japan subsidiary was always behind its forecasted numbers – which was an issue CW4 constantly e-mailed defendants Grant and Esaka about.  However, at the end of quarters, according to CW4, IRF's Japan subsidiary would regularly (and miraculously) make its forecasts by repeatedly manipulating its earnings through dealings with distributors Kaga and Maruben.

56.    According to CW4, defendant Esaka and the Japan subsidiary had a close relationship with the management of Kaga and Maruben.  CW4 stated that, at the end of quarters, Kaga and Maruben would regularly agree to accept product that they had no intention of keeping and would later return to IRF.  At the beginning of the next quarter, IRF's Japan subsidiary would create a RMA – a return materials authorization – that allowed Kaga and Maruben to return the previously shipped product.   IRF's Japan subsidiary booked revenues when product was shipped to Kaga and Maruben at the end of each quarter, even though it was known that the shipment would be returned via an RMA.

57.    CW4 corroborated the fact that the entire Company falsified sales by prematurely shipping product.  Specifically, CW4 stated that IRF (not just the Japan subsidiary) would "ship like crazy" at the end of quarters to meet public forecasts by pulling in orders from future quarters (commonly referred to as "channel stuffing").   Oftentimes, according to CW4, these shipments were fraudulent in that IRF would send these shipments to locations in Mexico or China that would hold the order for a few days so that it would not hit the customer's stock until the first or second day of the next quarter.   According to CW4,

Francisco Dubuitron, former Vice President of Logistics, was in charge of these arrangements.

58.     Confidential Witness Number 5 ("CW5") was employed at IRF between 1994 and March 2007, primarily in Temecula, CA.  From 2004 to CW5's departure, CW5 was a Business Unit Manager at IRF responsible for the forecast and actual profit and loss calculations for sales of rectifiers in the Computing Division of IRF.

59.     CW5 personally participated in conference calls with defendants Grant and Esaka and other Vice Presidents of Sales four or five times each quarter. During these calls, the various Vice Presidents would report on their status with regard to making forecasted numbers.  CW5 recalls several of these conference calls during which defendant Esaka informed defendant Grant that the Japan subsidiary was not going to make its earnings forecast.  CW5 recalls that in these instances Grant told Esaka to go to his customers and ask them for permission to ship product earmarked for the next quarter early – and that Esaka informed Grant that he had already made such requests and no additional customers were willing to do so.  According to CW5, in such instances defendant Grant would simply tell defendant Esaka that he had to meet forecasts and Grant would basically state "you have to figure out a way to do it but I do not want to know how you do it." Ultimately, according to CW5, the Japan subsidiary would meet its forecast numbers.

60.     Moreover, according to CW5, pulling in of orders from future quarters to meet current quarter financial forecasts was not limited to the Japan subsidiary. Oftentimes, sales representatives extended payment terms for customers willing to accept such payments.  This practice, according to CW5, was well-known to defendant Grant as it was discussed during internal conference calls that Grant participated in.

61.   Confidential Witness Number 6 ("CW6") was a Senior Risk & Treasury Analyst at IRF from August 2004 until November 2005.   CW6 was responsible for cash management and cash forecasting and reported to the Director of Treasury, Deidra Samuels.   Like CW4 and CW5, CW6 stated the Japan subsidiary was always behind its target forecasts in every quarter but that the Japan subsidiary always amazed CW6 by meeting its forecast targets.

62.   Other former employees corroborate the facts witnessed by CW6 concerning the fact that the Japan subsidiary oftentimes booked very large – and unexpected – orders at the end of quarters that enabled it to make forecasted numbers.   For instance, Confidential Witness Number 7 ("CW7") a former IRF Senior Manager in Financial Planning & Analysis in the Company's headquarters in El Segundo, CA from February 2005 to November 2006 remembered this occurring often and recalled such last-minute, unexpected transactions amounting to significant dollar amounts as high as $8 million.

63.   In addition, according to CW6, IRF's Japan subsidiary engaged in the unusual practice of extending letters of credit to its customers to fund purchases of IRF product.   By doing so, the Japan subsidiary could make sales in one quarter but defer the customer's obligation to pay for the product for 3-4 months.   CW5 also knew of this practice and corroborated the description provided by CW6.   This *undisclosed* practice of financing customer purchases further enabled the Japan subsidiary to manipulate its revenues and IRF to manipulate revenue recognition in its consolidated financial statements by enabling the Company to pull-in sales from future periods without getting customer commitments to pay in the current period.

64.   The accounts of these former IRF employees corroborate and provide further insight regarding the scope and knowledge of the fraud to which the Company has admitted by acknowledging that it has falsified earnings and revenue

by shipping product in direct contravention of GAAP and the Company's own accounting rules.

65.    As a result of the Company's investigation of the Japan subsidiary's accounting manipulations, the Company has disclosed that the Audit Committee of the Company's Board of Directors has determined investors should no longer rely on the Company's financial statements for the financial periods ending March 31, 2005 through December 30, 2006.   However, the Company's investigation is ongoing.

B.    International Rectifier Inflates
Its Cash Levels And Misrepresents The
Poor Quality Of Its Earnings
By Selling Fictitious Accounts Receivables

66.    Defendants knew or were deliberately reckless in not knowing that, during the Class Period, International Rectifier improperly "factored" accounts receivables and falsely accounted for such improper factoring.

67.    "Factoring" is the selling of invoices or accounts receivables held by a company (*i.e.*, amounts customers owe the company for goods and services) to another in exchange for a cash payment on the invoices before their actual due date.  GAAP allows for factoring and permits the recording of such cash payments on a company's balance sheets under certain specific circumstances.  Statements of Financial Accounting Standards Number 140 Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities ("SFAS   No. 140") Paragraph 112 states as follows:

"Factoring arrangements are a means of discounting accounts receivable on a nonrecourse, notification basis. Accounts receivable are sold outright, usually to a transferee (the factor) that assumes the full risk of collection, without recourse to the transferor in the event of a loss.  Debtors are directed to send payments to the transferee.

Factoring arrangements that meet the criteria in paragraph 9 shall be accounted for as sales of financial assets because the transferor surrenders control over the receivables to the factor.

Paragraph 9 of SFAS No. 140 provides that factoring arrangements can only be accounted for as sales if, *inter alia*, the holder has the right to pledge the assets.

68.     During the Class Period, the Company factored alleged accounts receivables and reported the cash received for its factoring on its balance sheets. However, as the Company admitted in a November 13, 2007 disclosure, a significant amount of the accounts receivables that it factored were fictitious:

[I]n the process of reconstructing the Japan subsidiary's financial statements, the Company found that certain ***fictitious customer invoices were sold as part of the Japan subsidiary's accounts receivable financing facilities***.  These accounts receivable sales were in an aggregate amount of up to ***$23 million per quarter*** in the Company's fiscal years 2006 and 2007.  Notwithstanding the nature of the invoices, the invoices were satisfied in ordinary course and no amounts have been outstanding under these accounts receivable financing facilities since the end of July 2007.  The Company plans to reflect these sales as advances against the Company's accounts receivable financing facilities and as short-term debt for the relevant periods.

69.     As a result of the Company factoring fictitious accounts receivables, the Company's financial representations were false and misleading in several ways.

70.     First, defendants reported inflated cash figures on the Company's balance sheets in violation of SFAS No. 140.  Specifically, since the accounts receivables were fake, the Company lacked the ability to surrender control over

such assets to the Factor and, thus, the Factoring Arrangements should not have been recorded as sales of assets pursuant to SFAS No. 140, paragraph 9.

71.     Second, defendants failed to properly report short term debt associated with these sales.   Since certain of the accounts receivables in question were fictitious, the factoring arrangements were improper and the Company was obligated to make whole the purchaser of the fake accounts receivables.   However, the Company failed to report short term debt associated with this obligation.   As noted above, the Company anticipates making adjustments to its prior financials to reflect these sales as advances against the Company's accounts receivable financing facilities and as short-term debt for the relevant periods.

72.     Third, the Company's financials also violated FASB Concept Statement No. 6 "Elements of Financial Statements" ("Concept No. 6") by reporting fake assets.   FASB Concept No. 6 provides a definition of assets and defines assets as "probable future economic benefits obtained or controlled by a particular entity as a result of past transactions or events."   By recognizing fictitious accounts receivable (and later cash through factoring), the Company's financials violated FASB Concept No. 6 because fictitious accounts receivable were recorded on its books even though the event of converting inventory sales to accounts receivable had not yet taken place.

73.     Fourth, by factoring fabricated accounts receivables, defendants were also able to disguise the poor quality of the Company's earnings.   As accounts receivables on a Company's financial statements get older, investors and analysts will begin to suspect that the income associated with those accounts receivables should be written-off.   When the Company factored the fictitious accounts receivables, they were removed from the Company's balance sheets and defendants were able to conceal from the public the fact that IRF's income had been falsely inflated.

C.    Defendants Manipulate Reported Margins, Operating Expenses And Pro Forma Earnings By Including Ordinary <u>Operating Costs In Restructuring Costs</u>

74.    Throughout the Class Period, defendants knew or were deliberately reckless in not knowing that the Company's gross margins, operating expenses and pro forma earnings, all of which are criteria closely monitored by investors, were manipulated.  Indeed, unbeknownst to investors, defendants manipulated all three of these key business metrics by improperly characterizing ordinary operating expenses as unusual, one-time restructuring costs.

75.    Operating expenses are the day-to-day expenses (such as sales and administration, research and development, or depreciation of plants and machinery expenses) required to run a business.

76.    Gross margins, which are linked to operating expenses, are simply revenues minus the cost of goods sold (and where expressed in percentage terms, that number is divided by revenues and multiplied by 100).  As operating expenses go up, gross margins decline.  Investors were keenly attuned to IRF's gross margins.  For instance, as detailed further herein, Citigroup's analyst covering IRF published a report stating:  "Our view has been that the IRF investment case has centered primarily on gross margin expansion and secondarily on revenue growth."  Several other analysts echoed the importance of IRF's gross margins.

77.    The Company's GAAP financial statements reflect all operating expenses.  However, "pro forma" financial statements exclude "unusual and nonrecurring" expenses and/or transactions when stating how much money a company actually made.  Companies provide a pro forma income statement excluding unusual events ostensibly because these one-time events are not indicative of the company's ongoing operations and, therefore, the company's

financial reports prepared in accordance with GAAP are not an accurate indication of the company's true worth.

78.     Throughout the Class Period, defendants highlighted the Company's pro forma financial statements ostensibly to give investors a better picture of the Company's true financial performance by purportedly excluding certain unusual, one-time costs associated with the Company's efforts to restructure its business.

79.     Prior to the Class Period, in the quarter ended December 31, 2002, the Company initiated a years-long process of "restructuring initiatives" (the "Restructuring Plan").  According to the Company's Form 10-K for fiscal year 2006, the Restructuring Plan's stated "goal was to reposition the Company to better fit the market conditions and de-emphasize its commodity business" and "included consolidating and closing certain manufacturing sites, upgrading equipment and processes in designated facilities and discontinuing production in a number of others. . . ."

80.     As a result of the Company's Restructuring Plan, the Company reported taking certain one-time charges throughout the Class Period.   For instance, the Company's Form 10-K for 2006 stated:

> The Company estimates that total charges associated with the restructuring will be approximately $279 million.  These charges will consist of approximately $220 million for asset impairment, plant closure and other charges, $6 million of raw material and work-in-process inventory, and $53 million for severance-related costs.
>
> For the fiscal year ended June 30, 2006, the Company recorded $15.9 million in total restructuring-related charges, consisting of: $8.2 million for asset impairment, plant closure costs and other charges, and $7.7 million for severance-related costs.  For the fiscal year ended June 30, 2005, the Company recorded $34.0 million in total

restructuring-related charges, consisting of: $25.3 million for asset impairment, plant closure costs and other charges, and $8.7 million for severance-related costs.  For the fiscal year ended June 30, 2004, the Company recorded $33.5 million in total restructuring-related charges, consisting of: $15.2 million for asset impairment, plant closure costs and other charges and $18.3 million for severance-related costs.  Restructuring-related costs were charged as incurred in accordance with SFAS No. 146, "Accounting for the Costs Associated with Exit or Disposal Activities".  Asset impairments were calculated in accordance with SFAS No. 144.

81.     The Company continued to take restructuring costs until December 31, 2006.

82.     Restructuring costs are looked upon by the market as one-time charges.  Thus, these types of expenses are often "forgiven" by the market as a nonrecurring expense.  If a company decides to exit an activity, the gain or loss from the exit of the activity is regarded as a one-time charge. However, due to the advantageous nature of a restructuring charge, the accounting guidance in this area is strict and a company must adhere to the accounting requirements of SFAS No. 146 "Accounting for Costs Associated with Exit or Disposal Activities" ("SFAS No. 146") in order to characterize such expenses as one-time charges.

83.     Before a company can take a restructuring charge it must have a plan in place and the plan must be disclosed in the notes to the financial statement.  The plan should be sufficient in detail with regards to the total amount expected to be incurred; including exit or disposal activity, expected completion date, the major types of costs associated with the activities, and reconciliation of the beginning and ending liability balances.  Once the plan is in place and restructuring costs are to be taken, a company must clearly show by line item in the financial statement the

activities in which the costs are aggregated.  Prior to the issuance of SFAS No. 146 in June 2002, restructuring costs regarding an exit activity was under the guidance of EITF 94-3 "Liability Recognition for Certain Employee Termination Benefits and Other Costs to Exit an Activity (including Certain Costs Incurred in a Restructuring).  Fundamentally, the requirements for disclosure and recording of restructuring costs have been around since 1994 (over a decade).  Thus, a company cannot record an operating expense as a restructuring charge in error; such "errors" are done deliberately in violation of the requirements as set forth in SFAS No. 146.

84.     However, unbeknownst to investors, expenses that the Company recorded as restructuring costs throughout the Class Period were, in fact, ordinary operating expenses.

85.     After the Class Period, the Company admitted on August 31, 2007 in an SEC filing it had improperly reported ordinary operating costs as restructuring costs:  "The Company has determined that certain of [the] amounts previously included in the Company's financial statements for fiscal 2003 to fiscal 2007 as 'Impairment of assets, restructuring, severance and other charges' should properly have been classified in other line items of the income statement or disclosed in a different manner in the Company's footnotes."

86.     On November 13, 2007, the Company further admitted that a material portion of its restructuring costs should have been (but was not) recorded as ordinary operating expenses:

> The investigation into the Company's public reporting of restructuring activities as reported in the Company's August 31, 2007 Form 12b-25 is substantially complete.  The resulting adjustments to the income statement will primarily reflect (1) *the reclassification of approximately $31 million of manufacturing costs* from the

consolidation of certain facilities **to cost of goods sold** from impairment, restructuring, severance and other charges, and (2) **the reclassification of approximately $20 million of non-restructuring related charges to selling, general and administrative, research and development or other expense line items** from impairment, restructuring, severance and other charges on the statement of operations. The Company intends to clarify the presentation of the manufacturing-related restructuring costs charged to cost of goods sold in the relevant footnote to the consolidated financial statements.

87.    By recording ordinary operating expenses as restructuring costs, the Company's financial statements were false and misleading in several respects. First, the financial statements violated SFAS No. 144 and SFAS No. 146. Second, the Company's financial statements falsely reported lower than actual ordinary operating expenses, which in turn materially inflated the Company's reported gross margins, a factor that was closely monitored by investors. Third, falsely reporting ordinary operating expenses as one-time restructuring costs was particularly misleading to investors because it gave a false impression of the value of the Company's core business operations. Many investors discount the importance of one-time events to focus on a Company's long term business potential, which many investors believe is better represented by the Company's pro forma financial results.

88.    Defendants knew and/or recklessly disregarded that the Company was improperly classifying these expenses. According to CW1, defendant Jurek regularly "scrutinized" and "manipulated" the numbers for the automotive division by reclassifying operating expenses as restructuring costs. According to CW1, Jurek did this to decrease the operating expense line item for the automotive division in order to increase profit margins for the division. For example,

according to CW1, Jurek improperly accounted for Research & Development costs incurred by one of the Company's software units as restructuring costs rather than an operating expense.  Similarly, according to CW1, defendant Jurek improperly accounted for the costs of training personnel as restructuring costs rather than an operating expense.

89.    According to CW1, Jurek received bonuses based upon the revenues and profit margins of the automotive division.

90.    CW1 worked with the Director of Finance for the automotive division, Mike Love, on a daily basis.  According to CW1, Love worked with Jurek to implement Jurek's accounting manipulations.  Love directly reported to defendant McGee.

91.    As a result of the Company's Investigation of its improper recording of ordinary operating expenses as one-time, restructuring costs, the Company disclosed that the Audit Committee of the Company's Board of Directors has determined the Company will properly classify these expenses when it issues restated financial results.

D.    Defendants Overstate Net Income In Violation Of Tax Laws By Illegally Transferring Income From Higher Tax Jurisdictions To Lower Tax Jurisdictions

92.    During the Class Period, defendants engaged in a scheme to underreport the Company's tax liabilities to various governmental agencies and in the Company's financial statements.  Specifically, as the Company has since admitted, defendants caused IRF to understate taxable income in higher tax jurisdictions and overstate taxable income in lower tax jurisdictions by manipulating the Company's "transfer pricing" figures.  "Transfer pricing" refers to the method by which companies allocate taxable income among individual business units.  Generally speaking, transactions between units of a multi-national

entity should reflect the equivalent of an arms-length negotiation.   Decisions concerning "transfer pricing" are not left to the various business units, but are performed by officers in a corporation's headquarters.   According to former IRF employees, as detailed below, this was the case at IRF.

93.   On August 31, 2007, the Company admitted it had "identified issues associated with its transfer pricing methodology and other tax issues for its fiscal years 2002-2007."  The Company further admitted it was likely "the amount of any potential tax liability *is material to income* in fiscal years 2004 through 2007" and that the Company would incur an "additional amount of taxes that would have been payable in the affected periods, as well as interest on overdue amounts of taxes payable and penalties that may be assessed by the relevant tax authorities upon the eventual resolution of this matter."

94.   The Company further admitted it would have to restate its financial results because of these tax manipulations and stated:  "The Company believes that cash taxes payable with respect to the Tax Matters described in Part III may exceed $75 million, a substantial portion of which is anticipated to be paid in the near term.   The changes in the Company's tax liabilities that may be required to be recorded will require a restatement of tax liabilities and tax provisions in prior years, including the first 2 quarters of fiscal year 2007."

95.   On November 13, 2007, the Company disclosed that, during the quarter ended September 30, 2007, the Company paid $74 million to the United States Internal Revenue Service (the "IRS") and various state agencies in back taxes (and interest) owed as a result of defendants' manipulations.  The Company further disclosed it may still owe taxes in other jurisdictions and was continuing to investigate this matter.

96.   The amount of defendants' manipulation of taxes was material to the Company's reported net income between 2004 and 2007, as the Company has

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. CV 07-02544-JFW (VBKx)

admitted.   While the Company has not reported net income for 2007, the $74 million payment to the IRS amounts to approximately 22% of the Company's *reported* $334.39 million net income between 2004 and 2006.

97.   As a result of the Company's Investigation of this manipulation of transfer pricing methodology, the Company has disclosed that the Audit Committee of the Company's Board of Directors has determined investors should no longer rely on the Company's financial statements for the quarters ended September 30, 2003, December 31, 2003, March 31, 2004 and June 30, 2004, the fiscal year ended June 30, 2004 and the quarters ended September 30, 2004 and December 31, 2004.   Additional adjustments will be made in the Selected Financial Data tables related to fiscal years ended June 30, 2002 and June 30, 2003 as well.  The Company's Investigation is ongoing.

98.   Defendants knew and/or recklessly disregarded that the Company's financial statements were false and misleading as a result of the tax violations. According to CW3, IRF used transfer pricing to allocate the profit of a sale between the IRF entity manufacturing the product and the IRF entity selling the product when the two entities were located in different countries.  CW3 worked at IRF for 15 years, holding various positions in operations and finance in Temecula, CA until leaving in August 2006.  From 2001 until 2003, CW3 was the Director of Finance and, for part of the time, CW3 reported directly to defendant McGee. From 2003 until CW3 left IRF in August 2006, CW3 was Director of Strategic Projects in the operations department reporting to former Senior Vice President of Manufacturing and then COO Nabeel Gareeb ("Gareeb").   Gareeb left IRF and then, CW3 reported to VP of Operations Walt Lifsey ("Lifsey").   Lifsey reported to defendant Alex Lidow.

99.   CW3 explained that IRF pays taxes in each jurisdiction/country based upon the amount of profit allocated to the IRF manufacturing entity versus the IRF

selling entity.  For instance, if a component is manufactured in the United States and sold to Japan, IRF pays a certain amount of taxes in the United States and a certain amount of taxes in Japan based upon the amount of profit allocated to the United States manufacturer and the Japanese seller as determined by the Company's transfer pricing methodology.

100.  According to CW3, IRF's headquarters provided a matrix to the Company's various business units that allocated profits between the Company's various manufacturing and selling entities for the Company's different products. This matrix was compiled by defendant McGee and the Company's Vice President of Tax, Chip Morgan ("Morgan").  According to CW3, determining the proper allocation of profit was the responsibility of McGee and Morgan.

E.    International Rectifier Reports
      False And Misleading Cash
      Flow From Operations By
      Incorrectly Classifying Tax Benefits

101.  For the six months ended December 31, 2005, IRF overstated its net cash provided by operating activities by $4.3 million by improperly accounting for tax benefits from the exercise of stock options.

102.  On May 15, 2006, the Company announced it would restate financial results to correct an overstatement of its cash flows from operations:

International Rectifier to Correct Classification within Its Statement of Cash Flows

EL SEGUNDO, Calif., May 15, 2006 (BUSINESS WIRE) -- International Rectifier (NYSE:IRF) today announced a filing extension for its Form 10-Q for the fiscal quarter ended March 31, 2006. The extension is required pending the completion of a review of the company's classification of excess tax benefits from the exercise of stock options under the newly adopted SFAS No. 123R (Share-

Based Payments). As part of that review, the company has determined it should correct the classification in its consolidated cash flow statements for the excess tax benefits generated from the exercise of stock options. In the first and second quarters of fiscal 2006, the company presented these excess tax benefits as operating cash flows, while SFAS 123R requires their presentation as financing cash flows. The company does not believe this change will impact its previously announced earnings and financial position for the quarter ended March 31, 2006.

For the six months ended December 31, 2005, the excess tax benefit from options exercised was $4.3 million, principally attributed to the three months ended September 30, 2005. ***As a consequence of this correction, net cash provided by operating activities will be reduced by $4.3 million and net cash provided by financing activities will be increased by such amount.***

103.   On May 17, 2006, the Company filed amended Form 10-Qs with the SEC to correct the false and misleading accounting.  In the Company's amended Form 10-Qs, signed by McGee with certifications by McGee and Alex Lidow, defendants admitted the Company's previous statements concerning the effectiveness of the Company's internal controls were false.  For instance, the Company's Form 10-Q/A for the quarter ended December 31, 2005 stated:

In our Quarterly Reports on Form 10-Q for the fiscal quarter ended December 31, 2005, previously filed on February 10, 2006, we originally reported that our disclosure controls and procedures were effective as of each of December 31, 2005. As further discussed in Note 1 to the Company's consolidated financial statements included in Item 1 of this Quarterly Report, we have restated the financial

statements, specifically the statement of cash flows, included in this Form 10-Q/A to reflect the amended correct classification of the excess tax benefits from stock options exercised as cash flows from financing activities rather than operating activities for the six months ended December 31, 2005. In light of the restatement, we have reassessed the effectiveness of our disclosure controls and procedures as of December 31, 2005 and have concluded that our disclosure controls and procedures were not effective, at the reasonable assurance level, as of December 31, 2005 due to the material weakness discussed below.

*     *     *

*As of December 31, 2005, we did not maintain effective controls over the preparation, review and presentation of our consolidated statements of cash flows.* Specifically, the controls were not effective to ensure that cash flows from the excess tax benefits from stock option exercised were presented as cash flows from financing activities in the consolidated statements of cash flows in accordance with generally accepted accounting principles. This control deficiency resulted in the restatement of our interim consolidated financial statements for the first and second quarter of fiscal 2006. In addition, this control deficiency could result in a misstatement of our cash flows from operating activities and cash flows from financing activities that would result in a material misstatement to our annual or interim consolidated statements of cash flows that would not be prevented or detected. Accordingly, we have determined that this control deficiency constitutes a material weakness.

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. CV 07-02544-JFW (VBKx)

104.   A similar disclosure was made for the quarter ended September 30, 2005.

105.   Defendants' mischaracterization of these tax benefits as cash flows from operations was both quantitatively and qualitatively material.  For the quarter ended September 30, 2005, the Company initially reported net cash flows from operations of $13.828 million.  The restated net cash flow from operations was $9.745 million.  Thus, the restatement reduced the Company's previously reported cash flows from operations by over $4 million, meaning the Company overstated its cash flows from operations in the quarter by approximately 42%.  Cash flow from operations is a critical number.  Investors and analysts focused on this number in estimating future growth for the Company and, thus, this 42% overstatement was quantitatively material.  The misstatement is qualitatively material because it evidences serious internal control problems.  The fact that the Company reported cash flow from Stock Options as cash flow from operations is not an inadvertent administrative error but rather an intentional act.  It is simple accounting that cash flow from sources other than general operations cannot be reported as operational revenue.

106.   The materiality of defendants' misstatements is evidenced by the fact that, as reported by the Associated Press on May 15, 2006, the Company's May 15, 2006 announcement caused the Company's stock price to decline markedly:

> The company said that in its quarters ended Sept. 30 and Dec. 31 of last year, it presented excess tax benefits from stock options as operating cash flows, while the benefits should have been presented as financing cash flows.
>
> *     *     *
>
> The announcement sent shares of International Rectifier down $1.58, or 3.3 percent, to close at $46.19 on the New York Stock

Exchange. The company's shares have traded in a range of $26.62 and
$56.20 in the past year.

F.    Defendants Conceal
      Their Fraudulent Conduct

107.   Confidential Witness Number 8 ("CW8") was a senior accountant and
worked in the fixed assets unit of IRF for two years until being laid off in August
2006.   CW8 initially reported to Craig Hutchinson, the North American
Accounting Manager, then to Dinh Han (who reported to Grace Adhikari, the
North American Accounting Manager), and then to Jeff Allen ("Allen").

108.   According to CW8, in December 2004 several of the Company's top
internal accountants left the company.  Steve Coy, the Global Controller, Heather
Sheehan, the North American Controller, and Craig Hutchinson, the North
American Accounting Manager, all resigned in that time period.  According to
CW8, rather than hiring qualified people from outside of the Company, IRF
instead made Allen the Company's Global Controller.  According to CW8, Allen
was not a CPA and was only given the position because Allen was considered to be
defendant "Mike McGee's prodigy."   While Allen was the Company's Global
Controller, he would not let certain qualified individuals analyze the Company's
accounting.

109.   CW8 participated in the Company's internal audits.  According to
CW8, one of the Company's internal auditors, Mark Larson ("Larson"), was laid
off after he started investigating suspicious activities in Japan.  According to CW8,
Larson was investigating the activities of defendant McGee.  According to CW8,
during an audit of IRF's Japan subsidiary, certain activities came to light that
Larson wanted to investigate.  However, Larson was instructed to discontinue his
investigation and was not allowed to go to Japan.  According to CW8, Larson was
laid off (or forced to resign) shortly thereafter.

V.   CLASS PERIOD DISCLOSURES

A.   Defendants' False And Misleading Statements Prior To The First Partial Disclosure Of The Fraudulent Scheme

110.   On July 31, 2003, defendants caused the Company to issue a press release falsely and/or misleadingly stating in part:

International Rectifier Reports Fiscal Fourth Quarter Results; Design Wins Drive Orders Up 7 Percent Sequentially With Margins Exceeding Guidance

EL SEGUNDO, Calif.--(BUSINESS WIRE)--July 31, 2003--For the fiscal fourth quarter, International Rectifier Corporation (NYSE:IRF) today reported ***pro forma net income of $15.4 million*** (or $0.24 per share), ***which excludes charges related to previously-announced severance and restructuring activities***, on revenues of $228.4 million, compared to net income of $16.1 million (or $0.25 per share) on revenues of $201.0 million in the prior-year quarter.  Including the above charges of $3.8 million, ***IR reported a net income of $13.2 million*** (or $0.20 per share) for the fiscal fourth quarter.

\*   \*   \*

***Fiscal fourth quarter gross margin expanded 130 basis points from the preceding quarter to 34.8 percent, ahead of previous guidance***. The improvement resulted from a richer mix of proprietary products shipped in the quarter and planned cost reductions. Gross margin on incremental product sales exceeded 56 percent, better than expected, due to greater sales of IR's analog ICs.

IR generated $63 million cash from operations during the quarter.  At year-end, the Company had $721 million in cash and cash investments compared to $687 million at the end of March quarter.

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. CV 07-02544-JFW (VBKx)

\*       \*       \*

Alex Lidow noted, "Our richer proprietary product mix and cost efficiencies pushed our product gross margins up 170 basis points. For the quarter ending September, IR expects revenues to grow about 3 percent sequentially plus or minus three points. We expect our revenues to continue to outpace the industry in Fiscal 2004 with margins expanding about 100 basis points each quarter."

For the fiscal year just ended, ***pro forma net income was $48.5 million*** (or $0.75 per share) on revenues of $864.4 million, compared to prior-year net income of $48.7 million (or $0.75 per share) on revenues of $720.2 million. Including restructuring charges, IR reported a net loss of $89.6 million (or $1.40 per share) for the fiscal year.

111.   The Company's July 31, 2003 press release falsely and misleadingly explained that the Company reported pro forma results to provide shareholders with a better picture of the Company's underlying operating performance without disclosing that the Company was including ordinary operating costs as one-time restructuring costs: "In addition to disclosing results that are determined in accordance with Generally Accepted Accounting Principles (GAAP), IR also discloses pro forma or non-GAAP results of operations that exclude costs related to restructuring activities.  IR discloses such pro forma information in order to reflect underlying operating performance and to permit shareholders and other readers to better assess the company's operating results."

112.   After issuing the press release on July 31, 2003, IRF hosted a conference call for investors and analysts at which defendants made a number of false and misleading statements consistent with the Company's press release.  The defendants participating in the conference call included defendants Alex Lidow

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. CV 07-02544-JFW (VBKx)

and McGee, each of whom acquiesced to each of the other defendants' false and misleading statements.  During the call, defendant McGee misleadingly stated:

> Earlier today, we announced results for our fourth quarter of fiscal '03. For the quarter, IR reported pro forma net income of $15.4 million, or 24 cents per share, excluding charges relating to the previously announced severance and restructuring activities, on revenues of 228.4 million, compared to net income of 16.1 million, or 25 cents per share, on revenues of 201 million in the prior-year quarter. Including the charges of $3.8 million, IR reported a net income of $13.2 million, or 20 cents per share, for the fiscal fourth quarter.
>
> *     *     *
>
> Fiscal fourth-quarter gross margin expanded 130 basis points to 34.8 percent from 33.5 percent in the prior quarter. Product gross margin expanded 170 basis points in the quarter. The improvement resulted from a richer mix of proprietary products shipped in the quarter and efficiencies from buyers' cost-reduction activities.
>
> *     *     *
>
> Our operating tax rate was 24 percent for the fiscal year, and we expect it to be the same for fiscal 2004.

113.   During the July 31, 2003 conference call, defendant Alex Lidow also answered analyst questions – providing misleading information concerning the Company's gross margins:

> THOMAS THORNHILL, ANALYST, UBS WARBURG: Alex, if you would like to expand on the gross margin comments, I would like to understand the difference between the 130 basis point increase overall and the product shipment increases of 170. That would be one

part of the question. The other has to do with incremental margins at 56. How much of an indicator of forward gross margins is the 56 percent, or what the potential for the Company is, in looking at what incremental margins were, being above 50 percent at 56?

ALEX LIDOW: Well, the difference between the overall 130 basis points and the 170 basis points on products is if you take royalties out, you get the product gross margins. And the royalties were down slightly quarter to quarter, so it really shows you the underlying strength of our mix shift, which is again reflected in this 56 percent incremental margin. We are selling mostly new proprietary products in the incremental revenues, and that's why you see the margin moving our overall gross margin. And it really pushes the Company's potential up. Eventually, we should achieve these incremental margins as our total margin for the Company.

114. Defendants' statements to the marketplace in ¶¶110-13 were materially false and misleading in two respects as detailed in §§ IV.A. and IV.C. First, the reported gross margin and pro forma net income figures were falsely inflated by exclusion of ordinary operating expenses, not just restructuring costs as represented by defendants.  Second, the reported income figures were also false and misleading because they included bogus and/or premature shipments of product in violation of GAAP and the Company's accounting policies.

115.  On October 6, 2003, the Company filed its Form 10-K with the SEC for the 2003 fiscal year, which included the same false and misleading financial results previously reported to investors on July 31, 2003.  The Form 10-K was signed by, among others, defendants Alex Lidow, Eric Lidow and McGee.

116.   The Form 10-K also falsely stated:

In accordance with Staff Accounting Bulletin No. 101, "Revenue Recognition", we recognize revenue when the evidence of an arrangement exists, pricing is fixed and determinable, collection is reasonably assured, and delivery or performance of service has occurred. We recognize the majority of revenues upon shipment for product sales to all customers, including distributors, with provisions for estimated returns and allowances recorded at the time of shipment.

117.   The Form 10-K also included certifications by defendants Alex Lidow and McGee attesting to the accuracy of the Company's financial statements and the adequacy of the Company's internal controls over financial reporting.   The certifications, which are attached hereto as Exhibits A and B, were substantially identical.   Defendant Alex Lidow's certification states:

I, Alexander Lidow, certify that:

1.      I have reviewed this annual report on Form 10-K of International Rectifier Corporation;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

(a)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(c)      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. CV 07-02544-JFW (VBKx)

(a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

118. Defendants' statements to the marketplace in ¶¶115-17 were materially false and misleading for the reasons set forth in §§ IV.A. and IV.C. and ¶114. In addition, the statements contained in ¶¶115-17 were false and misleading because (i) the SEC filings did not identify deficiencies or material weaknesses in the internal controls that resulted in the GAAP violations discussed above; (ii) the SEC filings did not disclose the fraudulent scheme alleged herein; (iii) no proper evaluation and report were ever conducted by the certifying officers for the purpose of identifying and eliminating internal control problems; and (iv) defendants wholly failed to maintain effective internal controls over financial reporting designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP as required by Public Company Accounting Oversight Board Auditing Standard No. 2, ¶7. The lack of sound internal controls and the existence of deficiencies and material weaknesses are evidenced by the Company's own admissions discussed herein and the need for the anticipated restatements.

119. On October 28, 2003, the defendants caused the Company to issue a press release falsely and/or misleadingly stating in part:

International Rectifier Reports Fiscal First Quarter Results

EL SEGUNDO, Calif., Oct 28, 2003 (BUSINESS WIRE) -- For the fiscal first quarter, International Rectifier Corporation (NYSE: IRF)

today reported ***pro forma net income of $19.8 million*** (or $0.30 per share), ***which excludes charges for severance and restructuring activities previously announced in December 2002***, on revenues of $234.1 million, compared to pro forma net income of $15.4 million (or $0.24 per share) on revenues of $228.4 million from the June quarter. Including the above charges of $4.0 million, ***IR posted a net income of $16.7 million*** (or $0.25 per share) for the fiscal first quarter compared to net income of $13.2 million (or $0.20 per share) including the $3.8 million charge in the June quarter. For the fiscal first quarter ended September 2002, pro forma net income was $13.9 million (or $0.21 per share) on revenues of $212.2 million. Net income was $11.0 million (or $0.17 per share) in that quarter.

*   *   *

Fiscal first quarter 2004 ***gross margin expanded 110 basis points from the June quarter to 35.9 percent***. Gross margin on incremental sales exceeded expectations at 79 percent. The improvement resulted from a richer mix of proprietary products shipped in the quarter and cost reductions.

Chief Executive Officer Alex Lidow stated, "We see our leading position in power management continuing to drive strong results. Our focus in content-rich advanced IT applications is paying off as we continue to see widespread acceptance of our proprietary products complemented by an emerging recovery in the PC market."

*   *   *

With indicators pointing to a sustainable recovery and IR's continued success with its proprietary products, the company has decided to divest or discontinue certain commodity products that are

not strategic to its business model, totaling approximately $100 million of annual revenue. This action is being taken to further focus resources on value-added opportunities and is expected to incrementally raise overall gross margins by 200 basis points within four quarters. This is in addition to the 100 basis point gain that IR previously announced for each of the December, March, and June quarters. IR anticipates no new charges associated with these activities and expects these actions to be accretive to company earnings.

Alex Lidow noted, "The outlook for our business continues to strengthen in the December quarter with orders up 30 percent through the first three weeks compared to the same period in the September quarter. Backlog visibility is the strongest that we've seen since the year 2000, greater than 80 percent of guidance revenue. For the quarter ending December, IR expects revenues to grow about 4 to 7 percent from the September quarter with gross margins up more than 100 basis points."

120.   The Company's October 28, 2003 press release falsely and misleadingly explained that the Company reported pro forma results to provide shareholders with a better picture of the Company's underlying operating performance without disclosing that the Company was including ordinary operating costs as one-time restructuring costs:  "In addition to disclosing results that are determined in accordance with Generally Accepted Accounting Principles (GAAP), IR also discloses pro forma or non-GAAP results of operations that exclude costs related to restructuring activities.  IR discloses such pro forma information in order to reflect underlying operating performance and to permit shareholders and other readers to better assess the company's operating results."

121.   After issuing the press release on October 28, 2003, IRF hosted a conference call for investors and analysts at which defendants made a number of false and misleading statements consistent with the Company's press release.  The defendants participating in the conference call included defendants Alex Lidow and McGee, each of whom acquiesced to each of the other defendants' false and misleading statements.  During the call, defendant McGee misleadingly stated:

> [E]arlier today we announced results for the first fiscal quarter of '04. For the September quarter, IR reported pro forma net income of $19.8 million, or 30 cents per share excluding charges related to previously announced severance and restructuring activities on revenues of $234.1 million compared to pro forma net income of $15.4 million or 24 cents per share on revenues of $228.4 million in the June quarter. Including the charges of $4 million IR reported a net income of $16.7 million or 25 cents per share compared to net income of $13.2 million or 20 cents per share including the charge of $3.8 million in the June quarter.
>
> *        *        *
>
> Fiscal first quarter 2004 gross margins expanded 110 basis points from the June quarter to -- 35.9%. Gross margin on incremental sales exceeded expectations at 79%. The improvement resulted from a richer mix of proprietary products shipped in the quarter and efficiencies from IR's cost reduction activity.
>
> *        *        *
>
> Our operating tax rate was 24% for the first quarter and we expect it to be the same through fiscal 2004.

122.   Defendants' statements to the marketplace in ¶¶119-21 were materially false and misleading in three respects as detailed in §§ IV.A., IV.C., and

IV.D.   First, the pro forma net income and reported gross margin figures were falsely inflated by exclusion of ordinary operating expenses, not just restructuring costs as represented by defendants.   Second, the reported income figures were also false and misleading because they included bogus and/or premature shipments of product in violation of GAAP and the Company's accounting policies.   Third, both the pro forma net income and GAAP net income figures were false and misleading as defendants had artificially inflated these numbers by violating tax laws.

123.   On November 19, 2003, the Company filed its Form 10-Q with the SEC, which included the same false and misleading financial results previously reported to investors on October 28, 2003.  The Form 10-Q was signed by McGee.

124.   The Form 10-Q also included certifications by defendants Alex Lidow and McGee attesting to the accuracy of the Company's financial statements and the adequacy of the Company's internal controls over financial reporting.   The certifications, which are attached hereto as Exhibits C and D, were substantially identical to the certification quoted in ¶117.

125.   Defendants' statements to the marketplace in ¶¶123-24 were materially false and misleading for the reasons set forth in ¶122.  In addition, the statements contained in ¶¶123-24 were false and misleading because (i) the SEC filings did not identify deficiencies or material weaknesses in the internal controls that resulted in the GAAP violations discussed above; (ii) the SEC filings did not disclose the fraudulent scheme alleged herein; (iii) no proper evaluation and report were ever conducted by the certifying officers for the purpose of identifying and eliminating internal control problems; and (iv) defendants wholly failed to maintain effective internal controls over financial reporting designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP as required by Public Company Accounting Oversight Board Auditing Standard

No. 2, ¶7.  The lack of sound internal controls and the existence of deficiencies and material weaknesses are evidenced by the Company's own admissions discussed herein and the need for the anticipated restatements.

126.   On January 29, 2004, the defendants caused the Company to issue a press release falsely and/or misleadingly stating in part:

> International Rectifier Reports Fiscal Second Quarter Results; Orders Rose 14 Percent Quarter on Quarter and 39 Percent Year on Year
>
> EL SEGUNDO, Calif.--(BUSINESS WIRE)--Jan. 29, 2004--For the December quarter, International Rectifier Corporation (NYSE:IRF) today reported ***pro forma net income of $24.6 million*** (or $0.36 per share), which ***excludes charges for ongoing severance and restructuring activities previously announced in December 2002***, on revenues of $252.3 million, compared to pro forma net income of $19.8 million (or $0.30 per share) on revenues of $234.1 million from the September quarter. For the December quarter, IR reported net income of $16.9 million (or $0.25 per share) compared to ***net income of $16.7 million*** (or $0.25 per share) in the September quarter. Net income in the December quarter included pretax charges of $10.1 million compared to $4.0 million in the September quarter. For the prior year quarter ended December 2002, pro forma net income was $10.1 million (or $0.16 per share) on revenues of $209.5 million. Net loss was ($121.3) million or ($1.90) per share in that quarter with $179.8 million in pretax charges.
>
> *        *        *
>
> IR's markets continued to show encouraging signs of a long-term recovery worldwide, with orders up significantly in all regions. Bookings in the Asia Pacific region remained the strongest, showing

quarter on quarter growth of 18 percent, followed by Japan and Europe, up 15 percent and 13 percent respectively.

*     *     *

***December quarter gross margin expanded 170 basis points from the September quarter to 37.6 percent, exceeding previous guidance.*** Gross margin on incremental sales exceeded expectations at 57 percent. The better than expected margin improvement resulted primarily from a richer mix of proprietary products and cost savings.

Chief Executive Officer Alex Lidow stated, "In addition to our strong order growth in every region, we secured over $120 million in design wins in the December quarter, a pattern that has been consistently building for some time."

*     *     *

Alex Lidow noted, "Orders continue to ramp and backlog coverage is now over 90 percent. For the March quarter, IR expects revenues to grow about 5 percent plus or minus a couple points over the December quarter. We expect our overall gross margins to improve by about 170 to 200 basis points, and we expect to end the fiscal year approaching all-time record levels."

127.  The Company's January 29, 2004 press release falsely and misleadingly explained that the Company reported pro forma results to provide shareholders with a better picture of the Company's underlying operating performance without disclosing that the Company was including ordinary operating costs as one-time restructuring costs:  "In addition to disclosing results that are determined in accordance with Generally Accepted Accounting Principles (GAAP), IR also discloses pro forma or non-GAAP results of operations that exclude costs related to restructuring activities. IR discloses both pro forma and

actual results of operations in order to allow the users of its financial statements to assess the Company's operating results with and without charges associated with the Company's ongoing restructuring initiatives previously announced in December 2002."

128.   After issuing the press release on January 29, 2004, IRF hosted a conference call for investors and analysts at which defendants made a number of false and misleading statements consistent with the Company's press release.  The defendants participating in the conference call included defendants Alex Lidow and McGee, each of whom acquiesced to each of the other defendants' false and misleading statements.  During the call, defendant McGee misleadingly stated:

> Earlier today we announced results for our December quarter of fiscal 2004. For the December quarter, IR reported pro forma net income of $24.6 million, or 36 cents per share, which excludes charges for ongoing severance and restructuring activities previously announced in December 2002. On revenues, of $252.3 million compare to pro forma net income of $19.8 million, or 30 cents per share, on revenues of $234.1 million from the September quarter. For the December quarter IR reported net income of $16.9 million, or 25 cents per share, compared to net income of $16.7 million or 25 cents per share in the September quarter. Net income in the December quarter included pretax charges of $10.1 million, compared to $4 million in the September quarter.

> *     *     *

> December gross margins expanded 170 basis points from the September quarter to 37.6%, ahead of previous guidance. Gross margin and incremental sales at 57% exceeded expectations. The

improvement resulted from cost savings and a richer mix of proprietary products, which accounted for 59% of customer sales.

\*       \*       \*

Our operating tax rate was 24% for the December quarter, and we expect it to be 24%, plus or minus half a percent, through fiscal 2004.

129.   During the January 29, 2004 conference call, defendant Alex Lidow also stated:  "In terms of improved guidance in gross margin, you're absolutely right, we substantially increased the guidance in margin this quarter.  It comes from 100 basis points to 170 to 200, and it comes from a better take up of proprietary products, a little bit comes from a stronger pricing environment, but really, that's only 20 to 50 basis points out of the 170 to 100 that we increased.  And I'd also like to point out that this is a very, very strong market, and we're pulling in our estimates of peak gross margin by one to two quarters with this increased guidance."

130.  Defendants' statements to the marketplace in ¶¶126-29 were materially false and misleading in three respects as detailed in §§ IV.A., IV.C., and IV.D.  First, the pro forma net income and reported gross margin figures were falsely inflated by exclusion of ordinary operating expenses, not just restructuring costs as represented by defendants.  Second, the reported income figures were also false and misleading because they included bogus and/or premature shipments of product in violation of GAAP and the Company's accounting policies.  Third, both the pro forma net income and GAAP net income figures were false and misleading as defendants had artificially inflated these numbers by violating tax laws.

131.   On February 6, 2004, the Company filed a Form 8-K with the SEC disclosing that defendants Eric Lidow, Alex Lidow and Grant had entered into stock trading plans pursuant to which:  "Eric Lidow will sell up to 214,500 shares

over a period of one year.  Alexander Lidow will sell up to 195,000 shares and Robert Grant up to 97,500 shares, in each case over a period of nine months."

132.   On February 18, 2004, the Company filed its Form 10-Q with the SEC, which included the same false and misleading financial results previously reported to investors on January 29, 2004.  The Form 10-Q was signed by McGee.

133.   The Form 10-Q also included certifications by defendants Alex Lidow and McGee attesting to the accuracy of the Company's financial statements and the adequacy of the Company's internal controls over financial reporting.   The certifications, which are attached hereto as Exhibits E and F, were substantially identical to the certification quoted in ¶117.

134.   Defendants' statements to the marketplace in ¶¶132-33 were materially false and misleading for the reasons set forth in ¶130.  In addition, the statements contained in ¶¶132-33 were false and misleading because (i) the SEC filings did not identify deficiencies or material weaknesses in the internal controls that resulted in the GAAP violations discussed above; (ii) the SEC filings did not disclose the fraudulent scheme alleged herein; (iii) no proper evaluation and report were ever conducted by the certifying officers for the purpose of identifying and eliminating internal control problems; and (iv) defendants wholly failed to maintain effective internal controls over financial reporting designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP as required by Public Company Accounting Oversight Board Auditing Standard No. 2, ¶7.  The lack of sound internal controls and the existence of deficiencies and material weaknesses are evidenced by the Company's own admissions discussed herein and the need for the anticipated restatements.

135.   On February 20, 2004, the Company filed a Form 8-K with the SEC disclosing that defendant McGee had entered into a stock trading plan under which

"McGee will sell up to 84,200 shares" over a period of 9 months.

136.  On April 29, 2004, the defendants caused the Company to issue a press release falsely and/or misleadingly stating in part:

International Rectifier Reports Fiscal Third Quarter Results; Proprietary Products Drive All-Time Record in Orders Up 68 Percent Year-Over-Year

EL SEGUNDO, Calif.--(BUSINESS WIRE)--April 29, 2004-- International Rectifier (NYSE:IRF) today reported **pro forma earnings of $29.8 million** (or $0.43 per share) in the March quarter compared to $24.6 million (or $0.36 per share) in the December quarter, and $12.1 million (or $0.19 per share) in the prior-year quarter.

The pro forma March quarter earnings **excluded** a $5.9 million net pretax gain from a settlement with Hitachi/Renesas and **a $9.9 million pretax charge for ongoing severance and restructuring activities**. The pro forma December quarter earnings excluded $10.1 million in restructuring-related pretax charges. The prior-year March quarter pro forma earnings excluded $6.4 million in restructuring-related pretax charges.

On a GAAP basis, **net income was $26.7 million** (or $0.39 per share) in the March quarter versus $16.9 million (or $0.25 per share) in the December quarter and $7.5 million (or $0.11 per share) in the prior-year quarter.

*     *     *

March quarter **gross margin expanded 200 basis points from the December quarter to 39.6 percent**. Gross margin on incremental sales exceeded expectations at 62 percent, primarily resulting from a

richer mix of proprietary products and excellent performance from operations in achieving more cost savings than expected.

\*      \*      \*

Lidow noted, "Our backlog is the highest in the Company's history and we have more than 90 percent coverage of our target revenue for the June quarter. . . ."

"For the June quarter, IR expects revenues to grow about 5 to 7 percent over the March quarter and reach an all-time record. . . .  We expect our overall gross margins to improve by 150 basis points or more, approaching record levels in the June quarter."

"The combination of leading-edge design wins, robust growth in key target markets, and the setting of industry standards in high performance analog ICs is fueling IR's outstanding prospects over the next several quarters."

137.   The Company's April 29, 2004 press release falsely and misleadingly explained that the Company reported pro forma results to provide shareholders with a better picture of the Company's underlying operating performance without disclosing that the Company was including ordinary operating costs as one-time restructuring costs:   "In addition to disclosing results that are determined in accordance with Generally Accepted Accounting Principles (GAAP), IR also discloses pro forma or non-GAAP results of operations that exclude costs related to restructuring activities and one-time income/loss items. IR discloses both pro forma and actual results of operations in order to allow the users of its financial statements to assess the Company's operating results with and without charges associated with the Company's ongoing restructuring initiatives previously announced in December 2002 . . . ."   The Company reported false and misleading "pro forma" net income for the quarter of $29,806 (which included a reduction of

$4,448 for a one-time litigation settlement) and "pro forma" net income per common share of $0.45 (also reduced by backing out the litigation settlement from the GAAP earnings).

138. After issuing the press release on April 29, 2004, IRF hosted a conference call for investors and analysts at which defendants made a number of false and misleading statements consistent with the Company's press release. The defendants participating in the conference call included defendants Alex Lidow and McGee, each of whom acquiesced to each of the other defendants' false and misleading statements. During the call, defendant McGee misleadingly stated:

Earlier today, we announced results for our March quarter of fiscal 2004. International Rectifier reported pro forma earnings of $29.8 million or 43 cents per share in the March quarter, compared to 24.6 million or 36 cents per share in the December quarter, and 12.1 million or 19 cents per share in the prior-year quarter.

\* \* \*

The pro forma December quarter earnings excluded 10.1 million in restructuring-related pretax charges.

\* \* \*

On a GAAP basis, net income was $26.7 million or 39 cents per share in the March quarter, versus 16.9 million or 25 cents per share in the December quarter and 7.5 million or 11 cents per share in the prior-year quarter.

\* \* \*

Gross margins expanded 200 basis points from the December quarter to 39.6 percent. Gross margins on incremental sales exceeded expectations at 62 percent, primarily resulting from a richer mix of

proprietary products and excellent performance from operations in achieving cost savings.

\*       \*       \*

Our operating tax rate was about 24 percent for the March quarter, and we expect it to be 24 percent plus or minus 0.5 percent for this year and fiscal 2005.

139.   Defendants' statements to the marketplace in ¶¶136-38 were materially false and misleading in three respects as detailed in §§ IV.A., IV.C., and IV.D.   First, the pro forma net income and reported gross margin figures were falsely inflated by exclusion of ordinary operating expenses, not just restructuring costs as represented by defendants.   Second, the reported income figures were also false and misleading because they included bogus and/or premature shipments of product in violation of GAAP and the Company's accounting policies.   Third, both the pro forma net income and GAAP net income figures were false and misleading as defendants had artificially inflated these numbers by violating tax laws.

140.   On May 18, 2004, the Company filed its Form 10-Q with the SEC, which included the same false and misleading financial results previously reported to investors on April 29, 2004.   The Form 10-Q was signed by McGee.

141.   The Form 10-Q also included certifications by defendants Alex Lidow and McGee attesting to the accuracy of the Company's financial statements and the adequacy of the Company's internal controls over financial reporting.   The certifications, which are attached hereto as Exhibits G and H, were substantially identical to the certification quoted in ¶117.

142.   Defendants' statements to the marketplace in ¶¶140-41 were materially false and misleading for the reasons set forth in ¶139. In addition, the statements contained in ¶¶140-41 were false and misleading because (i) the SEC filings did not identify deficiencies or material weaknesses in the internal controls

that resulted in the GAAP violations discussed above; (ii) the SEC filings did not disclose the fraudulent scheme alleged herein; (iii) no proper evaluation and report were ever conducted by the certifying officers for the purpose of identifying and eliminating internal control problems; and (iv) defendants wholly failed to maintain effective internal controls over financial reporting designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP as required by Public Company Accounting Oversight Board Auditing Standard No. 2, ¶7.  The lack of sound internal controls and the existence of deficiencies and material weaknesses are evidenced by the Company's own admissions discussed herein and the need for the anticipated restatements.

143.   On July 29, 2004, the defendants caused the Company to issue a press release falsely and/or misleadingly stating in part:

> International Rectifier Reports Fiscal Fourth Quarter Results; Gross Margin Up 160 Basis Points from Prior Quarter, Near Record Level; Business Outlook Remains Strong
>
> EL   SEGUNDO,   Calif.--(BUSINESS   WIRE)--July   29,   2004--International   Rectifier   (NYSE:IRF)   today   reported   ***pro forma earnings of $36.6 million*** (or $0.52 per share) in the June quarter (after including the dilutive impact of $0.01 per share from the first-time inclusion of 7.4 million shares underlying the Company's convertible debenture).  This compares to $29.8 million (or $0.43 per share) in the March quarter and $15.4 million (or $0.24 per share) in the prior-year quarter.
>
> ***The pro forma June quarter earnings excluded a $9.5 million pretax charge for ongoing severance and restructuring activities.***  The  pro  forma  March  quarter  earnings  excluded  $9.9  million  in

restructuring-related pretax charges and $5.9 million pretax gain related to the Hitachi settlement. The prior-year June quarter pro forma earnings excluded $3.8 million in restructuring-related pretax charges.

On a GAAP basis, ***net income was $29.4 million*** (or $0.42 per share) in the June quarter versus $26.7 million (or $0.39 per share) in the March quarter and $13.2 million (or $0.20 per share) in the prior-year quarter. The calculation of June quarter GAAP earnings per share included the dilutive impact of 7.4 million shares underlying the Company's convertible debenture.

*       *       *

June quarter gross margin expanded 160 basis points from the March quarter to 41.2 percent, or within a fraction of IR's all-time record level. Gross margin on incremental sales exceeded expectations at 59 percent, primarily resulting from a richer mix of proprietary products.

*       *       *

Alex Lidow noted, "In July, orders continue strong, up dramatically from the prior-year quarter, with normal seasonal business patterns being reflected on a sequential basis, most notably in the automotive and European markets. We have more than 90 percent backlog coverage of our target revenue for the September quarter. A PC upgrade cycle is clearly visible, fueled by business customers as noted in the latest CIO surveys as well as by the leaders in microprocessors, software, and PCs. Within this backdrop of very promising market prospects, IR continues to discontinue or divest commodity, non-strategic product business. Looking at the September

quarter, revenues are expected to grow 1 to 3 percent sequentially taking into account the planned divestiture of approximately $11 million of products which, if included, would translate into an equivalent of a 5 to 7 percent growth rate for the overall company. We expect our overall gross margins to increase 150 basis points or more, setting record levels in September."

"We continue to see broad end-market demand for our high performance analog ICs and advanced circuit device orders which are up 54 percent year-over-year. IR's leading design positions will continue to drive our growth."

For the fiscal year just ended, ***pro forma net income was $110.8 million*** (or $1.61 per share) on revenues of $1.06 billion, compared to prior-year pro forma net income of $48.5 million (or $0.75 per share) on revenues of $864.4 million. The calculation of fiscal 2004 pro forma earnings per share included a $0.01 dilutive impact from the 7.4 million shares underlying the Company's convertible debenture. On a GAAP basis, IR reported a net income of $89.8 million (or $1.31 per share) for fiscal 2004 compared to a net loss of $89.6 million (or $1.40 per share) for fiscal 2003.

144.   The Company's July 29, 2004 press release falsely and misleadingly explained that the Company reported pro forma results to provide shareholders with a better picture of the Company's underlying operating performance without disclosing that the Company was including ordinary operating costs as one-time restructuring costs:   "In addition to disclosing results that are determined in accordance with Generally Accepted Accounting Principles (GAAP), IR also discloses pro forma or non-GAAP results of operations that exclude costs related to restructuring activities and one-time income/loss items.  IR discloses both pro

forma and actual results of operations in order to allow the users of its financial statements to assess the Company's operating results with and without charges associated with the Company's ongoing restructuring initiatives previously announced in March 2002 . . . ."

145.   After issuing the press release on July 29, 2004, IRF hosted a conference call for investors and analysts at which defendants made a number of false and misleading statements consistent with the Company's press release.  The defendants participating in the conference call included defendants Alex Lidow and McGee, each of whom acquiesced to each of the other defendants' false and misleading statements.  During the call, defendant McGee misleadingly stated:

> Earlier today, we announced results for our fourth quarter of fiscal 2004. International Rectifier reported pro forma earnings of $36.6 million or 52 cents per share in the June quarter, including a diluted impact of 1 cent per share related to the Company's convertible debenture, and excluding a 9.5 million pretax charge for ongoing severance and restructuring activities. On a GAAP basis, net income was $29.4 million or 42 cents per share in the June quarter versus $26.7 million or 39 cents per share in the March quarter, and $13.2 million or 20 cents per share in the prior year quarter.
>
> *       *       *
>
> Gross margins on an incremental basis exceeded expectations at 59%, primarily resulting from a richer mix of proprietary products. We generated $80 million in cash from operations in the quarter and 163 million in the fiscal year.

146.   During the July 29, 2004 conference call, defendant Alex Lidow also stated:  "With our fiscal year just ending, we have set new records in revenues and

orders, and we exited the year with our gross margin within a fraction of its all-time high."

147. Defendants' statements to the marketplace in ¶¶143-46 were materially false and misleading in three respects as detailed in §§ IV.A., IV.C., and IV.D. First, the pro forma net income and reported gross margin figures were falsely inflated by exclusion of ordinary operating expenses, not just restructuring costs as represented by defendants. Second, the reported income figures were also false and misleading because they included bogus and/or premature shipments of product in violation of GAAP and the Company's accounting policies. Third, both the pro forma net income and GAAP net income figures were false and misleading as defendants had artificially inflated these numbers by violating tax laws.

148. On September 17, 2004, the Company filed its Form 10-K with the SEC, which included the same false and misleading financial results previously reported to investors on July 29, 2004. The Form 10-K was signed by, among others, defendants Alex Lidow, Eric Lidow and McGee.

149. The Form 10-K also falsely stated:

In accordance with Staff Accounting Bulletin No. 101, "Revenue Recognition", we recognize revenue when the evidence of an arrangement exists, pricing is fixed and determinable, collection is reasonably assured, and delivery or performance of service has occurred. We recognize the majority of revenues upon shipment for product sales to all customers, including distributors, with provisions for estimated returns and allowances recorded at the time of shipment.

150. The Form 10-K also included certifications by defendants Alex Lidow and McGee attesting to the accuracy of the Company's financial statements and the adequacy of the Company's internal controls over financial reporting. The

certifications, which are attached hereto as Exhibits I and J, were substantially identical to the certification quoted in ¶117.

151.  Defendants' statements to the marketplace in ¶¶148-50 were materially false and misleading for the reasons set forth in ¶147.  In addition, the statements contained in ¶¶148-50 were false and misleading because (i) the SEC filings did not identify deficiencies or material weaknesses in the internal controls that resulted in the GAAP violations discussed above; (ii) the SEC filings did not disclose the fraudulent scheme alleged herein; (iii) no proper evaluation and report were ever conducted by the certifying officers for the purpose of identifying and eliminating internal control problems; and (iv) defendants wholly failed to maintain effective internal controls over financial reporting designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP as required by Public Company Accounting Oversight Board Auditing Standard No. 2, ¶7.  The lack of sound internal controls and the existence of deficiencies and material weaknesses are evidenced by the Company's own admissions discussed herein and the need for the anticipated restatements.

152.  On October 27, 2004, the defendants caused the Company to issue a press release falsely and/or misleadingly stating in part:

> International Rectifier Reports Fiscal First Quarter Results; Company Achieves Record Revenues, Gross Margin and Backlog on Escalating Demand for Energy-Conserving Products
>
> EL SEGUNDO, Calif.--(BUSINESS WIRE)--Oct. 27, 2004-- International Rectifier (NYSE:IRF) today reported ***pro forma earnings of $42.4 million*** (or $0.59 per share) in the September quarter. This compares to $36.6 million (or $0.52 per share) in the June quarter and $19.8 million (or $0.30 per share) in the prior-year

quarter. ***The pro forma September quarter earnings excluded a $6.7 million pretax charge for previously-announced severance and restructuring activities.*** The pro forma June quarter earnings excluded $9.5 million in restructuring-related pretax charges. The prior-year September quarter pro forma earnings excluded $4.0 million in restructuring-related pretax charges.

On a GAAP basis, ***net income was $37.6 million*** (or $0.53 per share) in the September quarter versus $29.4 million (or $0.42 per share) in the June quarter and $16.7 million (or $0.25 per share) in the prior-year quarter.

\*     \*     \*

Chief Executive Officer Alex Lidow stated, "Overall, business exceeded our expectations with the most recent quarter reflecting record revenues, gross margins and backlog."

\*     \*     \*

September quarter product gross margins exceeded expectations and grew 190 basis points from the June quarter, resulting in an all-time company record gross margin of 42.7 percent. Gross margin on incremental sales exceeded expectations at 79 percent, primarily resulting from a richer mix of proprietary products that now total more than 67 percent of revenue.

\*     \*     \*

Alex Lidow noted, "In the current quarter, revenues are expected to be $312 million plus or minus five percent. We have more than 80 percent backlog coverage of our target revenue for the December quarter. We expect our overall gross margins to be at 42.7 percent plus or minus 100 basis points. We are planning to complete a

previously announced divestiture of approximately $10 million per
quarter in revenue by the end of December. This represents the final
piece of the previously-announced $100 million of annualized revenue
carve-out of non-strategic, commodity business."

153.   The Company's October 27, 2004 press release falsely and
misleadingly explained that the Company reported pro forma results to provide
shareholders with a better picture of the Company's underlying operating
performance without disclosing that the Company was including ordinary
operating costs as one-time restructuring costs:  "In addition to disclosing results
that are determined in accordance with Generally Accepted Accounting Principles
(GAAP), IR also discloses pro forma or non-GAAP results of operations that
exclude costs related to restructuring activities and one-time income/loss items. IR
discloses both pro forma and actual results of operations in order to allow the users
of its financial statements to assess the Company's operating results with and
without charges associated with the Company's ongoing restructuring initiatives
previously announced in December 2002, and with and without one-time
income/loss items, if any."

154.   After issuing the press release on October 27, 2004, IRF hosted a
conference call for investors and analysts at which defendants made a number of
false and misleading statements consistent with the Company's press release.  The
defendants participating in the conference call included defendants Alex Lidow
and McGee, each of whom acquiesced to each of the other defendants' false and
misleading statements.  During the call, defendant McGee misleadingly stated:

Earlier today we announced results for our first quarter of fiscal 2005.
International Rectifier reported pro forma earnings of $42.4 million,
or 59 cents per share, in the September quarter. Excluding a 6.7

million pre-tax charge for ongoing severance and restructuring activities.

On a GAAP basis, net income was $37.6 million, or 53 cents per share, in the September quarter versus 29.4 million, or 42 cents per share, in the June quarter, and 16.7 million, or 25 cents per share, in the prior year quarter.

\*      \*      \*

September quarter product gross margins exceeded expectations and grew 190 basis points from the June quarter. Resulting in record overall company gross margin of 42.7%. Gross margin on incremental sales exceeded expectations at 79%. Primarily resulting from a richer mix of proprietary products that now total more than 67% of revenues.

We generated $23 million in cash from operations. The company's cash and cash investments were $794 million at the end of September.

\*      \*      \*

In the September quarter, our effective tax rate was 27.5%.

155.   During the October 27, 2004 conference call, defendant Alex Lidow also stated:  "Overall, business exceeded our expectations with the most recent quarter reflecting record revenues, record gross margins, record backlog, plus about $150 million in new design wins."

156.   Defendants' statements to the marketplace in ¶¶152-55 were materially false and misleading in three respects as detailed in §§ IV.A., IV.C., and IV.D.  First, the pro forma net income and reported gross margin figures were falsely inflated by exclusion of ordinary operating expenses, not just restructuring costs as represented by defendants.  Second, the reported income figures were also false and misleading because they included bogus and/or premature shipments of

product in violation of GAAP and the Company's accounting policies.  Third, both the pro forma net income and GAAP net income figures were false and misleading as defendants had artificially inflated these numbers by violating tax laws.

157.   On November 12, 2004, the Company filed its Form 10-Q with the SEC, which included the same false and misleading financial results previously reported to investors on October 27, 2004.  The Form 10-Q was signed by McGee.

158.   The Form 10-Q also included certifications by defendants Alex Lidow and McGee attesting to the accuracy of the Company's financial statements and the adequacy of the Company's internal controls over financial reporting.  The certifications, which are attached hereto as Exhibits K and L, were substantially identical to the certification quoted in ¶117.

159.  Defendants' statements to the marketplace in ¶¶157-58 were materially false and misleading for the reasons set forth in ¶156.  In addition, the statements contained in ¶¶157-58 were false and misleading because (i) the SEC filings did not identify deficiencies or material weaknesses in the internal controls that resulted in the GAAP violations discussed above; (ii) the SEC filings did not disclose the fraudulent scheme alleged herein; (iii) no proper evaluation and report were ever conducted by the certifying officers for the purpose of identifying and eliminating internal control problems; and (iv) defendants wholly failed to maintain effective internal controls over financial reporting designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP as required by Public Company Accounting Oversight Board Auditing Standard No. 2, ¶7.  The lack of sound internal controls and the existence of deficiencies and material weaknesses are evidenced by the Company's own admissions discussed herein and the need for the anticipated restatements.

160.   On November 24, 2004, the Company filed a Form 8-K with the SEC in which it disclosed Alex Lidow and Grant had entered into stock trading plans under which Alex "Lidow will sell up to 195,000 shares and Robert Grant up to 102,500 shares, in each case over a period of ten months."

161.   On January 27, 2005, the defendants caused the Company to issue a press release falsely and/or misleadingly stating in part:

INTERNATIONAL RECTIFIER REPORTS FISCAL SECOND QUARTER RESULTS

***Gross Margins Set Record High***

EL SEGUNDO, Calif., January 27, 2005 — International Rectifier Corporation (NYSE:IRF) today reported ***adjusted earnings of $44.8 million*** (or $0.62 per share) for the December quarter.  This compares to $42.4 million (or $0.59 per share) for the September quarter and $24.6 million (or $0.36 per share) for the prior-year quarter. ***The adjusted December quarter earnings excluded a $6.8 million pretax charge for previously-announced severance and restructuring activities.***  The adjusted September quarter earnings excluded $6.7 million in severance and restructuring-related pretax charges.  For the prior-year quarter, adjusted earnings excluded $10.1 million in severance and restructuring-related pretax charges.

On a GAAP basis, ***net income was $39.5 million*** (or $0.55 per share) for the December quarter versus $37.6 million (or $0.53 per share) for the September quarter and $16.9 million (or $0.25 per share) for the prior-year quarter.

\*     \*     \*

Chief Executive Officer Alex Lidow stated, "***Our focus on proprietary products continues to drive our margin expansion.  Our***

***December quarter gross margins increased another 60 basis points from the prior quarter, hitting an all-time record of 43.3 percent.*** IR proprietary product revenues grew 39 percent over the prior-year quarter. We generated $76 million in cash from operations and ended the quarter at $839 million in total cash and cash investments."

\*     \*     \*

Alex Lidow noted, "Today, we're announcing another major phase in IR's long-term strategy for moving to high value-added products. Since first detailing our plan in March of 2000 to transform our company from a commodity component orientation to a proprietary product focus, we have made significant progress. Over the past eight quarters, we have increased our proprietary product mix from 56 percent to 69 percent of revenues. During this period, sales from our fastest growing product category, high performance analog ICs and advanced circuit devices, have more than doubled. Overall company gross margins have increased 11 percentage points over the same eight quarters. In addition, we have generated more than $360 million in cash from operations and maintain the strongest balance sheet in the company's history."

"We are now moving forward with the next phase of our transition. ***Over the next six quarters, we will continue to expand our proprietary product portfolio and plan to reach greater than 50 percent gross margins for the company within this period.*** This will involve a follow-on divestiture or discontinuation of $150 million in annual revenues that no longer add value to our business objectives. Our current visualization does not include any restructuring charges associated with these activities."

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. CV 07-02544-JFW (VBKx)

162.   The Company's January 27, 2005 press release falsely and misleadingly explained that the Company reported pro forma results to provide shareholders with a better picture of the Company's underlying operating performance without disclosing that the Company was including ordinary operating costs as one-time restructuring costs:  "In addition to disclosing results that are determined in accordance with Generally Accepted Accounting Principles (GAAP), IR also discloses adjusted or non-GAAP results of operations that exclude costs related to restructuring activities and one-time income/loss items. IR discloses both adjusted and actual results of operations in order to allow the users of its financial statements to assess the Company's operating results with and without charges associated with the Company's ongoing restructuring initiatives previously announced in December 2002, and with and without one-time income/loss items, if any."

163.   After issuing the press release on January 27, 2005, IRF hosted a conference call for investors and analysts at which defendants made a number of false and misleading statements consistent with the Company's press release.  The defendants participating in the conference call included defendants Alex Lidow and McGee, each of whom acquiesced to each of the other defendants' false and misleading statements.  During the call, defendant McGee misleadingly stated:

> Earlier today, we announced results for our second quarter of fiscal 2005. International Rectifier reported adjusted earnings of $44.8 million, or $0.62 per share in the December quarter, excluding a $6.8 million pretax charge for ongoing severance and restructuring activities. On a GAAP basis, net income was $39.5 million, or $0.55 per share in the December quarter, versus 37.6 million, or $0.53 per share in the September quarter, and $16.9 million, or $0.25 per share in the prior-year quarter.

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. CV 07-02544-JFW (VBKx)

\*     \*     \*

Our December gross margins increased another 60 basis points from the prior quarter, hitting an all-time record of 43.3 percent. We generated $76 million in cash from operations and ended the quarter at $839 million in total cash and cash investments.

\*     \*     \*

SG&A was $40.9 million, or 13.7 percent of revenues in the December quarter, compared to 15.1 percent a year ago and 14.9 percent in the September quarter.

\*     \*     \*

[O]ur effective tax rate for the December quarter was 22.8 percent. . . .

164.   Defendant Alex Lidow misleadingly commented on the Company's historic margins and goals to achieve higher margins, attributing the higher margins to a change in the Company's business focus, without disclosing the fact the Company was manipulating reported margins by falsely classifying operating expenses as one-time restructuring costs:

We continue to see major success with the Company's transition to high, value-added products and increased profitability. . . . This richer mix has enabled us to grow our gross margins 11 percentage points, setting a new high of 43.3 percent in this quarter. In the December quarter, we saw double-digit revenue growth across all end-markets, year-over-year.

\*     \*     \*

Over the last eight quarters, margins grew 11 percentage points. Over the next six quarters, we will continue to expand our proprietary product portfolio and plan to reach greater than 50 percent gross margin for the Company within this period.

165.  Defendants' statements to the marketplace in ¶¶161-64 were materially false and misleading in three respects as detailed in §§ IV.A., IV.C., and IV.D.  First, the pro forma net income and reported gross margin figures were falsely inflated by exclusion of ordinary operating expenses, not just restructuring costs as represented by defendants.  Second, the reported income figures were also false and misleading because they included bogus and/or premature shipments of product in violation of GAAP and the Company's accounting policies.  Third, both the pro forma net income and GAAP net income figures were false and misleading as defendants had artificially inflated these numbers by violating tax laws.

166.  On February 4, 2005, the Company filed a Form 8-K with the SEC disclosing that Eric Lidow had entered into a stock trading plan pursuant to which he would "sell up to 208,000 shares over a period of one year."

167.  On February 11, 2005, the Company filed its Form 10-Q with the SEC, which included the same false and misleading financial results previously reported to investors on January 27, 2005.  The Form 10-Q was signed by McGee.

168.  The Form 10-Q also included certifications by defendants Alex Lidow and McGee attesting to the accuracy of the Company's financial statements and the adequacy of the Company's internal controls over financial reporting.  The certifications, which are attached hereto as Exhibits M and N, were substantially identical to the certification quoted in ¶117.

169.  Defendants' statements to the marketplace in ¶¶167-68 were materially false and misleading for the reasons set forth in ¶165.  In addition, the statements contained in ¶¶167-68 were false and misleading because (i) the SEC filings did not identify deficiencies or material weaknesses in the internal controls that resulted in the GAAP violations discussed above; (ii) the SEC filings did not disclose the fraudulent scheme alleged herein; (iii) no proper evaluation and report were ever conducted by the certifying officers for the purpose of identifying and

eliminating internal control problems; and (iv) defendants wholly failed to maintain effective internal controls over financial reporting designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP as required by Public Company Accounting Oversight Board Auditing Standard No. 2, ¶7.  The lack of sound internal controls and the existence of deficiencies and material weaknesses are evidenced by the Company's own admissions discussed herein and the need for the anticipated restatements.

170.   On April 19, 2005, the Company issued a press release announcing it was accelerating the vesting of stock options for its employees:

International Rectifier Announces Accelerated Vesting of Stock Options

EL SEGUNDO, Calif.--(BUSINESS WIRE)--April 19, 2005--International Rectifier Corporation (NYSE:IRF) today announced the accelerated vesting of all currently outstanding unvested employee stock options. Unvested options to purchase approximately 7 million shares became exercisable as a result of the vesting acceleration.

The purpose of the accelerated vesting of outstanding unvested options is to enable the company to avoid recognizing in its income statement compensation expense associated with these options in future periods, upon adoption of FASB Statement No. 123R (Share-Based Payment) in July 2005. The resulting amount that will not be required to be expensed by the company is approximately $106 million over the course of the original vesting periods, $58 million of which would have been for fiscal year 2006. The company estimates a one-time charge as a result of the accelerated vesting of approximately $4 million in the June-quarter.

171. On April 28, 2005, the defendants caused the Company to issue a press release falsely and/or misleadingly stating in part:

International Rectifier Earnings Rise 40% Over Prior-Year Quarter on Strength of Proprietary Products

EL SEGUNDO, Calif., Apr 28, 2005 (BUSINESS WIRE) -- International Rectifier Corporation (NYSE: IRF) today reported ***adjusted earnings of $41.7 million*** (or $0.56 per share) for the March quarter -- a 40 percent increase over the prior-year quarter. This compares to $44.8 million (or $0.62 per share) for the December quarter. For the March, December, and prior-year quarter, ***adjusted earnings excluded $8.1 million, $6.8 million, and $9.9 million in pretax charges, respectively, for severance and restructuring activities announced in December 2002.*** A one-time $5.9 million net pretax gain from a patent settlement also is excluded from March 2004 adjusted earnings.

On a GAAP basis, ***net income increased $35.6 million*** (or $0.48 per share) for the March quarter versus $26.7 million (or $0.39 per share) for the prior-year quarter and was $39.5 million (or $0.55 per share) in the December 2004 quarter.

Chief Executive Officer Alex Lidow stated, "***Our focus on proprietary product sales resulted in a record gross margin of 44.4 percent***, an increase of 110 basis points from the December quarter and 480 basis points from the prior-year quarter. IR's proprietary product revenues grew 19 percent over the prior-year quarter. We generated $142 million in cash from operations through the first nine months of fiscal 2005 and ended the third quarter with over $850 million in total cash and cash investments."

\*     \*     \*

In the June quarter, revenues are expected to remain at March levels, plus or minus 4 percent. IR currently has more than 80 percent backlog coverage of target revenue for the June quarter. Overall gross margin is expected to be flat sequentially, plus or minus a point.

Lidow stated, "***We are on track to achieve our target that we set in January to realize a 50 percent gross margin by June 2006***. Two major factors driving the growth of power management are the accelerating demand for energy-conserving products and an emerging technology shift in IT. Energy conservation continues to be a major focal point in world economies and IR's power management solutions are proving vital in helping to meet the challenges. In fact, we've seen our revenues grow 58 percent year to date in energy-conserving appliance and lighting applications.

\*     \*     \*

"Over the past four quarters, International Rectifier has added over $200 million in new business at 71 percent incremental gross margin. During that same period we have been awarded more than half a billion dollars of new design wins which will contribute to IR's growth over the next four to six quarters. With these successes, ***we're on track to reach our target of 50 percent company gross margin by June 2006. Beyond that, we see even higher levels***."

172.   The Company's April 28, 2005 press release falsely and misleadingly explained that the Company reported pro forma results to provide shareholders with a better picture of the Company's underlying operating performance without disclosing that the Company was including ordinary operating costs as one-time restructuring costs:

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. CV 07-02544-JFW (VBKx)

In addition to disclosing results that are determined in accordance with Generally Accepted Accounting Principles (GAAP), IR also discloses adjusted or non-GAAP results of operations that exclude costs related to restructuring activities and one-time income/loss items. IR discloses both adjusted and actual results of operations to allow the users of its financial statements to assess the Company's operating results with and without charges associated with the Company's ongoing restructuring initiatives previously announced in December 2002, and with and without one-time income/loss items, if any. In connection with the restructuring activities, among other things, the Company is de-emphasizing some parts of its commodity business and accelerating the move to its proprietary products. The Company expects to record severance and restructuring charges as incurred in accordance with SFAS 146, "Accounting for the Costs Associated with Exit or Disposal Activities", through approximately calendar year-end 2005.

173. After issuing the press release on April 28, 2005, IRF hosted a conference call for investors and analysts at which defendants made a number of false and misleading statements consistent with the Company's press release. The defendants participating in the conference call included defendants Alex Lidow and McGee, each of whom acquiesced to each of the other defendants' false and misleading statements. During the call, defendant McGee misleadingly stated:

Earlier today, we announced results for our third quarter of fiscal 2005. International Rectifier reported adjusted earnings of $41.7 million, or $0.56 per share, in the March quarter, excluding $8.1 million in pre-tax charges for ongoing severance and restructuring activities.

On a GAAP basis, net income was $35.6 million, or $0.48 per share in the March quarter, versus $39.5 million, or $0.55 per share in the December quarter, and was $26.7 million, or $0.39 per share in the prior year quarter. (Indiscernible - audio difficulty) were $281.9 million in the March quarter, compared to $275.4 million in the prior year quarter, and down 6% from the December quarter, including the impact of product discontinuations. Excluding this impact, revenues were down 3% from the December quarter.

Our March quarter gross margins increased another 110 basis points from the prior quarter, hitting an all-time record of 44.4%. Proprietary product orders rose 10% from the December quarter, and represented 76% of total Company orders, compared to 66% in the prior year quarter.

Overall Company bookings were up 7% from the December quarter. We generated $43 million in cash from operations in the March quarter, and $142 million in the first nine months of fiscal 2005.

Total cash and cash investments are now over $850 million.

\*       \*       \*

SG&A was $40.8 million, or 14.5% of revenues in the March quarter[.]

\*       \*       \*

Our effective tax rate for the March quarter was 25.8%.

174.   Defendant Alex Lidow assured investors the Company was then achieving its margin goals, "we're on track to reach our target of 50% company gross margin by June, 2006.  Beyond that, we see even higher levels."

175.   Defendants' statements to the marketplace in ¶¶171-74 were materially false and misleading in four respects as detailed in §§ IV.A., IV.B., IV.C., and IV.D.  First, the pro forma net income and reported gross margin figures were falsely inflated by exclusion of ordinary operating expenses, not just restructuring charges as represented by defendants.  Second, the reported income figures were also false and misleading because they included bogus and/or premature shipments of product in violation of GAAP and the Company's accounting policies.  Third, both the pro forma net income and GAAP net income figures were false and misleading as defendants had artificially inflated these numbers by violating tax laws.  Fourth, the Company's cash on the balance sheet was artificially inflated (and its debt understated) by defendants' sale of fictitious accounts receivable.

176.   As a result of defendants' false and misleading statements, as repeated by analysts, IRF's stock price increased from a close of $42.02 on April 28, 2005 before the news was released to a close on April 29, 2005 of $42.54.

177.   On May 13, 2005, the Company filed with the SEC its Form 10-Q for the quarter ended March 31, 2005 signed by defendant McGee, which included the same false and misleading financial results previously reported to investors on April 29, 2005.

178.   The Form 10-Q also included certifications by defendants Alex Lidow and McGee attesting to the accuracy of the Company's financial statements and the adequacy of the Company's internal controls over financial reporting.   The certifications, which are attached hereto as Exhibits O and P, were substantially identical to the certification quoted in ¶117.

179.   Defendants' statements to the marketplace in ¶¶177-78 were materially false and misleading for the reasons set forth in ¶175.  In addition, the statements contained in ¶¶177-78 were false and misleading because (i) the SEC

filings did not identify deficiencies or material weaknesses in the internal controls that resulted in the GAAP violations discussed above; (ii) the SEC filings did not disclose the fraudulent scheme alleged herein; (iii) no proper evaluation and report were ever conducted by the certifying officers for the purpose of identifying and eliminating internal control problems; and (iv) defendants wholly failed to maintain effective internal controls over financial reporting designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP as required by Public Company Accounting Oversight Board Auditing Standard No. 2, ¶7.  The lack of sound internal controls and the existence of deficiencies and material weaknesses are evidenced by the Company's own admissions discussed herein and the need for the anticipated restatements.

180.   On July 28, 2005, the defendants caused the Company to issue a press release falsely and/or misleadingly stating in part:

International Rectifier Reports Fiscal Fourth Quarter Results

EL SEGUNDO, Calif., Jul 28, 2005 (BUSINESS WIRE) -- International Rectifier Corporation (NYSE:IRF) today reported **adjusted earnings of $38.4 million** (or $0.54 per share) for the June quarter on revenues of $281.8 million. This compares to $41.7 million (or $0.56 per share) for the March quarter on revenues of $281.9 million. **For the June and March quarters, adjusted earnings excluded $12.4 million and $8.1 million in pretax charges, respectively, for severance and restructuring activities announced in December 2002.**  As previously announced, a one-time $6.0 million pretax charge from the accelerated vesting of options also is excluded from the June quarter's adjusted earnings.

On a GAAP basis, ***net income was $24.7 million*** (or $0.35 per share) for the June quarter versus $35.7 million (or $0.48 per share) in the March quarter and $29.4 million (or $0.42 per share) for the prior-year quarter.

***Gross margin was 43.5 percent in the fourth quarter***. This compares to 44.4 percent in the March quarter and 41.2 percent in the year-ago fourth quarter. Pricing pressure on commodity products principally was responsible for the sequential decline.

For the fiscal year just ended, adjusted earnings per share were up 43 percent over the previous fiscal year. Adjusted net income was $167.3 million (or $2.30 per share) on revenues of $1.17 billion, compared to prior-year adjusted net income of $110.8 million (or $1.61 per share) on revenues of $1.06 billion. For the fiscal year just ended, gross margin was 43.5 percent compared to 38.8 percent in fiscal 2004.

Adjusted earnings excluded $34.0 million and $33.5 million for severance and restructuring activities announced in December 2002 for the fiscal year just ended and the previous fiscal year, respectively. Also excluded is the previously announced, one-time $6.0 million pretax charge from the accelerated vesting of options from this fiscal year's adjusted earnings and a one-time $5.9 million net pretax gain from the Hitachi settlement from the prior-year's adjusted earnings.

On a GAAP basis, IR reported net income of $137.5 million (or $1.91 per share) for fiscal 2005 compared to a net income of $89.8 million (or $1.31 per share) for fiscal 2004.

The company generated $79 million of cash from operations in the fourth quarter and $221 million for fiscal 2005, ending the year

1    with $941 million in cash and cash investments.

2         CEO Alex Lidow said, "We have positioned the company to

3    capitalize on the fastest-growing, high performance, power

4    management applications with our proprietary product strategy. This

5    has involved developing value-added products, such as high

6    performance analog ICs, as well as taking advantage of cross-selling

7    opportunities for our other product families. Our focus on these

8    applications and products has driven our revenues, gross margins, and

9    design wins to record levels this past fiscal year."

10                              *      *      *

11        CEO Alex Lidow stated, "Industry business conditions are

12   steadily improving, with the strongest part of the year still ahead amid

13   a major transition to new end products. A massive technology

14   generation change already is being seen in the IT space with the move

15   to multi-core processing. At the same time, we're entering an era

16   where energy savings is critical in both consumer and industrial

17   applications. IR is in an excellent position to capitalize on these

18   growth opportunities with a strong portfolio of power management

19   solutions, while steadily transforming its business model to reach

20   higher levels of profit making potential. The company's strategy to

21   redefine itself in the high performance, analog markets paid off again

22   last year and prospects are even brighter for fiscal 2006."

23   181.  The Company's July 28, 2005 press release falsely and misleadingly

24   explained that the Company reported pro forma results to provide shareholders

25   with a better picture of the Company's underlying operating performance without

26   disclosing that the Company was including ordinary operating costs as one-time

27   restructuring charges:

28

In addition to disclosing results that are determined in accordance with Generally Accepted Accounting Principles (GAAP), IR also discloses adjusted or non-GAAP results of operations that exclude costs related to restructuring activities and one-time income/loss items. IR discloses both adjusted and actual results of operations to allow the users of its financial statements to assess the Company's operating results with and without charges associated with the Company's ongoing restructuring initiatives previously announced in December 2002, and with and without one-time income/loss items, if any. In connection with the restructuring activities, the Company is de-emphasizing some parts of its commodity business and accelerating the move to its proprietary products and how they relate to its Focus Products' segments. The Company expects to record severance and restructuring charges as incurred in accordance with SFAS 146, "Accounting for the Costs Associated with Exit or Disposal Activities", through approximately calendar year-end 2005.

182.   After issuing the press release on July 28, 2005, IRF hosted a conference call for investors and analysts at which defendants made a number of false and misleading statements consistent with the Company's press release.  The defendants participating in the conference call included defendants Alex Lidow and McGee, each of whom acquiesced to each of the other defendants' false and misleading statements.  During the call, defendant McGee misleadingly stated:

International Rectifier reported adjusted earnings of $38.4 million or $0.54 per share in the June quarter. Excluding 12.4 million in pre-tax charges for ongoing severance and restructuring activities at a previously announced $6 million pre-tax charge from the accelerated vesting of options. We previously indicated that there was

about $12 million remaining in our 2002 restructuring charges to be included in calendar 2005. We've now found that estimate to be too low. Three years ago when we announced the charges, they were estimated at $220 million. Now we are projecting charges 15% above that figure to complete the process that will result in another 15 to $20 million to be incurred this calendar year.

On a GAAP basis, net income was $24.7 million or $0.35 per share in the June quarter versus $35.7 million or $0.48 per share in the March quarter and 29.4 million or $0.42 per share in the prior year quarter. Revenues were $281.8 million in the June quarter compared to 281.9 million in the March quarter. At 298.6 million in the prior year quarter. Our June quarter gross margin was 43.5% compared to 44.4% in the March quarter and 41.2% in the prior year quarter. For the fiscal year just ended, adjusted earnings per share grew 43%. Adjusted net income was $167.3 million or $2.30 per share on record revenues of $1.17 billion. Compared to prior year adjusted net income of 110.8 million or $1.61 per share on revenues of 1.06 billion.

On a GAAP basis, IR reported net income of $137.5 million or $1.91 per share for fiscal 2005 compared to net income of 89.8 million or $1.31 per share for fiscal 2004. We generated $79 million in cash from operations in the June quarter and 221 million in fiscal 2005. Total cash in cash investments are now $941 million. IR's inventories were $178 million and essentially flat at 14.5 weeks but reflected an increase of approximately $6 million over the March quarter as we strategically position product for a stronger second half of calendar 2005. Distributor inventories of IR products remain lean. IR shipments [INAUDIBLE] channel were flat from the March

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. CV 07-02544-JFW (VBKx)

quarter and distributor shipments to their customers were up 3%. Lead times declined and are now four to six weeks. And over all pricing was down more than 3%. Pricing pressure on commodity products was principally responsible for the sequential decline in gross margins.

*　　*　　*

SG&A was $45 million or 16% of revenues in the June quarter compared to 15.7% a year ago and 14.5% in the March quarter.

*　　*　　*

Our effective tax rate for the June quarter was 25%.

183.   During the conference call, defendant Alex Lidow falsely reassured investors that IRF did not engage in channel stuffing:   "A competitor in the commodity products business stuffed the channel and tanked the prices, so we saw more than 3% decline in pricing. Our commodity products revenues were down 15% because *we're just not going to participate in that game* and our margins were down 440 basis points."

184.   Defendants' statements to the marketplace in ¶¶180-83 were materially false and misleading in four respects as detailed in §§ IV.A., IV.B., IV.C., and IV.D.  First, the pro forma net income and reported gross margin figures were falsely inflated by exclusion of ordinary operating expenses, not just restructuring charges as represented by defendants.  Second, the reported income figures were also false and misleading because they included bogus and/or premature shipments of product in violation of GAAP and the Company's accounting policies.  Third, both the pro forma net income and GAAP net income figures were false and misleading as defendants had artificially inflated these numbers by violating tax laws.  Fourth, the Company's cash on the balance sheet

was artificially inflated (and its debt understated) by defendants' sale of fictitious accounts receivable.

185.   The Company's reported financial results beat analysts' expectations by a penny, but the Company's stock price dropped from $ 55.03 to only $47.05 after the Company's press release was issued.  The stock drop was the result of, among other things, defendants' disclosures that the Company's gross margins had declined.   Analysts focused on the Company's margin miss.   For example, Citigroup issued an analyst report on July 29, 2005 titled:  "IRF: Downgrading to Hold On Stalled Margin Expansion."   The Citigroup report explained:  "IRF has been a top pick since last fall, indicative of the 'gross margin restructuring' theme we have preferred . . . .   However, IRF now appears at significant risk of proceeding        . . . without realizing meaningful gross margin expansion from recent levels."  Had analysts and investors known the truth – that the Company was falsifying its financial results and artificially inflating its gross margins – the Company's stock would have dropped even more than it did.

186.   On August 25, 2005, defendants Alex Lidow and Grant and Vice President & General Counsel Donald Dancer entered into sales plans for common stock arising from the exercise of a portion of the Company stock options each then held.  The trading plan enabled Alex Lidow to sell up to 195,000 shares, Grant up to 120,000 shares and Donald Dancer up to 38,750 shares, in each case over a period of about nine months.

187.   On September 16, 2005, the Company filed with the SEC its Form 10-K for the year ended June 31, 2005, which included the same false and misleading financial results previously reported to investors on April 29, 2005.  The Form 10-K was signed by, among others, defendants Alex Lidow, Eric Lidow and McGee.

188.   The Form 10-K also falsely stated:

Critical Accounting Estimates

Revenue Recognition and Allowances

In accordance with Staff Accounting Bulletin No. 101, "Revenue Recognition", we recognize revenue when the evidence of an arrangement exists, pricing is fixed and determinable, collection is reasonably assured, and delivery or performance of service has occurred.  We recognize the majority of revenues upon shipment for product sales to all customers, including distributors, with provisions for estimated returns and allowances recorded at the time of shipment. Certain customers have limited rights of returns and price protection programs.  We continuously monitor product returns and potential price adjustments and record a provision for these based on notification we receive of pending credits and historical experience.  . . .

189.   The Form 10-K also included certifications by defendants Alex Lidow and McGee attesting to the accuracy of the Company's financial statements and the adequacy of the Company's internal controls over financial reporting.   The certifications, which are attached hereto as Exhibits Q and R, were substantially identical and similar to the certification in ¶117.

190. Defendants' statements to the marketplace in ¶¶187-89 were materially false and misleading for the reasons set forth in ¶184.  In addition, the statements contained in ¶¶187-89 were false and misleading because (i) the SEC filings did not identify deficiencies or material weaknesses in the internal controls that resulted in the GAAP violations discussed above; (ii) the SEC filings did not disclose the fraudulent scheme alleged herein; (iii) no proper evaluation and report were ever conducted by the certifying officers for the purpose of identifying and

eliminating internal control problems; and (iv) defendants wholly failed to maintain effective internal controls over financial reporting designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP as required by Public Company Accounting Oversight Board Auditing Standard No. 2, ¶7.  The lack of sound internal controls and the existence of deficiencies and material weaknesses are evidenced by the Company's own admissions discussed herein and the need for the anticipated restatements.

191.  On October 10, 2005, the Company issued a false and misleading press release stating in part:

International Rectifier Corporation (NYSE:IRF) today announced that, based on preliminary data, revenue for its fiscal 2006 first quarter ending September is expected to be approximately $273 million, down about 3 percent from June-quarter revenue of $281.8 million. Gross margin in the September quarter is expected to be approximately 40.5 percent versus 43.5 percent in the June quarter. On the July 28 conference call, IR had guided revenue to be flat to up 4 percent and gross margin to be flat to down 2 percentage points in the September quarter. Adjusted earnings per share on a diluted basis is expected to be $0.40-0.42 for the September quarter. Including charges from previously announced restructuring and severance activities, GAAP earnings per share on a diluted basis is expected to be $0.35-0.37.

CEO Alex Lidow said, "Although demand for our Focus products exceeded expectations in the September quarter, a large percentage of the orders came late in the quarter and the product mix was different than what was forecasted. At the same time, the

company did not have the incremental capacity to respond to the mix change by the end of the quarter. Additional planned capacity is scheduled to be brought online by the end of the calendar year.

"We expect revenue to be up in the December quarter due to strong demand for our Focus products and a favorable seasonal pattern."

192.  Analysts focused on the Company's disclosure that its gross margins would be lower than expected.  For example, on October 11, 2005, Citigroup issued an analyst report authored by Craig A. Ellis stating:

**Our view has been that the IRF investment case has centered primarily on gross margin expansion** and secondarily on revenue growth.  Monday's pre-announcement, despite including references to September order strength and the prospects for sequential December revenue growth, is a meaningful disappointment on both fronts. Indeed, with the gross margin declines accelerating in the current quarter versus the prior quarter (down 200 bps vs down 90 bps on an apples/apples basis) the shares are now a "show-me" story without a reasonable catalyst until 1Q06.

193.  The Company's stock price dropped significantly in response to the disclosure concerning the Company's faltering margins.  Whereas the Company's stock closed on October 10, 2005 at $40.70, on October 11, 2005 the stock closed at only $34.37.

194.  On October 27, 2005, the defendants caused the Company to issue a press release falsely and/or misleadingly stating in part:

International Rectifier Reports Fiscal First Quarter Results

EL SEGUNDO, Calif.--(BUSINESS WIRE)--Oct. 27, 2005-- International Rectifier Corporation (NYSE:IRF) today reported

*adjusted earnings of $29.4 million* (or $0.41 per share) for the September quarter on revenues of $272.6 million. This compares to $38.4 million (or $0.54 per share) for the June quarter on revenues of $281.8 million. For the prior-year quarter, adjusted earnings were $42.4 million on revenues of $312.2 million. For the September 2005, June 2005 and September 2004 quarters, *adjusted earnings excluded $4.3 million, $12.4 million and $6.7 million in pretax charges, respectively, for severance and restructuring activities announced in December 2002*. The June 2005 quarter also excluded a one-time $6.0 million pretax charge from the accelerated vesting of options.

On a GAAP basis, *net income was $26.2 million* (or $0.36 per share) for the September quarter versus $24.7 million (or $0.35 per share) in the June quarter and $37.6 million (or $0.53 per share) for the prior-year quarter.

Gross margin was 40.7 percent in the first quarter, down 280 basis points from 43.5 percent in the June quarter. The company reported gross margin of 42.7 percent in the year-ago September quarter.

*          *          *

The company generated $13.8 million of cash from operations in the first quarter, ending the quarter with $932 million in cash and cash investments.

CEO Alex Lidow said, "September quarter results were disappointing. Shippable demand for our Focus Products was very strong late in the quarter, but capacity was stretched to the limit. In addition, Non-Focus Product shipments were influenced by inventory

-86-

reductions in the distribution channel. Overall, shipments to distributors were down 12 percent in the quarter."

"We have shipped unfulfilled September orders early in the December quarter, positioning the company to reduce its overall inventories by at least $10 million by the end of December."

195. The Company's October 27, 2005 press release falsely and misleadingly explained that the Company reported pro forma results to provide shareholders with a better picture of the Company's underlying operating performance without disclosing that the Company was including ordinary operating costs as one-time restructuring charges:

In addition to disclosing results that are determined in accordance with Generally Accepted Accounting Principles (GAAP), IR also discloses adjusted or non-GAAP results of operations that exclude costs related to restructuring activities and one-time income/loss items, if any. IR discloses both adjusted and actual results of operations to allow the users of its financial statements to assess the Company's operating results with and without charges associated with the Company's ongoing restructuring initiatives previously announced in December 2002, and with and without one-time income/loss items, if any. In connection with the restructuring activities, the Company is de-emphasizing some parts of its commodity business and accelerating the move to its proprietary products and how they relate to its Focus Product segments. The Company expects to record severance and restructuring charges as incurred in accordance with SFAS 146, "Accounting for the Costs Associated with Exit or Disposal Activities," through approximately fiscal year-end 2006.

196.   After issuing the press release on October 27, 2005, IRF hosted a conference call for investors and analysts at which defendants made a number of false and misleading statements consistent with the Company's press release.  The defendants participating in the conference call included defendants Alex Lidow and McGee, each of whom acquiesced to each of the other defendants' false and misleading statements.  During the call, defendant McGee misleadingly stated:

> Early today we announced our fiscal first quarter results. International Rectifier reported adjusted earnings of $29.4 million or $0.41 per share in its September quarter, excluding 4.3 million in pre-tax charges for ongoing severance and restructuring activities. As we previously indicated, that there would be - - there was about $10 to $15 million remaining in our 2002 restructuring charges to be incurred in calendar 2005. Recognition of these charges has been pushed out through the end of fiscal 2006.

> On a GAAP basis, net income was $26.2 million or $0.36 per share in the September quarter, versus $24.7 million or $0.35 per share in the June quarter. And was $37.6 million or $0.53 per share in the prior year quarter. Revenues were $272.6 million in the September quarter, compared to 281.8 million in the June quarter and 312.2 million in the prior year quarter. Our September gross margin was 40.7%, compared to 43.5% in the June quarter and 42.7% in the prior year quarter. September gross margin includes the first time effects of expensing options and the implementation of our profit sharing plan. **We generated $13.8 million in cash from operations in the September quarter**. Total cash and cash investments are now $932 million.

*   *   *

Our effective tax rate for the June quarter was 27.5%.

\*      \*      \*

Gross margin for focus products declined to 48.8%, compared to 51.1% in the prior quarter. The decline was primarily due to seasonality, product mix and the effect of profit sharing and employee stock option expense.

197. Defendants' statements to the marketplace in ¶¶194-96 were materially false and misleading in five respects as detailed in §§ IV.A. – IV.E. First, the Company had falsified its cash flows from operations by over $4.1 million – as it has now admitted – in violation of GAAP (SFAS 123R), as set forth in §IV.E.    Second, the pro forma net income and reported gross margin figures were falsely inflated by exclusion of ordinary operating expenses, not just restructuring charges as represented by defendants.   Third, the reported income figures were also false and misleading because they included bogus and/or premature shipments of product in violation of GAAP and the Company's accounting policies.  Fourth, both the pro forma net income and GAAP net income figures were false and misleading as defendants had artificially inflated these numbers by violating tax laws.  Fifth, the Company's cash on the balance sheet was artificially inflated (and its debt understated) by defendants' sale of fictitious accounts receivable.

198.   On October 28, 2005, International Rectifier stock dropped $6.19, or 18%, to close at $27.86 after the Company posted a 30% drop in its first-period profit and low cash flow from operations, and gave a weak forecast for the December quarter.  Had defendants not falsified the Company's financial results, the price for IRF stock would have dropped even further than it did.

199. On November 1, 2005, the Company issued a press release announcing the Company would buy back up to $100 million in IRF stock.  The

press release also stated:  "The stock repurchase program reflects the Board's confidence in the overall financial strength of the company and prospects for the future."

200.   On November 14, 2005, the Company filed with the SEC its Form 10-Q for the quarter ended September 30, 2005 signed by defendant McGee, which included the same false and misleading financial results previously reported to investors on October 27, 2005.

201.   The Form 10-Q also included certifications by defendants Alex Lidow and McGee attesting to the accuracy of the Company's financial statements and the adequacy of the Company's internal controls over financial reporting.   The certifications, which are attached hereto as Exhibits S and T, were substantially identical and similar to the one in ¶117.

202.  Defendants' statements to the marketplace in ¶¶200-01 were materially false and misleading for the reasons set forth in ¶197.  In addition, the statements contained in ¶¶200-01 were false and misleading because (i) the SEC filings did not identify deficiencies or material weaknesses in the internal controls that resulted in the GAAP violations discussed above; (ii) the SEC filings did not disclose the fraudulent scheme alleged herein; (iii) no proper evaluation and report were ever conducted by the certifying officers for the purpose of identifying and eliminating internal control problems; and (iv) defendants wholly failed to maintain effective internal controls over financial reporting designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP as required by Public Company Accounting Oversight Board Auditing Standard No. 2, ¶7.  The lack of sound internal controls and the existence of deficiencies and material weaknesses are evidenced by the Company's own admissions discussed herein and the need for the anticipated restatements.

203.   On January 26, 2006, the defendants caused the Company to issue a press release falsely and/or misleadingly stating in part:

International Rectifier Reports Fiscal Second Quarter Results

EL SEGUNDO, Calif.--(BUSINESS WIRE)--Jan. 26, 2006-- International Rectifier Corporation (NYSE:IRF) today reported ***adjusted earnings of $26.5 million*** (or $0.37 per share) for the December quarter on revenues of $278.8 million. This compares to $29.4 million (or $0.41 per share) for the September quarter on revenues of $272.6 million. For the prior-year quarter, adjusted earnings were $44.8 million (or $0.62 per share) on revenues of $298.6 million. For the December 2005, September 2005 and December 2004 quarters, ***adjusted earnings excluded $3.1 million, $4.3 million and $6.8 million in pretax charges, respectively, for severance and restructuring activities announced in December 2002.***

On a GAAP basis, ***net income was $24.3 million*** (or $0.34 per share) for the December quarter versus $26.2 million (or $0.36 per share) in the September quarter and $39.5 million (or $0.55 per share) for the prior-year December quarter.

The expense for stock-based compensation lowered both the adjusted and GAAP EPS for the December quarter by $0.01 per share.

***Gross margin was 40.0 percent in the second quarter***, down 70 basis points from 40.7 percent in the September quarter. The company had provided guidance of down 200 basis points for the December quarter. IR reported gross margin of 43.3 percent in the year-ago December quarter. Thirteen-week product backlog was $203 million at the end of the December quarter, up 9 percent sequentially.

*        *        *

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. CV 07-02544-JFW (VBKx)

IR generated over $38 million in cash from operations in the December quarter. Total cash and cash investments are over $900 million.

\* \* \*

CEO Alex Lidow stated, "IR's orders accelerated significantly in the December quarter led by key end markets such as servers, appliances, digital TVs and game stations. With our increased capacity coming on-line to address our expanding backlog, we are well positioned to take full advantage of these opportunities in the year ahead."

204. The Company's January 26, 2006 press release falsely and misleadingly explained that the Company reported pro forma results to provide shareholders with a better picture of the Company's underlying operating performance without disclosing that the Company was including ordinary operating costs as one-time restructuring charges:

In addition to disclosing results that are determined in accordance with Generally Accepted Accounting Principles (GAAP), IR also discloses adjusted or non-GAAP results of operations that exclude costs related to restructuring activities and one-time income/loss items, if any. IR discloses both adjusted and actual results of operations to allow the users of its financial statements to assess the Company's operating results with and without charges associated with the Company's ongoing restructuring initiatives previously announced in December 2002, and with and without one-time income/loss items, if any. In connection with the restructuring activities, the Company is de-emphasizing some parts of its commodity business and accelerating the move to its proprietary products and how they relate

to its Focus Product segments. The Company expects to record severance and restructuring charges as incurred in accordance with SFAS 146, "Accounting for the Costs Associated with Exit or Disposal Activities", through approximately fiscal year-end 2006.

205.  After issuing the press release on January 26, 2006, IRF hosted a conference call for investors and analysts at which defendants made a number of false and misleading statements consistent with the Company's press release.  The defendants participating in the conference call included Alex Lidow and McGee, each of whom acquiesced to each of the other defendants' false and misleading statements.  During the call, defendant McGee misleadingly stated:

First, let me summarize our 2nd quarter results. Revenue was $278.8 million, up 2% over the prior quarter and down 7% from a year ago. Gross margin was 40%, down from 40.7% in the prior quarter and 43.3% from a year ago.

IR reported adjusted earnings of $26.5 million, or $0.37 per share. On a GAAP basis net income was $24.3 million, or $0.34 per share.

*     *     *

SG&A was $46.1 million, or 16.6% of revenue, flat on a percentage basis for the prior quarter.

*     *     *

Pretax charges for ongoing severance and restructuring activities related to our 2002 restructuring program were $3.1 million.

*     *     *

Total cash and cash investments are over $900 million.

206. Defendants' statements to the marketplace in ¶¶203-05 were materially false and misleading in four respects as detailed in §§ IV.A., IV.B.,

IV.C., and IV.D.  First, the pro forma net income and reported gross margin figures were falsely inflated by exclusion of ordinary operating expenses, not just restructuring charges as represented by defendants.  Second, the reported income figures were also false and misleading because they included bogus and/or premature shipments of product in violation of GAAP and the Company's accounting policies.  Third, both the pro forma net income and GAAP net income figures were false and misleading as defendants had artificially inflated these numbers by violating tax laws.  Fourth, the Company's cash on the balance sheet was artificially inflated (and its debt understated) by defendants' sale of fictitious accounts receivable.

207.   On February 10, 2006, the Company filed with the SEC its Form 10-Q for the quarter ended December 31, 2006 signed by defendant McGee, which included the same false and misleading financial results previously reported to investors on January 26, 2006.

208.   The Form 10-Q also included certifications by defendants Alex Lidow and McGee attesting to the accuracy of the Company's financial statements and the adequacy of the Company's internal controls over financial reporting.   The certifications, which are attached hereto as Exhibits U and V, were substantially identical and similar to the one in ¶117.

209.  Defendants' statements to the marketplace in ¶¶207-08 were materially false and misleading for the reasons set forth in ¶206.  In addition, the statements contained in ¶¶207-08 were false and misleading because (i) the SEC filings did not identify deficiencies or material weaknesses in the internal controls that resulted in the GAAP violations discussed above; (ii) the SEC filings did not disclose the fraudulent scheme alleged herein; (iii) no proper evaluation and report were ever conducted by the certifying officers for the purpose of identifying and eliminating internal control problems; and (iv) defendants wholly failed to

maintain effective internal controls over financial reporting designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP as required by Public Company Accounting Oversight Board Auditing Standard No. 2, ¶7.  The lack of sound internal controls and the existence of deficiencies and material weaknesses are evidenced by the Company's own admissions discussed herein and the need for the anticipated restatements.

210.  On March 20, 2006, Wachovia Securities issued an analyst report written by Craig Hettenbach initiating coverage of IRF with an Outperform rating.  Wachovia's analyst report highlighted the importance of IRF's gross margins to investors' valuation of the Company:   "IRF Is A Play On Expanding Gross Margins.  *We expect gross margin (GM) expansion to emerge as the key investment theme in IR in 2006.*"

211.  On April 12, 2006, the Company announced it was "exploring the potential sale of all the company's Non-Focus Products business" as opposed to previous disclosures that it was considering "plans to de-emphasize its commodity business."

212.  Analysts considered this an important step for the Company.  For example, on April 13, 2006, Cathay Financial issued an analyst report titled: "Upgrading to Outperform – Planned Divestiture of Non-Core Business Provides Catalyst" in which Cathay Financial set a new price target of $50 on the assumption that, among other things, this divestiture would enable the Company to increase its gross margins.

213.  Similarly, Wachovia Securities issued an analyst report on April 13, 2006, reiterating its Outperform rating and noting that "This Announcement Plays Into Our Investment Thesis of Expanding Gross Margins."

214.   On April 27, 2006, the defendants caused the Company to issue a press release falsely and/or misleadingly stating in part:

International Rectifier Third-Quarter Revenue up 7 Percent and Orders up 27 Percent over Prior Quarter

EL SEGUNDO, Calif., Apr 27, 2006 (BUSINESS WIRE) -- International Rectifier Corporation (NYSE:IRF) today reported ***adjusted earnings of $28.1 million*** (or $0.39 per share) for the March quarter on revenue of $297.1 million. This compares to $26.5 million (or $0.37 per share) for the December quarter on revenue of $278.8 million. For the prior-year quarter, adjusted earnings were $41.7 million (or $0.56 per share) on revenue of $281.9 million. For the March 2006, December 2005 and March 2005 quarters, ***adjusted earnings excluded $3.3 million, $3.1 million and $8.1 million in pretax charges, respectively, for severance and restructuring activities announced in December 2002***.

On a GAAP basis, ***net income was $25.7 million*** (or $0.36 per share) for the March quarter versus $24.3 million (or $0.34 per share) in the December quarter and $35.7 million (or $0.48 per share) for the prior-year March quarter.

The expense for stock-based compensation lowered both the adjusted and GAAP EPS for the March quarter by $0.01 per share.

***Gross margin was 40.0 percent in the third quarter***, unchanged from the December quarter. IR reported gross margin of 44.4 percent in the year-ago March quarter. Thirteen-week product backlog was $247 million at the end of the March quarter, up 22 percent sequentially.

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. CV 07-02544-JFW (VBKx)

*CEO Alex Lidow said, "Demand soared in the March quarter. Our orders grew 27 percent over the prior quarter as customers continue to turn to IR's leading power management solutions. Demand was strongest in Japan, where our orders were up 110 percent on the strength of new digital TV and game station programs.*

\*     \*     \*

IR generated $25 million in cash from operations in the March quarter and $74 million fiscal year-to-date. Total cash and cash investments were over $900 million as of the end of the March quarter.

\*     \*     \*

For the June quarter, IR expects Focus Products revenue to be up 7 to 9 percent over the prior quarter, with total company revenue up 5 to 8 percent. IR's backlog currently stands at more than 85 percent of target shipments. As IR continues to ramp new capacity, gross margin is expected to be 40.0 percent, plus or minus a point. IR expects to return to its target of 60 percent incremental gross margin levels in the September quarter as major new programs ramp into production.

CEO Alex Lidow stated, "Over the last several years, IR has been developing and introducing some of the most advanced power management products and new architectures for the next-generation of applications. That next generation has arrived. From new game stations, digital TVs, high-performance servers, 3G phones, hybrid vehicles and energy-efficient appliances, we are seeing strong demand for our leading products as reflected in our record orders and backlog.

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. CV 07-02544-JFW (VBKx)

This demand presents the opportunity for our Focus Products to significantly outperform the market in calendar 2006 and beyond, while achieving higher levels of gross margin."

215.   The Company's April 27, 2006 press release falsely and misleadingly explained that the Company reported pro forma results to provide shareholders with a better picture of the Company's underlying operating performance without disclosing that the Company was including ordinary operating costs as one-time restructuring charges:

In addition to disclosing results that are determined in accordance with Generally Accepted Accounting Principles (GAAP), IR also discloses adjusted or non-GAAP results of operations that exclude costs related to restructuring activities and certain one-time income/loss items, if any. IR discloses both adjusted and actual results of operations to allow the users of its financial statements to assess the company's operating results with and without charges associated with the company's ongoing restructuring initiatives previously announced in December 2002, and with and without certain one-time income/loss items, if any. In connection with the restructuring activities, the company is de-emphasizing some parts of its commodity business and accelerating the move to its proprietary products and how they relate to its Focus Product segments. The company expects to record severance and restructuring charges as incurred in accordance with SFAS 146, "Accounting for the Costs Associated with Exit or Disposal Activities", through approximately calendar year-end 2006.

216.   After issuing the press release on April 27, 2006, IRF hosted a conference call for investors and analysts at which defendants made a number of false and misleading statements consistent with the Company's press release.  The

defendants participating in the conference call included Alex Lidow and McGee, each of whom acquiesced to each of the other defendants' false and misleading statements.  During the call, defendant McGee misleadingly stated:

> First, let's summarize the third quarter results. Revenue was $297.1 million, up 7% over the prior quarter and up 5% from a year ago. Gross margin was 40%, unchanged from the prior quarter. IR reported adjusted earnings of $28.1 million or $0.39 per share. On a GAAP basis, net income was $25.7 million or $0.36 per share. Focused product revenues increased 6% from the prior quarter, and was 77% of total revenue. As we continue to ramp up our new capacity, gross margin on focus products was down slightly from 47.8% in the prior quarter to 47.4% in the March quarter.
>
> *       *       *
>
> Pre-tax charges for ongoing severance and restructured activities relating to the 2002 announcement were $3.3 million in the quarter.
>
> *       *       *
>
> Our tax rate for the March quarter was 27.5%.
>
> *       *       *
>
> Total cash and cash investments exceeded $900 million at the end of the March quarter.

217.   Defendant Alex Lidow falsely and/or misleadingly stated during the call:  "Our orders overall were up 27% sequentially.  So that's pretty dynamic.  *Japan alone was up 100% sequentially.  So that gives you a little hint of where some of the strength is coming from, both in the digital TV business and game station business*."

218.   Further, defendant Alex Lidow misleadingly commented on the Company's margin expectations without disclosing that the Company was falsely

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. CV 07-02544-JFW (VBKx)

accounting for operating expenses, which falsely inflated the reported margins: "We now have more than 85% of our target shipments in backlog as we continue to ramp new capacity, gross margin is expected to be 40%, plus or minus a point. IR expects to return to its target of 60% incremental gross margin levels in the September quarter as major new programs ramp into production."

219.  On April 28, 2006, one day after the Company issued its 3Q06 financial results and held its conference call with analysts and investors, defendant Alex Lidow was interviewed on CNBC by its host Maria Bartiromo:

> MARIA BARTIROMO, CNBC ANCHOR: International Rectifier stock today up about 7 percent at 45.18; that despite a 28 percent drop in net income for the third quarter.  Revenue at the power semiconductor company rose over 5 percent **with strongest demand coming out of Japan.  Their orders more than doubled because of rising demand for new digital TVs and game station programs.**  Alex Lidow is the CEO of International Rectifier.  He joins us now to talk about earnings and what [is] ahead.

*     *     *

> BARTIROMO: So how is the quarter?  Characterize things for us.  Is that where you saw much of the growth or your other two-thirds of your business?
>
> LIDOW: Well, I mean we -- this quarter we had record bookings and record backlog.  So **it was just a phenomenal quarter**.  And most of the growth came in from game stations, servers, energy efficient appliances, and digital TVs.

220.  Defendants' statements to the marketplace in ¶¶214-19 were materially false and misleading in five respects as detailed in §§ IV.A., IV.B., IV.C., and IV.D.  First, defendants' assertion that it was a "phenomenal" quarter

and the "strong" demand in Japan was misleading without disclosing the truth known to defendants – the Company was falsifying its financial statements and Japan was booking revenues from "fictitious" sales.  Second, the pro forma net income and reported gross margin figures were falsely inflated by exclusion of ordinary operating expenses, not just restructuring charges as represented by defendants.  Third, the reported income figures were also false and misleading because they included bogus and/or premature shipments of product in violation of GAAP and the Company's accounting policies.  Fourth, both the pro forma net income and GAAP net income figures were false and misleading as defendants had artificially inflated these numbers by violating tax laws.  Fifth, the Company's cash on the balance sheet was artificially inflated (and its debt understated) by defendants' sale of fictitious accounts receivable.

221.   Analysts responded favorably to defendants' false and misleading statements.  For example, on April 27, 2006, Wachovia published an analyst report written by Craig Hettenbach stating, in part:

IRF: Resumption of Strong Growth, Margin Expansion to Follow

Raising Estimates and Reiterating Our [Outperform] Rating

- Exciting New Product Cycles and [Gross Margin] Expansion Should Serve As Major Catalysts For IRF

222.   As a result of defendants' false and misleading statements, as repeated by analysts, IRF's stock price increased.  Whereas IRF's stock closed at $42.25 on April 27, 2006, it closed up at $45.20 on April 28, 2006.

B.   The First Partial Disclosure Of The Fraudulent Scheme And Defendants' Continuing False And Misleading Statements

223.   On May 15, 2006, the Company announced it would restate financial results to correct an overstatement of its cash flows from operations as set forth

herein in § IV.E.  As a result, the Company's stock price fell $1.58 (or 3.3 percent) from its close on May 12 to close at $46.19 on May 15, 2006.

224.   On May 17, 2006, the Company filed its Form 10-Q with the SEC, which included the same false and misleading financial results previously reported to investors on April 27, 2006.  The Form 10-Q was signed by, among others, defendants Alex Lidow and McGee.

225.   The Form 10-Q also included certifications by defendants Alex Lidow and McGee attesting to the accuracy of the Company's financial statements and the adequacy of the Company's internal controls over financial reporting.   The certifications, which are attached hereto as Exhibits W and X, were substantially identical to the certification quoted in ¶117.

226.  Defendants' statements to the marketplace in ¶¶224-25 were materially false and misleading for the reasons set forth in ¶220.  In addition, the statements contained in ¶¶224-25 were false and misleading because (i) the SEC filings did not identify deficiencies or material weaknesses in the internal controls that resulted in the GAAP violations discussed above; (ii) the SEC filings did not disclose the fraudulent scheme alleged herein; (iii) no proper evaluation and report were ever conducted by the certifying officers for the purpose of identifying and eliminating internal control problems; and (iv) defendants wholly failed to maintain effective internal controls over financial reporting designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP as required by Public Company Accounting Oversight Board Auditing Standard No. 2, ¶7.  The lack of sound internal controls and the existence of deficiencies and material weaknesses are evidenced by the Company's own admissions discussed herein and the need for the anticipated restatements.

227.   On May 19, 2006, defendants Eric Lidow, Alex Lidow, Executive Vice President Robert Grant and Executive Vice President & General Counsel Donald Dancer entered into sales plans for common stock enabling Eric Lidow to sell up to 208,000 shares over a period of about twelve months, Alex Lidow to sell up to 137,000 shares, Grant up to 160,000 shares and Donald Dancer up to 49,750 shares, in each case over a period of about nine months.

228.   On August 3, 2006, defendants caused the Company to issue a press release falsely and/or misleadingly reporting earnings per share that beat analyst estimates by a penny and stating in part:

International Rectifier Fourth-Quarter Revenue up 9 Percent over Prior Quarter with Strong Demand Momentum; Company Achieves Record Quarterly Revenue, Orders and Backlog

EL SEGUNDO, Calif.--(BUSINESS WIRE)--Aug. 3, 2006-- International Rectifier Corporation (NYSE:IRF) today reported ***adjusted earnings of $33.8 million*** (or $0.47 per share) for the June quarter on revenue of $322.7 million. This compares to adjusted earnings of $28.1 million (or $0.39 per share) for the March quarter on revenue of $297.1 million. For the prior-year June quarter, adjusted earnings were $38.4 million (or $0.54 per share) on revenue of $281.8 million.

***Adjusted earnings for the June 2006 quarter excluded $5.2 million of pretax severance and restructuring charges***, $13.6 million of pretax gain from the sale of an equity investment, and $1.4 million of pretax expenses associated with the proposed convertible debt offering, subsequently withdrawn, and the company's repatriation of special dividends under the American Jobs Creation Act of 2004. Adjusted earnings for the June 2006 quarter also excluded a $6.9

million tax expense from the repatriation of special dividends. For the March 2006 quarter, adjusted earnings excluded $3.3 million in pretax severance and restructuring charges. For the prior-year June 2005 quarter, adjusted earnings excluded $12.4 million in pretax severance and restructuring charges and $6.0 million in pretax charges from the accelerated vesting of employee stock options.

For the fiscal year just ended, ***adjusted net income was $117.7 million*** (or $1.64 per share) on revenue of $1.17 billion, compared to the prior-year adjusted net income of $167.3 million (or $2.30 per share) on revenue of $1.17 billion. ***Adjusted earnings for fiscal 2006 and 2005 excluded $15.9 million and $34.0 million, respectively, in pretax severance and restructuring charges***. Also excluded are the gain and expenses, and tax impact from the special dividend repatriation in the fourth quarter in fiscal 2006, and the charge from the accelerated vesting of options in the fourth quarter of fiscal 2005, referenced above. A $3.5 million pretax stock option expense is included in the adjusted earnings beginning fiscal 2006 due to the adoption of Statement of Accounting Standards No. 123R.

On a GAAP basis, ***net income was $31.0 million*** (or $0.43 per share) for the June quarter versus $25.7 million (or $0.36 per share) in the March quarter and $24.7 million (or $0.35 per share) for the prior-year June quarter. On a GAAP basis for fiscal 2006, IR reported net income of $107.2 million (or $1.49 per share) compared to net income of $137.5 million (or $1.91 per share) for fiscal 2005.

Stock-based compensation expense lowered both the adjusted and GAAP EPS for the June 2006 quarter by $0.01 per share.

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. CV 07-02544-JFW (VBKx)

For the June quarter, **gross margin was 39.6 percen**t versus 40.0 percent in the March quarter. IR reported gross margin of 43.5 percent in the year-ago June quarter. Thirteen-week product backlog was $276 million at the end of the June quarter, up 12 percent over the prior quarter.

\*      \*      \*

IR generated $87 million in cash from operations in the June quarter and $160 million for fiscal 2006. Total cash and cash investments were over $1 billion at the end of the June quarter.

229.   The Company's August 3, 2006 press release falsely and misleadingly explained that the Company reported pro forma results to provide shareholders with a better picture of the Company's underlying operating performance without disclosing that the Company was including ordinary operating costs as one-time restructuring charges:

In addition to disclosing results that are determined in accordance with Generally Accepted Accounting Principles (GAAP), IR also discloses adjusted or non-GAAP results of operations that exclude costs related to restructuring activities and certain one-time income/loss items, if any. IR discloses both adjusted and actual results of operations to allow the users of its financial statements to assess the company's operating results with and without charges associated with the company's ongoing restructuring initiatives previously announced in December 2002, and with and without certain one-time income/loss items, if any. In connection with the restructuring activities, the company is de-emphasizing some parts of its commodity business and accelerating the move to its proprietary products and how they relate to its Focus Product segments. The company expects to record

severance and restructuring charges as incurred in accordance with SFAS 146, "Accounting for the Costs Associated with Exit or Disposal Activities," through approximately calendar year-end 2006.

230.   After issuing the press release on August 3, IRF hosted a conference call for investors and analysts at which defendants made a number of false and misleading statements consistent with the Company's press release.   The defendants participating in the conference call included Alex Lidow and McGee, each of whom acquiesced to each of the other defendants' false and misleading statements.   During the call, defendant McGee misleadingly stated:

> First let me summarize our fourth quarter results. Revenue was $322.7 million, up 9% over the prior quarter and up 15% from a year ago. Gross margin was 39.6%, down 40 basis points from the prior quarter due to our continued capacity ramp. IR reported adjusted earnings of $33.8 million or $0.47 per share. On a GAAP basis, net income was $31 million or $0.43 per share. Focused product revenue increased 8% from the prior quarter and was 76% of total revenue.
>
> As I mentioned, we continue to ramp our new capacity resulting in a gross margin on focus products of 46.7% versus 47.4% in the prior quarter.
>
> *     *     *
>
> Pretax charges for ongoing severance and restructuring activities related to our 2002 announcement were $5.2 million in the quarter.
>
> *     *     *
>
> Total cash and cash investments exceeded $1 billion at the end of the June quarter.

231.   During the conference call on August 3, defendant Alex Lidow had the following false and misleading colloquy with analyst Simona Jankowski:

SIMONA JANKOWSKI: Okay. And just my quick follow-up is on your bookings increase of 27%, is that a function partly of bookings stretching out into a quarter beyond the September quarter, or can you maybe just peel back what are the components of such a significant increase that's so much ahead of your revenue guidance?

ALEX LIDOW: Yeah.  Some orders are certainly beyond the current quarter. Just to give you a couple of little benchmarks here, our starting backlog overall for a company is up 44% over last year, so we really have quite a substantial backlog to ship from right now. Just a little bit of color, ***Japan was up 87%. Again, that's mostly in the game station business***. Even if you take out game stations, our bookings were up 11% sequentially.

SIMONA JANKOWSKI: Okay. So the 87% that's bookings increase for Japan?

ALEX LIDOW: That's sequential bookings in Japan.

SIMONA JANKOWSKI: Got it. Okay.

ALEX LIDOW: That was after last quarter it was over 100% sequentially, ***so it has been really booming there.***

232.   On August 4, 2006, one day after the Company issued its 4Q06 financial results and held its conference call with analysts and investors, defendant Alex Lidow was interviewed on CNBC by its host Joe Kernen:

JOE KERNEN, CNBC ANCHOR:  How many times have we talked about how tough it is for chip makers in this environment?  Not, though, for shares of International Rectifier, which are indicated up about 6 percent if they do what they did late yesterday after the company reported earnings that were above expectations, and then raised guidance.   The power semiconductor maker now expects

revenues going forward to be 338 to 345 for the year versus 325.  And that -- actually, that is for the first quarter.  This coupled with positive comments about the quarter just ended.   As I said, nice move yesterday.  For his outlook on the company, we are joined now by Alex Lidow, CEO of International Rectifier.  And, Alex, while the rest of the chip world is talking about how tough it is in computing, you sell into that market.  Why are you doing well?

ALEX LIDOW, CEO, INTERNATIONAL RECTIFIER: Well, we certainly have some unusual drivers.  ***The game station business is really quite buoyant right now. And that was partially responsible for fueling the record revenues and record bookings last quarter.***

233.  Defendants' statements to the marketplace in ¶¶225-29 were materially  false and misleading in five respects as detailed in §§ IV.A., IV.B., IV.C., and IV.D.  First, it was misleading to report that business was "booming" in the Company's Japan subsidiary without disclosing that the subsidiary was falsifying its financial results.  Second, the pro forma net income and reported gross margin figures were falsely inflated by exclusion of ordinary operating expenses, not just restructuring charges as represented by defendants.  Third, the reported income figures were also false and misleading because they included bogus and/or premature shipments of product in violation of GAAP and the Company's accounting policies.  Fourth, both the pro forma net income and GAAP net income figures were false and misleading as defendants had artificially inflated these numbers by violating tax laws.  Fifth, the Company's cash on the balance sheet was artificially inflated (and its debt understated) by defendants' sale of fictitious accounts receivable.

234.  On September 15, 2006, the Company filed its Form 10-K with the SEC, which included the same false and misleading financial results previously

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. CV 07-02544-JFW (VBKx)

reported to investors on August 3, 2006.  The Form 10-K was signed by, among others, defendants Alex Lidow, Eric Lidow and McGee.

235.   The Form 10-K also falsely stated:

In accordance with Staff Accounting Bulletin No. 104, "Revenue Recognition", we recognize revenue when the evidence of an arrangement exists, pricing is fixed and determinable, collection is reasonably assured, and delivery or performance of service has occurred. We recognize the majority of revenues upon shipment for product sales to all customers, including distributors, with provisions for estimated returns and allowances recorded at the time of shipment.

236.   The Form 10-K also included certifications by defendants Alex Lidow and McGee attesting to the accuracy of the Company's financial statements and the adequacy of the Company's internal controls over financial reporting.   The certifications, which are attached hereto as Exhibits Y and Z, were substantially identical to the certification quoted in ¶117.

237. Defendants' statements to the marketplace in ¶¶234-36 were materially false and misleading for the reasons set forth in ¶233.  In addition, the statements contained in ¶¶234-36 were false and misleading because (i) the SEC filings did not identify deficiencies or material weaknesses in the internal controls that resulted in the GAAP violations discussed above; (ii) the SEC filings did not disclose the fraudulent scheme alleged herein; (iii) no proper evaluation and report were ever conducted by the certifying officers for the purpose of identifying and eliminating internal control problems; and (iv) defendants wholly failed to maintain effective internal controls over financial reporting designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP as required by Public Company Accounting Oversight Board Auditing Standard

No. 2, ¶7.  The lack of sound internal controls and the existence of deficiencies and material weaknesses are evidenced by the Company's own admissions discussed herein and the need for the anticipated restatements.

238.  On November 1, 2006, the Company announced it was selling its Power Control Systems business for about $290 million to Vishay Intertechnology Inc.  In the press release, Alex Lidow said, "The divestiture enables the company to concentrate more fully its resources and assets on its Focus Products business and more readily achieve IR's long-term profit margin goals."   This sale was completed on April 1, 2007.

239.  On November 2, 2006, the defendants caused the Company to issue a press release falsely and/or misleadingly stating in part:

International Rectifier First-Quarter Revenue up 7% over Prior Quarter and 26% over Prior-Year Quarter

Focus Products Revenue up 8% over Prior Quarter and 32% over Prior-Year Quarter

EL SEGUNDO, Calif.--(BUSINESS WIRE)--Nov. 2, 2006-- International Rectifier Corporation (NYSE:IRF) today reported *adjusted earnings of $37.8 million* (or $0.52 per share) for the September quarter on revenue of $344.2 million. This compares to adjusted earnings of $33.8 million (or $0.47 per share) for the June quarter on revenue of $322.7 million. For the prior-year September quarter, adjusted earnings were $29.4 million (or $0.41 per share) on revenue of $272.6 million.

*        *        *

On a GAAP basis, *net income was $34.1 million* (or $0.47 per share) for the September quarter versus $31.0 million (or $0.43 per

share) in the June quarter and $26.2 million (or $0.36 per share) for the prior-year September quarter.

IR's ***adjusted earnings for the September 2006 quarter excluded $5.2 million of pretax severance and restructuring charges.*** Adjusted earnings for the June 2006 quarter excluded $5.2 million of pretax severance and restructuring charges and other special charges associated with the dividend repatriation under the American Jobs Creation Act of 2004 and the company's proposed convertible debt offering which was subsequently withdrawn, offset by gains from the sale of an equity investment, net of applicable taxes. For the prior-year September 2005 quarter, adjusted earnings excluded $4.3 million in pretax severance and restructuring charges.

Stock-based compensation expense lowered both the adjusted and GAAP earnings per share for the September 2006 quarter by $0.02 per share compared to $0.01 per share in the June quarter.

For the September quarter, ***gross margin was 40.2 percent*** versus 39.6 percent in the June quarter. IR reported gross margin of 40.7 percent in the year-ago September quarter.

CEO Alex Lidow said, "We saw strong growth in our Focus Products business, up 8 percent over the prior quarter, led by a 17 percent sequential increase in our largest business segment, Computing and Communications. This reflects the continued success in ramping our fab capacity to support a number of major programs for game stations, servers, and dual-core notebooks and desktops. Yesterday, we announced an agreement to sell our PCS business which will enable the company to concentrate its resources and assets on the Focus Products business. We expect substantial benefits over

the next year, including a streamlined organization focused on capitalizing on some of the largest and fastest growing markets for power management while positioning the company to more readily achieve its long-term profit margin goals."

240. The Company's November 2, 2006 press release falsely and misleadingly explained that the Company reported pro forma results to provide shareholders with a better picture of the Company's underlying operating performance without disclosing that the Company was including ordinary operating costs as one-time restructuring charges:

> In addition to disclosing results that are determined in accordance with Generally Accepted Accounting Principles (GAAP), IR also discloses adjusted or non-GAAP results of operations that exclude costs related to restructuring activities and certain other income/loss items, if any. IR discloses both adjusted and actual results of operations to allow the users of its financial statements to assess the company's operating results with and without charges associated with the company's restructuring activities, and with and without certain other income/loss items, if any. In connection with the restructuring activities, the company is de-emphasizing its commodity business. The company has substantially completed the restructuring activities related to the December 2002 plan as of September 30, 2006. The company anticipates there will be additional charges, primarily severance-related costs, related to the contemplated PCS business divestiture and subsequent reorganization activities. The severance and restructuring charges will be recorded as incurred in accordance with SFAS 146, "Accounting for the Costs Associated with Exit or Disposal Activities."

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. CV 07-02544-JFW (VBKx)

241.   After issuing the press release on November 2, 2006, IRF hosted a conference call for investors and analysts at which defendants made a number of false and misleading statements consistent with the Company's press release.   The defendants participating in the conference call included Alex Lidow and McGee, each of whom acquiesced to each of the other defendants' false and misleading statements.   During the call, defendant McGee misleadingly stated:

> First, let me summarize our first quarter results. Revenue was $344.2 million, up 7% over the prior quarter and up 26% from a year ago. Gross margin was 40.2%, up 60 basis points from the prior quarter.
>
> IR reported adjusted earnings of $37.8 million, or $0.52 per share. On a GAAP basis net income was $34.1 million, or $0.47 per share.
>
> *     *     *
>
> SG&A was $53.5 million, or 15.5% of revenue, down from 15.9% in the prior quarter. For the December quarter we expect SG&A to approach 15% of revenue.
>
> *     *     *
>
> Our tax rate for the September quarter was 29.5%. For the December quarter we expect our tax rate to be 29.5% plus or minus half a point.

242.   Also during the November 2, 2006 conference call, defendants McGee and Alex Lidow misleadingly explained the Company was maintaining a strong balance sheet (i.e., keeping large amounts of cash on the balance sheet) and that this was important to the Company's customers.   Defendant McGee stated:

> We are looking at accelerated growth and so we're in a situation where having a strong balance sheet is appropriate and we're looking

at a customer base who is requiring us to maintain a very strong balance sheet. And so I think people are under the misconception that cash on the balance sheet isn't driving revenue growth. It is today.

243. Defendant Alex Lidow echoed the significance of the Company's purported large amount of cash on the Company's balance sheet during the November 2, 2006 conference call:

[W]e do have a strong cash balance. . . .  [T]hat cash today is still not underutilized, because it is creating revenue opportunities for us.

We're dealing with much larger customers who are betting their platform on International Rectifier on a sole source basis and so they're looking out five, seven years. If we [have] balance sheet risk or business risk on top of that technology risk, we're bound not to get some of those opportunities.

244. Defendants Alex Lidow and McGee also used the November 2, 2006 conference call to mislead investors as to the Company's purportedly growing margins and overall financial condition and business success:

[O]ur financial targets are unchanged. We're going to get to better than 50% gross margin driven by greater than 60% incremental gross margin.

\*       \*       \*

One key element that's really working in our favor is the ramping of our large-scale programs, and that's really unfolding as planned. But, you know, you talk about the margins and really I think I'd like to take a look on a broader picture of the last 12 months because that really tells the picture of the margins and how they've evolved.

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. CV 07-02544-JFW (VBKx)

14, 15 months ago we start[ed] accelerating our capacity to make significant room for major program wins, and we had to take a cost hit and it was more than we expected, there's no question about that. And we had to do it in order to ramp as quickly as we could to meet these customers' demands.

And at the same time, you know, we had a whole cadre of people carving out one quarter of our company and it certainly was a distraction to a lot of our business.

Now, all of these initiatives have paid off. We have a divestiture deal. We now have the capacity in place with more to come. We have a record backlog.

We scored these marquise programs that have driven our growth up 32% year-on-year in Focus Products, which is certainly well above any industry average. So going forward, I think we're in a great position.

You know, we now have a streamlined company, although we have to execute the divestiture. We have capacity. We have programs and we have backlog to outgrow the market into the foreseeable future.

245.  On November 3, 2006, one day after the Company issued its 1Q07 financial results and held its conference call with analysts and investors, defendant Alex Lidow was interviewed on CNBC by its host Joe Kernen:

JOE KERNEN, CNBC ANCHOR: Well, the upcoming roll-out of next game -- next generation game consoles powered results at International Rectifier. And the company posted 52 cents a share, that was 3 cents ahead of expectations on better than expected revenues. Let`s talk to the CEO, Alex Lidow -- CEO of International Rectifier.

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. CV 07-02544-JFW (VBKx)

Alex, was that what it was, the -- did that help you beat the Street, the game console sales?

ALEX LIDOW, CEO, INTERNATIONAL RECTIFIER: Well, it certainly helped. We also had very strong revenues from servers and digital TV, digital audio, and appliances.

246. Defendants' statements to the marketplace in ¶¶239-45 were materially false and misleading in four respects as detailed in §§ IV.A., IV.B., VI.C. and IV.D. First, the pro forma net income and reported gross margin figures were falsely inflated by exclusion of ordinary operating expenses, not just restructuring charges as represented by defendants. Second, the reported income figures were also false and misleading because they included bogus and/or premature shipments of product in violation of GAAP and the Company's accounting policies. Third, both the pro forma net income and GAAP net income figures were false and misleading as defendants had artificially inflated these numbers by violating tax laws. Fourth, the Company's cash on the balance sheet was artificially inflated (and its debt understated) by defendants' sale of fictitious accounts receivable.

247. Analysts responded favorably to defendants' false and misleading statements. For example, on November 3, 2006, IRF was upgraded by Sanders Morris from "hold" to "buy" with a price target of $46.

248. As a result of defendants' false and misleading statements on November 2 and 3, 2006, as repeated by analysts, IRF's stock price increased. The Company's stock closed on November 1, 2006 at $35.82, November 2, 2006 at $36.28, and November 3, 2006 at $40.13.

249. On November 13, 2006, the Company filed with the SEC its Form 10-Q for the 1Q07, signed by defendant McGee. The Form 10-Q included the same

false and misleading financial results previously reported to investors on November 3, 2006.

250.   The Form 10-Q also included certifications by defendants Alex Lidow and McGee attesting to the accuracy of the Company's financial statements and the adequacy of the Company's internal controls over financial reporting.   The certifications, which are attached hereto as Exhibits AA and BB, were substantially identical and both are similar to the certification included herein at ¶117.

251. Defendants' statements in the marketplace in ¶¶249-50 were materially false and misleading for the reasons set forth in ¶246.  In addition, the statements contained in ¶¶249-50 were false and misleading because (i) the SEC filings did not identify deficiencies or material weaknesses in the internal controls that resulted in the GAAP violations discussed above; (ii) the SEC filings did not disclose the fraudulent scheme alleged herein; (iii) no proper evaluation and report were ever conducted by the certifying officers for the purpose of identifying and eliminating internal control problems; and (iv) defendants wholly failed to maintain effective internal controls over financial reporting designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP as required by Public Company Accounting Oversight Board Auditing Standard No. 2, ¶7.  The lack of sound internal controls and the existence of deficiencies and material weaknesses are evidenced by the Company's own admissions discussed herein and the need for the anticipated restatements.

252.   On January 23, 2007, Piper Jaffray initiated coverage of IRF with an "Outperform" rating and a $50 price target.

253.   On January 25, 2007, the defendants caused the Company to issue a press release falsely and/or misleadingly stating in part:

International Rectifier Announces Second-Quarter Results

- Adjusted Revenue Up 3%, GAAP Revenue Up 4% Sequentially

- Focus Product Revenue Up 6% Sequentially and 31% from Prior Year

- Adjusted Gross Margin Up 50 Basis Points, GAAP Gross Margin Up 80 Basis Points Sequentially

- Total Company Orders Up 5% Sequentially and 32% from Prior Year

- Record Backlog and Revenue

Except as noted, financial results and commentary in this release include continuing and discontinued operations pending completion of the sale of IR's Power Control Systems (PCS) Business. Continuing operations results presented include Focus Product segments and the Commodity Product segment, in accordance with GAAP.

EL SEGUNDO, Calif.--(BUSINESS WIRE)--Jan. 25, 2007-- International Rectifier Corporation (NYSE:IRF) today reported fiscal second quarter results as follows:

Adjusted Earnings and Revenue

*Adjusted earnings were $42.5 million* (or $0.58 per share) for the December 2006 quarter on adjusted consolidated revenue of $354.7 million. This compares to adjusted earnings of $37.8 million (or $0.52 per share) for the September 2006 quarter on adjusted consolidated revenue of $344.2 million. For the prior-year December 2005 quarter, adjusted earnings were $26.5 million (or $0.37 per share) on adjusted consolidated revenue of $278.8 million. (See "Adjusted Earnings Reconciliation to GAAP" and "GAAP

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. CV 07-02544-JFW (VBKx)

Adjustment Summary" for reconciliation of GAAP to As Adjusted results.)

GAAP Earnings and Revenue

On a GAAP basis, **_net income was $71.9 million_** (or $0.99 per share) for the December 2006 quarter versus $34.1 million (or $0.47 per share) for the September 2006 quarter and $24.3 million (or $0.34 per share) for the prior year December 2005 quarter.

*     *     *

Gross Margin

Adjusted gross margin rose 50 basis points in the December quarter to 40.7 percent versus 40.2 percent in the September quarter and 40.0 percent in the prior-year December 2005 quarter.

On a GAAP basis, gross margin was 43.0 percent for the December 2006 quarter versus 42.2 percent in the September 2006 quarter and 43.0 percent for the prior-year December 2005 quarter which excluded $3.8 million, $5.0 million and $2.0 million of gross profit from discontinued operations for the December 2006, September 2006 and December 2005 quarters, respectively. (See "GAAP Adjustment Summary: Tables 1, 2 and 3.")

*     *     *

Cash

In the December quarter, cash flow from operations was $71.6 million. This was an increase of $60.3 million from the prior quarter. Cash and cash investments was $1.1 billion at the end of the quarter.

Outlook

For the March quarter, IR expects overall company revenue to be flat plus or minus 2 percent from the December quarter. Backlog

currently stands at approximately 80 percent of target shipments. IR expects adjusted total company March-quarter gross margin to be flat plus or minus 50 basis points sequentially.

CEO Alex Lidow stated, "While industry conditions appear uncertain over the near term, IR is in a favorable position with positive order momentum and record backlog. . . .  We have taken many steps over the past eighteen months to enhance the company's ability to grow rapidly and are now positioned to return to higher levels of profitability in calendar year 2007."

254. The Company's January 25, 2007 press release falsely and misleadingly explained that the Company reported pro forma results to provide shareholders with a better picture of the Company's underlying operating performance without disclosing that the Company was including ordinary operating costs as one-time restructuring charges:

In addition to disclosing results that are determined in accordance with Generally Accepted Accounting Principles (GAAP), IR also discloses adjusted or non-GAAP results of operations that exclude costs related to restructuring activities and certain other income/loss items, if any. IR discloses both adjusted and GAAP results of operations to allow the users of its financial statements to assess the company's operating results with and without charges associated with the company's restructuring activities, and with and without certain other income/loss items. The company has substantially completed the restructuring activities related to the December 2002 plan as of December 31, 2006. The company anticipates there will be additional charges related to the PCS business sale and subsequent reorganization activities.

255.   After issuing the press release on January 25, 2007 IRF hosted a conference call for investors and analysts at which defendants made a number of false and misleading statements consistent with the Company's press release.  The defendants participating in the conference call included Alex Lidow and McGee, each of whom acquiesced to each of the other defendants' false and misleading statements.  During the conference call, defendant McGee misleadingly stated:

> Revenue was up 3% sequentially at $354.7 million overall, and up 6% in Focus Products. December gross margin was up 50 basis points to 40.7% overall, and up 40 basis points to 47.4% in Focus Products. Operating expenses came in at $88.2 million or 25% of revenue versus $85.6 million, or 25% of revenue also in the September quarter. IR reported December adjusted net income of $42.5 million, or $0.58 per share versus $37.8 million, or $0.52 per share in September. Sequentially, inventory, including the amount held for sale for the PCS business, increased to $231.5 million, or 14.3 weeks versus $218.8 million, or 13 weeks. Accounts receivable decreased to $193.8 million, including the amount held for sale for the PCS transaction, from $210.6 million, and day sales outstanding decreased by six days from 55 to 49 days. Overall, I believe we had a very solid quarter.
>
> *      *      *
>
> Our adjusted tax rate for the December quarter was 26.5%. For the rest of the year we expect our tax rate to be 27%, plus or minus 0.5%. . . . Total cash and cash investments exceeded $1.1 billion at the end of the quarter.

256.   On January 26, 2007, one day after the Company issued its 2Q07 financial results and held its conference call with analysts and investors, defendant

Alex Lidow was interviewed on CNBC by its host Becky Quick:

> BECKY QUICK, CNBC ANCHOR: International Rectifier posting better than expected fourth-quarter results.  And the shares responding in after hours. The stock up about 7.5 percent.  For his outlook on the business, we are joined right now by Alex Lidow.  He is the CEO of International Rectifier.
>
> Mr. Lidow, thanks for being here today.
>
> ALEX LIDOW, CEO, INTERNATIONAL RECTIFIER:  My pleasure.
>
> QUICK: Obviously the Street liked what it heard last night.  Where were the biggest areas of strength?
>
> LIDOW: Well, you know, we are in sort of the must-have products this year, digital TVs and game stations.  And so our growth was certainly exemplary compared to the industry.  We in December grew 31 percent, about triple the industry rate.

257.   Also on January 26, 2007, Bloomberg published an article quoting defendant Alex Lidow's views of the Company's business in which he misleadingly stated:

> "*We see 2007 as the best year ever*."
>
> "I've read a lot about cloudy signals in various areas of the economy, but that's not what we are seeing.  And it's really because we've been focused on some really excellent applications – white goods appliances that save energy, flat TVs, servers and game stations – they are all doing quite well.  So we're very much driven by very popular applications."

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. CV 07-02544-JFW (VBKx)

"Certainly, an economic slowdown isn't going to be good for everybody, but I think we have key applications that can offset a lot of the effect of an economic slowdown."

258.   Defendants' statements to the marketplace in ¶¶253-57 were materially false and misleading in four respects as detailed in §§ IV.A., IV.B., VI.C. and IV.D.  First, the pro forma net income and reported gross margin figures were falsely inflated by exclusion of ordinary operating expenses, not just restructuring charges as represented by defendants. Second, the reported income figures were also false and misleading because they included bogus and/or premature shipments of product in violation of GAAP and the Company's accounting policies.  Third, both the pro forma net income and GAAP net income figures were false and misleading as defendants had artificially inflated these numbers by violating tax laws. Fourth, the Company's cash on the balance sheet was artificially inflated (and its debt understated) by defendants' sale of fictitious accounts receivable.

259.   Analysts responded favorably to defendants' January 2007 false and misleading statements.  For example, on January 25, 2007, Wachovia's Craig Hettenbach issued a very positive analyst report reiterating Wachovia's Outperform rating and declaring IRF "Our Top Investment Pick for 2007."  Wachovia's analyst report further commented on the importance of the Company's purportedly improving gross margins (which defendants were then manipulating) as integral to the Company's future success:

**Investment Thesis**:

We believe that IRF offers investors an attractive investment in a classic business model improvement story, reflected in our

Outperform rating.  The Company's GMs [Gross Margins] are 40% today, offering 10% points of expansion towards its target model.

260.   Similarly, Nollenberger Capital Partners initiated coverage of IRF on January 26, 2007 with a Buy rating stating:  "With good visibility, increasing capacity meeting demand, rising gross margins, and the imminent sale of the company's non-focus product line to Vishay, we believe IR is in a rather unique position relative to its peer group today."

261.   As a result of defendants' false and misleading statements, as repeated by analysts, IRF's stock price increased and closed at $42.37 on January 26, 2007 after closing at $37.63 on January 25 – an increase of $4.74 or over 12.5%.

262.   On February 9, 2007, the Company filed with the SEC its Form 10-Q for the 2Q07, signed by defendant McGee.  The Form 10-Q included the same false and misleading financial results previously reported to investors on January 25, 2007.

263.   The Form 10-Q also included certifications by defendants Alex Lidow and McGee attesting to the accuracy of the Company's financial statements and the adequacy of the Company's internal controls over financial reporting.  The certifications, which are attached in hereto as Exhibits CC and DD, were substantially identical and both are similar to the certification included herein at ¶117.

264.  Defendants' statements to the marketplace in ¶¶262-63 were materially false and misleading for the reasons set forth in ¶258.   In addition, the statements contained in ¶¶262-63 were false and misleading because (i) the SEC filings did not identify deficiencies or material weaknesses in the internal controls that resulted in the GAAP violations discussed above; (ii) the SEC filings did not disclose the fraudulent scheme alleged herein; (iii) no proper evaluation and report were ever conducted by the certifying officers for the purpose of identifying and

eliminating internal control problems; and (iv) defendants wholly failed to maintain effective internal controls over financial reporting designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP as required by Public Company Accounting Oversight Board Auditing Standard No. 2, ¶7.  The lack of sound internal controls and the existence of deficiencies and material weaknesses are evidenced by the Company's own admissions discussed herein and the need for the anticipated restatements.

265.  On March 12, 2007, IRF was upgraded to BB from BB- by credit rating agency Fitch Ratings based upon, at least in part, defendants' false and misleading statements.

C.    The Second Partial Disclosure
      Of The Fraudulent Scheme
      And Defendants' Continuing
      False And Misleading Statements

266.  Before the market open on April 9, 2007, the Company issued a press release partially revealing the Company had been falsely recognizing revenue and warning investors that the Company's previously released financial statements should not be relied upon:

EL SEGUNDO, Calif.--April 9, 2007--International Rectifier Corporation (NYSE:IRF) today announced that the **Audit Committee of its Board of Directors** has determined, based on an interim report of an **investigation conducted at its request, by independent investigators hired by outside legal counsel**, that the company's financial statements for the quarters ended December 31, 2006, September 30, 2006, March 31, 2006, December 31, 2005 and September 30, 2005, and for the year ended June 30, 2006, included in the company's Quarterly Reports on Form 10-Q and the Annual

Report on Form 10-K for such periods, should no longer be relied upon. It has not yet been determined whether and to what extent financial statements for earlier periods may have been affected by the matters discovered in the investigation. Based on the interim results of this investigation, ***the Audit Committee has determined that material weaknesses in the internal control over financial reporting exist at a foreign subsidiary***, and consequently the Audit Committee has determined that management's report on internal control over financial reporting as of June 30, 2006, included in the company's Annual Report on Form 10-K for the year then ended, should no longer be relied upon.

***The ongoing investigation has discovered some accounting irregularities at a foreign subsidiary***. These accounting irregularities include, among other things, ***premature revenue recognition of product sales***. The investigation is continuing and additional information will be sought to enable the Audit Committee to determine the extent by which accounts receivable, revenues and possibly other entries in the financial statements may have been misstated in any given accounting period, including possibly periods preceding the year ended June 30, 2006.

The Audit Committee is working with management to determine the extent to which accounting errors exist and require any restatement of the financial statements for prior periods. As of the date hereof, the company is unable to provide a reasonable estimate of the impact of the accounting errors on its financial statements and is unable to predict the likelihood, amount or the timing of any possible restatement.

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. CV 07-02544-JFW (VBKx)

1   　　　　At this time, the company anticipates that it will be unable to
2   file within the required time period, its Quarterly Report on Form 10-
3   Q for the period ending March 31, 2007 until the investigation is
4   completed, identified errors quantified, and previously issued
5   financial statements revised as may be necessary.

6   The company's analyst day planned for May 11, 2007 has been postponed.

7   　　267.　Following the Company's press release, on April 9, 2007, *The Wall
8   Street Journal* reported "***International Rectifier plunged after telling investors***
9   ***that its financials are faulty***" and noted the Company was the "Big Board's third-
10  largest-percentage decliner."

11  　　268.　Analyst William Conroy at Sanders Morris Harris immediately cut the
12  Company from "buy" to "neutral."

13  　　269.　The Company's stock price fell from a close of $38.80 on April 5,
14  2007 to a close of $35.97 on April 9, 2007.

15  　　270.　On April 10, 2007, Moody's Investors Service placed the corporate
16  family and long-term debt ratings of International Rectifier under review for
17  possible downgrade following the Company's Form 8-K announcement of an
18  internal investigation related to accounting irregularities at a foreign subsidiary,
19  prompting the company to issue a statement of non-reliance on prior financial
20  reports.  Standard & Poor's also put IRF on review for a possible downgrade.

21  　　271.　On April 23, 2007, analyst Suji De Silva of Cathay Financial cut his
22  rating of IRF from Outperform to Neutral, suspending his price target, because of
23  the "uncertainty of the investigation"

24  　　272.　After the market close on May 11, 2007, the Company filed with the
25  SEC a Form 12b-25 stating:

26  　　　　As previously announced in International Rectifier
27  Corporation's (the "Company") Current Report on Form 8-K filed

28

with the Securities and Exchange Commission on April 9, 2007 (incorporated herein and supplemented by this reference), the Audit Committee of the Board of Directors had determined that the Company's financial statements for the preceding six quarters and the fiscal year ended June 30, 2006, should no longer be relied upon. This determination was based on accounting irregularities discovered at a foreign subsidiary by independent investigators hired by outside legal counsel conducting an investigation at the Audit Committee's request.   As of the date of this filing, the investigation has found, among other things, a practice at that foreign subsidiary where from time to time certain unsubstantiated orders were entered.   These orders resulted in the shipment of products and *the recording of sales with no obligation by customers to receive and pay for the products*. *The practice included routing certain product shipments to warehouses not on the Company's logistical systems*.   The practice has been terminated and steps are being taken to assure compliance by that subsidiary with policies and practices established by the Company.   In addition to the financial statements for periods which the Company has advised should not be relied on, the investigation has developed information that *a significant increase in the reported sales by that subsidiary during the quarters ended March 31, 2005 and June 30, 2005 may have resulted from the practice described above*.   Accordingly, the Audit Committee has concluded that material weaknesses in internal control over financial accounting existed for those quarters and for the fiscal year ended June 30, 2005, and that the Company's financial statements for those quarters and for the fiscal year ended June 30, 2005 should not be relied upon, nor

should management's report on internal control over financial reporting contained in the Form 10-K for the period ended June 30, 2005.  The investigation is continuing and additional information is being sought to enable the Company to determine the extent by which accounts receivable, revenues, inventories and possibly other entries in financial statements were misstated in any accounting period.

273.   The stock price fell again from a close of $37.07 on May 11, 2007 to $35.80 on May 14, 2007.

274.   On May 16, 2007, Fitch Ratings put IRF "on Rating Watch Negative following the company's announcement that it will not meet Securities and Exchange Commission (SEC) financial reporting requirements due to an ongoing investigation into accounting irregularities relating to premature revenue recognition at one of IR's foreign subsidiaries."

275.   At the market open on July 2, 2007, the Company announced that its Board of Directors had terminated CFO Michael McGee on July 1, 2007 and that Grant, its Vice President of Global Sales, had resigned on July 1, 2007 as well.

276.   On July 2, 2007, in an article entitled "All's Not Right at International Rectifier," *CFO.com* assumed that the termination and resignation were related to the internal investigation, reporting that "[s]eventeen-year veteran CFO Michael McGee is fired and the global sales VP resigns as internal investigation of its accounting heats up."

277.   On July 5, 2007, *Forbes.com* published an article entitled "Internal Rectification" stating in part:

> International Rectifier has been mum on the reason behind the firing of its chief financial officer.  But speculation quickly emerged that the company axed its longtime financial head to correct the lax accounting that has recently hobbled company shares.

On Sunday, International Rectifier fired veteran Chief Financial Officer Michael McGee. It did not provide any reason for the termination. McGee joined the company in 1990 and had served as vice president and CFO since 1993.

Morningstar analyst Irina Logovinsky says she finds the lack of details behind the firing "disconcerting," especially given the length of McGee's service.  She said that McGee could have been forced out because of accounting problems at International Rectifier.

278.   On August 1, 2007, *CFO Magazine* reported:

The mystery deepens at International Rectifier Corp. In July, the power management company fired longtime CFO Michael P. McGee several months after launching an investigation into accounting irregularities at a foreign subsidiary.  While the company refuses to make any connection, ***it's hard not to suspect a link***.

The El Segundo, California-based company has been reticent in explaining where and when the irregularities took place.  So far, it has admitted only that there were unsubstantiated sales to warehouses outside the company's logistical system and that the result was "material weaknesses in internal control over financial accounting."  In addition, the company has said that its last six quarters of results are suspect.

However, at least one analyst, Todd Cooper of Stephens & Co., noted in a recent report that the errors were "likely at International Rectifier's Japanese subsidiary."   And McGee knows a lot about international finance and accounting -- particularly in Japan.  For five years, he served as co-CEO and chairman of Japan-based Nihon Inter

Electronics Corp., in which International Rectifier holds a 5 percent stake (*see On the Record*, January 2006).

* * *

What's clear is that interim CFO Linda J. Pahl, most recently the vice president of corporate finance, will eventually have a lot of explaining to do.  "***They've done some bad things, and no one really knows how bad at this point,***" Berger says.  "Until they know the details and how high up it goes, it could drag on for some time."

VI.   POST-CLASS PERIOD EVENTS

279.   Before the market open on August 30, 2007, the Company announced that Alex Lidow would take a "leave of absence . . . ***pending the resolution of the previously announced investigation*** conducted by the Audit Committee of the Board of the Company."  The stock price fell from a close of $38.39 on August 29, 2007 to $34.87 on August 30, 2007.

280.   The next day, on August 31, 2007, the Company filed a Form 8-K with the SEC stating:

As previously announced in International Rectifier Corporation's (the "Company") Current Report on Form 8-K filed with the Securities and Exchange Commission on April 9, 2007, the Audit Committee of the Board of Directors has determined that the Company's financial statements for the preceding six quarters and the fiscal year ended June 30, 2006, should no longer be relied upon. Additionally, as previously announced in the Company's Current Report on Form 8-K/A filed with the Securities and Exchange Commission on May 11, 2007, the Audit Committee has also determined that the Company's financial statements for the quarters ended March 31, 2005 and June 30, 2005, and for the fiscal year

ended June 30, 2005 should no longer be relied upon. These determinations were based on accounting irregularities discovered at the Company's Japan subsidiary by independent investigators hired by outside legal counsel conducting an investigation at the Audit Committee's request.

Concurrently with this report, the Company has filed a Notification of Late Filing on Form 12b-25 (incorporated herein by reference) that describes steps and practices taken in response to such irregularities, as well as other matters that prevent the timely filing of the Company's Annual Report on Form 10-K for the fiscal year ended June 30, 2007. As stated in the Form 12b-25, *in addition to accounting irregularities discovered in connection with the Company's ongoing investigation, the Company has identified issues associated with its transfer pricing methodology and other tax issues for its fiscal years 2002 through 2007*. Review of potential tax liabilities, credits and related matters is currently under way. The Company has not yet completed its determination of the amount of additional tax liability, but believes the amount of any potential tax liability is material to income in fiscal years 2004 through 2007. Accordingly, at a meeting on August 29, 2007, the Audit Committee concluded that, in addition to the periods specified in the Company's April 9, 2007 Current Report on Form 8-K and May 11, 2007 Current Report on Form 8-K/A, the Company's financial statements for (i) the fiscal quarters ended September 30, 2003, December 31, 2003, March 31, 2004 and June 30, 2004;  (ii) the 2004 fiscal year ended June 30, 2004; and (iii) the fiscal quarters ended  September 30, 2004 and December 31, 2004 should not be relied upon.

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. CV 07-02544-JFW (VBKx)

281.   Also on August 31, 2007, the Company filed with the SEC a Form 12b-25 stating:

As previously reported by International Rectifier Corporation (the "Company") on Form 8-K filed with the Securities and Exchange Commission ("SEC") on April 9, 2007, and on Form 8-K/A  and Form 12b-25, both filed with the SEC on May 11, 2007, the Audit Committee of the Company's Board of Directors has determined that the Company's financial statements for the quarter ended March 31, 2005 and the quarter and fiscal year ended June 30, 2005, the interim quarters of and the fiscal year ended June 30, 2006 and the quarters ended September 30, 2006 and December 30, 2006 should not be relied upon.  The Audit Committee also found material weaknesses in internal control over financial reporting for such periods and that management's report on internal control over financial reporting for such periods contained in its public reports should not be relied upon. This determination was based upon, among other things, irregularities in accounting practices discovered at the Company's subsidiary in Japan. The previously reported investigation being conducted by independent investigators hired by outside legal counsel engaged by the Audit Committee of the Board of Directors of the Company is ongoing.

Upon review of the Tax Matters described below, the Audit Committee has also determined, as set out in Item 4.02 of Form 8-K filed contemporaneously with this Form 12b-25, that in addition to the financial statements for the periods described in the Form 8-K dated April 9, 2007 and the Form 8K/A dated May 11, 2007, the financial statements for the quarters ended September 30, 2003, December 31,

2003, March 31, 2004 and June 30, 2004, the fiscal year ended June 30, 2004 and the quarters ended September 30, 2004 and December 31, 2004 should no longer be relied upon. Additional adjustments will be made in the Selected Financial Data tables related to fiscal years ended June 30, 2002 and June 30, 2003 as well.

The matters that prevent the Company from filing its Annual Report on Form 10-K for its fiscal year ended June 30, 2007 within the prescribed time period consist of the matters described in the results of the investigation to date as set out below, the continuing investigation and the finalization of the additional items described below.

INVESTIGATION TO DATE

MATTERS RELATING TO THE COMPANY'S SUBSIDIARY IN JAPAN

The Company's Japan subsidiary *circumvented established controls and processes to record false or premature sales by creating fictitious customer purchase orders in the existing control system*. These orders were diverted by the customer service function when the shipments arrived in Japan at the Company's freight forwarder and then redirected to multiple third party warehouses that were not reflected on the Company's books ("off-books warehouses"). *This inventory was stored in the off-books warehouses* until the Japan subsidiary could either re-sell the product to another customer or when the customer, in whose name the order had been entered, placed a bona fide order for such products. When the Japan subsidiary received an actual customer purchase order, the order was initially fulfilled from inventory in the off-books warehouses. *The customer*

*service personnel created an off-books access database to assist with managing the fulfillment of the orders through the off-books warehouses.*  If a real order could not be filled through the off-books warehouses, then the Japan subsidiary would place the order through the Company's normal purchase order system.   Part of the cash received from customers for actual accounts receivable was applied to fictitious accounts receivable.   *In addition, sales management entered into a number of arrangements at quarter ends with certain distributors to take excess product on verbal terms that included extended payment terms and/or an understanding that product would be taken back at the distributor's request.*

In an effort to mitigate the material weaknesses in internal control over financial reporting at the Company's Japan subsidiary, Corporate management is implementing new controls over inventory, order processing and financial accounting in alignment with the Company's regular control systems.   These actions include placing certain *key Japanese management team members on administrative leave and removing them from daily operations*; establishing immediate controls over the off-books inventory; performing a full physical count of the inventory in the third party off-books warehouses, valued at approximately $16 million at cost as of April 2007; establishing new order processing procedures and controls; engaging an interim financial controller for the Japan subsidiary with oversight by Corporate management; and regular monitoring, review and approval of critical controls at the Japan subsidiary (i.e., cash disbursements, order processing, payroll, collections, banking activity and logistics).

An independent accounting firm (other than the Company's independent registered public accounting firm) has been retained to assist management with the reconstruction of revenue, cost of sales, accounts receivable and inventory for the Japan subsidiary. Any other material issues that may result from the detailed review of the historical financial transactions at the Japanese subsidiary will be disclosed at a later date.

The Company plans to improve the existing processes and procedures and implement additional changes to the Japan subsidiary infrastructure and related processes and controls that are planned to strengthen and materially affect the internal control over financial reporting at that subsidiary.

REPORTING OF RESTRUCTURING ACTIVITIES

During the second quarter of fiscal year 2003 (ended December 31, 2002), the Company announced certain restructuring initiatives. As of December 31, 2006, charges associated with the December 2002 restructuring activities were completed. Total charges as of December 31, 2006 were reported at $279.1 million of which approximately $108 million were cash charges. These charges consisted of $219.2 million for asset impairment, plant closure and other charges, $6.0 million of raw material and work-in-process inventory, and $53.9 million for severance-related costs. ***The Company has determined that certain of these amounts previously included in the Company's financial statements for fiscal 2003 to fiscal 2007 as "Impairment of assets, restructuring, severance and other charges" should properly have been classified in other line items of the income statement or disclosed in a different manner in***

*the Company's footnotes*.   The restated financial statements will reflect the appropriate reclassification and revised disclosures.

CONTINUING INVESTIGATION

The investigation is continuing.  At this time, there can be no assurance that the continuing investigation will not develop additional issues that may have a material impact on the Company or its financial statements.   Any further material developments will be reported at a later date.

ADDITIONAL ITEMS

TAX MATTERS

During preparation for the adoption of FASB Interpretation No. 48, "Accounting for Uncertainty in Income Taxes—an interpretation of FASB Statement No. 109" ("FIN 48") in the quarter ending September 30, 2007 (the first quarter of the Company's fiscal year 2008), *the Company identified issues associated with its transfer pricing methodology and other tax issues for its fiscal years 2002-2007*.  Review of potential tax liabilities, credits and related matters is currently under way. The Company has not yet completed its determination of the amount of additional tax liability or the impact on its tax provision for affected periods, *but believes the amount of any potential tax liability is material to income in fiscal years 2004 through 2007*.  The Company expects the provision for income taxes will vary from period to period depending on the size of the intercompany transactions within the affected fiscal tax years, among other factors. The Company's tax liability will include the additional amount of taxes that would have been payable in the affected periods, as well as interest on overdue amounts of taxes payable and penalties

that may be assessed by the relevant tax authorities upon the eventual resolution of this matter.

RESTATEMENT OF FINANCIAL STATEMENTS

The Company is reconstructing certain financial records and accounts of its subsidiary in Japan using methodologies based in part upon third-party records or confirmations.  In addition, the Company is reviewing its tax position in various jurisdictions and revising its financial statements to take account of the results of the investigation and the restructuring and tax matters described in this report.   All these matters will be reflected in the anticipated restated financial statements for the periods previously and herein identified.

Finalization of the restatement is not expected to be completed within the extension of time for filing the Company's Annual Report on Form 10-K for the fiscal year ended June 30, 2007.   The Company plans to file its Form 10-K for the fiscal year ended June 30, 2007 as promptly as practicable after the completion of the matters described herein.

282.   In addition, the Company's Form 12b-25 disclosed: "The Company believes that cash taxes payable *with respect to the Tax Matters described in Part III may exceed $75 million*, a substantial portion of which is anticipated to be paid in the near term.  The changes in the Company's tax liabilities that may be required to be recorded will require a restatement of tax liabilities and tax provisions in prior years, including the first 2 quarters of fiscal year 2007."

283.   The Company further disclosed that, as of July 31, 2007, the costs incurred by IRF in connection with the investigation had reached approximately $13.1 million.

284.   Market columnist, Herb Greenberg of *Marketwatch.com* noted in a September 3, 2007 column: "***The NT-10-K is like reading a text on how to lie, cheat and steal from shareholders***."

285.   Commenting on the Company's Form 12b-25, on September 10, 2007, *Electronic Engineering Times* reported: "In it, the company discloses that its Japanese subsidiary created fictitious purchase orders and then moved components to third-party warehouses in the hope that real orders would materialize later."

286.   After the close of the market on October 2, 2007, the Company issued a press release announcing Alex Lidow – the son of the Company's Chairman of the Board of Directors and its founder – was resigning "effective immediately." No explanation for the resignation was given.   According to the Separation Agreement reached by the Company and Alex Lidow and filed with the SEC, Alex Lidow resigned "[a]t the Company's request."   As part of the Separation Agreement, the Company agreed to provide Alex Lidow's legal counsel with, among other things, "review of the contents of all witness interviews" and "documents, emails and any other electronic data collected by the Company [or its attorneys or consultants]" in connection with the investigation performed by or on behalf of the Audit Committee concerning the accounting improprieties alleged in this Complaint.   The Separation Agreement expressly did not release any party from any legal claims.

287.   On the same day the Company announced the resignation of Alex Lidow, October 2, 2007, the Company also issued a press release announcing it was making sweeping changes to its internal accounting processes, which changes specifically addressed defendants' conduct during the Class Period:

International Rectifier Outlines Key Internal Initiatives

EL SEGUNDO, Calif.--(BUSINESS WIRE) -- Oct. 2, 2007--International Rectifier Corporation (NYSE:IRF) today announced the

following initiatives:

- Shifted reporting of the internal audit function to the Audit Committee of the board of directors and the general counsel.
- Appointed a lead independent director.
- Appointed a Special Committee of the board to advise and support the acting chief executive officer.
- Evaluating independent third party consulting firms to document and assess the design effectiveness of processes and controls.
- Revamped the company's hotline process and placed it under the internal audit function.
- Changed reporting relationships at the company's Japan subsidiary to improve oversight of the subsidiary.
- Added interim processes to help assure adherence to proper revenue recognition policies at the Japan subsidiary.

The company expects to continue to assess and improve its internal controls and corporate governance environment.

288. On November 13, 2007, the Company filed a Form 12b-25 with the SEC explaining the Company would not be timely filing its Form 10-Q as required by the SEC because of the ongoing Audit Committee investigation, and further explaining:

The matters that prevent the Company from filing its quarterly report on Form 10-Q within the prescribed time period consist of the following:

RECONSTRUCTION OF THE FINANCIAL RECORDS OF THE COMPANY'S SUBSIDIARY IN JAPAN

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. CV 07-02544-JFW (VBKx)

The previously reported investigation conducted by independent investigators hired by outside legal counsel engaged by the Audit Committee of the Company's Board of Directors identified practices at the Company's subsidiary in Japan that involved circumvention of established controls and procedures to record false or premature sales by, among other things, creating fictitious customer purchase orders in the existing control system, as more fully described in the Company's Form 12b-25 filed August 31, 2007. The Company is implementing new controls at the subsidiary in Japan, as also described in the August 31, 2007 Form 12b-25. The Company has retained an independent accounting firm (other than the Company's independent registered public accounting firm) to assist in the reconstruction of the Company's Japan subsidiary financial records, including its revenue, cost of sales, accounts receivable and inventory. This effort is complex and employs methodologies based in part on third party records or confirmations and has not yet been completed.

In addition, in the process of reconstructing the Japan subsidiary's financial statements, *the Company found that certain fictitious customer invoices were sold as part of the Japan subsidiary's accounts receivable financing facilities*. *These accounts receivable sales were in an aggregate amount of up to $23 million per quarter in the Company's fiscal years 2006 and 2007*. Notwithstanding the nature of the invoices, the invoices were satisfied in ordinary course and no amounts have been outstanding under these accounts receivable financing facilities since the end of July 2007. The Company plans to reflect these sales as advances against the

Company's accounts receivable financing facilities and as short-term debt for the relevant periods.

TAX MATTERS

The analysis, assisted by an independent accounting firm (other than the Company's independent registered public accounting firm), of the tax issues related to the Company's transfer pricing methodology and other matters referred to in the August 31, 2007 Form 12b-25 has resulted in the Company filing qualified amended U.S. federal income tax returns for fiscal years 2004 through 2006.  In conjunction with the qualified amended tax returns, and extensions related to federal and state income tax returns for the fiscal year ended June 30, 2007, the Company has remitted income taxes and interest in the aggregate of $74 million to the Internal Revenue Service and various state revenue agencies during its fiscal quarter ended September 30, 2007.  The Company believes it may be entitled to refunds from the taxing authorities in certain foreign jurisdictions and owe additional taxes in other jurisdictions.  The Company is currently determining the tax amounts and preparing the amended tax returns to claim the tax refunds or pay additional taxes. As of the date of this filing, the calculations remain to be completed and amended returns remain to be prepared and filed. The Company believes, but can not give any assurance, that it will receive a net refund from such foreign jurisdictions. Additionally, the Company cannot predict the time at which any refunds will be received. The Company is in the process of determining the income tax provision impact of these adjustments and anticipates its effective tax rate to be higher than previously reported.

The Company is also analyzing its accounting for the

elimination of inter-company profit for products sold to subsidiaries that remain within the group at the end of the reporting period. Previously, the Company's practice had been to eliminate inter-company profit, net of tax, upon consolidation. The Company is now reviewing its treatment under SFAS 109, "Accounting for Income Taxes". The Company will include any impact of the inter-company profit accounting adjustments in its overall review and restatement of its tax provisions.

RESTRUCTURING

The investigation into the Company's public reporting of restructuring activities as reported in the Company's August 31, 2007 Form 12b-25 is substantially complete.  The resulting adjustments to the income statement will primarily reflect (1) the reclassification of approximately ***$31 million of manufacturing costs from the consolidation of certain facilities to cost of goods sold from impairment, restructuring, severance and other charges, and (2) the reclassification of approximately $20 million of non-restructuring related charges to selling, general and administrative, research and development or other expense line items from impairment, restructuring, severance and other charges on the statement of operations***.  The Company intends to clarify the presentation of the manufacturing-related restructuring costs charged to cost of goods sold in the relevant footnote to the consolidated financial statements.

CONTINUING INVESTIGATION

As of the date of this filing, the Audit Committee investigation continues. At this time there can be no assurance that the continuing investigation will not develop additional issues that may have a

material impact on the Company or its financial statements.   Any further material developments will be reported at a later date.

STATUS OF RESTATEMENT OF FINANCIAL STATEMENTS

The efforts to reconstruct the financial records of the Company's subsidiary in Japan, calculate the taxes owed and amend the tax returns in the various foreign jurisdictions, assess the likelihood of recovery in accordance with SFAS No. 109 and FIN 48, and to report these matters in the Company's financial statements are continuing.   These matters will be reflected in the restated financial statements for the periods previously described.   Should the ongoing investigation identify practices similar to those in Japan at other Company locations, or should other accounting irregularities be identified in the final phases of the investigation, additional efforts may be necessary to finalize the restatement of the financial statements, but in any event, the Company does not expect to complete the restatements or file the Form 10-Q for the fiscal quarter ended March 31, 2007, the Form 10-K for the fiscal year ended June 30, 2007, or the Form 10-Q for the fiscal quarter ended September 30, 2007, within the time extension for filing its fiscal first quarter 2008 ended September 30, 2007.   The Company plans to file its Form 10-K for the fiscal year ended June 30, 2007 and the previously referenced interim reports as promptly as practicable after the completion of the matters described herein.

289.   The Company further disclosed that as of September 30, 2007, it had paid approximately $23 million in connection with the Internal Investigation.

VII.   DEFENDANTS' INSIDER SELLING AND OTHER MOTIVES TO COMMIT FRAUD

290.   Defendants each acted with scienter with respect to the materially false and misleading statements discussed herein, in that they had actual knowledge that the statements were false or misleading, or acted with reckless disregard for the truth or falsity of those statements.  In addition to the allegations set forth above, defendants' scienter is established by the following facts.

291.   During the Class Period, defendants Eric Lidow, Alex Lidow, McGee and Grant (the only defendants for whom such trading is publicly available) collectively sold more than 1.5 million shares of IRF common stock, generating sale proceeds in excess of $63.7 million.  Specifically, during the Class Period (i) Alex Lidow sold 490,000 shares of IRF common stock at artificially inflated prices for proceeds of approximately $21 million; (ii) Eric Lidow sold 682,000 shares of IRF common stock at artificially inflated prices for proceeds of approximately $28.1 million; (iii) McGee sold 180,700 shares of IRF common stock at artificially inflated prices for proceeds of approximately $7.6 million; and (iv) Grant sold 158,636 shares of IRF common stock at artificially inflated prices for proceeds of approximately $7.1 million.  Alex Lidow, Eric Lidow and Grant sold shares of IRF common stock under stock trading plans, many of which were entered into during the Class Period.

292.   While plaintiffs do not rely upon allegations of insider selling to establish scienter, defendants' unusually large insider sales during the Class Period (as detailed in the table below) are consistent with and augment an already strong inference of scienter pleaded herein:

| INSIDER | DATE | SHARES DISPOSED | PRICE | PROCEEDS |
|---|---|---|---|---|
| LIDOW, ALEX | 08/01/03 | 1,000 | $29.31 | $29,311 |
| LIDOW, ALEX | 08/01/03 | 500 | $30.00 | $15,000 |
| LIDOW, ALEX | 08/07/03 | 1,500 | $30.71 | $46,067 |
| LIDOW, ALEX | 08/14/03 | 1,500 | $32.90 | $49,353 |
| LIDOW, ALEX | 08/18/03 | 1,500 | $34.21 | $51,315 |
| LIDOW, ALEX | 08/18/03 | 500 | $35.00 | $17,500 |
| LIDOW, ALEX | 08/25/03 | 2,000 | $38.19 | $76,381 |
| LIDOW, ALEX | 09/05/03 | 2,000 | $43.08 | $86,152 |
| LIDOW, ALEX | 09/10/03 | 2,000 | $42.63 | $85,261 |
| LIDOW, ALEX | 09/15/03 | 2,000 | $42.55 | $85,093 |
| LIDOW, ALEX | 09/25/03 | 2,000 | $41.11 | $82,225 |
| LIDOW, ALEX | 09/29/03 | 2,000 | $38.50 | $76,996 |
| LIDOW, ALEX | 10/09/03 | 2,000 | $42.82 | $85,646 |
| LIDOW, ALEX | 10/16/03 | 2,000 | $44.95 | $89,902 |
| LIDOW, ALEX | 10/23/03 | 2,000 | $42.99 | $85,976 |
| LIDOW, ALEX | 10/29/03 | 2,000 | $47.32 | $94,640 |
| LIDOW, ALEX | 11/06/03 | 2,000 | $50.22 | $100,432 |
| LIDOW, ALEX | 11/11/03 | 2,000 | $48.98 | $97,960 |
| LIDOW, ALEX | 11/11/03 | 2,000 | $48.57 | $97,146 |
| LIDOW, ALEX | 11/21/03 | 2,000 | $48.57 | $97,146 |
| LIDOW, ALEX | 11/25/03 | 2,000 | $52.46 | $104,927 |
| LIDOW, ALEX | 12/03/03 | 2,000 | $55.74 | $111,487 |
| LIDOW, ALEX | 12/10/03 | 2,000 | $48.68 | $97,362 |
| LIDOW, ALEX | 12/10/03 | 2,000 | $48.05 | $96,099 |

| | | | | |
|---|---|---|---|---|
| LIDOW, ALEX | 12/10/03 | 1,500 | $48.76 | $73,146 |
| LIDOW, ALEX | 02/19/04 | 5,000 | $47.47 | $237,333 |
| LIDOW, ALEX | 02/19/04 | 4,000 | $44.28 | $177,105 |
| LIDOW, ALEX | 02/25/04 | 4,000 | $44.28 | $177,105 |
| LIDOW, ALEX | 03/03/04 | 5,000 | $46.64 | $233,215 |
| LIDOW, ALEX | 03/11/04 | 1,000 | $45.00 | $45,000 |
| LIDOW, ALEX | 03/11/04 | 4,000 | $44.42 | $177,683 |
| LIDOW, ALEX | 03/18/04 | 1,000 | $45.20 | $45,200 |
| LIDOW, ALEX | 03/18/04 | 4,000 | $44.82 | $179,260 |
| LIDOW, ALEX | 03/23/04 | 4,000 | $42.48 | $169,929 |
| LIDOW, ALEX | 03/30/04 | 5,000 | $45.66 | $228,306 |
| LIDOW, ALEX | 04/06/04 | 5,000 | $48.01 | $240,068 |
| LIDOW, ALEX | 04/15/04 | 5,000 | $46.41 | $232,043 |
| LIDOW, ALEX | 04/19/04 | 5,000 | $45.29 | $226,437 |
| LIDOW, ALEX | 04/28/04 | 4,000 | $42.52 | $170,085 |
| LIDOW, ALEX | 04/28/04 | 4,000 | $40.06 | $160,254 |
| LIDOW, ALEX | 05/04/04 | 4,000 | $40.06 | $160,254 |
| LIDOW, ALEX | 05/13/04 | 4,000 | $40.85 | $163,406 |
| LIDOW, ALEX | 05/18/04 | 3,000 | $38.93 | $116,796 |
| LIDOW, ALEX | 05/28/04 | 4,000 | $43.97 | $175,894 |
| LIDOW, ALEX | 06/02/04 | 4,000 | $41.54 | $166,174 |
| LIDOW, ALEX | 06/07/04 | 4,000 | $42.98 | $171,938 |
| LIDOW, ALEX | 06/17/04 | 3,000 | $39.70 | $119,099 |
| LIDOW, ALEX | 06/17/04 | 1,000 | $40.00 | $40,000 |
| LIDOW, ALEX | 06/23/04 | 4,000 | $40.37 | $161,493 |
| LIDOW, ALEX | 06/29/04 | 4,000 | $40.51 | $162,040 |

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. CV 07-02544-JFW (VBKx)

| | | | | |
|---|---|---|---|---|
| LIDOW, ALEX | 07/08/04 | 3,000 | $35.75 | $107,239 |
| LIDOW, ALEX | 07/13/04 | 3,000 | $35.17 | $105,498 |
| LIDOW, ALEX | 07/22/04 | 3,000 | $34.86 | $104,574 |
| LIDOW, ALEX | 07/26/04 | 2,000 | $33.83 | $67,652 |
| LIDOW, ALEX | 08/04/04 | 3,000 | $37.41 | $112,216 |
| LIDOW, ALEX | 08/10/04 | 3,000 | $35.48 | $106,433 |
| LIDOW, ALEX | 08/18/04 | 3,000 | $34.54 | $103,624 |
| LIDOW, ALEX | 08/27/04 | 2,000 | $34.34 | $68,672 |
| LIDOW, ALEX | 08/31/04 | 2,000 | $32.52 | $65,039 |
| LIDOW, ALEX | 09/09/04 | 2,000 | $32.41 | $64,822 |
| LIDOW, ALEX | 09/13/04 | 3,000 | $35.43 | $106,303 |
| LIDOW, ALEX | 09/23/04 | 2,000 | $34.81 | $69,627 |
| LIDOW, ALEX | 09/23/04 | 1,000 | $35.00 | $35,000 |
| LIDOW, ALEX | 09/28/04 | 2,000 | $32.84 | $65,679 |
| LIDOW, ALEX | 10/06/04 | 3,000 | $36.88 | $110,651 |
| LIDOW, ALEX | 10/15/04 | 2,000 | $34.38 | $68,757 |
| LIDOW, ALEX | 10/18/04 | 2,000 | $34.38 | $68,760 |
| LIDOW, ALEX | 10/26/04 | 3,000 | $36.46 | $109,371 |
| LIDOW, ALEX | 11/01/04 | 4,000 | $40.13 | $160,524 |
| LIDOW, ALEX | 11/10/04 | 1,000 | $40.04 | $40,037 |
| LIDOW, ALEX | 11/10/04 | 3,000 | $39.81 | $119,415 |
| LIDOW, ALEX | 12/06/04 | 1,900 | $45.08 | $85,660 |
| LIDOW, ALEX | 12/06/04 | 3,100 | $44.59 | $138,219 |
| LIDOW, ALEX | 12/15/04 | 4,000 | $43.38 | $173,525 |
| LIDOW, ALEX | 12/21/04 | 4,000 | $42.41 | $169,654 |
| LIDOW, ALEX | 12/27/04 | 4,000 | $43.21 | $172,836 |

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. CV 07-02544-JFW (VBKx)

| | | | | |
|---|---|---|---|---|
| LIDOW, ALEX | 01/07/05 | 1,000 | $40.00 | $40,000 |
| LIDOW, ALEX | 01/07/05 | 3,000 | $39.55 | $118,642 |
| LIDOW, ALEX | 01/11/05 | 3,000 | $37.60 | $112,800 |
| LIDOW, ALEX | 01/21/05 | 3,000 | $36.44 | $109,332 |
| LIDOW, ALEX | 01/25/05 | 3,000 | $35.98 | $107,942 |
| LIDOW, ALEX | 02/01/05 | 3,000 | $39.40 | $118,199 |
| LIDOW, ALEX | 02/10/05 | 4,000 | $41.45 | $165,816 |
| LIDOW, ALEX | 02/17/05 | 4,000 | $42.78 | $171,129 |
| LIDOW, ALEX | 02/22/05 | 4,000 | $42.55 | $170,211 |
| LIDOW, ALEX | 03/03/05 | 1,000 | $45.00 | $45,000 |
| LIDOW, ALEX | 03/03/05 | 4,000 | $44.51 | $178,046 |
| LIDOW, ALEX | 03/11/05 | 5,000 | $46.68 | $233,390 |
| LIDOW, ALEX | 03/15/05 | 5,000 | $45.97 | $229,844 |
| LIDOW, ALEX | 03/24/05 | 5,000 | $45.88 | $229,402 |
| LIDOW, ALEX | 03/30/05 | 3,000 | $45.55 | $136,640 |
| LIDOW, ALEX | 03/30/05 | 2,000 | $44.11 | $88,212 |
| LIDOW, ALEX | 04/04/05 | 4,000 | $44.43 | $177,701 |
| LIDOW, ALEX | 04/12/05 | 4,000 | $43.03 | $172,111 |
| LIDOW, ALEX | 04/22/05 | 4,000 | $42.80 | $171,194 |
| LIDOW, ALEX | 04/28/05 | 4,000 | $42.80 | $171,194 |
| LIDOW, ALEX | 05/02/05 | 4,000 | $42.38 | $169,539 |
| LIDOW, ALEX | 05/11/05 | 4,000 | $42.32 | $169,270 |
| LIDOW, ALEX | 05/18/05 | 5,000 | $45.87 | $229,372 |
| LIDOW, ALEX | 05/27/05 | 5,000 | $47.93 | $239,672 |
| LIDOW, ALEX | 05/31/05 | 5,000 | $48.04 | $240,211 |
| LIDOW, ALEX | 06/08/05 | 5,000 | $48.58 | $242,891 |

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. CV 07-02544-JFW (VBKx)

| | | | | |
|---|---|---|---|---|
| LIDOW, ALEX | 06/14/05 | 5,000 | $48.78 | $243,921 |
| LIDOW, ALEX | 06/21/05 | 5,000 | $48.27 | $241,371 |
| LIDOW, ALEX | 06/30/05 | 5,000 | $48.10 | $240,493 |
| LIDOW, ALEX | 07/05/05 | 5,000 | $47.96 | $239,784 |
| LIDOW, ALEX | 07/14/05 | 5,000 | $53.65 | $268,261 |
| LIDOW, ALEX | 07/18/05 | 5,000 | $53.04 | $265,182 |
| LIDOW, ALEX | 07/26/05 | 5,000 | $54.87 | $274,333 |
| LIDOW, ALEX | 08/02/05 | 5,000 | $47.06 | $235,300 |
| LIDOW, ALEX | 08/09/05 | 4,000 | $43.74 | $174,972 |
| LIDOW, ALEX | 08/19/05 | 5,000 | $45.61 | $228,044 |
| LIDOW, ALEX | 08/22/05 | 5,000 | $45.80 | $229,011 |
| LIDOW, ALEX | 09/07/05 | 5,000 | $48.65 | $243,248 |
| LIDOW, ALEX | 09/15/05 | 5,000 | $48.37 | $241,863 |
| LIDOW, ALEX | 09/21/05 | 5,000 | $46.60 | $233,015 |
| LIDOW, ALEX | 09/26/05 | 5,000 | $45.77 | $228,867 |
| LIDOW, ALEX | 10/04/05 | 5,000 | $45.12 | $225,597 |
| LIDOW, ALEX | 10/12/05 | 2,000 | $34.46 | $68,911 |
| LIDOW, ALEX | 10/20/05 | 1,900 | $35.06 | $66,617 |
| LIDOW, ALEX | 10/20/05 | 1,100 | $34.80 | $38,277 |
| LIDOW, ALEX | 10/25/05 | 3,000 | $35.01 | $105,037 |
| LIDOW, ALEX | 11/11/05 | 2,000 | $33.02 | $66,040 |
| LIDOW, ALEX | 11/15/05 | 2,000 | $32.96 | $65,920 |
| LIDOW, ALEX | 11/21/05 | 2,000 | $34.53 | $69,055 |
| LIDOW, ALEX | 11/30/05 | 2,000 | $35.54 | $71,084 |
| LIDOW, ALEX | 12/09/05 | 2,000 | $34.27 | $68,531 |
| LIDOW, ALEX | 12/13/05 | 1,000 | $35.00 | $35,000 |

| | | | | |
|---|---|---|---|---|
| LIDOW, ALEX | 12/13/05 | 2,000 | $34.72 | $69,440 |
| LIDOW, ALEX | 12/22/05 | 2,000 | $33.05 | $66,105 |
| LIDOW, ALEX | 12/27/05 | 2,000 | $32.98 | $65,968 |
| LIDOW, ALEX | 01/05/06 | 3,000 | $35.52 | $106,562 |
| LIDOW, ALEX | 01/09/06 | 3,000 | $35.87 | $107,614 |
| LIDOW, ALEX | 01/19/06 | 3,000 | $35.74 | $107,234 |
| LIDOW, ALEX | 01/24/06 | 3,000 | $35.59 | $106,783 |
| LIDOW, ALEX | 01/31/06 | 3,000 | $36.53 | $109,599 |
| LIDOW, ALEX | 02/10/06 | 3,000 | $37.57 | $112,713 |
| LIDOW, ALEX | 02/16/06 | 3,000 | $38.11 | $114,317 |
| LIDOW, ALEX | 02/22/06 | 3,000 | $37.09 | $111,268 |
| LIDOW, ALEX | 02/28/06 | 3,000 | $36.83 | $110,486 |
| LIDOW, ALEX | 03/06/06 | 1,000 | $40.08 | $40,080 |
| LIDOW, ALEX | 03/06/06 | 3,000 | $39.74 | $119,221 |
| LIDOW, ALEX | 03/16/06 | 1,000 | $40.35 | $40,350 |
| LIDOW, ALEX | 03/16/06 | 3,000 | $39.74 | $119,206 |
| LIDOW, ALEX | 03/21/06 | 3,000 | $39.28 | $117,837 |
| LIDOW, ALEX | 03/31/06 | 4,000 | $41.29 | $165,160 |
| LIDOW, ALEX | 04/05/06 | 4,000 | $42.16 | $168,655 |
| LIDOW, ALEX | 04/13/06 | 4,000 | $42.42 | $169,676 |
| LIDOW, ALEX | 04/17/06 | 4,000 | $42.53 | $170,131 |
| LIDOW, ALEX | 04/25/06 | 4,000 | $43.23 | $172,934 |
| LIDOW, ALEX | 05/04/06 | 5,000 | $47.12 | $235,612 |
| LIDOW, ALEX | 05/10/06 | 5,000 | $47.98 | $239,877 |
| LIDOW, ALEX | 05/18/06 | 1,700 | $45.28 | $76,974 |
| LIDOW, ALEX | 05/18/06 | 3,300 | $44.42 | $146,593 |

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. CV 07-02544-JFW (VBKx)

| | | | | |
|---|---|---|---|---|
| LIDOW, ALEX | 05/26/06 | 4,000 | $43.16 | $172,639 |
| LIDOW, ALEX | 05/30/06 | 4,000 | $42.44 | $169,763 |
| **TOTAL** | | **490,000** | | **$20,886,721** |
| | | | | |
| LIDOW, ERIC | 07/31/03 | 1,500 | $27.88 | $41,822 |
| LIDOW, ERIC | 08/08/03 | 2,000 | $30.71 | $61,418 |
| LIDOW, ERIC | 08/15/03 | 2,000 | $33.78 | $67,555 |
| LIDOW, ERIC | 08/20/03 | 2,000 | $33.78 | $67,555 |
| LIDOW, ERIC | 08/27/03 | 2,000 | $39.20 | $78,392 |
| LIDOW, ERIC | 09/05/03 | 2,000 | $43.11 | $86,219 |
| LIDOW, ERIC | 09/12/03 | 2,000 | $41.77 | $83,549 |
| LIDOW, ERIC | 09/16/03 | 2,000 | $42.19 | $84,389 |
| LIDOW, ERIC | 09/23/03 | 2,000 | $42.50 | $84,997 |
| LIDOW, ERIC | 09/29/03 | 2,000 | $38.49 | $76,971 |
| LIDOW, ERIC | 10/07/03 | 2,000 | $40.80 | $81,600 |
| LIDOW, ERIC | 10/14/03 | 2,000 | $44.10 | $88,195 |
| LIDOW, ERIC | 10/24/03 | 2,000 | $43.10 | $86,200 |
| LIDOW, ERIC | 10/29/03 | 2,000 | $47.30 | $94,605 |
| LIDOW, ERIC | 11/03/03 | 2,000 | $48.83 | $97,655 |
| LIDOW, ERIC | 11/12/03 | 2,000 | $49.58 | $99,165 |
| LIDOW, ERIC | 11/20/03 | 2,000 | $48.77 | $97,531 |
| LIDOW, ERIC | 11/26/03 | 2,000 | $53.32 | $106,632 |
| LIDOW, ERIC | 12/04/03 | 2,000 | $53.36 | $106,719 |
| LIDOW, ERIC | 12/10/03 | 2,000 | $48.63 | $97,262 |
| LIDOW, ERIC | 12/18/03 | 2,000 | $47.70 | $95,409 |
| LIDOW, ERIC | 12/22/03 | 2,000 | $48.11 | $96,225 |

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. CV 07-02544-JFW (VBKx)

| LIDOW, ERIC | 12/31/03 | 2,000 | $49.46 | $98,920 |
|---|---|---|---|---|
| LIDOW, ERIC | 01/07/04 | 2,000 | $51.59 | $103,185 |
| LIDOW, ERIC | 01/14/04 | 2,000 | $52.29 | $104,580 |
| LIDOW, ERIC | 01/23/04 | 2,000 | $49.98 | $99,954 |
| LIDOW, ERIC | 01/26/04 | 2,000 | $50.46 | $100,915 |
| LIDOW, ERIC | 02/03/04 | 2,000 | $49.69 | $99,385 |
| LIDOW, ERIC | 02/10/04 | 2,000 | $48.98 | $97,950 |
| LIDOW, ERIC | 02/18/04 | 2,000 | $48.46 | $96,928 |
| LIDOW, ERIC | 02/20/04 | 7,500 | $46.00 | $344,975 |
| LIDOW, ERIC | 02/25/04 | 7,500 | $44.28 | $332,099 |
| LIDOW, ERIC | 03/02/04 | 7,500 | $48.42 | $363,138 |
| LIDOW, ERIC | 03/12/04 | 7,500 | $44.84 | $336,294 |
| LIDOW, ERIC | 03/12/04 | 7,500 | $44.04 | $330,279 |
| LIDOW, ERIC | 03/24/04 | 7,500 | $43.29 | $324,698 |
| LIDOW, ERIC | 03/31/04 | 7,500 | $45.92 | $344,372 |
| LIDOW, ERIC | 04/06/04 | 7,500 | $47.97 | $359,757 |
| LIDOW, ERIC | 04/15/04 | 7,500 | $46.48 | $348,629 |
| LIDOW, ERIC | 04/19/04 | 7,500 | $45.33 | $339,945 |
| LIDOW, ERIC | 04/28/04 | 7,500 | $42.54 | $319,015 |
| LIDOW, ERIC | 05/04/04 | 7,500 | $40.00 | $300,030 |
| LIDOW, ERIC | 05/14/04 | 7,500 | $39.78 | $298,367 |
| LIDOW, ERIC | 05/18/04 | 3,000 | $38.96 | $116,879 |
| LIDOW, ERIC | 05/25/04 | 3,000 | $40.25 | $120,750 |
| LIDOW, ERIC | 06/02/04 | 3,000 | $41.72 | $125,152 |
| LIDOW, ERIC | 06/10/04 | 3,000 | $42.32 | $126,955 |
| LIDOW, ERIC | 06/14/04 | 3,000 | $41.24 | $123,724 |

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. CV 07-02544-JFW (VBKx)

| | | | | |
|---|---|---|---|---|
| LIDOW, ERIC | 06/24/04 | 3,000 | $41.20 | $123,613 |
| LIDOW, ERIC | 06/29/04 | 3,000 | $40.68 | $122,052 |
| LIDOW, ERIC | 07/07/04 | 3,000 | $36.55 | $109,658 |
| LIDOW, ERIC | 07/15/04 | 3,000 | $34.37 | $103,116 |
| LIDOW, ERIC | 07/20/04 | 3,000 | $35.08 | $105,228 |
| LIDOW, ERIC | 07/26/04 | 3,000 | $33.79 | $101,381 |
| LIDOW, ERIC | 08/03/04 | 3,000 | $37.33 | $111,990 |
| LIDOW, ERIC | 08/11/04 | 3,000 | $33.52 | $100,564 |
| LIDOW, ERIC | 08/19/04 | 3,000 | $34.92 | $104,768 |
| LIDOW, ERIC | 08/24/04 | 3,000 | $33.91 | $101,731 |
| LIDOW, ERIC | 08/31/04 | 3,000 | $32.51 | $97,524 |
| LIDOW, ERIC | 09/08/04 | 3,000 | $31.53 | $94,604 |
| LIDOW, ERIC | 09/17/04 | 3,000 | $33.85 | $101,550 |
| LIDOW, ERIC | 09/21/04 | 3,000 | $35.71 | $107,119 |
| LIDOW, ERIC | 09/29/04 | 3,000 | $34.08 | $102,246 |
| LIDOW, ERIC | 10/07/04 | 3,000 | $37.41 | $112,227 |
| LIDOW, ERIC | 10/11/04 | 3,000 | $35.24 | $105,722 |
| LIDOW, ERIC | 10/20/04 | 3,000 | $35.88 | $107,641 |
| LIDOW, ERIC | 10/29/04 | 3,000 | $39.76 | $119,276 |
| LIDOW, ERIC | 11/02/04 | 3,000 | $40.58 | $121,733 |
| LIDOW, ERIC | 11/11/04 | 3,000 | $40.92 | $122,762 |
| LIDOW, ERIC | 11/15/04 | 3,000 | $42.80 | $128,403 |
| LIDOW, ERIC | 11/23/04 | 3,000 | $43.30 | $129,912 |
| LIDOW, ERIC | 12/03/04 | 3,000 | $45.32 | $135,964 |
| LIDOW, ERIC | 12/08/04 | 3,000 | $42.75 | $128,263 |
| LIDOW, ERIC | 12/13/04 | 3,000 | $42.25 | $126,735 |

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. CV 07-02544-JFW (VBKx)

| | | | | |
|---|---|---|---|---|
| LIDOW, ERIC | 12/21/04 | 3,000 | $42.41 | $127,232 |
| LIDOW, ERIC | 12/29/04 | 3,000 | $44.30 | $132,904 |
| LIDOW, ERIC | 01/05/05 | 3,000 | $40.58 | $121,745 |
| LIDOW, ERIC | 01/13/05 | 3,000 | $37.73 | $113,189 |
| LIDOW, ERIC | 01/18/05 | 3,000 | $37.88 | $113,631 |
| LIDOW, ERIC | 01/26/05 | 3,000 | $37.04 | $111,133 |
| LIDOW, ERIC | 02/03/05 | 3,000 | $39.49 | $118,465 |
| LIDOW, ERIC | 02/10/05 | 3,000 | $41.49 | $124,471 |
| LIDOW, ERIC | 02/18/05 | 4,000 | $41.49 | $165,961 |
| LIDOW, ERIC | 02/18/05 | 4,000 | $42.35 | $169,397 |
| LIDOW, ERIC | 02/18/05 | 4,000 | $42.35 | $169,397 |
| LIDOW, ERIC | 02/22/05 | 4,000 | $42.58 | $170,318 |
| LIDOW, ERIC | 03/04/05 | 4,000 | $45.36 | $181,425 |
| LIDOW, ERIC | 03/09/05 | 4,000 | $47.15 | $188,582 |
| LIDOW, ERIC | 03/15/05 | 4,000 | $45.95 | $183,786 |
| LIDOW, ERIC | 03/21/05 | 4,000 | $45.09 | $180,355 |
| LIDOW, ERIC | 03/31/05 | 4,000 | $45.47 | $181,875 |
| LIDOW, ERIC | 04/05/05 | 4,000 | $44.13 | $176,530 |
| LIDOW, ERIC | 04/14/05 | 4,000 | $42.53 | $170,138 |
| LIDOW, ERIC | 04/18/05 | 4,000 | $40.75 | $163,018 |
| LIDOW, ERIC | 04/28/05 | 4,000 | $40.75 | $163,018 |
| LIDOW, ERIC | 05/02/05 | 4,000 | $42.39 | $169,578 |
| LIDOW, ERIC | 05/13/05 | 4,000 | $43.58 | $174,321 |
| LIDOW, ERIC | 05/16/05 | 4,000 | $44.05 | $176,180 |
| LIDOW, ERIC | 05/26/05 | 4,000 | $47.92 | $191,699 |
| LIDOW, ERIC | 05/31/05 | 4,000 | $48.05 | $192,180 |

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. CV 07-02544-JFW (VBKx)

| | | | | |
|---|---|---|---|---|
| LIDOW, ERIC | 06/06/05 | 4,000 | $47.98 | $191,906 |
| LIDOW, ERIC | 06/16/05 | 4,000 | $49.32 | $197,261 |
| LIDOW, ERIC | 06/24/05 | 4,000 | $49.04 | $196,160 |
| LIDOW, ERIC | 06/27/05 | 4,000 | $47.85 | $191,415 |
| LIDOW, ERIC | 07/06/05 | 4,000 | $48.87 | $195,481 |
| LIDOW, ERIC | 07/15/05 | 4,000 | $52.76 | $211,044 |
| LIDOW, ERIC | 07/22/05 | 4,000 | $54.94 | $219,760 |
| LIDOW, ERIC | 07/26/05 | 4,000 | $55.19 | $220,754 |
| LIDOW, ERIC | 08/05/05 | 4,000 | $44.67 | $178,695 |
| LIDOW, ERIC | 08/10/05 | 4,000 | $43.98 | $175,919 |
| LIDOW, ERIC | 08/15/05 | 4,000 | $43.92 | $175,678 |
| LIDOW, ERIC | 08/26/05 | 4,000 | $46.57 | $186,265 |
| LIDOW, ERIC | 08/30/05 | 4,000 | $47.02 | $188,060 |
| LIDOW, ERIC | 09/02/05 | 4,000 | $47.90 | $191,581 |
| LIDOW, ERIC | 09/06/05 | 4,000 | $48.38 | $193,537 |
| LIDOW, ERIC | 09/15/05 | 4,000 | $48.40 | $193,590 |
| LIDOW, ERIC | 09/21/05 | 4,000 | $48.40 | $193,590 |
| LIDOW, ERIC | 09/26/05 | 4,000 | $45.78 | $183,121 |
| LIDOW, ERIC | 10/05/05 | 4,000 | $43.52 | $174,079 |
| LIDOW, ERIC | 10/14/05 | 4,000 | $35.23 | $140,923 |
| LIDOW, ERIC | 10/18/05 | 4,000 | $35.08 | $140,339 |
| LIDOW, ERIC | 10/27/05 | 4,000 | $34.33 | $137,334 |
| LIDOW, ERIC | 11/02/05 | 4,000 | $30.00 | $120,000 |
| LIDOW, ERIC | 11/10/05 | 4,000 | $32.49 | $129,952 |
| LIDOW, ERIC | 11/15/05 | 4,000 | $32.97 | $131,893 |
| LIDOW, ERIC | 11/22/05 | 4,000 | $35.21 | $140,845 |

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. CV 07-02544-JFW (VBKx)

| | | | | |
|---|---|---|---|---|
| LIDOW, ERIC | 11/29/05 | 4,000 | $35.54 | $142,155 |
| LIDOW, ERIC | 12/05/05 | 4,000 | $33.79 | $135,177 |
| LIDOW, ERIC | 12/15/05 | 4,000 | $34.26 | $137,027 |
| LIDOW, ERIC | 12/20/05 | 4,000 | $32.59 | $130,378 |
| LIDOW, ERIC | 12/27/05 | 4,000 | $32.98 | $131,927 |
| LIDOW, ERIC | 01/04/06 | 4,000 | $33.97 | $135,896 |
| LIDOW, ERIC | 01/13/06 | 4,000 | $35.76 | $143,040 |
| LIDOW, ERIC | 01/18/06 | 4,000 | $34.42 | $137,677 |
| LIDOW, ERIC | 01/24/06 | 4,000 | $35.83 | $143,323 |
| LIDOW, ERIC | 02/03/06 | 4,000 | $36.37 | $145,488 |
| LIDOW, ERIC | 05/18/06 | 4,000 | $44.61 | $178,453 |
| LIDOW, ERIC | 05/23/06 | 4,000 | $43.95 | $175,813 |
| LIDOW, ERIC | 05/31/06 | 4,000 | $43.63 | $174,520 |
| LIDOW, ERIC | 06/02/06 | 4,000 | $45.23 | $180,926 |
| LIDOW, ERIC | 06/07/06 | 4,000 | $41.04 | $164,140 |
| LIDOW, ERIC | 06/15/06 | 4,000 | $40.87 | $163,494 |
| LIDOW, ERIC | 06/20/06 | 4,000 | $40.00 | $159,982 |
| LIDOW, ERIC | 06/29/06 | 4,000 | $38.34 | $153,345 |
| LIDOW, ERIC | 07/06/06 | 4,000 | $37.00 | $148,007 |
| LIDOW, ERIC | 07/11/06 | 4,000 | $35.60 | $142,391 |
| LIDOW, ERIC | 07/21/06 | 4,000 | $35.60 | $142,391 |
| LIDOW, ERIC | 07/27/06 | 4,000 | $34.99 | $139,972 |
| LIDOW, ERIC | 08/01/06 | 4,000 | $34.79 | $139,151 |
| LIDOW, ERIC | 08/10/06 | 4,000 | $34.47 | $137,897 |
| LIDOW, ERIC | 08/18/06 | 4,000 | $35.30 | $141,201 |
| LIDOW, ERIC | 08/22/06 | 4,000 | $34.35 | $137,386 |

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. CV 07-02544-JFW (VBKx)

| | | | | |
|---|---|---|---|---|
| LIDOW, ERIC | 08/30/06 | 4,000 | $35.14 | $140,551 |
| LIDOW, ERIC | 09/06/06 | 4,000 | $34.95 | $139,807 |
| LIDOW, ERIC | 09/12/06 | 4,000 | $36.38 | $145,539 |
| LIDOW, ERIC | 09/22/06 | 4,000 | $35.69 | $142,745 |
| LIDOW, ERIC | 09/27/06 | 4,000 | $35.75 | $143,011 |
| LIDOW, ERIC | 10/05/06 | 4,000 | $33.98 | $135,917 |
| LIDOW, ERIC | 10/10/06 | 4,000 | $35.33 | $141,301 |
| LIDOW, ERIC | 10/20/06 | 4,000 | $35.54 | $142,174 |
| LIDOW, ERIC | 10/25/06 | 4,000 | $36.52 | $146,085 |
| LIDOW, ERIC | 11/02/06 | 4,000 | $36.24 | $144,942 |
| LIDOW, ERIC | 11/07/06 | 4,000 | $40.64 | $162,564 |
| LIDOW, ERIC | 11/14/06 | 4,000 | $40.40 | $161,586 |
| LIDOW, ERIC | 11/21/06 | 4,000 | $40.23 | $160,902 |
| LIDOW, ERIC | 11/28/06 | 4,000 | $39.43 | $157,717 |
| LIDOW, ERIC | 12/05/06 | 4,000 | $41.09 | $164,368 |
| LIDOW, ERIC | 12/15/06 | 4,000 | $39.79 | $159,149 |
| LIDOW, ERIC | 12/18/06 | 4,000 | $39.64 | $158,543 |
| LIDOW, ERIC | 12/28/06 | 4,000 | $38.83 | $155,329 |
| LIDOW, ERIC | 01/04/07 | 4,000 | $38.87 | $155,488 |
| LIDOW, ERIC | 01/12/07 | 4,000 | $39.79 | $159,145 |
| LIDOW, ERIC | 01/17/07 | 4,000 | $38.91 | $155,640 |
| LIDOW, ERIC | 01/23/07 | 4,000 | $37.48 | $149,923 |
| LIDOW, ERIC | 02/01/07 | 4,000 | $41.56 | $166,250 |
| LIDOW, ERIC | 02/06/07 | 4,000 | $41.11 | $164,421 |
| LIDOW, ERIC | 02/15/07 | 4,000 | $43.01 | $172,044 |
| LIDOW, ERIC | 02/20/07 | 4,000 | $42.92 | $171,660 |

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. CV 07-02544-JFW (VBKx)

| | | | | |
|---|---|---|---|---|
| LIDOW, ERIC | 02/28/07 | 4,000 | $42.81 | $171,238 |
| LIDOW, ERIC | 03/09/07 | 4,000 | $42.95 | $171,815 |
| LIDOW, ERIC | 03/14/07 | 4,000 | $40.90 | $163,580 |
| LIDOW, ERIC | 03/22/07 | 4,000 | $39.76 | $159,040 |
| LIDOW, ERIC | 03/27/07 | 4,000 | $39.05 | $156,209 |
| LIDOW, ERIC | 04/04/07 | 4,000 | $38.65 | $154,582 |
| **TOTAL** | | **682,000** | | **$28,126,863** |
| | | | | |
| MCGEE, MICHAEL P | 11/12/04 | 96,000 | $40.55 | $3,893,021 |
| MCGEE, MICHAEL P | 08/10/05 | 84,700 | $44.08 | $   3,733,576 |
| **TOTAL** | | **180,700** | | **$7,626,597** |
| | | | | |
| GRANT, ROBERT | 11/29/04 | 2,500 | $43.27 | $108,179 |
| GRANT, ROBERT | 12/08/04 | 2,500 | $42.73 | $106,820 |
| GRANT, ROBERT | 12/14/04 | 2,500 | $43.13 | $107,818 |
| GRANT, ROBERT | 12/21/04 | 2,500 | $42.40 | $106,006 |
| GRANT, ROBERT | 12/29/04 | 2,500 | $44.31 | $110,778 |
| GRANT, ROBERT | 01/06/05 | 2,500 | $40.54 | $101,350 |
| GRANT, ROBERT | 02/09/05 | 2,500 | $41.59 | $103,974 |
| GRANT, ROBERT | 02/18/05 | 2,500 | $42.35 | $105,881 |
| GRANT, ROBERT | 02/23/05 | 2,500 | $42.07 | $105,172 |
| GRANT, ROBERT | 03/04/05 | 2,500 | $45.35 | $113,369 |
| GRANT, ROBERT | 03/10/05 | 2,500 | $46.78 | $116,938 |
| GRANT, ROBERT | 03/17/05 | 2,500 | $45.20 | $113,007 |

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. CV 07-02544-JFW (VBKx)

| GRANT, ROBERT | 03/23/05 | 2,500 | $45.96 | $114,904 |
|---|---|---|---|---|
| GRANT, ROBERT | 03/28/05 | 2,500 | $45.34 | $113,343 |
| GRANT, ROBERT | 03/28/05 | 2,500 | $45.34 | $113,343 |
| GRANT, ROBERT | 04/02/05 | 2,500 | $42.15 | $105,382 |
| GRANT, ROBERT | 04/06/05 | 2,500 | $44.57 | $111,426 |
| GRANT, ROBERT | 04/14/05 | 2,500 | $42.51 | $106,285 |
| GRANT, ROBERT | 04/27/05 | 2,500 | $42.72 | $106,804 |
| GRANT, ROBERT | 05/06/05 | 2,500 | $42.68 | $106,694 |
| GRANT, ROBERT | 05/10/05 | 2,500 | $42.65 | $106,630 |
| GRANT, ROBERT | 05/20/05 | 2,500 | $46.13 | $115,336 |
| GRANT, ROBERT | 05/24/05 | 2,500 | $47.30 | $118,258 |
| GRANT, ROBERT | 06/02/05 | 2,500 | $48.82 | $122,058 |
| GRANT, ROBERT | 06/08/05 | 2,500 | $48.57 | $121,432 |
| GRANT, ROBERT | 06/14/05 | 2,500 | $48.79 | $121,982 |
| GRANT, ROBERT | 06/21/05 | 2,500 | $47.85 | $119,617 |
| GRANT, ROBERT | 07/08/05 | 2,500 | $50.29 | $125,729 |
| GRANT, ROBERT | 07/15/05 | 2,500 | $52.76 | $131,896 |
| GRANT, ROBERT | 07/18/05 | 2,500 | $53.07 | $132,687 |
| GRANT, ROBERT | 07/26/05 | 2,500 | $55.18 | $137,951 |
| GRANT, ROBERT | 08/05/05 | 2,500 | $44.67 | $111,675 |
| GRANT, ROBERT | 08/09/05 | 2,500 | $43.73 | $109,313 |
| GRANT, ROBERT | 08/18/05 | 2,500 | $43.71 | $109,282 |
| GRANT, ROBERT | 08/22/05 | 2,500 | $45.81 | $114,527 |
| GRANT, ROBERT | 08/31/05 | 2,500 | $47.86 | $119,656 |
| GRANT, ROBERT | 09/08/05 | 2,500 | $49.33 | $123,319 |
| GRANT, ROBERT | 09/15/05 | 3,000 | $48.37 | $145,101 |

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. CV 07-02544-JFW (VBKx)

| | | | | |
|---|---|---|---|---|
| GRANT, ROBERT | 09/21/05 | 3,000 | $46.56 | $139,681 |
| GRANT, ROBERT | 09/26/05 | 3,000 | $45.80 | $137,403 |
| GRANT, ROBERT | 10/04/05 | 3,000 | $45.09 | $135,258 |
| GRANT, ROBERT | 03/06/06 | 3,000 | $40.08 | $120,240 |
| GRANT, ROBERT | 03/16/06 | 3,000 | $40.11 | $120,329 |
| GRANT, ROBERT | 03/31/06 | 3,000 | $41.29 | $123,861 |
| GRANT, ROBERT | 04/05/06 | 3,000 | $42.19 | $126,583 |
| GRANT, ROBERT | 04/13/06 | 3,000 | $42.45 | $127,342 |
| GRANT, ROBERT | 04/17/06 | 3,000 | $42.51 | $127,516 |
| GRANT, ROBERT | 04/25/06 | 3,000 | $43.24 | $129,734 |
| GRANT, ROBERT | 05/04/06 | 3,000 | $47.11 | $141,343 |
| GRANT, ROBERT | 05/10/06 | 3,000 | $47.97 | $143,895 |
| GRANT, ROBERT | 05/18/06 | 3,000 | $44.59 | $133,772 |
| GRANT, ROBERT | 05/26/06 | 3,000 | $43.14 | $129,425 |
| GRANT, ROBERT | 05/30/06 | 3,000 | $42.42 | $127,246 |
| GRANT, ROBERT | 06/08/06 | 3,000 | $41.45 | $124,363 |
| GRANT, ROBERT | 06/12/06 | 3,000 | $40.59 | $121,780 |
| GRANT, ROBERT | 06/23/06 | 1,236 | $40.75 | $50,366 |
| GRANT, ROBERT | 11/08/06 | 1,000 | $40.00 | $40,000 |
| GRANT, ROBERT | 11/16/06 | 1,000 | $40.99 | $40,987 |
| GRANT, ROBERT | 11/21/06 | 1,000 | $40.08 | $40,084 |
| GRANT, ROBERT | 11/29/06 | 1,000 | $40.00 | $40,000 |
| GRANT, ROBERT | 12/06/06 | 1,000 | $41.52 | $41,517 |
| GRANT, ROBERT | 12/12/06 | 1,000 | $40.03 | $40,033 |
| GRANT, ROBERT | 01/31/07 | 1,000 | $41.40 | $41,401 |
| GRANT, ROBERT | 02/08/07 | 1,000 | $42.26 | $42,255 |

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. CV 07-02544-JFW (VBKx)

| GRANT, ROBERT | 02/14/07 | 1,000 | $43.16 | $43,160 |
|---|---|---|---|---|
| GRANT, ROBERT | 02/22/07 | 1,000 | $43.88 | $43,880 |
| GRANT, ROBERT | 02/27/07 | 900 | $43.17 | $38,852 |
| **TOTAL** | | **158,636** | | **$7,076,227** |

293.   In addition to benefitting from the sale of stock at artificially inflated prices resulting from the defendants' fraudulent scheme.   Defendants were motivated to perpetrate the fraud to achieve large bonus payments.   The Company's SEC filings disclose that defendants Grant and McGee received bonuses "based on achievement of certain performance targets relating to Company revenues, gross margin, earnings per share and other individual targets established at the beginning of the fiscal year."   Alex Lidow's bonus was also linked to profitability and revenues, among other things.

294.   Additionally, defendants were motivated to conceal the fraud in effort to consummate the disposition of one the Company's underperforming (and low margin) business units.   The Company sold its Power Control Systems ("PCS") unit to Vishay Intertechnology, in a transaction completed on April 1, 2007 – approximately one week before the Company disclosed it had been falsely recognizing revenue and warning investors that the Company's previously released financial statements should not be relied upon.   Defendants, particularly defendant Jurek who engaged in fraudulent manipulation of the PCS unit's financial results and (according to CW1) played a role in the sale of the PCS unit, were motivated, in part, to manipulate the PCS unit's financial statements and conceal the existence of their fraudulent scheme to effectuate the sale of the Power Control Systems unit to Vishay Intertechnology.

VIII.  <u>LOSS CAUSATION</u>

295.  Defendants' scheme operated as a fraud or deceit on Lead Plaintiffs and the members of the Class because the false and misleading statements artificially inflated International Rectifier's securities prices throughout the Class Period.  Indeed, the false and misleading representations concerning IRF's financial results and internal controls – plus the non-disclosures of material facts concerning the Company's violation of Company and SEC policies and accounting regulations – caused and maintained the artificial inflation in the Company's securities prices throughout the Class Period and until the truth was slowly revealed to the market.

296.  Throughout the Class Period, as detailed above, the prices of the Company's securities were artificially inflated as a direct result of defendants' misrepresentations and omissions regarding the Company.  When the truth about the Company was partially revealed to the market beginning with the Company's disclosure on May 15, 2006, some of the inflation that had been caused by defendants' misrepresentations and omissions was eliminated from the price of the Company's securities, causing significant damages to Lead Plaintiffs and the other Class members.

297.  As pleaded herein, during the Class Period and afterwards, IRF's securities consistently reacted to information in the market place.  For example, on May 15, 2006, the Company announced (in a press release quoted herein) it would restate financial results for quarters ended September 30 and December 31 of 2005 to properly account for taxes related to the exercise of stock options granted employees.  The Company had presented excess tax benefits from stock options as operating cash flows, which benefits should have been presented as financing cash flows.  The disclosure revealed, among other things, the Company's cash flows

from operations had been artificially inflated by $4.3 million.  This news caused the Company's common stock price to fall $1.58, or 3.3 percent, to close at $46.19.

298.   Before the open of the market on Monday, April 9, 2007, the Company issued a press release (as quoted herein) partially revealing, among other things, that the Company had been falsely recognizing revenue and warning investors that the Company's previously released financial statements, from as early as the quarter ending September 30, 2005, should no longer be relied upon. The April 9, 2007 press release, however, only announced "interim results" of the "ongoing investigation" and stated that the Company was "unable to provide a reasonable estimate of the impact of the accounting errors."   The Company's common stock, which had closed at $38.80 on Thursday, April 5, fell 7.3 percent to close at $35.97 on Monday, April 9, 2007.

299.   After the close of the market on Friday, May 11, 2007, the Company filed its Form 12b-25 (as quoted herein) disclosing, among other things, that a foreign subsidiary improperly recognized revenue.  In that filing, the Company stated that the subsidiary had a practice of entering "unsubstantiated orders" that "included routing certain product shipments to warehouses not on the Company's logistical systems."   The Form 12b-25 stated that the "unsubstantiated orders" resulted in a "significant increase in the reported sales by that subsidiary during the quarters March 31, 2005 and June 30, 2005 may have resulted."  As a result of the Company's disclosures in the Form 12b-25, the Company's stock price dropped from its close of $37.07 on May 11, 2007, to close down 3.4 percent at $35.80 on Monday, May 14, 2007.

300.   On August 30, 2007, before the open of the market, the Company announced that the Company's long-time CEO and Director Alex Lidow would take a leave of absence pending the resolution of the Investigation.  As a result of this announcement, the Company's common stock price fell from a close of $38.39

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. CV 07-02544-JFW (VBKx)

on August 29, 2007, to a close of $34.87 on August 30, 2007, a drop of 9.2 percent.  The announcement that the Company's CEO, defendant Alex Lidow, was leaving the Company was a clear indication to the marketplace that the Investigation had uncovered substantial improprieties conducted by or with the approval of the Company's most senior executives – resulting in the elimination of artificial inflation in the prices for the Company's securities.

301.  The removal of the artificial inflation through declines in the Company's securities prices following these revelations resulted in Lead Plaintiffs and the other members of the Class suffering damages.  These declines and corresponding losses are directly attributable to the market's reaction to the disclosure of information that had previously been misrepresented or concealed by defendants and to the market's adjustment of the Company's securities prices to reflect the newly emerging truth about the Company's condition.

302.  The totality of the circumstances around the common stock price drops combine to negate any inference that the economic loss suffered by Lead Plaintiffs and the other members of the Class was caused by changed market conditions, macroeconomic or industry factors or company-specific facts unrelated to defendants' fraudulent conduct.  While there was some rebound of stock price after the first partial disclosures, these price increases were attributable to defendants' statements downplaying the fraud and additional statements concealing other fraudulent schemes, new market conditions, macroeconomic or other factors and Company-specific facts unrelated to the fraudulent conduct alleged herein.  Had Lead Plaintiffs and the other members of the Class known of the material adverse information not disclosed by defendants named herein, or been aware of the truth behind these defendants' material misstatements, they would not have purchased IRF securities at artificially inflated prices.

## IX.    IRF AND ITS SUBSIDIARIES OPERATED AS A SINGLE UNIT

303.    Although IRF (which had its World Headquarters in El Segundo, California) had a number of subsidiaries located throughout the world, these subsidiaries operated largely under the control of IRF.    These subsidiaries operated as part of the Company's worldwide operations.

304.    According to its public filings, the Company's consolidated financial statements include results from the company and all of its subsidiaries which are located in North America, Europe and Asia.    The Company applied one recognition policy to its consolidated financial statements.    The Company's audit committee oversaw the financial reporting for company's consolidated financial statements.

305.    As disclosed in its filings with the SEC, IRF evaluated the internal controls of its subsidiaries.    Indeed, its Form 10-Q for the first quarter of 2005 dated September 30, 2005 provides as follows under the heading Item 4 Controls and Procedures:

(a)    Evaluation of disclosure controls and procedures

Our management, with the participation of our Chief Executive Officer, Alexander Lidow, and Chief Financial Officer, Michael P. McGee, carried out an evaluation of the effectiveness of our disclosure controls and procedures pursuant to Exchange Act Rule 13a-15(b).  Based on that evaluation, the Chief Executive Officer and Chief  Financial Officer concluded that, as of the end of the period covered by this report, such controls and procedures are effective at the reasonable assurance level in making known to them material information related to us (*including our consolidated subsidiaries*) required to be included in this report.

306. Several CWs discussed how financial and forecasting information from the various segments and subsidiaries was sent to and/or incorporated into information systems for use by the entire Company:

(a) A number of former employees confirmed that the Company's various subsidiaries sent forecasting numbers to the parent company. Confidential Witness Number 9 ("CW9"), who was the IRF Vice President of Internal Marketing and Development and Vice President of Business Development from 1981 through the Spring 2007, explained how the Japan subsidiary rolled up its numbers each quarter and sent them to McGee at headquarters. CW7, who was employed at the Company from Spring 2005 through November 2006 as a Senior Manager of Financial Planning and Analysis during a portion of the time, explained how when CW7 was in corporate accounting, CW7 received quarterly reports from the forecasting system directly from Director of Finance, Holly Bjorklund ("Bjorklund"). These reports were generated by Bjorklund with information taken from the forecasting system and summarized the quarterly sales forecasts for the entire Company, including its subsidiaries. CW7 also explained that the sales forecasts reports CW7 received were broken down by market, or international subsidiary, and included the forecasts for Japan.

(b) Confidential Witness Number 10 ("CW10"), who was employed with the Company between 1990 and 2002 as a Director of Sales for Latin America and the Southwestern United States, Director of Business in the marketing department and then a Director of Sales, stated that the Japanese subsidiary was set up with the same computer infrastructure and software as headquarters and the rest of International Rectifier's other offices.

(c) According to CW2, who was employed as a customer service manager at the Company between 2001 and December 2006, the Company used the Vision database system globally. CW2 explained that their Vision system

contained the Company's manufacturing and financial information and CW1, a Vice President of Automotive Systems Product Development at IRF Headquarters from 2001 through Spring 2005 who was responsible for certain of IRF's international divisions, stated that the system held the IRF sales forecasts, including the international subsidiaries.  This witness said that each division, including the international subsidiaries, compiled its own forecasts and incorporated these figures into Vision.  As such, defendant Grant had access to all the sales forecasts for the company through Vision.  In addition, this witness said, though the individual subsidiaries initially determined their own forecasts, Grant had absolute control over global sales and marketing and directed the subsidiaries with any adjustments to the forecasts.  According to CW5, who was employed as a business unit manager with responsibilities for forecasting and profit and loss calculations for sales of one division from approximately 1994 through Spring 2007, this was the database used for order entry, logistical, inventory and backlog at the Company and Japan had access to this database and entered its own orders.

(d)    CW7 also explained that the Company used another system called Hyperion company-wide.  CW6, who was employed as a senior risk and treasury analyst from Summer 2004 until late 2005, explained that the corporate office and the international subsidiary offices used Hyperion to enter receipts and disbursements for cash forecasting purposes on a monthly basis. This witness explained that the corporate and the international subsidiaries were connected through Hyperion such that CW6 could view the cash forecasting entries made by the various subsidiaries.

(e)    In addition, per Confidential Witness Number 11 ("CW11"), who was a Director of Global Network from 2001 through Summer 2006, the Tokyo office and other IRF offices around Japan shared the same network with IRF's headquarters and were on the same email messaging system.  Confidential

Witness Number 12 ("CW12"), a regional customer service manager from 2000 through 2005, stated that offices in the United States and Japan had the same email server and email addresses were uniform such that IRF employees went by first initial, last name @ IRF.com, including those who worked in Japan.

307.   The Company had a number of policies that applied to and regulated all IRF employees worldwide:

(a)   For example, the Company's Code of Ethics, a copy of which is attached to the Company's Form 8-K filed on November 28, 2005, provided in pertinent part:

> This Code of Ethics summarizes the commitment of [IRF] to conduct its business activities in accordance with the highest ethical standards and consistent with all applicable laws, rules and regulations.   All employees of IR and its affiliates and subsidiaries and IR's Board of Directors are required to comply with the principles set forth in this Code of Ethics.

Among other things, as provided in the Code's Overview, IRF declared that it is "committed to upholding high professional standards in all our global business operations" and that it has "an obligation to be aware of and comply with the legal boundaries wherever we do business."   The Code directed employees who were contacted by the financial community or others seeking information regarding International Rectifier's business activities to refer all inquiries to the IRF Investor Relations organization.   It further directs all employees to raise concerns to "your supervisor or manager, next level of management; company legal counsel, human resources, ethics hotline 1-877-466-8545, Ethics website, Audit Committee, IR Audit Committee."

(b)   According to CW6, the Company maintained various types of insurance policies such as property and Director and Officer policies through

Marsh & McLellan for all of its businesses including its international segments.

(c)     According to CW12, the Company also had global policies and procedures which the various international segments and subsidiaries were expected to follow, such as how to process orders and returns.

308.   Various former employees explained how the Company oversaw operations on a global basis:

(a)     The Company and its subsidiaries conducted conference calls to discuss the subsidiaries' business.   For example, CW5 stated that there were general conference calls with defendants Grant, King, Hitchcock, Esaka and other Vice Presidents of Sales (including the Vice President of Sales for Europe, Vice President of Sales for Asia and a Vice President of Sales for North America). CW5 further explained that these calls were held regularly, approximately four to five per quarter and that each Vice President reported on the orders for its division and whether the division would meet its forecast during these calls.

(b)     The Company's management would also meet regularly with its subsidiaries to discuss sales. According to CW1, the Company held worldwide sales meetings at the Company's headquarters in El Segundo, CA.  CW1 further explained that Vice Presidents from various subsidiaries, such as defendant Esaka, would attend these on a monthly basis.

(c)     Confidential Witness Number 13 ("CW13"), a Director of Global Accounts between 2003 and Summer 2005 also explained that CW13 attended monthly "demand creation calls" ran by defendant Grant.   CW13 described these as demand fulfillment calls because defendant Grant wanted to know how the participants would meet their forecasts.  In addition to Grant, Vice Presidents from various segments attended these calls including defendant Esaka, the Vice President of Sales of Americas Paul Rolls, the Vice President of Sales,

Asia Pacific region, Steven Tsang, the Vice President of Sales in Europe, Berthold Duecker, and the Vice President of Product Management, Linda King.

(d)     As Confidential Witness Number 14 ("CW14") who worked as a sales operations manager from the beginning of the Class Period through Spring 2006, explained how in 2003 Grant organized all sales regions in all segments under one global system, the Global Sales Operations group.  As part of this structure change, the Company implemented ProChannel, a uniform system that provided automatic pricing and information about its products.

(e)     According to CW2, there were also Global Customer Service meetings among employees worldwide, which were designed to align their practices with each other.  Each region sent one Customer Service Manager to these meetings.

309.  In addition, the former employees explained how employees of international subsidiaries reported to employees at the Company's headquarters. CW6 explained that the Controller for the Japanese subsidiary, Yoko Misaki, reported to IRF Controller, who was Jeff Allen and then Linda Pahl, in the El Segundo office. CW8 who worked at the Company as a senior accountant and then in fixed assets from approximately from 2004 through 2006, confirmed that the Company had a Global Controller.  CW12 also explained how the Company had a Global Services Manager, Gerry Lyons, who was responsible for ensuring compliance with these global policies and procedures.

310.  Several additional factors indicate that the IRF in the United States largely controlled its subsidiaries, wanted to "centralize" the practices of IRF and its subsidiaries and essentially functioned as a single unit:

(a)     CW3, who was employed by IRF for 15 years holding various positions in operations and finance until CW3 in 2006 (including position of Controller of the "switch business," Director of Finance and Director of Strategic

1   Projects in the operations department), stated that, during CW3's tenure, there was

2   a "philosophy of centralization" meaning that McGee and Alex Lidow exercised

3   tight control over the whole company, including the international subsidiaries.

4      (b)    Confidential Witness Number 15 ("CW15"), a member of the

5   Company's Quality Control Group during virtually the entire Class Period, stated

6   that CW15 viewed IRF and the Japan subsidiary as a single company in terms of

7   quality issues.  CW15 noted that, although the Japan subsidiary had two quality

8   representatives in 2005 and 2006, these men reported to the Quality Control Group

9   department in the United States.

10      (c)    CW15, also explained how CW15 would assist the Japan

11  subsidiary with certain problems it was having.  For example, CW15 explained

12  that, if products failed and they happened to a customer in Japan, CW15 would

13  help out.  Moreover, CW15 would talk to Esaka many times a year discussing how

14  they could land business with a certain customer and whether they could meet this

15  prospective customer's requirements.  CW13 visited the Japan subsidiary to meet

16  with Japanese customers.

17      (d)    Employees from the United States would handle the revenue

18  cut-off testing for other areas.  For example, Confidential Witness Number 16

19  ("CW16"), a senior internal auditor from August 2004 through May 2005

20  explained how CW16 handled revenue cut-off testing in Tijuana, Mexico and

21  Singapore.  CW16 further stated that IRF initially hired a consultant from Century

22  Resources, a division of Century Group now based out of El Segundo, CA, to do

23  the sales cutoff testing in the Japan subsidiary.  During the third quarter of 2004

24  and the first quarter of 2005, the consultant in Japan was a Japanese national who

25  was stationed in Los Angeles.

26      (e)    According to CW12 marketing efforts were all centered in the

27  United States.

28

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. CV 07-02544-JFW (VBKx)

1   X.   NO SAFE HARBOR

2        311.   The statutory safe harbor provided for forward-looking statements

3   under certain circumstances does not apply to any of the allegedly false or

4   misleading statements pleaded in this Complaint.   The statements alleged to be

5   false or misleading herein all relate to then-existing facts and conditions.   In

6   addition, to the extent certain of the statements alleged to be false or misleading

7   may be characterized as forward-looking, they were not adequately identified as

8   forward-looking statements when made, and there were no meaningful cautionary

9   statements identifying important facts that could cause actual results to differ

10  materially from those in the purportedly forward-looking statements.   To the extent

11  that the statutory safe harbor is intended to apply to any forward-looking

12  statements pleaded herein, defendants are liable for those false forward-looking

13  statements because at the time each of those forward-looking statements was made,

14  defendants had actual knowledge that the particular forward-looking statement was

15  materially false or misleading.   In addition, to the extent any of the statements set

16  forth above were accurate when made, they became inaccurate or misleading

17  because of subsequent events, and defendants failed to update those statements

18  which later became inaccurate.

19  XI.   PRESUMPTION OF RELIANCE

20       312.   The market for the Company's securities was, at all times, an efficient

21  market that promptly digested current information with respect to the Company

22  from all publicly-available sources and reflected such information in the prices of

23  the Company's securities.   Throughout the Class Period:

24            (a)    IRF stock was actively traded on the New York Stock

25  Exchange;

26            (b)    The market price of IRF securities reacted promptly to the

27  dissemination of public information regarding the Company;

28

-173-     CONSOLIDATED CLASS ACTION COMPLAINT
          Case No. CV 07-02544-JFW (VBKx)

1    (c)    Securities analysts followed and published research reports

2  regarding IRF that were publicly available to investors;

3    (d)    The average weekly trading volume for IRF stock during the

4  Class Period was approximately 5.6 million shares; and

5    (e)    The Company's market capitalization was in excess of $1.5

6  billion during the Class Period and the Company had over 72 million shares

7  outstanding as of 2/2/07.

8    313.   Throughout the Class Period, the Company was consistently followed

9  by securities analysts as well as the business press.  During this period, IRF and

10  certain defendants continued to pump materially false information into the

11  marketplace regarding the financial condition of the Company.  This information

12  was promptly reviewed and analyzed by the ratings agencies, analysts and

13  institutional investors and assimilated into the price of the Company's securities.

14    314.   As a result of the misconduct alleged herein (including defendants'

15  misstatements and omissions), the market for IRF securities was artificially

16  inflated.  Under such circumstances, the presumption of reliance available under

17  the "fraud-on-the-market" theory applies.

18    315.   Lead Plaintiff and the other Class members justifiably relied on the

19  integrity of the market price for the Company's securities and were substantially

20  damaged as a direct and proximate result of their purchases of IRF securities at

21  artificially inflated prices and the subsequent decline in the price of those securities

22  when the truth was disclosed.

23    316.   Had Lead Plaintiff and the other members of the Class known of the

24  material adverse information not disclosed by the defendants, or been aware of the

25  truth behind the defendants' material misstatements, they would not have

26  purchased IRF securities at artificially inflated prices.

27

28

1    XII.    <u>CLASS ACTION ALLEGATIONS</u>

2        317.  Lead Plaintiffs bring this action on their own behalf and as a class

3  action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure

4  on behalf of all persons or entities (the "Class") who acquired the securities of IRF

5  during the period from July 31, 2003 through August 29, 2007, inclusive, and who

6  suffered damages as a result.  Excluded from the Class are: (i) the defendants; (ii)

7  members of the family of any defendant; (iii) any person who was an officer or

8  director of IRF during the Class Period; (iv) any firm, trust, corporation, officer, or

9  other entity in which any defendant has a controlling interest; and (v) the legal

10  representatives, agents, affiliates, heirs, successors-in-interest or assigns of any

11  such excluded party.

12        318.  The Class is so numerous that joinder of all Class members is

13  impracticable.  IRF common stock was actively traded on the NYSE, an efficient

14  market, throughout the Class Period.  While the exact number of Class members

15  can only be determined by appropriate discovery, Lead Plaintiffs believe that Class

16  members number in the tens of thousands.  During the Class Period there were

17  millions of shares of IRF common stock outstanding.  Based upon the volume of

18  trading of IRF's common stock during the Class Period, it is believed that tens of

19  thousands of investors purchased IRF common stock during the Class Period,

20  rendering joinder of all such purchasers impracticable.

21        319.  Lead Plaintiffs' claims are typical of the claims of the members of the

22  Class. Lead Plaintiffs and all Class members sustained damages as a result of the

23  wrongful conduct complained of herein.

24        320.  Lead Plaintiffs will fairly and adequately protect the interests of the

25  Class members and have retained Court-appointed counsel competent and

26  experienced in class action and securities litigation.  Lead Plaintiffs have no

27

28

interests that are contrary to or in conflict with those of the Class members that Lead Plaintiffs seek to represent.

321.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.   Because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members individually to seek redress for the wrongful conduct alleged herein.

322.   Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of law and fact common to the Class are:

(a)   whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)   whether documents, including the Company's SEC filings, press releases and public statements made by defendants during the Class Period contained misstatements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(c)   whether defendants acted with the requisite state of mind in omitting and/or misrepresenting material facts in the documents filed with the SEC, press releases and public statements;

(d)   whether the market prices of IRF's common stock during the Class Period were artificially inflated due to the material misrepresentations complained of herein; and

(e)   whether the Class members have sustained damages and, if so, the appropriate measure thereof.

323.   Lead Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

324.   Notice can be provided to the record owners of IRF stock via first class mail using techniques and a form of notice similar to those customarily used in securities class actions.

XIII.   CLAIMS FOR RELIEF

## Count I

### Violations Of Section 10(b) Of The Exchange Act And Rule 10b-5 Promulgated Thereunder Against The Officer Defendants And International Rectifier

325.   Plaintiffs repeat and re-allege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

326.   Throughout the Class Period, IRF and the Officer Defendants individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the United States mails, engaged and participated in a continuous course of conduct to conceal adverse material information about International Rectifier, including its true financial results and prospects, as specified herein.  These defendants employed devices, schemes and artifices to defraud while in possession of material, adverse non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about International Rectifier not misleading.  Specifically, these defendants knew or, but for their deliberate recklessness, should have known that the Company's reported financial results during the Class Period, as filed with the SEC and disseminated to the investing public, were materially overstated and were not presented in accordance with GAAP.  Further, these defendants knew of existing adverse facts which undermined their representations about International Rectifier's existing business and prospects during the Class Period.

327.   IRF and the Officer Defendants, as top executive officers of the Company or its Japan subsidiary, are liable as direct participants in the wrongs complained of herein.  Through their positions of control and authority as officers of the Company and/or its subsidiary, each of these individual defendants was able to and did control the content of the public statements disseminated by International Rectifier.  With knowledge of the falsity and/or misleading nature of the statements contained therein and in reckless disregard of the true financial results of the Company, these defendants caused the heretofore complained of public statements to contain misstatements and omissions of material facts as alleged herein.

328.   IRF and the Officer Defendants acted with scienter throughout the Class Period, in that they either had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with deliberately reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Officer Defendants were among the senior management of the Company and/or its subsidiary, and were therefore directly responsible for the false and misleading statements and/or omissions disseminated to the public through press releases, news reports and filings with the SEC.

329.   Defendants' misrepresentations and/or omissions were intentional or reckless and done for the purpose of enriching themselves at the expense of Lead Plaintiffs and the Class and to conceal the Company's true operating condition from the investing public.  Defendants IRF and the Officer Defendants engaged in this scheme to inflate the Company's reported revenues and prospects in order to create the illusion that International Rectifier was a successful, strong and growing company.

330.   As a result of those deceptive practices and false and misleading statements and/or omissions, the market price of International Rectifier's securities was artificially inflated throughout the Class Period.  In ignorance of the false and misleading nature of the representations and/or omissions described above and the deceptive and manipulative devices employed by defendants, Lead Plaintiffs and the other members of the Class, in reliance on either the integrity of the market or directly on the statements and reports of defendants, purchased International Rectifier securities at artificially inflated prices and were damaged thereby.

331.   Had Lead Plaintiffs and the other members of the Class known of the material adverse information not disclosed by defendants, or been aware of the truth behind defendants' material misstatements, they would not have purchased International Rectifier securities at artificially inflated prices.

332.   By virtue of the foregoing, defendants IRF, and Officer Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## Count II

### Violations Of Section 20(a) Of The Exchange Act Against All Defendants

333.   Plaintiffs repeat and re-allege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

334.   Defendant Eric Lidow, by virtue of his position with International Rectifier and his specific acts, was, at the time of the wrongs alleged herein, a controlling person of International Rectifier within the meaning of Section 20(a) of the Exchange Act.  He had the power and influence and exercised the same to cause International Rectifier to engage in the illegal conduct and practices complained of herein.  Eric Lidow was the Company's Founder and the Chairman of the Board of Directors, and actively managed the Company and its reporting to investors and its accounting practices.  Defendant Eric Lidow was thereby and

otherwise a culpable participant in the fraud perpetrated by International Rectifier.

335.   Defendant Alex Lidow, by virtue of his position with International Rectifier and his specific acts, was, at the time of the wrongs alleged herein, a controlling person of International Rectifier within the meaning of Section 20(a) of the Exchange Act.   He had the power and influence and exercised the same to cause International Rectifier to engage in the illegal conduct and practices complained of herein.   Alex Lidow was the Company's CEO and a Director, and actively managed the Company and its reporting to investors and its accounting practices.   Defendant Alex Lidow was thereby and otherwise a culpable participant in the fraud perpetrated by International Rectifier.

336.   Defendant McGee, by virtue of his position with International Rectifier and his specific acts, was, at the time of the wrongs alleged herein, a controlling person of International Rectifier within the meaning of Section 20(a) of the Exchange Act.   He had the power and influence and exercised the same to cause International Rectifier to engage in the illegal conduct and practices complained of herein.   McGee was the Company's Chief Financial Officer and an Executive Vice President and actively managed the Company and its reporting to investors and its accounting practices.   Defendant McGee was thereby and otherwise a culpable participant in the fraud perpetrated by International Rectifier.

337.   Defendant Grant, by virtue of his position with International Rectifier and his specific acts, was, at the time of the wrongs alleged herein, a controlling person of International Rectifier within the meaning of Section 20(a) of the Exchange Act.   He had the power and influence and exercised the same to cause International Rectifier to engage in the illegal conduct and practices complained of herein.   Grant was the Company's Executive Vice President, Global Sales and Marketing and actively managed the Company and its reporting to investors and its

accounting practices.   Defendant Grant was thereby and otherwise a culpable participant in the fraud perpetrated by International Rectifier.

338.   Defendant Jurek, by virtue of his position with International Rectifier and his specific acts, was, at the time of the wrongs alleged herein, a controlling person of International Rectifier within the meaning of Section 20(a) of the Exchange Act.  He had the power and influence and exercised the same to cause International Rectifier to engage in the illegal conduct and practices complained of herein.  Jurek was an executive officer of the Company actively managed relevant aspects of the Company and its reporting to investors and its accounting practices. Defendant Jurek was thereby and otherwise a culpable participant in the fraud perpetrated by International Rectifier.

339.   Defendant Esaka, by virtue of his position with IRF's Japan subsidiary and his specific acts, was, at the time of the wrongs alleged herein, a controlling person of International Rectifier within the meaning of Section 20(a) of the Exchange Act.  He had the power and influence and exercised the same to cause International Rectifier to engage in the illegal conduct and practices complained of herein.  Esaka was the Japan subsidiary's Vice President and actively managed the subsidiary and the Company's reporting to investors and its accounting practices.  Defendant Esaka was thereby and otherwise a culpable participant in the fraud perpetrated by International Rectifier.

340.   By reason of the conduct of International Rectifier as alleged in this Complaint, the Officer Defendants are liable for the aforesaid wrongful conduct of International Rectifier and liable to Lead Plaintiffs and the Class for the substantial damages which they suffered in connection with their purchases or acquisitions of shares as a result of International Rectifier's violations of the Exchange Act.

341.  IRF is also liable as a controlling entity of its wholly owned subsidiaries, including its Japan subsidiary. By virtue of IRF's ownership of 100%

of its subsidiaries and its ability to effectuate policies and procedures across the Company's entire business, IRF, was, at the time of the wrongs alleged herein, a controlling person of the subsidiaries within the meaning of Section 20(a) of the Exchange Act.  IRF had the power and influence and exercised the same to cause the subsidiaries to engage in the illegal conduct and practices complained of herein.   IRF was thereby and otherwise a culpable participant in the fraud perpetrated by International Rectifier's various subsidiaries.

### PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for relief and judgment as follows:

A.     Declaring this action to be a proper class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

B.     Awarding Lead Plaintiffs and the Class compensatory damages and/or rescission;

C.     Awarding Lead Plaintiffs and the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees and other costs;

D.     Awarding Lead Plaintiffs and the Class the fees and expenses incurred in this action, including expert witness fees and attorneys fees; and

E.     Awarding such other relief as this Court may deem just and proper.

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. CV 07-02544-JFW (VBKx)

## DEMAND FOR JURY TRIAL

Lead Plaintiffs hereby demand a trial by jury in this action of all issues so triable.

Dated:  January 14, 2008

Respectfully submitted,

BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP

_____
BLAIR A. NICHOLAS

BLAIR A. NICHOLAS
MATTHEW P. SIBEN
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel:   (858) 793-0070
Fax:  (858) 793-0323

Dated:  January 14, 2008

BERMAN DeVALERIO PEASE
TABACCO BURT & PUCILLO

_____
NICOLE LAVALLEE

JOSEPH J. TABACCO, JR.
NICOLE LAVALLEE
JULIE J. BAI
425 California Street, Suite 2100
San Francisco, CA 94104-2205
Tel:   (415) 433-3200
Fax:  (415) 433-6382

*Attorneys for Co-Lead Plaintiffs General
Retirement System of the City of Detroit and
Massachusetts Laborers' Pension Fund*

-183-

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. CV 07-02544-JFW (VBKx)

## CERTIFICATION

Walter Stampor, Executive Secretary of the General Retirement System of the City of Detroit ("Detroit General") declares, as to the claims asserted under the federal securities laws, that:

1.    I am authorized to make this certification on behalf of Detroit General.

2.    I have reviewed the amended complaint to be filed in this matter.

3.    Detroit General did not purchase the securities that are the subject of this action at the direction of its counsel, Bernstein Litowitz Berger & Grossmann LLP, or to participate in this action.

4.    Detroit General is willing to serve as a Lead Plaintiff and class representative on behalf of the Class, including providing testimony at deposition and trial, if necessary. Detroit General fully understands the duties and responsibilities of the Lead Plaintiff under the Private Securities Litigation Reform Act regarding its options as to selection and retention of counsel and overseeing the prosecution of the action for the Class.

5.    Detroit General's transactions in International Rectifier Corporation securities that are the subject of this action are set forth in the chart attached hereto.

6.    Detroit General has been appointed as lead plaintiff in the following actions filed under the federal securities law during the three years prior to the date of this Certification:

*In re R&G Financial Corp. Securities Litigation*
*Brody v. Dot Hill Systems Corp., et al.*

7.    Detroit General has commenced and/or moved for appointment as lead plaintiff in the following actions filed under the federal securities laws during the three years preceeding the date of this Certification, but was not appointed or withdrew.

*In re Bearingpoint, Inc. Securities Litigation*
*Maiden v. Merge Technologies, Inc.*
*Connecticut Retirement v. Amgen Inc et al*
*Southeastern Pennsylvania Transportation Authority v. Aetna Inc. et al*

In both *Amgen* and *Aetna*, Detroit General withdrew its motions before lead plaintiff was determined.

8.    In addition, Detroit General is currently seeking to serve as lead plaintiff in the following actions filed under the federal securities laws during the three years preceding the date of this Certification.

*Kurzweil v. Medtronic, Inc. et al*

9.    Detroit General will not accept any payment for serving as a Lead Plaintiff on behalf of the Class beyond its pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) relating to the representation of the Class as ordered or approved by the Court.

**PAGE    184**

I declare under penalty of perjury that the foregoing is true and correct. Executed this
_10_ day of January 2008.

Walter Stampor
Executive Secretary
General Retirement System of the City of Detroit

**PAGE**    185

General Retirement System of the City of Detroit
Transactions in International Rectifier Corporation (IRF)
Class Period: July 31, 2003 through August 29, 2007

| Transaction | Date | Shares | Price |
|---|---|---|---|
| SELL | 9/26/2003 | 10,300 | $ 39.446 |
| SELL | 12/11/2003 | 6,300 | $ 51.327 |
| SELL | 2/19/2004 | 1,300 | $ 46.969 |
| SELL | 2/23/2004 | 3,000 | $ 44.480 |
| BUY | 3/15/2004 | 12,000 | $ 43.753 |
| BUY | 5/7/2004 | 10,800 | $ 41.576 |
| SELL | 9/8/2004 | 10,000 | $ 31.399 |
| SELL | 9/8/2004 | 7,100 | $ 31.399 |
| BUY | 1/27/2005 | 9,300 | $ 38.300 |
| BUY | 5/16/2005 | 5,200 | $ 44.594 |
| SELL | 6/15/2005 | 4,100 | $ 48.492 |
| SELL | 12/16/2005 | 26,100 | $ 33.412 |
| BUY | 2/5/2007 | 27,000 | $ 41.799 |
| BUY | 2/23/2007 | 10,500 | $ 44.066 |
| SELL | 4/24/2007 | 16,300 | $ 36.168 |
| SELL | 5/24/2007 | 21,200 | $ 34.244 |

## CERTIFICATION OF THE MASSACHUSETTS LABORERS' PENSION FUND PURSUANT TO THE FEDERAL SECURITIES LAWS

I, THOMAS MASIELLO, hereby certify that the following is true and correct to the best of my knowledge, information and belief:

1.    I am the Administrator for the Massachusetts Laborers' Pension Fund (the "Mass Laborers' Pension Fund"), 14 New England Executive Park, Suite 200, Burlington, MA 01803-0900. My responsibilities include monitoring outside litigation, supervising outside litigation counsel, and participating in making litigation decisions on behalf of the Mass Laborers' Pension Fund.

2.    I have reviewed the Consolidated Class Action Complaint and have authorized its filing.

3.    The Mass Laborers' Pension Fund did not purchase the securities that are the subject of this action at the direction of its counsel, Berman DeValerio Pease Tabacco Burt & Pucillo, or to participate in any private action arising under the Securities Exchange Act of 1934.

4.    The Mass Laborers' Pension Fund is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

5.    Mass Laborers' Pension Fund's class period trades of International Rectifier common stock are set forth in the chart attached hereto as Exhibit 1.

6.    During the three-year period preceding the date of this Certification, the Mass Laborers' Pension Fund served as a representative party on behalf of a class in the following action filed under the federal securities laws: *In re Micromuse Securities Litigation*, Case No. CV 04-00136 SBA (N.D. Cal.). On December 7, 2005, the court granted final approval to the $2.625 million settlement secured for the class.

7.    The Mass Laborers' Pension Fund will not accept payment for serving as a representative party on behalf of the Class beyond its pro rata share of any possible recovery, except for an award, as

PAGE   187

ordered or approved by the Court, for reasonable costs and expenses (including lost wages) directly related to its representation of the Class.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 11 day of January 2008.

Thomas Masiello
Administrator
Massachusetts Laborers' Pension Fund

PAGE 188

2

## *International Rectifier*

**Class Period:  07/31/03 - 08/29/07**
**MA Laborers Pension Fund**

| Trade Date | Shares Bought | Shares Sold | Price/Share |
|---|---|---|---|
| 09/20/05 | 1,200 | | $48.3000 |
| 10/26/05 | 400 | | $35.5450 |
| 05/05/06 | 14,600 | | $47.8573 |
| 05/10/06 | 2,500 | | $47.9796 |
| 06/30/06 | | (700) | $39.0825 |
| 12/13/06 | 1,400 | | $39.8693 |
| 12/14/06 | 5,100 | | $40.3181 |
| 06/22/07 | | (563) | $36.6929 |
| 08/07/07 | | (337) | $35.9500 |

**PAGE**  _189_

# EXHIBIT A

EXHIBIT A
PAGE 190

QuickLinks -- Click here to rapidly navigate through this document

EXHIBIT 31.1

## CERTIFICATION

I, Alexander Lidow, certify that:

1.  I have reviewed this annual report on Form 10-K of International Rectifier Corporation;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (c)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: October 6, 2003

/s/ ALEXANDER LIDOW

Alexander Lidow
*Director and Chief Executive Officer*

QuickLinks

CERTIFICATION

Source: INTERNATIONAL RECTIF, 10-K, October 06, 2003

EXHIBIT _A_
PAGE _191_

# EXHIBIT B

EXHIBIT _B_
PAGE _192_

QuickLinks -- Click here to rapidly navigate through this document

EXHIBIT 31.2

## CERTIFICATION

I, Michael P. McGee, certify that:

1.
   I have reviewed this annual report on Form 10-K of International Rectifier Corporation;

2.
   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.
   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.
   The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

   (a)
      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b)
      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (c)
      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.
   The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

   (a)
      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (b)
      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: October 6, 2003

/s/ MICHAEL P. MCGEE

Michael P. McGee
*Executive Vice President and Chief Financial Officer*

QuickLinks

EXHIBIT 31.2
CERTIFICATION

Source: INTERNATIONAL RECTIF, 10-K, October 06, 2003

EXHIBIT _B_
PAGE _193_

# EXHIBIT  C

EXHIBIT ___C___
PAGE ___194___

**EXHIBIT 31.1**

## CERTIFICATION

I, Alexander Lidow, certify that:

1.  I have reviewed this interim report on Form 10-Q of International Rectifier Corporation;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (c)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: November 19, 2003

s/ ALEXANDER LIDOW
Alexander Lidow
Director and Chief Executive Officer

EXHIBIT _C_
PAGE _195_

# EXHIBIT  D

EXHIBIT  $D$

PAGE  $196$

EXHIBIT 31.2

## CERTIFICATION

I, Michael P. McGee, certify that:

1.  I have reviewed this interim report on Form 10-Q of International Rectifier Corporation;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

2.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

3.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

    (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (c) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

    (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: November 19, 2003

/s/ MICHAEL P. MCGEE
Michael P. McGee
Executive Vice President and
Chief Financial Officer

Source: INTERNATIONAL RECTIF, 10-Q, November 19, 2003

EXHIBIT D
PAGE 197

# EXHIBIT E

EXHIBIT __E__

PAGE __198__

EXHIBIT 31.1

## CERTIFICATION

I, Alexander Lidow, certify that:

1.  I have reviewed this interim report on Form 10-Q of International Rectifier Corporation;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (c)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 18, 2004

/s/ ALEXANDER LIDOW
Alexander Lidow
Director and Chief Executive Officer

EXHIBIT ___E___
PAGE ___199___

# EXHIBIT F

EXHIBIT F

PAGE 200

**EXHIBIT 31.2**

## CERTIFICATION

I, Michael P. McGee, certify that:

1. I have reviewed this interim report on Form 10-Q of International Rectifier Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

2. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

3. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

   (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (c) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

   (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 18, 2004

/s/ MICHAEL P. MCGEE
Michael P. McGee
Executive Vice President and
Chief Financial Officer

Source: INTERNATIONAL RECTIF, 10-Q, February 18, 2004

EXHIBIT   F
PAGE   201

# EXHIBIT  G

EXHIBIT ___G___
PAGE ___202___

**EXHIBIT 31.1**

## CERTIFICATION

I, Alexander Lidow, certify that:

1.   I have reviewed this interim report on Form 10-Q of International Rectifier Corporation;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

   (a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (c)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

   (a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: May 18, 2004

s/ ALEXANDER LIDOW
Alexander Lidow
Director and Chief Executive Officer

EXHIBIT ___G___
PAGE ___203___

# EXHIBIT H

EXHIBIT ___H___
PAGE ___204___

EXHIBIT 31.2

## CERTIFICATION

I, Michael P. McGee, certify that:

1.   I have reviewed this interim report on Form 10-Q of International Rectifier Corporation;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

   (a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (c)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

   (a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: May 18, 2004

                                        /s/ MICHAEL P. MCGEE
                                        Michael P. McGee
                                        Executive Vice President and
                                        Chief Financial Officer

EXHIBIT   H
PAGE      265

# EXHIBIT I

EXHIBIT ___I___
PAGE ___206___

QuickLinks -- Click here to rapidly navigate through this document

EXHIBIT 31.1

### CERTIFICATION

I, Alexander Lidow, certify that:

1.
I have reviewed this annual report on Form 10-K of International Rectifier Corporation;

2.
Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.
Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.
The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

(a)
Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)
Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(c)
Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.
The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

(a)
All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)
Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: September 17, 2004

/s/ ALEXANDER LIDOW

Alexander Lidow
Director and Chief Executive Officer

EXHIBIT _____I_____
PAGE _____207_____

# EXHIBIT J

EXHIBIT ___J___
PAGE ___208___

QuickLinks -- Click here to rapidly navigate through this document

EXHIBIT 31.2

## CERTIFICATION

I, Michael P. McGee, certify that:

1.
    I have reviewed this annual report on Form 10-K of International Rectifier Corporation;

2.
    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.
    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.
    The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

(a)
    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)
    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(c)
    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.
    The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

(a)
    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)
    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: September 17, 2004

/s/ MICHAEL P. MCGEE
_____

Michael P. McGee
Executive Vice President and Chief Financial Officer

EXHIBIT ___J___
PAGE ___209___

# EXHIBIT  K

EXHIBIT _K_
PAGE _210_

EXHIBIT 31.1

## CERTIFICATION

I, Alexander Lidow, certify that:

1. I have reviewed this quarterly report on Form 10-Q of International Rectifier Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (c)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: November 12, 2004

/s/ ALEXANDER LIDOW
Alexander Lidow
Director and Chief Executive Officer

EXHIBIT ___K___
PAGE ___211___

# EXHIBIT  L

EXHIBIT ___L___
PAGE ___212___

**EXHIBIT 31.2**

## CERTIFICATION

I, Michael P. McGee, certify that:

1.   I have reviewed this quarterly report on Form 10-Q of International Rectifier Corporation;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

2.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

3.   The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

    (a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (c)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

    (a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: November 12, 2004

/s/ MICHAEL P. MCGEE
Michael P. McGee
Executive Vice President and
Chief Financial Officer

EXHIBIT    L
PAGE    213

Source: INTERNATIONAL RECTIF, 10-Q, November 12, 2004

# EXHIBIT  M

EXHIBIT $m$
PAGE  $214$

EXHIBIT 31.1

## CERTIFICATION

I, Alexander Lidow, certify that:

1.  I have reviewed this quarterly report on Form 10-Q of International Rectifier Corporation;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

    (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (c) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

    (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 11, 2005

/s/ ALEXANDER LIDOW
Alexander Lidow
Director and Chief Executive Officer

1

Source: INTERNATIONAL RECTIF, 10-Q, February 11, 2005

EXHIBIT _____ m
PAGE _____ 215

# EXHIBIT N

EXHIBIT _N_
PAGE _216_

**EXHIBIT 31.2**

## CERTIFICATION

I, Michael P. McGee, certify that:

1.  I have reviewed this quarterly report on Form 10-Q of International Rectifier Corporation;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

2.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

3.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (c)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 11, 2005

/s/ MICHAEL P. MCGEE
Michael P. McGee
Executive Vice President and
Chief Financial Officer

1

EXHIBIT _N_
PAGE _217_

# EXHIBIT O

EXHIBIT ___O___
PAGE ___218___

EXHIBIT 31.1

## CERTIFICATION

I, Alexander Lidow, certify that:

1.  I have reviewed this quarterly report on Form 10-Q of International Rectifier Corporation;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (c)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: May 13, 2005

/s/ ALEXANDER LIDOW
Alexander Lidow
Director and Chief Executive Officer

1

EXHIBIT _____O_____
PAGE _____219_____

# EXHIBIT  P

EXHIBIT ____P____
PAGE ____220____

EXHIBIT 31.2

## CERTIFICATION

I, Michael P. McGee, certify that:

1.  I have reviewed this quarterly report on Form 10-Q of International Rectifier Corporation;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

2.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

3.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

    (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (c) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

    (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: May 13, 2005

/s/ MICHAEL P. MCGEE
Michael P. McGee
Executive Vice President and
Chief Financial Officer

1

Source: INTERNATIONAL RECTIF, 10-Q, May 13, 2005

EXHIBIT    P
PAGE    221

# EXHIBIT  Q

EXHIBIT ___Q___
PAGE ___222___

**EXHIBIT 31.1**

## CERTIFICATION

I, Alexander Lidow, certify that:

1.      I have reviewed this annual report on Form 10-K of International Rectifier Corporation;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13(a)-15(f) and 15(d)-15(f)) for the registrant and have:

(a)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

(a)      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: September 16, 2005

/s/ ALEXANDER LIDOW
Alexander Lidow
Director and Chief Executive Officer

1

**EXHIBIT** _Q_
**PAGE** _223_

# EXHIBIT  R

EXHIBIT ___R___
PAGE ___224___

EXHIBIT 31.2

## CERTIFICATION

I, Michael P. McGee, certify that:

1.     I have reviewed this annual report on Form 10-K of International Rectifier Corporation;

2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.     The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13(a)-15(f) and 15(d)-15(f)) for the registrant and have:

      (a)     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

      (b)     Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

      (c)     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

      (d)     Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.     The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

      (a)     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

      (a)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: September 16, 2005

/s/ MICHAEL P. MCGEE
Michael P. McGee
Executive Vice President and Chief Financial Officer
(Principal Financial Accounting Officer)

1

EXHIBIT    R
PAGE    225

# EXHIBIT  S

EXHIBIT     S

PAGE     226

**EXHIBIT 31.1**

## CERTIFICATION

I, Alexander Lidow, certify that:

1.   I have reviewed this quarterly report on Form 10-Q of International Rectifier Corporation;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13(a)-15(f) and 15(d)-15(f)) for the registrant and have:

   (a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

   (a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: November 11, 2005

/s/ Alexander Lidow
Alexander Lidow
Director and Chief Executive Officer

1

EXHIBIT ___S___
PAGE ___227___

Source: INTERNATIONAL RECTIF, 10-Q, November 14, 2005

# EXHIBIT T

EXHIBIT _T_
PAGE _228_

**EXHIBIT 31.2**

## CERTIFICATION

I, Michael P. McGee, certify that:

1.    I have reviewed this quarterly report on Form 10-Q of International Rectifier Corporation;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13(a)-15(f) and 15(d)-15(f)) for the registrant and have:

   (e)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (f)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (g)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (h)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

   (a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: November 11, 2005

/s/ Michael P. McGee
Michael P. McGee
Executive Vice President and
Chief Financial Officer
(Principal Financial and Accounting Officer)

1

**EXHIBIT** T
**PAGE** 229

# EXHIBIT U

EXHIBIT ___U___
PAGE ___230___

http://sec.gov/Archives/edgar/data/316793/000110465906007883/a06-4662_1ex31d1.htm

EX-31.1 2 a06-4662_1ex31d1.htm 302 CERTIFICATION

**EXHIBIT 31.1**

## CERTIFICATION

I, Alexander Lidow, certify that:

1.   I have reviewed this quarterly report on Form 10-Q of International Rectifier Corporation;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13(a)-15(f) and 15(d)-15(f)) for the registrant and have:

   (a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

   (a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

EXHIBIT ___U___
PAGE ___231___

(b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 10, 2006

/s/ Alexander Lidow

Alexander Lidow
Director and Chief Executive Officer

EXHIBIT    U
PAGE    232

# EXHIBIT  V

EXHIBIT ___V___
PAGE ___233___

http://sec.gov/Archives/edgar/data/316793/000110465906007883/a06-4662_1ex31d2.htm

EX-31.2 3 a06-4662_1ex31d2.htm 302 CERTIFICATION

**EXHIBIT 31.2**

### CERTIFICATION

I, Michael P. McGee, certify that:

1. I have reviewed this quarterly report on Form 10-Q of International Rectifier Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13(a)-15(f) and 15(d)-15(f)) for the registrant and have:

   (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

   (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

EXHIBIT ___V___
PAGE ___234___

(b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 10, 2006

/s/ Michael P. McGee

Michael P. McGee
Executive Vice President and
Chief Financial Officer
(Principal Financial and
Accounting
Officer)

EXHIBIT ___V___
PAGE ___235___

# EXHIBIT W

EXHIBIT ___W___
PAGE ___236___

EXHIBIT 31.1

## CERTIFICATION

I, Alexander Lidow, certify that:

1. I have reviewed this Quarterly Report on Form 10-Q of International Rectifier Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13(a)-15(f) and 15(d)-15(f)) for the registrant and have:

    (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

    (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: May 17, 2006

/s/ Alexander Lidow
Alexander Lidow
Director and Chief Executive Officer

1

Source: INTERNATIONAL RECTIF, 10-Q, May 17, 2006

# EXHIBIT X

EXHIBIT    X

PAGE    238

**EXHIBIT 31.2**

## CERTIFICATION

I, Michael P. McGee, certify that:

1.  I have reviewed this Quarterly Report on Form 10-Q of International Rectifier Corporation;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13(a)-15(f) and 15(d)-15(f)) for the registrant and have:

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: May 17, 2006

/s/ Michael P. McGee
Michael P. McGee
Executive Vice President and
Chief Financial Officer
(Principal Financial and Accounting
Officer)

1

EXHIBIT ____ X____
PAGE ____239____

# EXHIBIT Y

EXHIBIT ___Y___
PAGE ___240___

EXHIBIT 31.1

## CERTIFICATION

I, Alexander Lidow, certify that:

1.     I have reviewed this annual report on Form 10-K of International Rectifier Corporation;

2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.     The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13(a)-15 (f) and 15(d)-15(f)) for the registrant and have:

    (a)     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)     Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)     Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.     The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

    (a)     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: September 15, 2006

/s/ ALEXANDER LIDOW
Alexander Lidow
Director and Chief Executive Officer

EXHIBIT ___Y___
PAGE ___24H___

# EXHIBIT Z

EXHIBIT ___Z___
PAGE ___242___

**EXHIBIT 31.2**

## CERTIFICATION

I, Michael P. McGee, certify that:

1.   I have reviewed this annual report on Form 10-K of International Rectifier Corporation;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13(a)-15 (f) and 15(d)-15(f)) for the registrant and have:

   (a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

   (a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (a)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: September 15, 2006

/s/ MICHAEL P. MCGEE
Michael P. McGee
Executive Vice President and
Chief Financial Officer
(Principal Financial Accounting Officer)

EXHIBIT 2
PAGE 243

# EXHIBIT AA

Exhibit   AA
PAGE   244

EXHIBIT 31.1

## CERTIFICATION

I, Alexander Lidow, certify that:

1.   I have reviewed this Quarterly Report on Form 10-Q of International Rectifier Corporation;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13(a)-15(f) and 15(d)-15(f)) for the registrant and have:

   (a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

   (a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: November 10, 2006

                                                    /s/ Alexander Lidow
                                                    Alexander Lidow
                                                    Director and Chief Executive Officer

1

EXHIBIT ___AA___
PAGE ___245___

# EXHIBIT BB

EXHIBIT __BB__
PAGE __246__

**CERTIFICATION**

EXHIBIT 31.2

I, Michael P. McGee, certify that:

1.   I have reviewed this Quarterly Report on Form 10-Q of International Rectifier Corporation;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13(a)-15(f) and 15(d)-15(f)) for the registrant and have:

   (a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

   (a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: November 10, 2006

/s/ Michael P. McGee
Michael P. McGee
Executive Vice President and
Chief Financial Officer
(Principal Financial and Accounting Officer)

1

# EXHIBIT CC

EXHIBIT _CC_
PAGE _248_

EXHIBIT 31.1

## CERTIFICATION

I, Alexander Lidow, certify that:

1.   I have reviewed this Quarterly Report on Form 10-Q of International Rectifier Corporation;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13(a)-15(f) and 15(d)-15(f)) for the registrant and have:

   (a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

   (a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 9, 2007

/s/ Alexander Lidow
Alexander Lidow
Director and Chief Executive Officer

1

Source: INTERNATIONAL RECTIF, 10-Q, February 09, 2007

EXHIBIT   *CC*
PAGE   *249*

# EXHIBIT DD

xHIBIT DD

PAGE    256

**CERTIFICATION**

EXHIBIT 31.2

I, Michael P. McGee, certify that:

1.   I have reviewed this Quarterly Report on Form 10-Q of International Rectifier Corporation;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13(a)-15(f) and 15(d)-15(f)) for the registrant and have:

   (a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

   (a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 9, 2007

/s/ Michael P. McGee
Michael P. McGee
Executive Vice President and
Chief Financial Officer
(Principal Financial and Accounting
Officer)

1

Source: INTERNATIONAL RECTIF, 10-Q, February 09, 2007

EXHIBIT   DD
PAGE   251