Joseph J. Tabacco, Jr. (75484)
Email: jtabacco@bermanesq.com
Nicole Lavallee (165755)
Email: nlavallee@bermanesq.com
Julie J. Bai (227047)
Email: jbai@bermanesq.com
**BERMAN DeVALERIO PEASE TABACCO
    BURT & PUCILLO**
425 California Street, Suite 2100
San Francisco, CA  94104-2205
Telephone: (415) 433-3200
Facsimile:  (415) 433-6382

Blair A. Nicholas
Email: blairn@blbglaw.com
Matthew P. Siben
Email: matthews@blbglaw.com
**BERNSTEIN LITOWITZ BERGER &
GROSSMANN LLP**
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Telephone: (858) 793-0070
Facsimile:  (858) 793-0323

**Attorneys for Co-Lead Plaintiffs Massachusetts Laborers'
Pension Fund and General Retirement System of the City of Detroit**

**[Additional Counsel Appear on Signature Page]**

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE INTERNATIONAL RECTIFIER CORPORATION SECURITIES LITIGATION | No. CV 07-02544-JFW (VBKx) <br><br> **PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' FIVE MOTIONS TO DISMISS PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT** <br><br> Date:  May 5, 2008 <br> Time:  1:30 p.m. <br> Ctrm:  16 <br> Honorable John F. Walter <br><br> Complaint filed: April 17, 2007 <br> Trial Date: None set |

# TABLE OF CONTENTS

I.  INTRODUCTION ........................................................................................... 1

II.  STATEMENT OF FACTS ............................................................................ 4

    A.  Defendants ........................................................................................... 4

    B.  Numerous Former Employees Confirm That Defendants Knew or Recklessly Disregarded The Fact That IRF Reported False and Misleading Earnings By Recognizing Revenue On Fabricated and Premature Shipments of Product .......................... 6

    C.  IRF Inflated Its Cash Levels And Misrepresented The Poor Quality Of Its Earnings By Selling Fictitious Accounts Receivables .......................................................................................... 9

    D.  Defendants Manipulated Margins, Operating Expenses And Pro Forma Earnings By Improperly Characterizing Ordinary Operating Costs As Restructuring Costs ............................................ 10

    E.  Defendants Overstated Net Income In Violation of Tax Laws By Illegally Transferring Income From Higher Tax Jurisdictions to Lower Tax Jurisdictions ..................................... 11

    F.  IRF Reported False and Misleading Cash Flow From Operations By Incorrectly Classifying Tax Benefits ......................... 12

    G.  Defendants Concealed Their Fraudulent Conduct ............................. 13

    H.  Defendants' False and Misleading Statements .................................. 13

    I.  Defendants Partially Disclose Their Fraudulent Scheme .................. 14

    J.  A Recent, Post-Complaint SEC Filing Reveals That, During The Class Period, The Company Engaged In Improper Revenue Recognition At Yet Another Business Unit And That It Is Under Investigation by the SEC, US Attorney, and IRS ................... 17

III.  ARGUMENT ............................................................................................... 18

    A.  On A Motion To Dismiss Under The PSLRA, The Court Must Accept The Complaint's Allegations As True And Construe The Facts In Plaintiffs' Favor ............................................................ 18

    B.  Viewed In Their Entirety, The Facts Alleged Give Rise To A Strong Inference That Defendants Engaged In Conscious Misbehavior Or Were Severely Reckless ........................................ 19

        1.  The Number and Extent of GAAP Violations and the Magnitude of the Impending Restatement Support A Strong Inference of Scienter ................................................... 21

i

2.  The *Nature* Of The Accounting Violations Strongly Suggests Scienter ................................................................26

3.  Defendants' Knowledge of Contrary Facts Obtained From Internal Reports and Meetings Supports A Strong Inference of Scienter ................................................................28

4.  The Company's Dismissal Of An Employee Who Sought To Investigate The Wrongdoing At The Japan Subsidiary And Defendant McGee's Role Therein Further Bolsters The Strong Inference Of Scienter ................31

5.  The Corroboration Of The Fraud By Numerous Confidential Former Employees Of The Company Is Strong Evidence Of Scienter ................................................32

6.  The Termination And "Resignation" Of Senior IRF Officers Supports An Inference Of Scienter ...........................37

7.  Alex Lidow And McGee's Certifications Falsely Attesting To The Accuracy Of The Company's Financial Statements And Adequacy Of Its Internal Controls Also Demonstrate Scienter ......................................39

8.  The Fact That Defendants Benefited Financially from the Fraud Bolsters A Strong Inference Of Scienter ................41

    a.  The Massive Insider Stock Sales ...................................41

        1.  The Amount Of Insider Trading Alone Is Suspicious ......................................................41

        2.  Implementation Of Rule 10b5-1 Trading Plans Does Not Negate An Inference Of Scienter ............................................................42

        3.  Lack Of Sales Transaction Does Not Negate An Inference Of Scienter .......................44

        4.  Increase In Holdings Does Not Negate An Inference Of Scienter ...........................................44

    b.  Defendants' Receipt Of Incentive Bonuses Tied To IRF's Revenues, Margins And Earnings Further Supports Scienter .................................................45

9.  A Strong Inference Of Scienter Is Established By Defendants' Inability To Proffer A More Credible Explanation Of The Well-Pleaded Facts As Mere Mistake Or Negligence ...........................................................46

C.  IRF's Argument That It Cannot Be Liable For The Acts Of Its Subsidiary Misses The Point.................................................48

ii

D.   Plaintiffs Plead A Strong Inference That IRF Acted With Scienter ........................................................................ 52

E.   Defendant Grant Is Liable Under §10(b) Regardless of Whether He Personally Issued A False and Misleading Statement to the Public ............................................................................... 56

F.   Plaintiffs Have Properly Alleged Loss Causation ............. 60

G.   Defendants Are Liable Under Section 20(a) ..................... 64

   1.   The Individual Defendants Controlled The Company ............. 66

      a.   Alex Lidow .................................................. 67

      b.   Michael McGee ............................................. 67

      c.   Robert Grant ............................................... 68

      d.   Eric Lidow ................................................. 69

   2.   IRF Controlled Its Japanese Unit ........................... 70

H.   The Complaint Properly Extends The Class Period, And The Court Need Not Revisit The Appointment Of Lead Plaintiff ............ 72

IV.   CONCLUSION .......................................................... 75

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

TABLE OF AUTHORITIES

2

**Federal Cases**

3

380544 Canada, Inc. v. Aspen Tech., Inc.,
    2008 U.S. Dist. LEXIS 20968 (S.D.N.Y. Mar. 18, 2008) ........................ 35, 37

4

5

Arthur Children's Trust v. Keim,
    994 F.2d 1390 (9th Cir. 1993)................................................................ 67

6

Atlas v. Accredited Home Lenders Holding Co.,
    2008 U.S. Dist. LEXIS 3863 (S.D. Cal. Jan. 4, 2008) .................................... 59

7

8

Barrie v. Intervoice-Brite, Inc.,
    397 F.3d 249 (5th Cir. 2005), *clarified,*
    409 F.3d 653 (5th Cir. 2005) ................................................................ 46

9

10

Bowles v. Seminole Rock & Sand Co.,
    325 U.S. 410 (1945) ......................................................................... 58

11

Bowoto v. ChevronTexaco Corp.,
    312 F.Supp.2d 1229 (N.D. Cal. 2004) ...................................................... 48

12

13

Caremark, Inc. v. Coram Healthcare Corp.,
    113 F.3d 645 (7th Cir. 1997) ............................................................... 61

14

Carlson v. Xerox Corp.,
    392 F.Supp.2d 267 (D. Conn. 2005) ....................................................... 49

15

16

Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.,
    497 F.3d 546 (5th Cir. 2007)............................................................ 37, 43

17

Cheney v. Cyberguard Corp.,
    213 F.R.D. 484 (S.D. Fla. 2003) ............................................................ 74

18

19

Chill v. GE,
    101 F.3d 263 (2d Cir. 1996) ................................................................ 48

20

Chu v. Sabratek Corp.,
    100 F.Supp.2d 815 (N.D. Ill. 2000)......................................................... 26

21

22

Circuit, In re Green Tree Fin. Corp. Stock Litig.,
    61 F.Supp.2d 860 (D. Minn. 1999), rev'd, Fla. State Bd. of Admin. v. Green
    Tree Fin. Corp., 270 F.3d 645 (8th Cir. 2001) ............................................ 21

23

24

City of Monroe Emples. Ret. Sys. v. Bridgestone Corp.,
    399 F.3d 651 (6th Cir. 2005)............................................................ 46, 56

25

Communs. Workers of Am. Plan for Emples Pensions and Death Bents. v. CSK
    Auto Corp.,
    525 F.Supp.2d 1116 (D. Ariz. 2007)........................................................ 22

26

27

D.E. & J L.P. v. Conaway,
    284 F.Supp.2d 719 (D. Mich. 2003), aff'd,
    133 Fed.Appx. 994 (6th Cir. 2005)......................................................... 64

28

Dolgow v. Anderson,
438 F.2d 825 (2d Cir. 1970) ............................................................... 46

DSAM Global Value Fund v. Altris Software, Inc.,
288 F.3d 385 (9th Cir. 2002) ............................................................... 19

Eminence Capital, LLC v. Aspeon, Inc.,
316 F.3d 1048 (9th Cir. 2003) ............................................................. 76

Fla. State Bd. of Admin.v. Green Tree Fin.,
270 F.3d 645 (8th Cir. 2001) ............................................................... 22

Freeland v. Iridium World Communs., Ltd.,
233 F.R.D. 40 (D.D.C. 2006) .............................................................. 62

Garfield v. NCD Health Corp.,
466 F.3d 1255 (11th Cir. 2006) ........................................................... 41

Gompper v. VISX, Inc.,
298 F.3d 893 (9th Cir. 2002) ............................................................... 20

Greebel v. FTP Software, Inc.,
194 F.3d 185 (1st Cir. 1999) ............................................................... 28

Higginbotham v. Baxter Int'l, Inc.,
495 F.3d 753 (7th Cir. 2007) ........................................................ 36, 52

Holmes v. Baker,
166 F.Supp.2d 1362 (S.D. Fla. 2001) .................................................. 46

Howard v. Everex Sys., Inc.,
228 F.3d 1057 (9th Cir. 2000) ...................................................... passim

Howard v. Hui,
2001 U.S. Dist. LEXIS 15443 (N.D. Cal. Sept. 24, 2001) ..................... 66

Hunt v. Enzo Biochem, Inc.,
471 F.Supp.2d 390 (S.D.N.Y. 2006) .................................................... 61

In re Acterna Corp. Sec. Litig.,
378 F.Supp.2d 561 (D. Md. 2005) ....................................................... 64

In re Alstom SA Sec. Litig.,
454 F.Supp.2d 187 (S.D.N.Y. 2006) .................................................... 39

In re Alstom, S.A. Sec. Litig.,
406 F.Supp.2d 433 (S.D.N.Y. 2005) .................................................... 25

In re Am. Bank Note Holographics Sec. Litig.,
93 F.Supp.2d 424 (S.D.N.Y. 2000) ...................................................... 25

In re Amylin Pharms., Inc. Sec. Litig.,
2003 WL 21500525 (S.D. Cal. Oct. 10, 2002) ...................................... 44

In re AOL Time Warner Inc. Sec. & ERISA Litig.,
381 F.Supp.2d 192 (S.D.N.Y. 2004) .................................................... 26

In re BISYS Sec. Lit.,
    397 F.Supp.2d 430 (S.D.N.Y. 2005) ...................................................... 56

In re BP Prudhoe Bay Royalty Trust Sec. Litig.,
    2007 U.S. Dist. LEXIS 83007 (W.D. Wash. Oct. 26, 2007) ................... 59, 71

In re Bradley Pharms., Inc. Sec. Litig.,
    421 F.Supp.2d 822 (D.N.J. 2006).......................................................... 63

In re Cardinal Health Inc. Sec. Litig.,
    426 F.Supp.2d 688 (S.D. Ohio 2006)...................................................... 43

In re Catalina Mktg. Corp. Sec. Litig.,
    390 F.Supp.2d 1110 (M.D. Fla. 2005) .................................................... 32

In re Citisource, Inc. Sec. Litig.,
    694 F.Supp. 1069 (S.D.N.Y. 1988) ........................................................ 72

In re Copper Mountain Sec. Litig.,
    311 F.Supp.2d 857 (N.D. Cal. 2004)...................................................... 25

In re Cray Inc. Deriv. Litig.,
    431 F.Supp.2d 1114 (W.D. Wash. 2006) ............................................... 43

In re Cyberonics Inc. Sec. Litig.,
    468 F.Supp.2d 936 (S.D. Tex. 2006)................................................... 74, 75

In re Cylink Sec. Litig.,
    178 F.Supp.2d 1077 (N.D. Cal. 2001) .............................................. 21, 65, 68

In re Daou Sys., Inc. Sec. Litig.,
    411 F.3d 1006 (9th Cir. 2005) ......................................................... passim

In re Dura Pharms., Inc. Secs. Litig.,
    452 F.Supp.2d 1005 (S.D. Cal. 2006) .................................................... 61

In re Dynex Capital, Inc., Secs. Litig.,
    2006 U.S. Dist. LEXIS 4988 (S.D.N.Y. Feb. 10, 2006) ............................. 55

In re Enron Corp. Sec., Deriv. & ERISA Litig.,
    2003 WL 22331268 (S.D. Tex. Apr. 22, 2003) ........................................ 28

In re Entropin, Inc., Sec. Litig.,
    487 F.Supp.2d 1141 (C.D. Cal. 2007)...................................................... 66

In re Faro Techs. Sec. Litig.,
    534 F.Supp.2d 1248 (M.D. Fla. 2007) .................................................... 48

In re Flag Telecom Hldgs., Ltd. Sec. Litig.,
    245 F.R.D. 147 (S.D.N.Y. 2007)............................................................ 63

In re Global Crossing Sec. & ERISA Litig.,
    225 F.R.D. 436 (S.D.N.Y. Aug. 8, 2004) ................................................ 64

In re Hamilton Bancorp, Inc. Sec. Litig.,
    194 F.Supp.2d 1353 (S.D. Fla. 2002)...................................................... 32

vi

In re Hansen Natural Corp. Sec. Litig.,
    527 F.Supp.2d 1142 (C.D. Cal. 2007) .................................................. 19, 40, 59

In re Homestore.com, Inc. Sec. Litig.,
    347 F.Supp.2d 769 (C.D. Cal. 2004) ................................................................ 67

In re ICN Pharms. Sec. Litig.,
    299 F.Supp.2d 1055 (C.D. Cal. 2004), aff'd,
    184 Fed. Appx. 672 (9th Cir. 2006) ................................................................ 27

In re Ikon Office Solutions, Inc.,
    66 F.Supp.2d 622 (E.D. Pa. 1999) ................................................................ 56

In re Immune Response Sec. Litig.,
    375 F.Supp.2d 983 (S.D. Cal. 2005) .................................................. 19, 30, 66

In re InfoSonics Corp. Deriv. Litig.
    2007 U.S. Dist. LEXIS 66043 (D. Cal. Sept. 4, 2007) .................................. 43

In re Interpublic Sec. Litig.,
    2003 U.S. Dist. LEXIS 8844 (S.D.N.Y. May 29, 2003) ................................ 56

In re Kidder Peabody Sec. Litig.,
    10 F.Supp.2d 398 (S.D.N.Y. 1998) ................................................ 32, 33, 34, 71

In re LaBranche Sec. Litig.,
    405 F.Supp.2d 333 (S.D.N.Y. 2005) ................................................................ 67

In re Lattice Semiconductor Corp. Sec. Litig.,
    2006 U.S. Dist. LEXIS 262 at **40, 41, 44, 50 (D. Or. 2006) ...................... 30

In re Marsh & McLennan Cos. Sec. Litig.,
    501 F.Supp.2d 452 (S.D.N.Y. 2006) .......................................................... passim

In re McKesson HBOC, Inc. Sec. Litig.,
    126 F.Supp.2d 1248 (N.D. Cal. 2000) ....................................................... passim

In re Mercator Software, Inc. Sec. Litig.,
    161 F.Supp.2d 143 (D. Conn. 2001) .......................................................... 21, 39

In re NextCard, Inc. Sec. Litig.,
    2006 U.S. Dist. LEXIS 16156 (N.D. Cal. Mar. 20, 2006) ............................ 30

In re NorthPoint Communs. Group, Inc. Sec. Litig.,
    221 F.Supp.2d 1090 (N.D. Cal. 2002) ............................................................ 20

In re Nuko Info. Sys., Inc. Sec. Litig.,
    199 F.R.D. 338 (N.D. Cal. 2000) ............................................................... 21, 44

In re NYSE Specialists Sec. Litig.,
    405 F.Supp.2d 281 (S.D.N.Y. 2005) ................................................................ 49

In re OCA, inc. Sec. & Deriv. Litig.,
    2006 U.S. Dist. LEXIS 90854 (E.D. La. Dec. 14, 2006) .............................. 40

In re Openwave Sys. Sec. Litig.,
   528 F.Supp.2d 236 (S.D.N.Y. 2007) .................................................... 48

In re Oxford Health Plans, Inc. Sec. Litig.,
   187 F.R.D. 133 (S.D.N.Y. 1999)......................................................... 45

In re Parmalat Sec. Litig.,
   375 F.Supp.2d 278 (S.D.N.Y. 2005) .................................................... 63

In re Parmalat Sec. Litig.,
   376 F.Supp.2d 472 (S.D.N.Y. 2005) .................................................... 49

In re Petco Animal Supplies Inc., Sec. Litig.,
   No. 05-CV-0823-H (RBB), Order (S.D. Cal. July 31, 2006) ...................... 60

In re Philip Servs. Corp. Sec. Litig.,
   383 F.Supp.2d 463 (S.D.N.Y. 2004) .................................................... 20

In re PMA Capital Corp. Sec. Litig.,
   2005 U.S. Dist. LEXIS 15696 (E.D. Pa. July 27, 2005) ............................ 40

In re ProQuest Sec. Litig.,
   527 F.Supp.2d 728 (E.D. Mich. 2007) ........................................... 23, 24

In re Read-Rite Corp. Sec. Litig.,
   335 F.3d 843 (9th Cir. 2003) ............................................................ 24

In re Real Estate Assoc. Ltd. P'ship Litig.,
   223 F.Supp.2d 1142 (C.D. Cal. 2002) .................................................. 59

In re Refco, Inc. Sec. Litig.,
   503 F.Supp.2d 611 (S.D.N.Y. 2007) .................................................... 50

In re Scottish Re Group Secs. Litig.,
   524 F.Supp.2d 370 (S.D.N.Y. 2007) .................................................... 39

In re SeeBeyond Tech. Corp. Sec. Litig.,
   266 F.Supp.2d 1150 (C.D. Cal. 2003) .................................................. 45

In re Seitel, Inc. Sec. Litig.,
   447 F.Supp.2d 693 (S.D. Tex. 2006)..................................................... 63

In re Select Comfort Corp. Sec. Litig.,
   2000 U.S. Dist. LEXIS 22697 (D. Minn. Jan. 27, 2000) ........................ 73, 74

In re Silicon Graphics Sec. Litig.,
   183 F.3d 970 (9th Cir. 1999)......................................................... 24, 42

In re Software Toolworks Inc. Sec. Litig.,
   50 F.3d 615 (9th Cir. 1995) .............................................................. 60

In re Sonus Networks Sec. Litig.,
   2006 U.S. Dist. LEXIS 28272 (D. Mass. May 10, 2006) ............................ 55

In re Spectrum Brands, Inc. Sec. Litig.,
   461 F.Supp.2d 1297 (N.D. Ga. 2006) .................................................. 45

In re Splash Tech. Hldgs Sec. Litig.,
    2000 U.S. Dist. LEXIS 15370 (N.D. Cal. Sept. 29, 2000).............................. 65

In re Sunbeam Sec. Litig.,
    89 F.Supp.2d 1326 (S.D. Fla. 1999)................................................................. 54

In re Syncor Int'l. Corp. Sec. Litig.,
    327 F.Supp.2d 1149 (C.D. Cal. 2004) ............................................................. 25

In re Telxon Corp. Sec. Litig.,
    67 F.Supp.2d 803 (N.D. Ohio 1999) ............................................................... 72

In re The Baan Co. Sec. Litig.,
    103 F.Supp.2d 1 (D.D.C. 2000) ...................................................................... 26

In re Vantive Corp. Sec. Litig.,
    110 F.Supp.2d 1209 (N.D. Cal. 2000), aff'd,
    283 F.3d 1079 (9th Cir. 2002)......................................................................... 25

In re Vantive Corp. Sec. Litig.,
    283 F.3d 1079 (9th Cir. 2002)......................................................................... 30

In re Vivendi Universal, S.A. Sec. Litig.,
    381 F.Supp.2d 158 (S.D.N.Y. 2003) .............................................................. 46

In re Warner Communs. Sec. Litig.,
    618 F.Supp.735 (S.D.N.Y. 1985), aff'd,
    798 F.2d 35 (2d Cir. 1986) ...................................................................... 54, 55

In re Wet Seal, Inc. Sec. Litig.,
    518 F.Supp.2d 1148 (C.D. Cal. 2007)............................................................. 36

In re Worldcom Inc. Sec. Litig.,
    352 F.Supp.2d 472 (S.D.N.Y. 2005) .............................................................. 56

In re Worldcom, Inc. Sec. Litig.,
    346 F.Supp.2d 628 (S.D.N.Y. 2004) .............................................................. 27

In re Worlds of Wonder Sec. Litig.,
    814 F. Supp. 850 (N.D. Cal. 1993).................................................................. 43

Jacobs v. Coopers & Lybrand, L.L.P.,
    1999 U.S. Dist. LEXIS 2102 (S.D.N.Y. Mar. 1, 1999) ................................. 69

Kaltman v. Key Energy Servs.,
    447 F.Supp.2d 648 (W.D. Tex. 2006) ............................................................. 39

Kemmerer v. Weaver,
    445 F.2d 76 (7th Cir. 1971) ............................................................................ 71

Limantour v. Cray Inc.,
    432 F.Supp.2d 1129 (W.D. Wash. 2006) ....................................................... 40

Lax v. First Merchants Acceptance Corp.,
    1997 U.S. Dist. LEXIS 11866 (N.D. Ill. Aug. 11, 1997)............................... 73

Livid Hldgs. Ltd. v. Salomon Smith Barney, Inc.,
    416 F.3d 940 (9th Cir. 2005) ............................................................ 20

Makor Issues & Rights, Ltd. v. Tellabs, Inc.,
    513 F.3d 702 (7th Cir. 2008) ............................................................ 24

Marsden v. Select Med. Corp.,
    2006 U.S. Dist. LEXIS 16795 (E.D. Pa. Apr. 6, 2006) ................................. 34

McHenry v. Renne,
    84 F.3d 1172 (9th Cir. 1996) ............................................................ 20

Menkes v. Stolt-Nielsen S.A.,
    2006 U.S. Dist. LEXIS 42644 (D. Conn. June 19, 2006) ............................ 49

Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit,
    547 U.S. 71 (2006) ...................................................................... 18

Middlesex Ret. Sys. v. Quest Software Inc.,
    527 F.Supp.2d 1164 (C.D. Cal. 2007) .............................................. 38, 40

No. 84 Employer-Teamster Joint Council Pension
    Trust Fund v. Am. West Hldg. Corp.,
    320 F.3d 920 (9th Cir. 2003) ...................................................... passim

Nordstrom, Inc. v. Chubb & Son, Inc.,
    54 F.3d 1424 (9th Cir. 1995) .......................................................... 52, 54

NorthPoint,
    184 F.Supp.2d 991 (N.D. Cal. 2001) .................................................. 37

Nursing Home Pension Fund, Local 144 v. Oracle Group,
    380 F.3d 1226 (9th Cir. 2004) .................................................... passim

Official Unsecured Creditors Comm. of Media Vision Tech. v. Jain,
    215 F.R.D. 587 (N.D. Cal. 2003) ...................................................... 21

Ong v. Sears, Roebuck & Co.,
    459 F.Supp.2d 729 (N.D. Ill. 2006) .................................................. 61

Pac. Can. Co. v. Hewes,
    95 F.2d 42 (9th 1938) .................................................................. 48

Paracor Fin., Inc. v. G.E. Capital Corp.,
    96 F.3d 1151 (9th Cir. 1996) .................................................... 65, 66, 71

Phoenix Canada Oil Co. v. Texaco, Inc.,
    842 F.2d 1466 (3d Cir. 1988) .......................................................... 49

PR Diamonds, Inc. v. Chandler,
    364 F.3d 671 (6th Cir. 2004) .......................................................... 45

Press v. Chemical Inv. Servs. Corp.,
    166 F.3d 529 (2d Cir. 1999) .......................................................... 55

Provenz v. Miller,
    102 F.3d 1478 (9th Cir. 1996)....................................................................... 21

Pugh v. Tribune Co.,
    2008 U.S. App. LEXIS 6912 (7th Cir. Apr. 2, 2008) .............................. 52, 53

Rehm v. Eagle Fin. Corp.,
    954 F.Supp. 1246 (N.D. Ill. 1997)................................................................ 22

Rosenbaum Capital, LLC v. McNulty,
    2008 U.S. Dist. LEXIS 20347 (N.D. Cal. Mar. 4, 2008) ............................. 36

Rothman v. Gregor,
    220 F.3d 81 (2d Cir. 2000) ........................................................................... 22

S. Ferry LP # 2 v. Killinger,
    399 F.Supp.2d 1121 (D. Wash. 2005)........................................................... 44

Schlagal v. Learning Tree Int'l,
    1998 U.S. Dist. LEXIS 20306 (C.D. Cal. Dec. 23, 1998) ........................... 30

SEC v. Power,
    525 F.Supp.2d 415 (S.D.N.Y. 2007) ............................................................ 57

Siemers v. Wells Fargo & Co,
    2006 WL 3041090 (N.D. Cal. Oct. 24, 2006) .............................................. 59

Southland Sec. Corp. v. INSpire Ins. Solutions Inc.,
    365 F.3d 353 (5th Cir. 2004)................................................................... 53, 55

Steckman v. Hart Brewing Inc.,
    143 F.3d 1293 (9th Cir. 1998) ...................................................................... 27

Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.,
    128 S.Ct. 761 (2008) ..................................................................................... 60

Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.,
    2005 U.S. Dist. LEXIS 10780 (S.D.N.Y. June 1, 2005)............................... 73

Tellabs, Inc. v. Makor Issues & Rights, Ltd.,
    127 S.Ct. 2499 (2007) ........................................................................... passim

Thomas v. Metro. Life Ins. Co.,
    2007 U.S. Dist. LEXIS 74789 (W.D. Okla. Oct. 5, 2007)............................ 72

U.S. v. Ebbers,
    458 F.3d 110 (2d Cir. 2006), cert. denied,
    127 S.Ct. 1483, 167 L. Ed. 2d 244 (2007) .................................................. 27

U.S. v. Olis,
    429 F.3d 540 (5th Cir. Tex. 2005)................................................................. 58

W.R. Grace & Co. v. Western U.S. Indus.,
    608 F.2d 1214 (9th Cir. 1979)....................................................................... 54

xi

Wiestchner v. Monterey Pasta Co.,
  294 F.Supp.2d 1102 (N.D. Cal. 2003) ............................................................. 43

Wool v. Tandem Computers, Inc.,
  818 F.2d 1433 (9th Cir. 1987) ...................................................................... 58, 66

**Federal Statutes**

15 U.S.C. §78c(a)(9) ............................................................................................... 56

15 U.S.C. §78j(b) ............................................................................................... 1, 57

15 U.S.C. §78u-4(b)(2) ........................................................................................... 19

18 U.S.C. §1350 ...................................................................................................... 40

**Federal Rules**

Fed. R. Evid. 801(d)(2)(D) ........................................................................ 34, 35, 36

Federal Rule of Civil Procedure 8(a) ..................................................................... 20

**Federal Regulations**

17 C.F.R. §210.4-01(a) ...................................................................................... 21, 22

17 C.F.R. §230.405 ................................................................................................. 71

17 C.F.R. §240.10b-5 ..................................................................................... passim

# I.      INTRODUCTION

This securities class action alleges a fraudulent scheme by International Rectifier Corporation ("IRF" or "Company") and its senior officers and executives to artificially inflate IRF's stock price, in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §78j(b) and 78t(a), and Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. §240.10b-5.[1]   Lead Plaintiffs, the General Retirement System of the City of Detroit and the Massachusetts Laborers' Pension Fund ("Plaintiffs"), on behalf of a class of persons who purchased IRF securities from July 31, 2003 through August 29, 2007 ("Class Period"), submit this memorandum in opposition to the motions to dismiss filed by Defendants IRF, Eric Lidow, Alex Lidow, McGee and Grant ("Defendants").[2]

The Consolidated Class Action Complaint ("Complaint," hereinafter cited as "¶_") alleges that, throughout the Class Period, Defendants issued false and misleading financial statements and press releases that overstated the Company's revenues, earnings, cash levels, gross margins, and income; falsely certified that the Company was in compliance with Generally Accepted Accounting Principles ("GAAP"); and falsely represented that IRF had implemented adequate internal financial controls.   IRF has admitted that it engaged in numerous accounting violations and that it plans to restate *four years* of financial statements, for fiscal years 2003, 2004, 2005 and 2006.   An ongoing investigation by independent investigators and outside counsel hired by the Company's Audit Committee ("Investigation") and the revelation of accounting fraud at IRF resulted in the

---

[1] Named as Defendants are the Company, its founder and former Chairman and CEO Eric Lidow ("Eric Lidow" or "E. Lidow"), Eric Lidow's son and IRF's former Chief Executive Officer ("CEO") Alexander Lidow ("Alex Lidow" or "A. Lidow"), former Chief Financial Officer ("CFO") Michael P. McGee ("McGee"), former Executive Vice President of Global Sales and Marketing Robert Grant ("Grant"), former Vice President of Automotive Products Ivo Jurek ("Jurek"), and Vice President of IRF's Japan unit Fumihide Esaka ("Esaka").

[2] Eric Lidow is sued only in his capacity as a control person under §20(a).  Because Jurek and Esaka are now residing overseas, service of the Consolidated Class Action Complaint has not yet been effectuated on them.

termination and resignation of the Company's top officers, including its CEO, CFO, Executive VP of Global Sales and Marketing, and several senior members of management at its Japan unit.

Defendants seek to portray the fraud at IRF as the act of rogue, lower-level employees at one business unit, about which they had no knowledge. Nothing could be further from the truth. First, the facts alleged in the Complaint establish that Defendants' admitted "accounting irregularities" were not limited to Japan, or to Tijuana, but instead were Company-wide and were orchestrated from the Company's headquarters. The Company's improper practices were well known among Company employees. Indeed, IRF employees half-joked that, when the Company met financial forecasts at the end of each financial quarter, it was because the "parking lot was full of trailers" loaded with product that would be sold once genuine customers could be found. ¶8.

Second, numerous former employees who were in a position to know have stated that Defendants were aware of the fraud and participated in it. Third, the wrongdoing involved accounting violations that, by their very nature, reflected an intent to deceive investors rather than innocent mistakes as Defendants claim. Fourth, the wrongdoing was not limited to improper revenue recognition but involved a variety of improper practices that falsely portrayed the Company as more successful than it was and artificially inflated the price of the Company's securities, to the detriment of Class Members once the fraud was disclosed to the public and the stock price declined as a result.

Defendants manipulated IRF's reported financial results by: (1) creating fictitious purchase orders and recognizing revenue for bogus shipments of product; (2) keeping a second set of books to monitor the fake sales; (3) selling fictitious accounts receivables; (4) burying everyday operating costs as one-time restructuring charges; (5) recording earnings on bogus shipments of product that merely sat in tractor trailers in the Company's parking lots; (6) understating its tax liabilities by at

least *$74 million*, and exposing the Company to recourse by governmental agencies; and (6) incorrectly recording tax benefits from the exercise of stock options as cash flow from operations rather than cash flow from financing.  As one noted market columnist observed, IRF's disclosures of wrongdoing were "like reading a text on how to lie, cheat and steal from shareholders."  ¶17.

As a result of the Investigation, the Company's directors announced sweeping changes in its system of internal controls, including a wholesale house cleaning.  No longer would the Company's internal auditors report to the Company's management. Now, the internal auditors must report directly to the Audit Committee and the Company's general counsel.  ¶18.

These alleged facts amply demonstrate Defendants' liability for securities fraud.  However, this is an unfolding story.  The Investigation, which is ongoing and now in its *twelfth month,* has not been limited to Japan and has cost a whopping *$48 million* so far.  Plaintiffs and the investing public continue to learn more about the accounting manipulations at IRF, and the Company has yet to restate its financials. What is becoming increasingly clear is that fraud infiltrated every aspect of the Company's business.  For example, in a February 11, 2008 SEC filing, the Company admitted to: (1) improper revenue recognition at its Aerospace and Defense ("A & D") segment, by employing accounting gimmicks eerily similar to the ones it employed at its Japan unit; (2) the understatement of its liabilities, including accounts payable and accrued expenses, stemming from the Company's failure to implement adequate cutoff procedures for open invoices at the end of each reporting period; and (3) what it euphemistically describes as "judgmental adjustments" of quarterly financial results "in an effort to meet quarterly earnings targets" – in other words, it manipulated its financial results to meet earnings forecasts.  *See* SEC Form NT 10-Q, attached as Exhibit A to Plaintiffs' Request for Judicial Notice ("Pl. RJN").  The Company has also now revealed that it is being investigated by the SEC, the U.S. Attorney's Office, and the IRS.  *Id*.

Faced with these admitted improprieties, Defendants cannot challenge the fact that the Complaint properly alleges that IRF issued materially false and misleading financial statements.  Moreover, except for Defendant Grant, none of the Defendants dispute that the Complaint properly alleges that they made false and misleading statements.   Nevertheless, Defendants ask the Court to dismiss this case at the pleading stage for failure to plead scienter, loss causation or Defendants control over fraudulent actors.   Further, Defendants argue that Plaintiffs are foreclosed from pursuing claims for certain false and misleading statements because they pre-date the start of the proposed original class period.  As discussed below, these arguments are meritless.   The Complaint alleges a strong inference of scienter, loss causation, Defendants' control person liability, and appropriately sets a Class Period that reflects the four-year period during which Defendants successfully concealed the fraud from the investing public.  Accordingly, Plaintiffs' claims should be sustained, and Defendants' motions to dismiss should be denied.

## II.    STATEMENT OF FACTS

### A.    Defendants

Defendant IRF, headquartered in El Segundo, California, designs, manufactures and markets power management devices used in applications such as computers, appliances, satellites, aircraft, automobiles and consumer electronics. ¶¶1, 27.  The Company operates business units around the world.  ¶¶303-304, 310.

IRF's founder and Chairman during the Class Period, Eric Lidow, previously served as CEO until March 1995 and was succeeded by his son, Alex Lidow.  Eric Lidow signed the Company's false and misleading SEC filings, including the 2003 through 2006 Form 10-Ks.  He is named only for violations of §20(a).  ¶28.

Alex Lidow was the CEO and a director of IRF during the Class Period. Upon revelation of the fraud at IRF, Alex Lidow, after serving as CEO for 12 years, resigned "at the Company's request."  ¶19.  Defendant McGee, IRF's CFO and an Executive Vice President ("EVP"), served as CFO from 1993 until the Company

4

terminated his employment on July 2, 2007 in the wake of the accounting fraud at IRF. *Id.* Both Alex Lidow and McGee signed the Company's false and misleading SEC filings, including the 2003 through 2006 Form 10-Ks and Form 10-Qs; participated in drafting and/or approved the Company's false and misleading press releases; repeatedly signed sworn certifications falsely attesting to the accuracy of IRF's financial statements and the adequacy of its internal controls; and, otherwise repeatedly made false and misleading statements to investors regarding the Company's financial condition.  ¶37.[3]

Defendant Grant was, during the Class Period, EVP of Global Sales and Marketing and one of the Company's Executive Officers.  He was also one of IRF's top six highly compensated executives.   As detailed below, Grant played a significant role in the accounting fraud at IRF.  He resigned from the Company on July 1, 2007 — shortly before revelation of the fraud at IRF.  ¶¶19, 31.

Defendant Esaka was, during the Class Period, Vice President ("VP") of IRF's Japan subsidiary.   With the authorization and knowledge of the other Defendants, he knowingly manipulated the Japanese business unit's financial results, which were consolidated with the Company's financial results and reported to the public. ¶33.

Defendant Jurek was, during the Class Period, VP of Automotive Products. He was responsible for meeting sales and margins forecasts for the Company's entire automotive division.   ¶¶32, 49.   As detailed below, Jurek was intimately involved in the fraud at IRF.

///

///

///

---

[3] From June 2000 to June 2005, McGee also served as Chairman of Nihon Inter Electronics Corporation ("Nihon"), a Japanese corporation that IRF helped found and in which IRF held a significant number of shares (17.5% at year-end 2005). From June 2000 to June 2003, McGee was also Co-CEO of Nihon.  ¶30.

**B.   Numerous Former Employees Confirm That Defendants Knew or Recklessly Disregarded The Fact That IRF Reported False and Misleading Earnings By Recognizing Revenue On Fabricated and Premature Shipments of Product**

With Defendants' knowledge and participation, the Company falsified its reported revenues and earnings by recording as sales the premature and/or bogus shipment of product that was being sent to sit in warehouses or tractor trailers without any intention that a customer would receive it presently. ¶41. In so doing, the Company violated its own revenue recognition policy and GAAP. *See* ¶¶42-43.

The Company admitted in an August 31, 2007 SEC filing that it had been falsely reporting revenues and earnings through a scheme to ship products to fulfill "fictitious" customer orders and that it created a second set of books to monitor the fake sales. ¶44.[4] Additionally, at the end of each quarter, sales management at its Japan unit entered into arrangements with certain distributors to take excess product on verbal terms that included extended payment terms and/or an understanding that the product would be taken back at the distributor's request. *Id.*

Information obtained from former IRF employees confirms that these accounting manipulations were designed to meet revenue and earnings forecasts at the end of each financial quarter. Moreover, according to former employees at IRF, practices similar to those employed at the Japan unit could be found at the Company's other locations, including IRF's Tijuana factory. ¶47.

According to CW1, VP of Automotive Products who had responsibilities in several of IRF's international divisions and who reported to Defendant Jurek, Jurek told CW1 that *Jurek, Grant and Esaka would regularly meet forecasted numbers for the Japan subsidiary by authorizing bogus shipments of product*. ¶49. At the end of fiscal quarters, *pursuant to Jurek, Grant and Esaka's authorization*, IRF would load

---

[4] Defendant McGee accuses Plaintiffs of using "argumentative terminology" in describing IRF's sales, purchase orders and accounts as "fictitious." McGee Br. at 8. However, these are the Company's own words. *See, e.g.,* ¶44 (quoting Company's disclosure of "fictitious" customer purchase orders).

6

product on tractor trailers as if it was being shipped to a customer when, in fact, Jurek, Grant and Esaka *knew* the product would remain on the trailer in IRF's parking lot or would be sent to a warehouse to be stored until a real customer placed a real order for the product. According to CW1, the Company recognized revenue at the time of the bogus shipments, contrary to GAAP and the Company's own accounting policy. *Id.*

According to CW1, it was a poorly kept secret within the Company that IRF made false shipments so that it could improperly book revenue. This was a Company-wide practice. IRF employees half-joked (internally) that, when the Company met financial forecasts at the end of financial quarters, it was because the "parking lot was full of trailers." ¶51. According to CW1, Defendants not only knew about the improper shipments but had access to internal Company reports that would confirm that the Company was shipping product before any customer had bought the product. IRF maintained an internal database system called Vision, which provided a detailed analysis of the Company's customer orders including global sales forecasts, sales forecasts for each subsidiary, production forecasts, actual production data, inventory levels, shipments, early shipments, and customer orders. According to CW1, *shipments made either prematurely or without a purchase order would show up on the Vision system as shipments without a corresponding customer order.* ¶52.[5]

According to CW3, who for part of a 15-year stint at IRF served as Director of Finance reporting directly to McGee, *Alex Lidow and McGee utilized the Vision system to review revenue information on at least a daily basis and more often at the end of quarters*. ¶¶52-53. According to CW3, Alex Lidow and McGee also received daily reports with current revenue information. ¶53.

---

[5] CW1's description of Vision is corroborated by other former employees, including CW2, a former Customer Service Manager for North America who worked at IRF from 2001 to December 2006. *Id.*

7

According to former employee CW4, a unit manager and then Director of Corporate Sales Operations who was responsible for worldwide profit and loss statements for 17 product lines at IRF, the Japan unit was always behind its forecasted numbers – which was an issue CW4 constantly emailed Grant and Esaka about.  ¶55.  However, at the end of quarters, according to CW4, IRF's Japan subsidiary would regularly, and miraculously, make its forecasts.  It did this by repeatedly manipulating its earnings through dealings with distributors Kaga and Maruben, with whom Defendant Esaka and the Japan subsidiary had a close relationship.  ¶¶55-56.  According to CW4, at the end of each quarter, Kaga and Maruben would agree to accept product they had no intention of keeping and would later return to IRF.  IRF's Japan unit booked revenues when product was shipped to Kaga and Maruben at the end of each quarter, even though it was known that the shipment would be returned via a return materials authorization.  ¶56.

CW4 also corroborated the fact that the *entire Company* falsified sales by prematurely shipping product.  According to CW4, IRF would "ship like crazy" at the end of quarters to meet public forecasts by pulling in orders from future quarters, commonly referred to as "channel stuffing."  Often these shipments were fraudulent because IRF would send these shipments to locations in Mexico or China that would hold the order for a few days so that it would not hit the customer's stock until the first or second day of the next quarter.  According to CW4, Francisco Dubuitron, former VP of Logistics, was in charge of these arrangements.  ¶57.

Another former employee, CW5, a Business Unit Manager who participated in conference calls with Grant and Esaka and other VPs of Sales four to five times each quarter, recalls several conference calls during which Esaka informed Grant that the Japan subsidiary was not going to make its earnings forecast.  In these instances Grant told Esaka *to go to his customers and ask them for permission to ship product earmarked for the next quarter early*.  Esaka informed Grant that he had already done this and no additional customers were willing to do so.  In such

8

instances, Grant would tell Esaka he had to make the forecasts and would basically state, "you have to figure out a way to do it *but I do not want to know how you do it*." Ultimately, the Japan subsidiary would meet its forecast numbers. ¶¶58-59.[6] According to CW5, pulling in of orders from future quarters to meet current forecasts was not limited to the Japan unit. Often sales representatives extended payment terms for customers willing to accept such payments. CW5 said *this practice was well known to Grant* as it was discussed during internal conference calls in which Grant participated. ¶60.

According to CW6, a former Risk and Treasury Analyst, the Japan subsidiary also had a practice of financing customer purchases by extending letters of credit to its customers to fund purchases of IRF's product. By doing this, Japan could make sales in one quarter but defer the customer's obligation to pay for the product for three to four months. *Id.* CW5 confirms this practice. This further enabled Japan to manipulate its revenues by pulling in sales from future periods without getting customer commitments to pay in the current period. ¶63.

## C. IRF Inflated Its Cash Levels And Misrepresented The Poor Quality Of Its Earnings By Selling Fictitious Accounts Receivables

IRF has also admitted that it improperly "factored" (i.e. sold) accounts receivables and falsely accounted for such factoring. ¶66. IRF has admitted that "certain fictitious customer invoices were sold as part of the Japan subsidiary's accounts receivable financing facilities" and that this was a material amount. These sales totaled up to $23 million per quarter in fiscal years 2006 and 2007. ¶68.

As detailed in the Complaint, as a result of factoring fictitious accounts receivables, the Company's financial representations were false and misleading because: (1) Defendants reported inflated cash figures on the balance sheets in violation of SFAS No. 140; (2) Defendants failed to properly report short term debt

---

[6] Emphasis added, citations and footnotes omitted unless otherwise indicated.

associated with these sales; (3) IRF's financials also violated FASB Concept Statement No. 6 by reporting fake assets; and (4) Defendants were able to disguise the poor quality of IRF's earnings.  As accounts receivables get older, investors and analysts expect the income associated with those accounts receivables to be written off.  However, the writing off of accounts receivables is a generally red flag to investors that a company's earnings are not of high quality.  When the Company factored the fictitious accounts receivables, they were removed from the Company's balance sheets and, thus, Defendants were able to conceal from the public the fact that IRF's income had been falsely inflated.  ¶¶69-73.

### D. Defendants Manipulated Margins, Operating Expenses And Pro Forma Earnings By Improperly Characterizing Ordinary Operating Costs As Restructuring Costs

A company's gross margins, pro forma earnings, and operating expenses are criteria that are closely monitored by investors.  In this case, the Company repeatedly issued pro forma financial results in its press releases that excluded certain purportedly one-time expenses.  *See, e.g.*, ¶¶77, 78, 110-114, 119-122, 126-130, 136-139, 143-147, 152-156.  However, unbeknownst to investors, the Company manipulated its gross margins, operating expenses and pro forma earnings by improperly characterizing ordinary operating expenses as unusual, one-time restructuring costs.  ¶¶74, 78-80.

As alleged in the Complaint, restructuring costs are looked upon by the market as one-time charges.  Thus, these types of expenses are often "forgiven" by the market as a nonrecurring expense.  Due to the advantageous nature of a restructuring charge, the accounting guidance in this area is strict and a company must adhere to the accounting requirements of SFAS No. 146 in order to characterize such expenses as one-time charges.  ¶¶82-83.  Significantly, a company cannot record an operating expense as a restructuring charge in error; *such "errors" are done deliberately* in violation of the requirements as set forth in SFAS No. 146. ¶83.

Unbeknownst to investors, expenses that IRF recorded as restructuring costs were, in fact, ordinary operating expenses.  ¶84.  The Company has admitted that it improperly reported ordinary operating costs as restructuring costs in violation of GAAP.  ¶¶85-86.  As a result, the Company's financial statements falsely reported lower than actual ordinary operating expenses, which in turn materially inflated the Company's reported gross margins and gave a false impression of the value of the Company's core business operations.  ¶87.

Defendants knew and/or recklessly disregarded that IRF was improperly classifying these expenses.  According to CW1, Defendant Jurek regularly "scrutinized" and "manipulated" the numbers for the automotive division by reclassifying operating expenses as restructuring costs.  Jurek did this to decrease the operating expense line item for the automotive division in order to increase profit margins for the division.  ¶88.  CW1 has provided specific examples of Jurek's manipulation of the numbers.  *Id*.  According to CW1, Jurek received bonuses based upon the revenues and profit margins of the automotive division.  ¶89.[7]

**E.    Defendants Overstated Net Income In Violation of Tax Laws By Illegally Transferring Income From Higher Tax Jurisdictions to Lower Tax Jurisdictions**

Defendants also engaged in a scheme to underreport the Company's tax liabilities by failing to pay at least *$74 million in taxes*, thereby materially affecting the accuracy of its financial statements.  As the Company has admitted, it understated taxable income in higher tax jurisdictions and overstated taxable income in lower tax jurisdictions by manipulating the Company's "transfer pricing" figures.  Transfer pricing refers to the method by which companies allocate taxable income among individual business units.  According to CW3, who for a time reported directly to Defendant McGee, IRF used transfer pricing to allocate the profit of a sale between the IRF entity manufacturing the product and the IRF entity selling the

---

[7] CW1 worked with the Director of Finance for the automotive division, Mike Love, on a daily basis, who worked with Jurek to implement Jurek's accounting manipulations.  Love reported directly to McGee.  ¶90.

product when the two entities were located in different countries.  ¶98.  Decisions concerning transfer pricing are not left to the various business units, but are performed by officers in a corporation's headquarters.   ¶92.   In this case, *determining the proper allocation of profit was the responsibility of McGee* and IRF's VP of Tax, Chip Morgan.  ¶100.

IRF has admitted it identified issues associated with its transfer pricing methodology and other tax issues for fiscal years 2002 through 2007, and would have to restate its financial results because of these tax manipulations.   ¶¶93-94. Moreover, IRF has disclosed that, in the quarter ended Sept. 30, 2007, it paid $74 million to the IRS and various state agencies in back taxes and interest as a result of Defendants' manipulations and may still owe taxes in other jurisdictions.  ¶95.  The amount of Defendants' manipulation of taxes was material to its reported net income between 2004 and 2007, as the $74 million payment amounted to approximately 22% of IRF's reported $334.39 million net income between 2004 and 2006.  ¶96.

## F.    IRF Reported False and Misleading Cash Flow From Operations By Incorrectly Classifying Tax Benefits

On May 15, 2006, IRF announced it would restate financial results to correct an overstatement of its cash flows from operations.  ¶¶102, 223.  For the six months ended December 31, 2005, IRF overstated its net cash provided by operating activities by $4.3 million by improperly accounting for tax benefits from the exercise of stock options.  ¶101.  The Company presented these excess tax benefits as operating cash flows while SFAS 123R required their presentation as financing cash flows.  ¶102.

The restatement reduced the Company's previously reported cash flows from operations by over $4 million, meaning the Company *overstated its cash flows from operations by approximately 42%* for that quarter.   ¶105.   As explained in the Complaint, cash flow from operations is a critical number to investors.  Reporting

12

cash flow from stock options as cash flow from operations is an egregious violation of the most basic of accounting rules. *Id.*

### G. Defendants Concealed Their Fraudulent Conduct

According to a former senior accountant at IRF, Defendants concealed their fraudulent conduct by appointing unqualified and compliant personnel to head the Company's accounting and control groups. ¶¶107-108. And, when an internal auditor did suspect wrongdoing, according to a former senior accountant with personal knowledge, Defendants fired the would-be whistle blower. ¶109.

### H. Defendants' False and Misleading Statements

As detailed in paragraphs 110 to 264 of the Complaint, Defendants issued numerous false and misleading statements to the investing public regarding the Company's revenues, earnings, cash levels, gross margins, and income, and also falsely certified in SEC filings that the Company was in compliance with GAAP and had implemented adequate internal financial controls.

IRF's reported gross margins were considered by the market to be a key measure of the Company's performance. Indeed, throughout the Class Period, numerous analysts emphasized the importance of IRF's gross margins. ¶76. For example, on October 11, 2005, Citigroup's analyst Craig A. Ellis stated that "the IRF investment case has centered *primarily on gross margin expansion* and secondarily on revenue growth." ¶192.

The importance of the margin number to investors was not lost upon Defendants, who repeatedly emphasized in SEC filings, press releases, and conference calls with analysts that the Company was achieving record revenues, earnings and margins, *largely attributable to IRF's Japan subsidiary. See, e.g.* ¶¶214, 217, 219, 231, 244. For example, on April 27, 2006, Defendants issued a false press release announcing that third quarter revenue was up 7% and that orders were up 27% over the prior quarter. CEO Alex Lidow stated that "[d]emand soared in the March quarter [and] *was strongest in Japan*, where our orders were *up 110*

*percent* on the strength of new digital TV and game station programs." ¶214. Japan, of course, was the same subsidiary that, as discussed above, was always behind in its sales forecasts but always miraculously met those forecasts at the end of each quarter. These, and similar false and misleading statements made by Defendants are detailed with particularity in the Complaint.

## I.   Defendants Partially Disclose Their Fraudulent Scheme

Before the market opened on April 9, 2007, IRF issued a press release partially revealing that the Company had been falsely recognizing revenue and warning investors that its previously released financial statements for the quarters ended September 30, 2005 to December 31, 2006 and for the year ended June 30, 2006 should not be relied upon. ¶266.[8]   Referring to the Investigation, IRF disclosed, *inter alia,* that "the Audit Committee has determined that *material weaknesses in the internal control over financial reporting exist at a foreign subsidiary*...and that the investigation has discovered some *accounting irregularities*...includ[ing] *premature revenue recognition of product sales*."   ¶266. The market's reaction was swift and decisive. As reported by *The Wall Street Journal,* "International Rectifier plunged after telling investors that its financials are faulty" and noted that IRF was the "Big Board's *third largest-percentage decliner*." ¶267. Analyst William Conroy at Sanders Morris Harris immediately cut the Company from "buy" to "neutral," and the stock price fell from a close of $38.80 on April 5, 2007 to a close of $35.97 on April 9, 2007. ¶¶268-269. On April 10, 2007, Moody's Investors Service placed IRF's family and long-term debt ratings under review for possible downgrade, and Standard and Poor's followed suit. On April 23, 2007, an analyst at Cathay Financial cut his rating of IRF from Outperform to Neutral because of the "uncertainty of the investigation." ¶271.

---

[8] Defendant IRF mistakenly reads the Complaint as alleging that IRF's disclosure of the Investigation was itself an "act[] of deception." *See* IRF Br. at 19. Rather, the Complaint identifies the Company's disclosure of the Investigation as a "partial disclosure" because it only partially revealed the truth.

14

Over the next four months, the Company made additional disclosures of wrongdoing.[9]

On May 11, 2007, IRF disclosed that the as yet unidentified subsidiary had a practice of entering unsubstantiated orders, recording sales with no obligation of customers to receive and pay for the products, and routing shipments to warehouses not on the Company's logistical systems. As a result, "*a significant increase in the reported sales by that subsidiary during the quarters ended March 31, 2005 and June 30, 2005 may have resulted from the practice described above*." It cautioned that material weaknesses in internal controls existed, and the financial statements for fiscal year 2005 should no longer be relied upon. ¶272. In response, the stock price fell from a close of $37.07 on May 11, 2007 to $35.80 on May 14, 2007. ¶273.

On July 2, 2007, IRF announced that its Board of Directors had terminated CFO McGee and that Defendant Grant had resigned. ¶275. Several analysts found these terminations significant, with one surmising that they were intended "to correct the lax accounting that has recently hobbled company shares." A Morningstar analyst found McGee's termination "disconcerting" given his 17-year tenure at IRF and speculated that McGee had been forced out because of IRF's accounting problems. ¶277. An article in *CFO Magazine* noted IRF's reticence to explain "where and when the irregularities took place" and posited that "*McGee knows a lot about international finance and accounting – particularly in Japan.* What was clear, however, was that "[t]hey've done some bad things, and no one really knows how bad at this point." ¶278.

Before the market opened on August 30, 2007, IRF announced that CEO Alex Lidow would be taking a leave of absence pending the Investigation, and the

---

[9] Contrary to McGee's assertion, Plaintiffs did not "rush[] to the courthouse with their first complaint on April 17, 2007" or file suit based on "sheer speculation." McGee Br. at 1, 6. Plaintiffs first appeared in this action 60 days after the first complaint was filed when, *after conducting an investigation into the matter*, they sought to be appointed lead plaintiffs. The Consolidated Class Action Complaint is their first complaint in this matter.

stock price fell from a close of $38.39 on August 29, 2007 to $34.87 on August 30, 2007.  ¶279.  The following day, the Company disclosed in its Form 8-K that the accounting manipulations occurred at its Japan unit.  IRF also revealed that it had "*identified issues associated with its transfer pricing methodology and other tax issues for fiscal years 2002 through 2007*" and that the potential tax liability would be *material to income* for those fiscal years, approaching $75 million.  Accordingly, its financial statements for fiscal years 2003 and 2004 should no longer be relied upon.  ¶280.

In a Form 12b-25 also filed on August 31, 2007, IRF disclosed that its Japan subsidiary had "circumvented established controls and processes to record false or premature sales by creating fictitious customer purchase orders in the existing control system," had diverted orders to third party warehouses not reflected on the Company's books, and created a separate, off-books database to manage the fulfillment of the orders through the off-books warehouses.  Additionally, "sales management entered into a number of arrangements at quarter ends with certain distributors to take excess product on verbal terms that included extended payment terms and/or an understanding that product would be taken back at the distributor's request."  The Company announced that it would implement new controls and would be "placing certain key Japanese management team members on administrative leave and removing them from daily operations."  ¶281.

In that same Form 12b-25, IRF also disclosed that certain costs and charges identified as restructuring charges and previously included in its financial statements for fiscal years 2003 to 2007 "should properly have been classified in other items of the income statement or disclosed in a different manner in the Company's footnotes."  The Company was unable to say when it would be able to complete its restatement.  *Id*.

In response, market columnist Herb Greenberg of *Marketwatch.com* noted in a September 7, 2007 column: "The NT-10-K is *like reading a text on how to lie, cheat and steal from shareholders*."  ¶284.

On October 2, 2007, the Company issued a press release announcing that its long-time CEO Alex Lidow would be resigning "effective immediately."   No explanation for the resignation was given, but a separation agreement between IRF and Alex Lidow filed with the SEC indicated that he resigned "[a]t the Company's request."  That same day, IRF announced that it was making sweeping changes in its internal accounting processes, as detailed in the Complaint, but that its Investigation was ongoing.  ¶287.  One of those sweeping changes was a wholesale house cleaning, including a directive that the Company's internal auditors would henceforth report directly to the Audit Committee and IRF's general counsel rather than to management.  *Id.*

**J.    A Recent, Post-Complaint SEC Filing Reveals That, During The Class Period, The Company Engaged In Improper Revenue Recognition At Yet Another Business Unit And That It Is Under Investigation by the SEC, US Attorney, and IRS**

As noted in the Introduction, the Company's investigation is ongoing, and Plaintiffs and the investing public continue to learn more about the fraud at IRF each day.  A SEC Form NT 10-Q filed by the Company on February 11, 2008 has revealed that the Investigation has uncovered revenue recognition improprieties at IRF's A & D segment, and that these accounting violations affected its reported results for fiscal years 2003 through the second quarter of fiscal year 2008.  *See* Pl. RJN Ex. A at 3.  The improprieties include: "(i) shipping product to distributors in an earlier quarter than that in which product was needed..., (ii) shipping product to distributors prior to quarter-ends with a promise to accept returns of the product in a subsequent quarter, and (iii) providing product originally ordered by direct customers to distributors prior to quarter-ends and subsequently reacquiring these products with the payment of fees to the distributors."  *Id.*

1       Additionally, the Company has uncovered "potential unrecorded liabilities"

2   stemming from its failure to "implement[] adequate cutoff procedures for open

3   invoices at each period end.  Consequently, [its] accounts payable and accrued

4   expense balances were understated...."  *Id*.  IRF also engaged in several practices

5   that it euphemistically describes as having "included the *judgmental adjustment* of

6   various elements of quarterly financial results *in an effort to meet quarterly earnings*

7   *targets*"; that the cost of its Investigation as of December 31, 2007 is approximately

8   $48 million; and that, "[s]hould the Audit Committee investigation identify practices

9   similar to those in the Japan Subsidiary and the A & D segment in other Company

10  locations, ... additional efforts may be necessary to finalize the Company's

11  restatement."  *Id*. at 4, 5 and 7.  Thus, IRF has now acknowledged that its improper

12  revenue recognition practices were not limited to its Japan business.  The Company

13  has also revealed that it is being investigated by the SEC, the U.S. Attorney's Office,

14  and the IRS, in connection with these matters. *Id*. at 4-5.

15  **III.   ARGUMENT**

16      **A.   On A Motion To Dismiss Under The PSLRA, The Court

17          Must Accept The Complaint's Allegations As True And
           Construe The Facts In Plaintiffs' Favor**

18      On a motion to dismiss, courts must accept plaintiffs' material allegations as

19  true and construe them in the light most favorable to plaintiffs.  *In re Daou Sys., Inc.*

20  *Sec. Litig.*, 411 F.3d 1006, 1013 (9th Cir. 2005); *Nursing Home Pension Fund, Local*

21  *144 v. Oracle Group*, 380 F.3d 1226, 1229 (9th Cir. 2004).  In its recent decision in

22  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S.Ct. 2499 (2007) ("*Tellabs*"), the

23  Supreme Court reaffirmed that this standard applies to Private Securities Litigation

24  Reform Act ("PSLRA") cases.  The Court also emphasized that "'private securities

25  litigation [i]s an indispensable tool with which defrauded investors can recover their

26  losses' - a matter crucial to the integrity of domestic capital markets."  *Id*. at 2508

27  n.4 (quoting *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 81

28  (2006)).  *See also In re Immune Response Sec. Litig.*, 375 F.Supp.2d 983, 1018 (S.D.

1   Cal. 2005) ("courts must be careful not to set the [post-PSLRA pleading] hurdles so

2   high that even meritorious actions cannot survive a motion to dismiss.   Such a

3   regime would defeat the remedial goals of the federal securities laws.").

4        **B.   Viewed In Their Entirety, The Facts Alleged Give Rise To A**
5        **Strong Inference That Defendants Engaged In Conscious**
         **Misbehavior Or Were Severely Reckless**

6        To establish a violation of §10(b), the PSLRA requires that the Complaint

7   allege with particularity facts giving rise to a strong inference that the defendants

8   acted with scienter.  15 U.S.C. §78u-4(b)(2); *Tellabs,* 127 S.Ct. at 2504.  Defendants

9   act with the requisite scienter when they act either intentionally or with deliberate

10  recklessness.  *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am.*

11  *West Hldg. Corp.*, 320 F.3d 920, 937 (9th Cir. 2003); *DSAM Global Value Fund v.*

12  *Altris Software, Inc.*, 288 F.3d 385, 388 (9th Cir. 2002); *In re Hansen Natural Corp.*

13  *Sec. Litig.*, 527 F.Supp.2d 1142, 1151 (C.D. Cal. 2007).  An actor is deliberately

14  reckless if "he had reasonable grounds to believe material facts existed that were

15  misstated or omitted, but nonetheless failed to obtain and disclose such facts

16  although [he] could have done so without extraordinary effort." *Howard v. Everex*

17  *Sys., Inc.*, 228 F.3d 1057, 1064 (9th Cir. 2000).

18       As explained in *Tellabs,* a complaint pleads scienter where "a reasonable

19  person would deem the inference of scienter cogent and at least as compelling as any

20  plausible opposing inference one could draw from the facts alleged." 127 S.Ct. at

21  2510.   A court must consider "plausible nonculpable explanations for the

22  defendant's conduct, as well as inferences favoring the plaintiff.  The inference that

23  the defendant acted with scienter need not be irrefutable, i.e., of the 'smoking-gun'

24  genre, or even the 'most plausible of competing inferences.'" *Id*.  Since a motion to

25  dismiss is not a trial, Plaintiffs' task is simply to allege enough allegations to support

26

27

28

inferences of scienter that are equally as strong as inferences suggesting innocent conduct.  *Id*. at n.5.[10]

*Tellabs* reaffirmed the well settled principle that "courts must consider the complaint *in its entirety*....   The inquiry, as several Courts of Appeals have recognized, is whether *all* of the facts alleged, *taken collectively*, give rise to a strong inference of scienter, not whether any individual allegation *scrutinized in isolation*, meets that standard."   127 S.Ct. at 2509 (citing *Gompper v. VISX, Inc*., 298 F.3d 893, 897 (9th Cir. 2002).[11]   Thus, Defendants' invitation here to view each of Plaintiffs' allegations in isolation should be rejected.  *See, e.g.,* IRF Br. at 15-16; A. Lidow Br. at 7; McGee Br. at 15-19.[12]

Defendants attempt to distance themselves from the fraud at IRF by suggesting it was the work of some lower level employees acting without the knowledge of senior management.  However, when the Court examines the facts as a

[10]  Both direct and circumstantial evidence can give rise to a strong inference of scienter.  *Livid Hldgs. Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 948 (9th Cir. 2005); *In re Network Assocs. Sec. Litig.*, 2003 U.S. Dist. LEXIS 14442 at **46-47 (N.D. Cal. Mar. 25, 2003).

[11]  *See, e.g., Am. West*, 320 F.3d at 945 (reversing district court's dismissal of complaint because "although ... some of Plaintiffs' allegations are individually lacking, ... the allegations in their totality are sufficient to meet the stringent pleading standard set forth in the PSLRA"); *In re NorthPoint Communs. Group, Inc. Sec. Litig.*, 221 F.Supp.2d 1090, 1102 (N.D. Cal. 2002) (even where each "allegation is slightly flawed, taken together they speak to more than just unfounded office gossip or mistaken understandings"); *In re Philip Servs. Corp. Sec. Litig.*, 383 F.Supp.2d 463, 476 (S.D.N.Y. 2004) (defendant "cannot secure dismissal by cherry-picking" plaintiff's allegations).

[12]  Defendants complain that the Complaint is too lengthy and detailed, in violation of Federal Rule of Civil Procedure 8(a)'s requirement that the Complaint contain a short and concise statement of the claim.  *See* IRF Br. at 21; A. Lidow Br. at 3; McGee Br. at 13 n.5.   The Supreme Court addressed this point in *Tellabs,* noting that, while "[i]n an ordinary civil action ... the rule encourages brevity, the complaint must say enough to give the defendant 'fair notice of what the plaintiff's claim is and the grounds upon which it rests.'"  127 S.Ct. at _2507 (citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346 (2005)).  Plaintiffs' detailed allegations here reflect that fact and reality that the PSLRA requires specific and detailed allegations in order to withstand dismissal.   Thus, Alex Lidow's citation to *McHenry v. Renne,* 84 F.3d 1172 (9th Cir. 1996), is hardly persuasive, since it did not involve a securities fraud claim that is subject to the PSLRA's stringent pleading standard.  Here, the length of the Complaint is particularly appropriate given that Defendants' fraudulent scheme spanned four years and encompassed a variety of improper accounting machinations, each of which is alleged with sufficient particularity.

whole, the inference of Defendants' knowledge or deliberate recklessness is indeed strong and compelling.

### 1. The Number and Extent of GAAP Violations and the Magnitude of the Impending Restatement Support A Strong Inference of Scienter

While GAAP violations alone may not suffice to establish scienter, they can nevertheless support a strong inference of scienter. *Daou*, 411 F.3d at 1023; *In re Impax Labs., Inc. Sec. Litig.*, 2007 U.S. Dist. LEXIS 52356 at **24-25 (N.D. Cal. July 18, 2007) (when significant GAAP violations are described, they provide powerful indirect evidence of scienter); *In re Adaptive Broadband Sec. Litig.*, 2002 U.S. Dist. LEXIS 5887 at *38 (N.D. Cal. Apr. 2, 2002) (same).[13]

Under GAAP, a restatement is considered extraordinary, because it is only required for material accounting errors or irregularities that either were known or should have been known at the time the financial statements were prepared. *See* 17 C.F.R. §210.4-01(a). In this case, Defendants' impending restatement is hardly consistent with "honest error." *See* McGee Br. at 16.[14]

---

[13] The fact that a company violates its own accounting policies can also support an inference of scienter. *See, e.g., Provenz v. Miller*, 102 F.3d 1478, 1490 (9th Cir. 1996); *In re Nuko Info. Sys., Inc. Sec. Litig.*, 199 F.R.D. 338, 343 (N.D. Cal. 2000); *Official Unsecured Creditors Comm. of Media Vision Tech. v. Jain*, 215 F.R.D. 587, 588 (N.D. Cal. 2003) (compiling cases).

[14] McGee cites a case that was *reversed* by the 8th Circuit, *In re Green Tree Fin. Corp. Stock Litig.*, 61 F.Supp.2d 860, 877 n.21 (D. Minn. 1999), *rev'd, Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645 (8th Cir. 2001) (reversing district court's dismissal of complaint), for the proposition that a restatement is fully consistent with "honest error" and "is not an admission that defendants knowingly made accounting mistakes or overlooked material information." McGee Br. at 16. However, a restatement, especially when coupled with other scienter evidence, can give rise to a strong inference of scienter. *Adaptive Broadband*, 2002 U.S. Dist. LEXIS 5887 at *42; *In re Cylink Sec. Litig.*, 178 F.Supp.2d 1077, 1084 (N.D. Cal. 2001). *See also In re Mercator Software, Inc. Sec. Litig.*, 161 F.Supp.2d 143, 150 (D. Conn. 2001) (firing of VP of Finance and CFO's resignation on same day as restatement announced was evidence of scienter). Similarly, a company's admissions of wrongdoing and serious deficiencies in its internal accounting controls as a result of an internal investigation can constitute compelling evidence of scienter. *See, e.g., In re Nature's Sunshine Prods. Sec. Litig.*, 2007 U.S. Dist. LEXIS 37018 at *29 (D. Utah May 21, 2007) (plaintiffs met the pleading requirements of scienter through, *inter alia,* supporting documents including the investigation by a special committee).

1    Although Defendants attempt to characterize the restatement as involving

2    nothing more than "mere publication of inaccurate accounting figures," *see, e.g.,*

3    McGee Br. at 16-17, this case involves far more than that.  The GAAP violations

4    here will necessitate a massive restatement of over *four years* of financial results for

5    numerous accounting violations that were obviously intentional in nature.

6    In this case, the magnitude and pervasiveness of the accounting violations and

7    impending restatement strongly support an inference of Defendants' scienter.  *See*

8    *id.* ("Lead Plaintiff has alleged substantial evidence that improper recognition was so

9    widespread...that senior management must have known of the practice.  This is

10   powerful circumstantial evidence of scienter.").[15]  As explained in *Rehm v. Eagle*

11   *Fin. Corp.,* 954 F.Supp. 1246, 1256 (N.D. Ill. 1997), "the magnitude of reporting

12   errors may lend weight to allegations of recklessness....  The more serious the error,

13   the less believable are defendants['] protests that they were completely unaware of

14   [the company's] true financial status and the stronger is the inference that defendants

15   must have known about the discrepancy."

16   Here, the magnitude of the restatement is staggering, with the Company

17   planning to restate at least *four years* of financial statements, for fiscal years 2003,

18   2004, 2005 and 2006, and the possibility of additional restatements still lurking

19   while the Investigation continues *into its twelfth month.* Similar cases involving

20   multiple-year restatements have found this to be strong evidence of *scienter.  See,*

21   *e.g., Communs. Workers of Am. Plan for Emples Pensions and Death Bents. v. CSK*

22   *Auto Corp.,* 525 F.Supp.2d 1116, 1122-1126 (D. Ariz. 2007) (five years of financial

---

[15] It is well settled that the magnitude of a restatement can establish a strong
inference of scienter. *See Fla. State Bd. of Admin.v. Green Tree Fin.,* 270 F.3d 645,
665 (8th Cir. 2001) ("the sheer size of the...write-down adds to the inference that the
defendants must have been aware the problem was brewing"); *Rothman v. Gregor,*
220 F.3d 81, 92 (2d Cir. 2000) (magnitude of write-offs rendered "less credible"
defendants' arguments that they acted without scienter); *In re Hypercom Corp. Sec.*
*Litig.,* 2006 U.S. Dist. LEXIS 2669 at *13 (D. Ariz. Jan. 24, 2006) ("the greater the
magnitude of the restatement or GAAP violation, the more likely that such a
restatement or violation was made consciously or recklessly"); *MicroStrategy,* 115
F.Supp.2d at 637 (significant overstatements of revenue tend to support the
conclusion that defendants acted with scienter).

restatements and unexplained resignations of CEO, CFO, and COO sufficient to survive dismissal); *In re ProQuest Sec. Litig.*, 527 F.Supp.2d 728, 743 (E.D. Mich. 2007) (restating seven years of earnings and firing financial VP raised a "quite compelling" inference of scienter).

Moreover, while the Company has yet to restate, it is clear from the Company's admissions to date that the amounts involved are pervasive – they are material to income, revenue, earnings and gross margins.  For example, just the restatement of tax liabilities in the amount of $74 million to date constitutes approximately 22% of IRF's reported net income between 2004 and 2006.  ¶96.  In another example, the Company's May 15, 2006 disclosure that it overstated cash flows from operations by improperly accounting for tax benefits from the exercise of stock options will reduce its previously reported cash flows from operations by over $4 million – *approximately 42%* for the quarter ended March 31, 2006.  ¶¶101-105. In yet another example, the Company disclosed that certain fictitious customer invoices which were sold as accounts receivable "were in an aggregate amount of up to $23 million per quarter" in fiscal years 2006 and 2007 and would be restated as short-term debt.  ¶10.

These matters were also material in terms of their effect on the market and Company's stock price.  As discussed in §2(H) *supra,* throughout the Class Period, investors were keenly monitoring IRF's publicly reported gross margins.  ¶11. IRF's stock price was closely linked to its reported gross margins.  ¶12.  Alex Lidow and McGee repeatedly touted the success of its Japan business unit and particularly its Japanese gaming products as the reason for IRF's record margins, earnings, revenues and customer backlogs each quarter.  *See, e.g.,* ¶¶214, 217, 219.  In fact, the Company itself has admitted that "*a significant increase* in the reported sales by [the Japan unit] during the quarters ended March 31, 2005 and June 30, 2005 may have resulted" from the fraudulent accounting practices there.  ¶272.  With these rosy (but false) press releases, financial reports, and statements, analysts issued

favorable ratings for IRF and the stock price rose.  *See* §2(H), *supra.*  However, as also discussed above, the market reacted swiftly and adversely when the truth was revealed.  *See id.*  For example, *The Wall Street Journal* reported that "International Rectifier plunged after telling investors that is financials are faulty," and IRF was the "Big Board's third largest-percentage decliner" for that day.  ¶267.

In light of the fact that it was openly discussed by and well known to senior officers and executives that the Japan unit consistently had trouble meeting its earnings and sales forecasts but always "miraculously" met or exceeded those forecasts at the end of each quarter, (*see, e.g.,* ¶¶53, 55, 59-60), and the additional facts that Alex Lidow and McGee reviewed on at least a daily basis Vision reports that would have shown the fictitious and premature sales (*see* ¶¶52-53), and that Jurek, Grant and Esaka regularly authorized improper bogus shipments so the Japan subsidiary could make numbers (¶49) it is inconceivable that Defendants were unaware of the accounting manipulations in the Japan unit, particularly where Defendants credited Japan for so much of IRF's success.[16]  This is particularly true given that IRF and its subsidiaries operated as a single, centralized unit, with the Company's consolidated financial statements including results from all of its business units.  ¶¶303-304, 310.  *See* §III.C, *infra.*[17]

---

[16] *See Am. West,* 320 F.3d at 943 n.21 (notion that a major company issue did not come to the attention of management was "patently incredible" and "absurd"); *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702 (7th Cir. 2008) ("*Tellabs II*") (same); *In re PeopleSoft, Inc. Sec. Litig.*, 2000 U.S. Dist. LEXIS 10953 at **8 -10 (N.D. Cal. May 26, 2000) (courts have held that "facts critical to a business's core operations or an important transaction generally are so apparent that their knowledge may be attributed to the company and its key officers"); *In re Musicmaker.com Sec. Litig.*, 2001 U.S. Dist. LEXIS 25118 at *73 (C.D. Cal. June 4, 2001) (complaint alleged strong inference of scienter against CEO where transaction represented a significant source of income to the company).

[17] Contrary to Defendants' assertion, *In re Read-Rite Corp. Sec. Litig.*, 335 F.3d 843 (9th Cir. 2003), did not "reject" the notion that facts critical to a business' core operations can be so apparent that their knowledge may be attributed to key officers. *See* McGee Br. at 15; A. Lidow Br. at 7.  The court merely indicated that after *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970, 985 (9th Cir. 1999), plaintiffs must plead particular facts raising a strong inference of knowledge or deliberate recklessness; knowledge cannot simply be presumed.  335 F.3d at 848.  *See In re Impax,* 2007 U.S. Dist. LEXIS 52356 at **29-30.  Moreover, here, unlike in *In re Vantive Corp. Sec. Litig.*, 110 F.Supp.2d 1209, 1218 (N.D. Cal. 2000), *aff'd*, 283 F.3d 1079 (9th

1    In such instances, GAAP violations do indeed support scienter because,

2  "[a]fter all, books do not cook themselves."  *In re McKesson HBOC, Inc. Sec. Litig.*,

3  126 F.Supp.2d 1248, 1273 (N.D. Cal. 2000).

4    Given these facts, it defies credulity for the Defendants who had responsibility

5  for IRF's financial, reporting, disclosure, and legal obligations to assert that they

6  were unaware of the fraud.  Contrary to Defendants' contention, *see* A. Lidow Br. at

7  6 and McGee Br. at 15, "Defendants' positions and experience are factors that pled

8  with others (e.g., the size of the accounting irregularities and that they pertained to

9  [the Company's] most important assets) [can] state scienter with the required

10  measure of specificity.  To the extent Defendants argue that position-and-experience

11  evidence is incompetent as proof of scienter, the Court has not found any case to that

12  effect and Defendants have brought none to the Court's attention. Indeed, most

13  authorities have found the opposite." *In re Triton Energy Ltd. Sec. Litig.*, 2001 U.S.

14  Dist. LEXIS 5920 at *33 (E.D. Tex. Mar. 30, 2001).[18]

15    At the very least, these facts strongly suggest that Defendants were

16  deliberately reckless or chose to remain "willfully ignorant" of the wrongdoing.  *See*

17

18  _____

19  Cir. 2002), and *In re Copper Mountain Sec. Litig.*, 311 F.Supp.2d 857, 872 (N.D.
   Cal. 2004), Plaintiffs' allegations regarding the importance of Japan's performance
20  to IRF's bottom line and the significant oversight that Defendants had over Japan's
   operations are neither "boilerplate" nor non-specific, unsubstantiated allegations.
   [18] *See, e.g., In re Syncor Int'l. Corp. Sec. Litig.*, 327 F.Supp.2d 1149, 1163 n.6 (C.D.
21  Cal. 2004), *aff'd in part and rev'd in part on other grounds,* 239 Fed. Appx. 318
   (9th Cir. 2007) ("the Court considers the defendants' positions in the company as
22  one factor in determining scienter, [although] their positions cannot be the sole basis
   of such a finding"); *In re Alstom, S.A. Sec. Litig.,* 406 F.Supp.2d 433, 459-60
23  (S.D.N.Y. 2005) ("*Alstom I*") (defendants' positions as CEO and CFO, together with
   their direct involvement in day-to-day operations, signatures on false SEC filings,
24  duty as signors to familiarize themselves with facts relevant to company's core
   operations, importance of company's Marine division and fact that it was the
   company's fastest growing unit and the situs of the fraud, all combined to allege a
25  strong inference of their scienter); *In re Am. Bank Note Holographics Sec. Litig.,* 93
   F.Supp.2d 424, 448 (S.D.N.Y. 2000) (finding scienter allegation sufficient as to
26  CFO and controller who, because of their positions, were "uniquely situated" to
   control revenue recognition procedures, and revenues had been overstated for a
27  period of two years in SEC filings); *MicroStrategy,* 115 F.Supp.2d at 637 (such facts
   "cry out, how could the defendants not have known that the financial statements
28  were false'").

1 *In re Cell Pathways, Inc. Sec. Litig.,* 2000 U.S. Dist. LEXIS 8584 at *27 (E.D. Pa.
2 June 20, 2000).

3       **2.**      **The *Nature* Of The Accounting Violations Strongly**
4             **Suggests Scienter**

5       Where, as here, the *nature* of the accounting violations reflects conscious
6 misbehavior and/or deliberate recklessness, the Complaint establishes a strong and
7 cogent inference of scienter.  *See, e.g., In re AOL Time Warner Inc. Sec. & ERISA*
8 *Litig.,* 381 F.Supp.2d 192, 229-30 (S.D.N.Y. 2004) ("If in fact [defendant]
9 engineered a separation transaction to make it appear that [the company] was
10 receiving $20 million in ... revenue, when in actuality it was giving itself its own
11 money, then [defendant] has acted fraudulently."); *Philip Servs.*, 383 F.Supp.2d at
12 471-72 (active facilitation of accounting fraud constitutes conscious misbehavior).

13       Here, the nature of the accounting violations strongly suggests scienter,
14 because "violations involving the premature or inappropriate recognition of revenue
15 suggest a *conscious choice* to recognize revenue in a manner alleged to be improper,
16 and may therefore support a stronger inference of scienter."  *In re The Baan Co. Sec.*
17 *Litig.,* 103 F.Supp.2d 1, 21 (D.D.C. 2000).  *See also McKesson,* 126 F.Supp.2d at
18 1273 (holding that where revenue inflation is "widespread and significant" a strong
19 inference arises that "senior management intentionally misstated earnings").
20 Specifically, Defendants' inappropriate recognition of revenue, fictitious sales,
21 bogus shipment of product, channel stuffing, and understatement of taxable income
22 all suggest a *conscious decision* to violate GAAP and the Company's own
23 accounting policies.  *See, e.g., Chu v. Sabratek Corp.,* 100 F.Supp.2d 815, 821 (N.D.
24 Ill. 2000) (allegations that defendants booked revenue on "phony" and
25 "consignment" sales established scienter).[19]

26     
27 [19] As Defendant Grant concedes, and as explained in *"Tellabs II,"* while "[a] certain
amount of channel stuffing could be innocent[,] … *it becomes a form of fraud …*
28 *when it is used, as the complaint alleges, to book revenues on the basis of goods*
*shipped but not really sold because the buyer can return them.*  They are in effect
sales on consignment, and such sales cannot be booked as revenue."513 F.3d at 709.

Similarly, Defendants' improper characterization of ordinary operating expenses as unusual, one-time restructuring costs and their reporting of cash flow from stock options as cash flow from operations were not minor violations and were not done in error; such "errors" are done deliberately in violation of basic accounting principles. *See* ¶¶74, 83, 105. Another court has described similar conduct—the unsupported accounting of operational expenses as capital expenses—as "criminal." *In re Worldcom, Inc. Sec. Litig.*, 346 F.Supp.2d 628, 640 (S.D.N.Y. 2004). *See also U.S. v. Ebbers*, 458 F.3d 110, 112 (2d Cir. 2006), *cert. denied,* 127 S.Ct. 1483, 167 L. Ed. 2d 244 (2007) (affirming conviction for fraudulent scheme that "primarily involved" capitalization of operating expenses).[20]

In dealing with a similar issue, the court in *MicroStrategy* explained that although "[t]he mere fact that there was a restatement or a violation of GAAP, by itself, cannot give rise to a strong inference of scienter; the *nature* of such a restatement or violation, however, may ultimately do so." 115 F.Supp.2d at 635 (emphasis in original). The court explained:

> This is so because violations of simple rules are obvious, and an inference of scienter becomes more probable as the violations become more obvious. Put another way, if the GAAP rules and...accounting policies Defendants are alleged to have violated are relatively simple, it is more likely that the Defendants were aware of the violations and consciously or intentionally implemented or supported them, or were reckless in this regard.

That is precisely what happened in this case, and thus Grant's reliance on *Steckman v. Hart Brewing Inc.,* 143 F.3d 1293, 1298 (9th Cir. 1998), and *In re ICN Pharms. Sec. Litig.,* 299 F.Supp.2d 1055, 1061-62 (C.D. Cal. 2004), *aff'd,* 184 Fed. Appx. 672 (9th Cir. 2006), is misplaced. *See* Grant Br. at 12.

[20] Consequently, there is no basis for McGee's contention that the accounting violations that were unrelated to the Company's Japan business "involved no *hint* of misconduct by anyone." *See* McGee Br. at 7; *see also id.* at 8. Nor has he presented plausible, non-culpable inferences that are more compelling than the inference that these were deliberate violations of basic accounting rules and tax laws.

1   *Id.* at 638.  *See also Montalvo v. Tripos, Inc.*, 2005 U.S. Dist. LEXIS 22752 at *22

2   (E.D. Mo. Sept. 30, 2005) (refusing to dismiss complaint alleging violations of

3   "clear and precise" GAAP rules).

4        The fact that employees at the Company joked about the trailers in the parking

5   lot and IRF's improper revenue recognition practices further supports a strong

6   inference of scienter.  *See Greebel v. FTP Software, Inc.,* 194 F.3d 185, 202 (1st Cir.

7   1999) (stating that intentional warehousing of products where there is no obligation

8   or expectation that products will be purchased is considered "very serious"); *In re*

9   *Enron Corp. Sec., Deriv. & ERISA Litig.*, 2003 WL 22331268 at *3 (S.D. Tex. Apr.

10  22, 2003) (workplace environment where fraudulent techniques were joked about

11  evidenced scienter).

12        **3.    Defendants' Knowledge of Contrary Facts Obtained
                   From Internal Reports and Meetings Supports A
13                 Strong Inference of Scienter**

14        Plaintiffs' allegations do not, however, rest alone on the nature and magnitude

15  of the restatement.  Rather, the Complaint alleges that Defendants were aware of the

16  fraud or were deliberately reckless by turning a blind eye to the evidence of the

17  fraud.  Specifically, and contrary to Defendants' assertions (*see* A. Lidow Br. at 1-2,

18  8-9; McGee Br. at 3, 10, 12, 15, 19, 20; Grant Br. at 2, 13, 14), the Complaint

19  alleges far more than that Defendants' access to the internal reports "*could*" have

20  informed them of the wrongdoing.  *See also* IRF Br. at 4 (claiming that Plaintiffs

21  have merely alleged that Alex Lidow and McGee "*should* have known about the

22  fraud").  Rather, Defendants' contemporaneous receipt and review of these reports

23  and their attendance at meetings discussing these matters *would* in fact have revealed

24  the fraudulent sales and shipments.[21]  According to CW3, who from 2001 to 2003

25  _____
26  [21]  Thus, IRF is simply incorrect in claming that "Plaintiffs do not allege that
      [Alex Lidow and McGee] were aware of this practice."  IRF Br. at 5.  According to
27  Alex Lidow, the complaint relies on a "blanket assertion that Lidow *could* have
      reviewed sales information on a company database and 'received daily reports with
28  revenue information.'"  A. Lidow Br. at 9 (citing ¶53).  However, that is *not* what
      the Complaint alleges.  Rather, it alleges that Alex Lidow *did in fact* review those
      reports every day and more often than daily at the end of financial quarters.  ¶53.

was the Director of Finance and reported directly to McGee, *Defendants Alex Lidow and McGee utilized the Vision system to review revenue information on at least a daily basis and more often at the end of quarters*. ¶98.[22]   According to CW3, Alex Lidow and McGee *also received daily reports with revenue information from the current day*.   ¶53.  Alex Lidow claims that CW3's allegation "does not even begin to establish scienter."  A. Lidow Br. at 8.  However, according to CW1, *shipments made either prematurely or without a purchase order would have shown up on the Company's Vision system as shipments without a corresponding customer order* and thus would have revealed the fraudulent sales, or at the very least raised a red flag.  ¶52.[23]

McGee claims that one cannot plead securities fraud by pointing to the existence of routine business records.  McGee Br. at 3.  That is simply not true.  Where, as here, the Complaint alleges that company records would have disclosed wrongdoing or at least raised a red flag, such allegations provide classic evidence of scienter.[24]   *See, e.g., Nursing Home*, 380 F.3d at 1230-31 (finding strong inference

---

Alex Lidow is not free to rewrite the allegations of the Complaint to suit his purposes.

[22] CW3's position from 2001 to 2003 shows that McGee is incorrect when he claims that the CWs were several levels below him in the corporate hierarchy.  McGee Br. at 3.  McGee admits this fact but states:  "but that was in 2001-2003 *before the alleged Class Period.*"  McGee Br. at 3.  That is *also* not true.  The Class Period runs from July 31, 2003 through August 29, 2007.  *See* Complaint at 1.  CW1 later worked with the Director of Finance for the automotive division, Mike Love, on a daily basis, who worked with Jurek to implement Jurek's accounting manipulations.  Love reported directly to McGee.  ¶90.  CW1 has stated that Jurek also reported to Grant.  ¶48.

[23] As alleged in the Complaint, the Vision system provided a detailed analysis of the Company's customer orders including global sales forecasts, sales forecasts for each subsidiary, production forecasts, actual production data, inventory levels, shipments, early shipments, and customer orders.  ¶98.  Thus, contrary to Alex Lidow's assertion, the Complaint does indeed include an "adequate description of the[] contents" of the Vision reports and does allege with specificity the particular information that Lidow reviewed and how that information would have alerted Defendants to the fraud.  *See* A. Lidow Br. at 9.

[24] McGee claims that Plaintiffs fail to plead any facts to demonstrate how "missing customer numbers" should have alerted him to any accounting or financial reporting errors or fraud.  *Id.* at 11 n.3.  However, at the very least, a CFO who was not deliberately ignoring his duties as the Company's principal financial officer and who was well aware of the importance of the Japan unit's sales numbers and forecasts in

29

of scienter where contemporaneous reports, available to the person making forecasts, contradicted defendants' statements); *Immune Response*, 375 F.Supp.2d at 1022 (scienter was adequately pled where plaintiffs alleged defendants had access to specified reports or statements containing contrary facts, and described meetings where issues were discussed) (distinguishing *Silicon Graphics*, 183 F.3d at 985).[25] Defendants' authorities to the contrary are inapposite.[26]

CFO McGee protests that he knew nothing about any of the accounting wrongdoing at the Company and that none of it was his "fault."  *See* McGee Br. at 3, 11.  In a similar vein, CEO Alex Lidow claims that the detailed allegations lead to only one reasonable inference:  that specific employees who engaged in the misconduct "obscured their actions from Lidow" and that he himself was deceived by the wrongdoers and was thus a victim of the fraud.  *See* Lidow Br. at 4, 6.[27]

order to meet analysts' expectations regarding gross margins, earnings, profits and sales *would* have inquired into missing purchase orders and premature shipments of product.

[25] *See also In re Lattice Semiconductor Corp. Sec. Litig.,* 2006 U.S. Dist. LEXIS 262 at \*\*40, 41, 44, 50 (D. Or. 2006) (allegations that defendants attended monthly and quarterly financial review meetings and received daily and weekly reports based on databases tracking products showed that defendants had access to information, and supported strong inference of scienter); *In re NextCard, Inc. Sec. Litig.,* 2006 U.S. Dist. LEXIS 16156 at \*17-18 (N.D. Cal. Mar. 20, 2006) (scienter pled where defendants met daily to devise ways to reduce loan losses, and received weekly status reports); *Schlagal v. Learning Tree Int'l,* 1998 U.S. Dist. LEXIS 20306 at \*54 (C.D. Cal. Dec. 23, 1998) (scienter requirement satisfied by allegations that defendants had knowledge of critical adverse information because they received monthly operations reports, monthly financial reports, and daily management information system reports tracking company's daily performance, and regularly attended board meetings).

[26] Here, unlike in *Apple,* 243 F.Supp.2d at 1026, Plaintiffs have alleged more than that Lidow and McGee had "*access* to data."  They have alleged that Lidow and McGee actually *saw* the data that would have revealed the fraud.  Nor does the Complaint make "general allegations of 'negative internal reports.'" *In re Vantive Corp. Sec. Litig.,* 283 F.3d 1079, 1088 (9th Cir. 2002).  Rather, as required by *Vantive,* the Complaint includes "adequate corroborating details," including the sources of the information, how Plaintiffs learned of the reports, which officers received them, and an adequate description of their contents. *Id.* at 1087. *See* ¶¶29-30, 52-53, 59-60, 98, 308(a).

[27] Similarly, Defendant Grant, IRF's Senior VP of Global Sales and Marketing, claims that the Japan unit "hid" the false shipments through another set of books.  Grant Br. at 4, 11.  While the Japan unit may have hidden these false shipments from the investing public, it certainly did not hide them from Defendant Grant, as he was fully aware of what Japan was doing and indeed authorized it. *See* ¶¶55, 59, 60.

Defendants' arguments fail for several reasons.  Most poignantly, these arguments beg the question:  Why were they fired?  As discussed in §III.B.6, *infra*, where, as here, the senior officers a corporation are fired in the wake of revelations of accounting fraud and a massive restatement, that fact raises a strong inference of their *scienter*.  Thus, Lidow's assertion that the only plausible inference is that he was a victim of the fraud rings hollow.  Moreover, the premise of Lidow's argument – that the wrongdoers concealed their wrongdoing from the Individual Defendants – has no basis in fact or in the allegations of the Complaint, which must be accepted as true.  *See Tellabs,* 127 S.Ct. at 2509.  Contrary to his assertion, the Complaint alleges that the *Defendants* kept two sets of books, ¶3, and that "all of these fictitious accounts created in the Japan subsidiary became so confusing that ... the Company created a separate set of books *to track the real sales versus the fictitious sales.*"  ¶10.  *See also* 281 ("[s]ervice personnel created an off-books database *to assist with managing the fulfillment of the orders* through the off-books warehouses).  The Complaint does *not* allege that the "wrongdoers" kept two sets of books to conceal the wrongdoing *from* the Defendants.

In light of the facts that (i) the fraud at the Japanese subsidiary was authorized by senior officers in the Company's headquarters working directly under Lidow and McGee (¶¶19, 33, 49, 50, 55, 59, 60), (ii) Lidow and McGee repeatedly touted the record revenues at the Japanese business and the purportedly historic profit margins that were largely attributable to the Japan unit, (iii) Alex Lidow and McGee were both fired from the Company in the wake of the revelations of wrongdoing, the more compelling inference is that they knew or recklessly disregarded the truth.

### 4. The Company's Dismissal Of An Employee Who Sought To Investigate The Wrongdoing At The Japan Subsidiary And Defendant McGee's Role Therein Further Bolsters The Strong Inference Of Scienter

Additional evidence of Defendants' scienter is the fact that the Company terminated the employment of an internal auditor at IRF who sought to investigate

suspicious activities at the Japan subsidiary and Defendant McGee's role therein. As explained in the Complaint, when in the course of an audit of IRF's Japan subsidiary, Mark Larson, an internal auditor at the Company, became aware of certain suspicious activities at the Japan subsidiary and sought to investigate, he was instructed to discontinue his investigation and was not allowed to travel to Japan. He was "laid off" (or forced to resign) shortly thereafter.  ¶109.

The Company's successful squelching of Larson's investigation into wrongdoing and McGee's possible role in it is further evidence of scienter, as it shows an awareness of possible wrongdoing and an attempt to conceal it.  Not surprisingly, courts consistently recognize that the fact that the company is informed of potential fraud constitutes direct evidence of scienter.  *See*, *e.g.*, *In re Catalina Mktg. Corp. Sec. Litig.*, 390 F.Supp.2d 1110, 1115 (M.D. Fla. 2005) (fact that defendants were confronted by employees about the misstatements supports a finding of scienter); *In re Hamilton Bancorp, Inc. Sec. Litig.*, 194 F.Supp.2d 1353, 1358 (S.D. Fla. 2002) (fact that "the fraud was brought to management's attention" supported a strong inference of scienter); *In re Kidder Peabody Sec. Litig.*, 10 F.Supp.2d 398, 416 (S.D.N.Y. 1998) ("Based on this evidence [that employees raised concerns about the potential for profit distortions], a reasonable trier of fact could conclude that if officials at [the company] remained ignorant of Jett's false profits it was because they deliberately chose to look the other way.").

### 5. The Corroboration Of The Fraud By Numerous Confidential Former Employees Of The Company Is Strong Evidence Of Scienter

As detailed above, *see* §II *supra,* and in the Complaint, Plaintiffs have identified 17 former employees at IRF who, as confidential witnesses (CWs), provided substantial corroboration for Plaintiffs' allegations that Defendants were aware of the accounting gimmickry at IRF and either participated in it or willfully ignored what was taking place, in disregard of their duties as officers and executives charged with truthfully conveying the Company's results of operations.  Again, it

must be emphasized that these CWs revealed accounting machinations that were not limited to Japan or to improper revenue recognition but involved a variety of tricks designed to inflate results of operations. *See, e.g.,* ¶¶88, 90 (according to CW1, Jurek regularly scrutinized and manipulated the numbers for the automotive division by reclassifying operating expenses as restructuring costs, in order to increase profit margins for the division, and the director of finance for the automotive division, who reported directly to McGee, worked with Jurek to implement Jurek's accounting manipulations).

Defendants improperly characterize the CWs here as "an assortment of relatively low-level former IR employees" (IRF Br. at 4; *see also* McGee Br. at 3), when in fact, several of them were members of senior management and, in some cases, reported directly to Defendants. *See, e.g.,* ¶48 (CW1 was VP of Automotive Systems Product Development who reported to Jurek); ¶98 (CW3 was Director of Finance who reported to McGee and then later Director of Strategic Projects who reported to IRF's Chief Operating Officer); ¶54 (CW4 was Director of Corporate Sales Operations); ¶306(a) (CW9 was VP of Internal Marketing and Development and also VP of Business Development).[28]

Defendant Grant claims that the information obtained from CW1 should be "given no credence" because it was not based on CW1's personal knowledge. *See* Grant Br. at 15 (citing ¶49).[29]  However, CW1 did indeed have personal knowledge, as the Complaint alleges that Jurek *told* CW1 that Jurek, Grant and Esaka would regularly meet forecasted numbers for the Japan subsidiary *by authorizing bogus shipments of product*.  ¶49.  At the end of fiscal quarters, pursuant to Jurek, Grant and Esaka's authorization, IRF would load product on tractor trailers as if it was

---

[28] In a transparent attempt to minimize the importance of these sources and their role in the Company, IRF refers to CW1 as someone "who worked in the automotive division in El Segundo," IRF Br. at 4, when in fact, as noted, CW1 was a *Vice President* who had responsibilities in several of IRF's international divisions and who *reported to Defendant Jurek*.  ¶49.

[29] As noted, CW1 reported to Jurek, who reported directly to Grant and CEO Alex Lidow.  ¶48.

being shipped to a customer when, in fact, Jurek, Grant and Esaka knew the product would remain on the trailer in IRF's parking lot or would be sent to a warehouse to be stored until a real customer placed a real order for the product.  According to CW1, the Company recognized revenue at the time of the bogus shipments.  *Id*.

Grant attempts to explain away this damaging revelation of his role in the fraud as nothing more than "gossip" and "hearsay" that is probative of nothing. Grant Br. at 15.  Quite the contrary, Jurek's statement to CW1 constitutes a key admission against interest, and clearly is probative of Grant's (and Jurek and Esaka's) scienter.  *See* Fed. R. Evid. 801(d)(2)(D) (admission by party-opponent is not hearsay).  Moreover, a complaint need not plead admissible evidence.[30]

Grant's scienter is further bolstered by CW4, who indicates that the Japan unit was always behind in its forecasted numbers, about which CW4 constantly emailed Grant and Esaka.  However, at the end of quarters, according to CW4, Japan would regularly, and miraculously, make its forecasts by manipulating its earnings.  ¶¶55-56.  Further corroboration of Grant's scienter comes from CW5, who personally participated in conference calls with Grant and Esaka four to five times each quarter. ¶59.  As explained in the Complaint:

> CW5 recalls several…conference calls during which Esaka informed Grant that the Japan subsidiary was not going to make its earnings forecast.…   [I]n these instances Grant told Esaka *to go to his customers and ask them for permission to ship product earmarked for the next quarter early*.  … Esaka informed Grant that he had already made such requests and no additional customers were willing to do so.

---

[30] *Marsden v. Select Med. Corp.*, 2006 U.S. Dist. LEXIS 16795, at *43 (E.D. Pa. Apr. 6, 2006) (refusing to disregard information from witnesses who "lacked *personal* knowledge" and "at most, repeat[ed] 'hearsay'") (emphasis in original); *McKesson*, 126 F. Supp. 2d at 1272 ("Some defendants appear to argue that the newspaper articles should be discounted because they are hearsay.  This objection is not well-taken, because all pleadings on information and belief are hearsay.  Even under the Reform Act, plaintiffs are only required to plead facts, not to produce admissible evidence.").

> [I]n such instances, … Grant would simply tell … Esaka that he had to meet forecasts and Grant would basically state "you have to figure out a way to do it *but I do not want to know how you do it*." Ultimately, the Japan subsidiary would meet its forecast numbers.

*Id.*

Grant claims that the most "logical" inference to be drawn is that he "expected Esaka to come up with a new discount or incentive" and this was a "routine exhortation" for which an executive should not be held liable. Grant Br. at 16. However, the subsequent revelations about the fictitious customer accounts and shipments, combined with CW1's report that Jurek, Grant and Esaka regularly met forecasts by authorizing bogus shipments of product, *see* ¶49, indicate something far more nefarious. Recently, in *380544 Canada, Inc. v. Aspen Tech., Inc.,* 2008 U.S. Dist. LEXIS 20968 at **63-66 (S.D.N.Y. Mar. 18, 2008) ("*Canada*"), the court rejected an attempt by the defendant to explain away similar statements at a sales meeting as not being "an unusual remark for an executive in his position[,]" holding that these statements raised a strong inference of scienter.

Grant erroneously asserts that the only improprieties attributed to him concern the Japan subsidiary. Grant Br. at 1. This is incorrect. According to CW5, *pulling in of orders from future quarters to meet current forecasts was not limited to the Japan subsidiary,* and this practice was *well known to Grant as it was discussed during internal conference calls in which he participated.* ¶60.

The foregoing allegations of these confidential sources, and those alleged *supra* at §III.B(3), amply demonstrate Defendants' scienter. Citing *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 756-57 (7th Cir. 2007), Defendants nevertheless contend that, after the Supreme Court's *Tellabs* decision, a cogent and compelling case for scienter can no longer be based on unidentified former employees, such as the CWs in this case. *See* IRF Br. at 13; A. Lidow Br. at 9 n.2; McGee Br. at 20, 21 n.10; Grant Br. at 13-14. However, two courts in this Circuit have expressly

35

declined to follow *Higginbotham* on the ground that it is contrary to established Ninth Circuit law. *See Rosenbaum Capital, LLC v. McNulty*, 2008 U.S. Dist. LEXIS 20347 at *18 (N.D. Cal. Mar. 4, 2008) (Conti, J.) (stating that the Ninth Circuit has not yet addressed whether confidential sources may give rise to the cogent and compelling inference of scienter required by *Tellabs*, and that "[w]ithout guidance stating otherwise, this Court is unwilling to abandon the binding Ninth Circuit precedent of *Daou* for the reasoning articulated…in *Higginbotham*"), and *In re Wet Seal, Inc. Sec. Litig.*, 518 F.Supp.2d 1148, 1170 (C.D. Cal. 2007) (declining to follow *Higginbotham*'s suggestion that allegations from confidential witnesses must be "discounted" and concluding that the court was "duty bound to apply [Ninth] circuit law unless an intervening Supreme Court decision has enunciated  a rule clearly irreconcilable with circuit precedent").

Tellingly, not even the Seventh Circuit itself seems inclined to follow *Higginbotham* on this point.  In his *Tellabs II* decision following remand from the Supreme Court, Judge Posner noted that where, as here, the confidential sources are "*numerous* and *consist of persons who from the description of their jobs were in a position to know at first hand the facts*" and information attributed to these witnesses is "set forth in convincing detail, with some of the information, moreover, *corroborated by multiple sources*...the absence of proper names does not invalidate the drawing of a strong inference from informants' assertions." 513 F.3d at 711-712 (citing *Daou,* 411 F.3d at 1015-16).  *See also Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*, 497 F.3d 546, 552 (5th Cir. 2007) (stating, in a post-*Tellabs* decision, that "[c]onfidential source statements are a permissible basis on which to make an inference of scienter").

Citing *NorthPoint,* 184 F.Supp.2d 991, 1000 (N.D. Cal. 2001), IRF also asserts that courts in this Circuit disregard allegations of confidential former employees where the complaint fails to identify their specific duties or how they came to learn of the information.  IRF Br. at 14.  In this case, however, the

36

Complaint *does* identify the CWs' position and duties, how they learned the information, and the context in which they learned of it. *See* ¶¶48-63, 90, 97, 100, 107-109. Consequently, Plaintiffs' reliance on these CWs is entirely proper and appropriate. *See, e.g., Daou,* 411 F.3d at 1015 (sources should be described with sufficient particularity to support probability that a person in that source's position would possess the information alleged); *Nursing Home,* 380 F.3d at 1233 (same) (citing *Novak v. Kasaks,* 216 F.3d 300, 314 (2d Cir. 2000)).

Nor do the CWs have to be accountants to be considered reliable sources with relevant and valuable information, as IRF *repeatedly* contends in its brief (while failing to cite any case so holding).[31] *See* IRF Br. at 1, 4, 7, 14, 15. *See, e.g., Canada,* 2008 U.S. Dist. LEXIS 20968 at *83 (rejecting defendant's argument that confidential sources must have been connected to company's accounting department or have been knowledgeable of company's accounting; rather, plaintiffs need only allege that the informants were in a position to have possessed the information alleged) (citing *Novak,* 216 F.3d at 314); *Alstom I,* 406 F.Supp.2d at 505 (allegations by confidential employee sources that cost overruns were "widely known" at the company did not "depend on whether the employee had a link to a particular department…. The allegation is that cost overruns were widely known, and is thus supported by the fact that various employees…stated that 'everyone knew' of the cost overruns").

Accordingly, the information obtained from these former employees is properly considered and supports a strong inference of Defendants' scienter.

### 6. The Termination And "Resignation" Of Senior IRF Officers Supports An Inference Of Scienter

As noted above, at or around the same time the Company revealed the accounting irregularities, it also terminated the employment of several longtime

---

[31] One source, CW8, was in fact a senior accountant at IRF who participated in IRF's internal audits and who revealed that internal auditor Mark Larson was "laid off" after he started investigating suspicious activities in Japan and McGee's role therein. ¶¶107-108.

senior officers and executives, including Alex Lidow, who had been CEO for 12 years and who resigned "at the Company's request," and Defendant McGee, who had been CFO for 17 years and was also an Executive Vice President.   ¶19. Additionally, Defendant Grant, IRF's VP of Global Sales and Marketing, resigned shortly before the fraud was revealed, and the Company placed "certain key Japanese management team members on administrative leave and remove[d] them from daily operations."  ¶¶19, 31.

Defendant McGee suggests that his firing from the Company at the time of the revelations of fraud was nothing more than evidence of "employer dissatisfaction" rather than any indication of wrongdoing on his part.  McGee Br. at 10.  However, where, as here, key personnel are terminated, "resign" or "retire" amidst revelations and investigation of financial improprieties, the timing of termination or resignations supports a strong inference of scienter.  *See*, *e.g.*, *Middlesex Ret. Sys. v. Quest Software Inc.*, 527 F.Supp.2d 1164, 1188 (C.D. Cal. 2007) (Carter, J.) ("the allegations about Morse's resignation lean heavily towards a finding of scienter"); *In re Sipex Corp. Sec. Litig.*, 2005 U.S. Dist. LEXIS 30854 at *3 (N.D. Cal. Nov. 17, 2005) (where an "audit committee conducted an internal investigation and recommended certain remedial actions" including "[t]ermination of certain employees" and "[r]estructuring" accounting controls, the court concluded this supported a strong inference of scienter because "[s]*uch house-cleaning and reforms do not follow innocent mistakes. Rather, they customarily, even if not invariably, follow systemic and fraudulent abuse of internal financial controls.*").[32]  Defendants'

---

[32] *See also Impax*, 2007 U.S. Dist. LEXIS 52356 at **26-27 (noting that "when such corporate re-shuffling occurs in tandem with financial restatements, these changes add one more piece to the scienter puzzle"); *In re Adaptive*, 2002 U.S. Dist. LEXIS 5887 at *43 (same); *In re McKesson*, 126 F.Supp.2d at 1274 (same); *In re Scottish Re Group Secs. Litig.*, 524 F.Supp.2d 370, 394 (S.D.N.Y. 2007) (same); *Kaltman v. Key Energy Servs.*, 447 F.Supp.2d 648, 664 (W.D. Tex. 2006) (same); *In re Alstom SA Sec. Litig.*, 454 F.Supp.2d 187, 208 (S.D.N.Y. 2006) (same); *Mercator*, 161 F.Supp.2d at 150 (same).

38

1   unexplained terminations simultaneously with admitted wrongdoing at the Company

2   supports a strong inference of scienter.

3          **7.**    **Alex Lidow And McGee's Certifications Falsely Attesting To The Accuracy Of The Company's Financial Statements And Adequacy Of Its Internal Controls Also Demonstrate Scienter**

6         In their capacities as CEO and CFO of the Company, respectively,

7   Alex Lidow and McGee were responsible for the preparation of the Company's

8   financial statements and for ensuring that the periodic reports filed with the SEC

9   containing such financial statements complied fully with the disclosure requirements

10  of the federal securities laws.  Additionally, Alex Lidow and McGee were required

11  to sign Sarbanes Oxley ("SOX") certifications acknowledging their responsibility

12  for, *inter alia*, ensuring that the financial statements did not contain any false or

13  misleading statements and that they had established and maintained sufficient

14  internal disclosure controls and procedures.  *See* ¶¶37, 117, 124, 133, 141, 150, 158,

15  168, 178, 189, 201, 208, 225, 236, 250, 263.  In connection with this obligation,

16  Alex Lidow and McGee signed certifications for various quarterly or fiscal year-end

17  financial statements stating that they had, in fact, evaluated the financial controls and

18  found them to be sufficient, when in reality, as Defendants have since admitted, they

19  were not.

20        Contrary to McGee's assertion, *see* McGee Br. at 2, courts have indeed held

21  that the false certification of financial statements and adequacy of internal controls

22  can constitute evidence of scienter.  *See*, *e.g.*, *Lattice*, 2006 U.S. Dist. LEXIS 262 at

23  **50-51 (finding that false SOX certifications supported a strong inference of

24  intent); *In re OCA, Inc. Sec. & Deriv. Litig.*, 2006 U.S. Dist. LEXIS 90854 at *39

25  (E.D. La. Dec. 14, 2006) (holding that defendants' false SOX certifications,

1    combined with other allegations, supported an inference of defendants' scienter).[33]

2    As the court stated in *Middlesex*, 527 F.Supp.2d at 1189-90:

3            For [SOX] certifications to have any substance, signatories to the

4            certifications must be held accountable for the statements.... *It would*

5            *be wholly inappropriate to permit a signatory to evade liability*

6            because he/she did not prepare the financial report, as Defendants

7            argue, *on the ground that the signatory was unaware of the*

8            *misstatements made therein.* To hold otherwise would effectively

9            eviscerate the entire substance of 18 U.S.C. § 1350, the purpose of

10           which is to ensure that regardless of who prepared the statements, the

11           signatories are attesting to their accuracy and reliability.... *Given that*

12           *the Company is currently in the process of restating numerous*

13           *financial reports, contemporaneous knowledge of the financial reports*

14           *signed by the Individual Defendants can be inferred.*

15           Even Defendant McGee acknowledges that false SOX certifications can be

16   probative of scienter, where, as here, the person signing the certification "had reason

17   to know, *or should have suspected*" that the financial statements contained material

18   misstatements or omissions. *Garfield v. NCD Health Corp.,* 466 F.3d 1255, 1265-67

19   (11th Cir. 2006) (cited in McGee Br. at 18).[34]

---

20   [33] *See also Limantour v. Cray Inc.*, 432 F.Supp.2d 1129, 1160 (W.D. Wash. 2006)

21   (finding that the complaint adequately alleged that SOX certifications were false and
     misleading based on defendants' disclosures regarding material weaknesses in

22   internal controls and procedures); *In re PMA Capital Corp. Sec. Litig.*, 2005 U.S.
     Dist. LEXIS 15696 at **32-33 n.8 (E.D. Pa. July 27, 2005) (holding that internal

23   control statements in SOX certifications are actionable if false and noting that "it is a
     violation of securities laws to fail to disclose the true facts regarding the adequacy of

24   your internal controls"). *See generally Novak*, 216 F.3d at 311 (the high standard for
     alleging scienter may be met by alleging that defendants (1) "engaged in deliberately

25   illegal behavior," (2) "knew facts or had access to information suggesting that their
     public statements were not accurate;" or (3) "failed to check information they had a

26   duty to monitor").
     [34] McGee makes the unfounded assertion that, because SOX certifications are

27   mandatory, "a more compelling inference is that the signer [of a SOX certification]
     was unaware of any material misstatement." McGee Br. at 18 & n.7. He does not

28   explain why this would be so. If anything, the fact that senior officers have no
     choice but to file these certifications would suggest that they will sign them

### 8.     The Fact That Defendants Benefited Financially from the Fraud Bolsters A Strong Inference Of Scienter

The above facts more than amply establish a strong inference of scienter as to each Defendant.  Nevertheless, the fact that certain of the Individual Defendants also benefitted from the fraud further bolsters the above allegations.  Courts recognize that allegations of a motive to commit fraud may also be relevant to the determination of whether a strong inference of scienter exists.  *See*, *e.g.*, *Tellabs*, 127 S.Ct. at 2511; *Livid Hldgs.*, 416 F.3d at 948-49.  Thus, "[t]he presence of 'motive,' while not necessary to satisfy the pleading requirements of the PSLRA, may contribute to a strong inference of scienter."  *In re Hypercom*, 2006 U.S. Dist. LEXIS 2669 at *27.

### a.     The Massive Insider Stock Sales

### 1.     The Amount Of Insider Trading Alone Is Suspicious

Collectively, Grant, Alex Lidow, Eric Lidow and McGee sold approximately 1.5 million shares of stock for proceeds of approximately $63.7 million during the Class Period. ¶292.   Alex Lidow sold 490,000 shares for gross proceeds of $20,886,721.  Eric Lidow sold 682,000 shares for gross proceeds of $28,126,863.  Grant sold 158,636 shares for gross proceeds of $7,076,227.  McGee sold 180,700 shares for gross proceeds of $7,626,597.   The size alone of these stock sales demonstrate that these defendants engaged in suspicious trading that is probative of scienter.  *Daou*, 411 F.3d at 1022 ("[u]nusual trading or trading at suspicious times or in suspicious amounts… has long been recognized as probative of scienter") (citations omitted, emphasis added).[35]

---

irrespective of whether they have reason to believe they are accurate and truthful. Moreover, SOX required the Company to establish appropriate internal controls to make McGee aware of the type of wrongdoing that is known to have occurred at IRF.

[35] Contrary to Defendants' assertions, the Ninth Circuit clearly confirmed in *Daou* that insider trades do not have to be suspicious in every way in order to support an inference of scienter. *Id.*  Thus, their reliance on earlier cases to hold otherwise is misplaced.   Additionally, *Silicon Graphics* did not hold, as several defendants suggest, that "information about the percentage of shares sold by grant-information

### 2.   Implementation Of Rule 10b5-1 Trading Plans Does Not Negate An Inference Of Scienter

Defendants IRF, Grant and Alex Lidow argue that the sales by Grant, Eric Lidow and Alex Lidow were not suspicious because they were made pursuant to Rule 10b5-1 plans.  *See* IRF Br. at 19, Grant Br. at 17, A. Lidow Br. at. 11. However, this argument is misplaced.

Since the terms of trading plans are unknown, it is impossible to determine whether Defendants actually complied with the trading plans or manipulated the trading plans in order to engage in insider trading.[36]  This is particularly true here since the applicable trading plans, which permitted Defendants Grant and Alex Lidow to sell massive quantities of stock during the Class Period, were largely *adopted during the Class Period*, a suspicious fact which actually strengthens the scienter inference.[37]  As the Fifth Circuit recently explained, defendants' "attempt to use the 10b5-1 Plan[s] as a non-suspicious explanation is flawed because, inter alia, [defendants] entered into the Plan[s] during the Class Period."  *Cent. Laborers'*, 497 F.3d at 554 (rejecting defendants' argument and finding insider sales contributed to strong inference of scienter).

Significantly, the SEC has generally started to scrutinize Rule 10b5-1 plans as a result of studies revealing abusive trading ostensibly pursuant to Rule 10b5-1.  *See*

---

is required" but rather that it is merely a "relevant" factor to consider in determining whether insider trading is suspicious.  183 F.3d at 986.

[36]  Grant's claim that, "as Plaintiffs acknowledge, Grant sold his stock under prearranged Rule 10b5-1 stock trading plans *complied with SEC regulations*" (sic) is wrong.  Grant Br. at 17.  Plaintiffs' ¶291 merely states that "Grant sold shares of IRF common stock under stock trading plans."  Plaintiffs cannot and, thus, do *not* allege whether the trading plans were in compliance with SEC regulations.

[37]  Defendants had already started to engage in the fraud when they set up their plans. Per Form 4s filed by Grant (Ex. 1), 100% of Grant's Class Period dispositions were pursuant to one of the three plans adopted during the class period on 11/12/04, 8/19/05 and 5/16/06.  Per Alex Lidow's Form 4s filed by IRF (Costley Decl. Ex. C), 91% of Alex Lidow's class period dispositions were pursuant to one of the three plans adopted during the Class Period on 2/3/04, 11/12/04, and 8/22/05.  Thus, the Individual Defendants could have easily tailored these plans to coincide with the scheme thus the plans cannot negate scienter at the pleading stage.

Plaintiffs' RJN, Ex. at B.  Cognizant of these considerations, in recent well-reasoned opinions, courts properly refuse to consider the impact of a trading plan at the pleading stage.  *In re Cardinal Health Inc. Sec. Litig.*, 426 F.Supp.2d 688, 734 (S.D. Ohio 2006) ("As it is typically premature to raise affirmative defenses in a motion to dismiss, this Court will not consider the impact of [defendant]'s purported 10b5-1 trading plan at this stage of the pleadings."); *Cent. Laborers'*, 497 F.3d at 554.[38]

Defendants' cases do not hold otherwise.  Contrary to Alex Lidow's assertion, *Wietschner* does not support his assertion that, "because the sales were made pursuant to a non-discretionary 10b5-1 trading plan, they raise the opposite inference – that the sales were *not* unusual and suspicious."  A. Lidow Br. at 11.  Rather, the court there simply noted that sales pursuant to a Rule 10b5-1 trading plan "*could* raise an inference that the sales were pre-scheduled and not suspicious."  *Wiestchner v. Monterey Pasta Co.*, 294 F.Supp.2d 1102, 1117 (N.D. Cal. 2003).  Defendant Grant's reliance on *In re Worlds of Wonder Sec. Litig.*, 814 F. Supp. 850, 871-72 (N.D. Cal. 1993), *aff'd in part and rev'd in part,* 35 F.3d 1404 (9th Cir. 1994), is also misplaced as the court there was analyzing whether the *evidence* supported *a claim for insider trading* on *summary judgment*.  Grant Br. at 17.  The court concluded that the defendant had refuted the claims because he "submitted unchallenged evidence that it sold its shares because it faced a pressing need to service a huge debt incurred from overinvesting in real estate.  Moreover, Robinson sold its stock according to a prearranged plan *that conformed to SEC regulations*."  *Id.*  Similarly, IRF's reliance upon *S. Ferry LP # 2 v. Killinger*, 399 F.Supp.2d 1121, 1145 (D. Wash. 2005), is misplaced.  IRF Br. at 19.  In *South Ferry LP*, it is unclear whether the defendant traded pursuant to a Rule 10b5-1 trading plan and, moreover,

---

[38] *See also In re InfoSonics Corp. Deriv. Litig.*, 2007 U.S. Dist. LEXIS 66043, 24-25 (D. Cal. Sept. 4, 2007) (whether these trading plans were legitimately adopted or were put in place after learning of material, nonpublic information that could affect the price of stock, can not be resolved at the pleading stage."); *In re Cray Inc. Deriv. Litig.*, 431 F.Supp.2d 1114, 1131 (W.D. Wash. 2006) ("The Court will not dismiss the insider sales claims on the basis of a yet-to-be-pled affirmative defense, particularly where…Defendants bear the burden of proof.").

43

the court concluded that the "timing of Defendant's trade neither strengthens nor weakens the inference of scienter." *Id.*

### 3. Lack Of Sales Transaction Does Not Negate An Inference Of Scienter

Defendant McGee's emphasis on the fact that he only sold shares on two occasions is misguided for two reasons. First, these were very large sales. ¶292. Second, courts have held that even a lack of insider transactions is not dispositive of scienter. *Am. West,* 320 F.3d at 944 (a lack of insider trading is "not dispositive as to scienter.")[39]

### 4. Increase In Holdings Does Not Negate An Inference Of Scienter

McGee, Alex Lidow and Grant's final attempt to negate the suspiciousness of their sales on grounds that their respective holdings increased or remained steady during the class period is also unavailing. *See* McGee Br. at 24; Grant Br. at 17; A. Lidow Br. at 12. As a practical matter, defendants' arguments are entirely disingenuous here because the only facts before this Court indicate that they paid little or nothing to increase their holdings. According to his submission in Luthin Decl ¶11, McGee's holdings and beneficial ownerships increased as a result of (i) the automatic (cost-free) maturing of restricted stock grants; (ii) the vesting of stock option grants; and (iii) 401(k) plan contributions. Presumably, McGee incurred no out-of-pocket expense for either the restricted stock or the stock options.

---

[39] *See also Nuko*, 199 F.R.D. at 344-45 (absence of any allegations concerning insider trading had "little bearing on determining whether Plaintiffs [had] adequately pleaded scienter"); *In re APAC Teleservs., Inc. Sec. Litig.*, 1999 U.S. Dist. LEXIS 17908 at **21-22 (S.D.N.Y. Nov. 19, 1999) ("The fact that not every one of the defendants may have sold stock does not defeat an inference of scienter at this stage of the litigation."); *In re Amylin Pharms., Inc. Sec. Litig.*, 2003 WL 21500525, at *5 (S.D. Cal. Oct. 10, 2002) (complaint raised requisite scienter inference regardless of lack of insider trading allegations); *In re Adaptive Broadband Sec. Litig.*, 2002 U.S. Dist. LEXIS 5887 at *49 (N.D. Cal. Apr. 2, 2002) ("Plaintiffs are only obliged to state some set of facts giving rise to a strong inference of deliberate recklessness.... [G]iven the sufficiency of the facts supporting the deliberately reckless GAAP violations, it makes no difference that there were no stock sales, or that the Complaint only alludes to internal company reports.") (citation omitted).

Even if the price of IRF stock had fallen since the stock grant, it is still worth something since McGee received those shares at *no cost*.  Moreover, more facts are needed to determine (i) whether McGee paid for the 401 K shares; or (ii) whether there were any restrictions as to McGee's ability to sell the shares obtained through the restricted stock or 401(k) grants.  Similarly, Alex Lidow admits that his holdings increased because additional options vested.  A. Lidow Br. at 12.  Grant's proffer is even less relevant since his Form 4s and Form 5s do not establish how his holdings increased – whether it was because of the vesting of restricted stock grants, 401(k) matching contributions by the company or other means of acquiring stock without a cash outlay. [40]  *See also* Plaintiffs' RJN Opp. at 6-8.

As a legal matter, Defendants' assertion that Defendants purchased more shares of stock than they sold does not negate Plaintiffs' allegations of scienter and "affects little the scienter analysis."  *In re Spectrum Brands, Inc. Sec. Litig.*, 461 F.Supp.2d 1297, 1317 n.6 (N.D. Ga. 2006).[41]  To the contrary, the Complaint establishes Defendants profited from huge insider sales at the Company's artificially inflated stock price during the Class Period.

**b.  Defendants' Receipt Of Incentive Bonuses Tied To IRF's Revenues, Margins And Earnings Further Supports Scienter**

---

[40] As set forth in Plaintiffs' RJN Opp., Grant's documents do not actually support his factual assertion that his holdings increased 200%.

[41] *See also In re SeeBeyond Tech. Corp. Sec. Litig.*, 266 F.Supp.2d 1150, 1169 (C.D. Cal. 2003) (strong scienter inference found despite argument that defendant's stock purchases negated scienter); *PR Diamonds, Inc. v. Chandler,* 364 F.3d 671, 691 (6th Cir. 2004) (court rejected defendants' contention that purchases of shares during the class period refutes any inference of scienter.); *In re Oxford Health Plans, Inc. Sec. Litig.*, 187 F.R.D. 133, 140 (S.D.N.Y. 1999) ("retention of a large position in [a company] and...pre-announcement purchases [do not] vitiate insider trading liability.") (citation and internal quotations omitted).  *See also Nursing Home*, 380 F.3d at 1232 (98% of shares retained); *Dolgow v. Anderson*, 438 F.2d 825, 828 (2d Cir. 1970) (defendants' exercise of options to purchase and retain more stock than they sold does not preclude an inference of scienter).  Some courts even find that an acquisition can even *evidence* scienter.  *Holmes v. Baker,* 166 F.Supp.2d 1362, 1378 (S.D. Fla. 2001) (finding some merit in plaintiff's contention that purchases *evidenced* scienter because defendants believed fraud would continue and stock would continue to be artificially inflated).

The Complaint alleges that Defendants were motivated to artificially inflate the price of the Company's securities in order to receive large bonus payments. ¶293.   Defendants Grant, McGee and Alex Lidow's receipt of bonuses was contingent upon their accomplishment of targets relating to the Company's revenues, gross margins, earnings per share and profitability, among other things. ¶32, 293.  Thus, Defendants' compensation in the form of bonuses, combined with other factors discussed herein, supports a strong inference of scienter.  *See Am. West*, 320 F.3d at 944 (concluding that "a strong inference of scienter can be inferred from Plaintiffs' allegations [that defendants] were motivated to inflate America West's financial results and stock prices because their eligibility for stock options and executive bonuses were based principally on the company's financial performance"); *Schlagal*, 1998 U.S. Dist. LEXIS 20306, at **50-51 (same).[42]

### 9. A Strong Inference Of Scienter Is Established By Defendants' Inability To Proffer A More Credible Explanation Of The Well-Pleaded Facts As Mere Mistake Or Negligence

Collectively, the well-pleaded facts establish a strong inference of fraudulent intent.   Among other things, the well-pleaded facts establish that each of the Individual Defendants was fired or forced to resign shortly after the Company's Audit Committee initiated a $48+ million investigation that unearthed purposeful bogus shipment of product to falsify the Company's financial results, admittedly "fictitious" financing arrangements to hide the bogus shipments, illegal tax avoidance, and other violations of basic accounting rules impacting the Company's

---

[42] *See also Barrie v. Intervoice-Brite, Inc*., 397 F.3d 249, 264 (5th Cir. 2005), *clarified,* 409 F.3d 653 (5th Cir. 2005) ("allegations of knowledge and severe recklessness must be considered in conjunction with the defendants' bonuses and stock sales profits; *City of Monroe Emples. Ret. Sys. v. Bridgestone Corp.,* 399 F.3d 651, 685, n.28 (6th Cir. 2005) ("reject[ing the] suggestion that the withholding of information by senior corporate executives to effectuate an inflation of the executives' bonuses, stock prices, and job security [was] an 'ordinary corporate event'"); *In re Vivendi Universal, S.A. Sec. Litig.,* 381 F.Supp.2d 158, 185 (S.D.N.Y. 2003) ($3 million bonus, more than two and a half time defendant's salary, provided even greater motive for inflating company's financial performance and, together with other sufficient motive allegations, supported an inference of scienter).

most critical financial metrics.  These disclosures forced the Company to admit that years of financial results were false when issued and caused the Audit Committee to institute a complete overhaul of the Company's internal financial controls – wresting all authority for financial reporting from senior management.  Now, the SEC, the United States Attorney's Office, and the IRS have launched investigations.  The inference is strong that Defendants' misstatements were not the result of mere negligence, but rather criminal fraudulent conduct.

Faced with the Complaint's well-pleaded allegations, Defendants offer no persuasive alternative explanation of the facts that would support a reasonable inference that International Rectifier's admittedly false financial statements were issued by mistake or mere negligence.  Defendants' failure to proffer any plausible innocent explanation supports denial of the motions to dismiss.  *Tellabs I* instructs that the Court "must take into account plausible opposing inferences" in determining whether a strong inference of scienter exists.  127 S. Ct. at 2509.  Following *Tellabs*, courts have explained that a defendant's failure to propose an opposing plausible inference more credible than that alleged by the plaintiff weighs heavily in favor of finding a strong inference of scienter.  *See, e.g., Tellabs II,* 513 F.3d at 711 ("Because the alternative hypotheses--either a cascade of innocent mistakes, or acts of subordinate employees, either or both resulting in a series of false statements--are far less likely than the hypothesis of scienter at the corporate level at which the statements were approved, the latter hypothesis must be considered cogent.").[43]  Here, Defendants do not, and cannot, offer any innocent explanation to compete with the strong inference of scienter alleged in the Complaint.  The fact that

---

[43] *See also In re Faro Techs. Sec. Litig.*, 534 F.Supp.2d 1248, 1264 (M.D. Fla. 2007) ("In spite of a direct invitation to do so, [defendants] do not provide the Court with a 'plausible opposing inference' sufficient to counter the significant weight of the scienter inference that arises from the totality of the allegations.  In fact, the absence of any suggested counter inference strengthens the contention that there can be but one conclusion drawn from the facts, as pled....  As no opposing inference is evident, the inference of scienter is cogent, indeed."); *In re Openwave Sys. Sec. Litig.,* 528 F.Supp.2d 236, 250 (S.D.N.Y. 2007) (same).

47

1   Defendants offer no credible competing inference demonstrates that Plaintiffs have

2   pleaded a sufficiently cogent inference of scienter.

3       **C.    IRF's Argument That It Cannot Be Liable For The Acts Of
            Its Subsidiary Misses The Point**

4

5       IRF's attempt to distance itself from the wrongdoing of its Japanese

6   subsidiary misses the point and should be rejected.  *Here, the fraud was authorized*

7   *by employees in the Company's headquarters in California*.  ¶49.  The cases cited by

8   Defendants are inapposite, as they merely stand for the unremarkable proposition

9   that a parent company is not automatically liable for fraud by its subsidiary if its

10  officers and executives did not participate in the fraud.  While generally, a parent

11  corporation "is not vicariously liable for the securities fraud of its subsidiary," *In re*

12  *McKesson,* 126 F.Supp.2d at 1277 (citing *Chill v. GE*, 101 F.3d 263, 268 (2d Cir.

13  1996), liability will attach, where, as here, the parent either participates in the fraud

14  or controls the subsidiary.  When a parent corporation makes or adopts a material

15  false statement about a subsidiary's performance, liability will attach provided the

16  parent acted with scienter.[44]

17      As stated in *In re NYSE Specialists Sec. Litig.*, 405 F.Supp.2d 281, 314

18  (S.D.N.Y. 2005), *aff'd in part and rev'd in part on other grounds,* 503 F.3d 89 (2d

19  Cir. 2007), *cert. denied,* 2008 U.S. LEXIS 2855 (2008), courts have recognized that

20  a plaintiff can establish that a parent company acted with scienter in connection with

21  a manipulative scheme effectuated by a corporate subsidiary, such as where the

22  subsidiary's scheme was orchestrated by the parent company or the parent was a

23

24  [44] Moreover, it is well established in the Ninth Circuit that "a parent corporation can
    be held vicariously liable for the acts of a subsidiary corporation if an agency

25  relationship exists between the parent and the subsidiary."  *Bowoto v.
    ChevronTexaco Corp.*, 312 F.Supp.2d 1229, 1238 (N.D. Cal. 2004).  *See also Pac.*

26  *Can. Co. v. Hewes*, 95 F.2d 42 (9th 1938).  Unlike liability under the alter-ego or
    veil piercing test, agency liability does not require the court to disregard the

27  corporate form.  *Id.*; *Phoenix Canada Oil Co. v. Texaco, Inc.*, 842 F.2d 1466, 1477
    (3d Cir. 1988) ("an arrangement [must] exist between the two corporations so that

28  one acts on behalf of the other and within usual agency principles, [and] the
    arrangement must be relevant to the plaintiff's claim of wrongdoing.").

1   party to, or otherwise involved in, the manipulative transactions.  *Id.* (citing *Carlson*

2   *v. Xerox Corp.*, 392 F.Supp.2d 267, 287-88 (D. Conn. 2005), and *In re Parmalat*

3   *Sec. Litig.*, 376 F.Supp.2d 472, 507 (S.D.N.Y. 2005)).

4        Moreover, though Defendants knew about the fraudulent acts of the Japan

5   subsidiary, that is not required to state a §10(b) claim, despite IRF's suggestion to

6   the contrary.  *See* IRF Br. at 1.  *See, e.g, Menkes v. Stolt-Nielsen S.A.,* 2006 U.S.

7   Dist. LEXIS 42644 at *18-19 (D. Conn. June 19, 2006) (denying parent company

8   and its senior officers' motions to dismiss complaint alleging securities fraud by

9   company's subsidiary where parent company and its officers oversaw subsidiary's

10  operations and had information about the subsidiary that suggested misconduct); *In*

11  *re Alstom I,* 406 F.Supp.2d at 459-60 (holding that parent company and its officers

12  could be held liable under §10(b) for wrongdoing at its Marine division due to

13  parent's failure to disclose the wrongdoing in its financial statements, parent

14  company's access to information that would have disclosed the fraud, the

15  importance of that division, and that fact that it was the company's fastest growing

16  unit); *NYSE,* 405 F.Supp.2d at 314 (parent company's scienter can be pled by

17  alleging that it recklessly disregarded red flags that should have put it on notice of

18  subsidiary's scheme) (citing *In re GE Sec. Litig.*, 1995 U.S. Dist. LEXIS 14490

19  (S.D.N.Y. Oct. 4, 1995), *aff'd*, 101 F.3d 263 (2d Cir. 1996)).

20       Thus, in *In re Refco, Inc. Sec. Litig.*, 503 F.Supp.2d 611 (S.D.N.Y. 2007),

21  officers of the parent corporation moved for dismissal, arguing plaintiffs had failed

22  to sufficiently allege scienter as to their statements about the subsidiary's finances.

23  *Id.* at 640.  The court granted the motion as to the defendants whose duties did not

24  involve reviewing the subsidiary's accounts, but denied as to those closely involved

25  in the financial operation of the subsidiary.  *Id.* at 651-652.

26       Defendants' assertions notwithstanding, Plaintiffs are not arguing that a parent

27  company is automatically liable for the acts of its subsidiaries.  Rather, IRF is liable

28  because it issued false financial statements regarding the Japan division's operations

and exercised oversight and control over Japan such that there is sufficient allegations of its own scienter.   As detailed in the Complaint, IRF and its subsidiaries operated as a single, centralized unit, with the Company's consolidated financial statements including results from all of its subsidiaries.   ¶¶303-304, 310. IRF's senior officers, including Lidow and McGee, exercised tight control over its subsidiaries.   ¶310.   The Company believed in and emphasized the importance of this centralized system for overseeing its subsidiaries, and IRF's senior executives had daily access to the Company's Vision system to monitor the Company's sales and forecasts, including those of its subsidiaries.   ¶¶52-53.

As detailed in the Complaint, the fraudulent activities in Japan were well known to IRF's senior management.   Confidential former employees witnessed Defendants' repeated instructions to Japan to meet numbers via any means necessary and the miraculous turnaround at the end of each quarter – and Defendant Jurek boasted he and Defendant Grant authorized bogus shipments for the Japanese subsidiary to meet numbers.   ¶¶49, 55, 59-60, 63.   A number of former employees confirmed that the Company's subsidiaries sent forecasting numbers to the parent company.   CW9, who was IRF's VP of Internal Marketing and Development and also VP of Business Development, explained how the Japan subsidiary rolled up its numbers each quarter and sent them to McGee at headquarters.   ¶306(a).   CW2 explained that Defendant Grant likewise had daily access to the subsidiaries' sales forecasts through the Company's Vision system, had substantial control over Japan's sales forecasts, and directed the subsidiaries with any adjustments to the forecasts. ¶306(c).   Defendants Grant, Jurek and Esaka also participated regularly in conference calls to discuss sales and earnings forecasts.   ¶¶29-30, 59-60, 308(a). *See Nursing Home,* 380 F.3d at 1230-31 (holding that complaint's allegations created a strong inference of scienter where plaintiffs alleged that all sales information for the company was in a database regularly monitored by the company's top executives,

50

1   who must have been aware that company was not going to meet its sales
2   projections).

3           The decision in *In re Marsh & McLennan Cos. Sec. Litig.*, 501 F.Supp.2d 452
4   (S.D.N.Y. 2006), is instructive.  Like IRF, the defendants in *Marsh* relied on *Chill* to
5   argue that MMC, Marsh's parent company, could not be held responsible for the
6   misconduct at its subsidiary.  *Id*. at 482.  The district court correctly noted that *Chill*
7   affirmed that parent corporations cannot be held liable merely for relying on their
8   subsidiaries' internal controls.  "Plaintiffs, however, allege more than MMC's mere
9   reliance on Marsh's financial controls; they allege MMC's awareness, reckless
10  disregard, and complicity in the misbehavior at Marsh and a breakdown in MMC's
11  *own* internal controls."  *Id*. at 482-83.

12          Here, as in *Marsh,* "[t]he factual allegations underlying [the Japan
13  subsidiary's] integration with [IRF] demonstrate the parent company's familiarity
14  with the subsidiary's operations and, ultimately, its misconduct."  *Id*. at 483.  The
15  court noted, *inter alia,* that employees from the parent company attended meetings
16  of the subsidiary's division in which the misconduct occurred and that the corporate
17  parent had emphasized its knowledge and oversight of the subsidiary.  *Id*.  Thus,
18  here, as in *Marsh,* "there are sufficient allegations regarding the pervasiveness of the
19  fraud, the conscious misbehavior of particular corporate employees, and the
20  complicity of the corporate entities to find that [the parent company] was aware of or
21  recklessly disregarded the intentional misconduct of [the subsidiary].  Consequently,
22  the allegations of the Complaint sufficiently plead the scienter of [the] corporate
23  defendant[]."  501 F.Supp.2d at 483.[45]

24  ///

25

---

26  [45]  *Higginbotham v. Baxter,* 495 F.3d at 756-57, is distinguishable, because, as
    explained in *Tellabs II*, "the subsidiary had tried to conceal [its fraud] from the
27  parent," 513 F.3d at 711-712, whereas here, IRF oversaw, authorized and
    participated in the Japan subsidiary's fraud.  *See* discussion *supra* at n.27.  *Pugh v.*
28  *Tribune Co.*, 2008 U.S. App. LEXIS 6912 (7th Cir. Apr. 2, 2008), is distinguishable
    for the same reason.  *See* discussion, *infra*, at n.46.

**D.      Plaintiffs Plead A Strong Inference That IRF Acted With Scienter**

The Complaint establishes a strong inference of scienter as to corporate defendant IRF through, at least, three independent means.  *First*, the Company's scienter is established by the well-pleaded allegations establishing that Defendants Alex Lidow and McGee – the Company's senior officers to whom the Company publicly attributed its false and misleading statements made during the Class Period – acted with knowledge and reckless disregard for the truth.  It is well established that scienter is properly alleged against a corporation where it is properly alleged against at least one corporate officer.  *See Nursing Home,* 380 F.3d at 1234-35 (10b-5 cause of action against executives creates a cause of action against the company itself).  *See also Nordstrom, Inc. v. Chubb & Son, Inc.,* 54 F.3d 1424, 1435-36, 1446 (9th Cir. 1995) ("Corporate scienter relies heavily on the awareness of the directors and officers, who – unlike the public relations or personnel departments – are necessarily aware of the requirements of SEC regulations and state law and of the 'danger of misleading buyers and sellers.'").  Here, as set forth above, Defendants Alex Lidow and McGee knowingly signed false filings with the SEC and made misleading statements in conference calls and press releases, and as such IRF is liable under §10(b).

*Second*, Plaintiffs establish a strong inference of scienter as to Defendant IRF by alleging a strong inference of scienter as to IRF's senior officers – including Grant, Jurek, and Esaka – who furnished false and misleading information to be included in the Company's SEC filings, press releases and other false statements issued during the Class Period.  To determine the scienter of a corporation, the Fifth Circuit interpreted the Ninth Circuit's holding in *Nordstrom* to require courts "to look to the state of mind of the individual corporate official or officials who make or issue the statement (or order or approve it or its making or issuance, or *who furnish information* or language for inclusion therein, or the like)...."  *Southland Sec. Corp.*

52

*v. INSpire Ins. Solutions Inc.*, 365 F.3d 353, 366 (5th Cir. 2004).  In an opinion by Judge Posner, the Seventh Circuit, relying on *Southland*, recently reached the same conclusion.  *See Tellabs II,* 513 F.3d at 708 ("[C]orporate scienter could be based on the state of mind of someone *who furnished false information* that became the basis of a fraudulent public announcement....  [T]he corporation would be liable, just as it would be in a common law tort suit.").  Here, as set forth above, Plaintiffs plead a strong inference of scienter as to Defendants Grant, Jurek and Esaka.  Moreover, the well-pleaded allegations establish that Grant, Jurek and Esaka caused the Company to issue false and misleading financial statements in SEC filings and press releases by purposefully causing the Company to enter into sham transactions and thereby furnishing false and misleading information to be included in the Company's financial statements.  Under both *Southland* and *Tellabs II* – based upon the Ninth Circuit's *Nordstrom* decision – Grant, Jurek and Esaka's scienter is attributable to IRF, and IRF is liable for the false and misleading statements issued because of these Defendants' conduct.[46]

Defendant IRF asserts that under the law of the Ninth Circuit, the knowledge of "lower level" employees cannot be imputed to a corporate defendant, and in this case Plaintiffs "attribute every specific allegation of scienter to lower level employees, none of whom made a public statement on behalf of the company."  IRF Br. at 10 (citing *Nordstrom* and *Apple*).  This argument is fatally flawed in several respects.  Plaintiffs have alleged specific facts establishing that Defendants Alex Lidow and McGee, who issued the false statements, acted with scienter. Moreover, Defendants Grant, Esaka and Jurek were hardly "lower level employees"

---

[46] IRF can seek no support in the Seventh Circuit's recent holding in *Pugh*, 2008 U.S. App. LEXIS 6912.  Among other things, in *Pugh*, the perpetrators of the fraud were employed by two independent subsidiary newspapers owned by a parent corporation and these subsidiaries took great "pains to conceal the scheme" from the parent enterprise.  *Id*. at *26.  Moreover, the scheme was only tangentially, if at all, related to falsifying the company's financial statements.  *Id*. at *23.  Here, the fraudulent scheme was known to and directed by IRF officers within the Company's headquarters, and was for the sole purpose of falsifying the financial results issued to investors.

as Grant was EVP of Global Sales and Marketing and one of the Company's most highly compensated executives (¶31), Esaka was VP of IRF's Japan subsidiary (¶33), and Defendant Jurek was VP of Automotive Products and was responsible for meeting sales and margins forecasts for the Company's entire automotive division (¶¶32, 49).  For the purposes of §10(b), "courts have *readily attributed the scienter of management-level employees to corporate defendants*."  *Marsh*, 501 F.Supp.2d at 481 (analyzing and collecting §10(b) cases in which corporate scienter was established by the knowledge of, among others, vice presidents).[47]  Here, Defendants Grant, Jurek and Esaka were officers and executives of the Company, and their scienter is imputed to the Company.

Moreover, IRF's contention misreads and misapplies the holding of *Nordstom*.  In *Nordstrom* the Ninth Circuit rejected Defendants' reading of §10(b) by agreeing with the holding in *In re Warner Communs. Sec. Litig.*, 618 F.Supp.735 (S.D.N.Y. 1985), *aff'd*, 798 F.2d 35 (2d Cir. 1986).  *Nordstrom*, 54 F.3d at 1435.  In *Warner*, the court held that to show corporate scienter, plaintiffs "need only show either that one or more members of top management knew of material information..., *but failed to stop the issuance of misleading statements* or to correct prior statements that had become misleading, or that [corporate] management had *recklessly failed to set up a procedure that insured the dissemination of correct information to the marketplace*."  *Id.* at 752.  The Ninth Circuit, citing *Warner* favorably, clearly does not require scienter to be found in the person uttering the alleged false statements – anyone in corporate management will suffice.   The contrary rule proffered by Defendants would lead to disastrous results, insulating from liability, for example, a CEO who causes the company's investor relations department to mislead the

---

[47] *See also W.R. Grace & Co. v. Western U.S. Indus.*, 608 F.2d 1214, 1218 (9th Cir. 1979) ("It is a well settled principle that knowledge of officers and key employees of a corporation, obtained while acting in the course of their employment and within the scope of their authority, is imputed to the corporation itself."); *In re Sunbeam Sec. Litig.*, 89 F.Supp.2d 1326, 1340 (S.D. Fla. 1999) ("knowledge of individuals who exercise substantial control over a corporation's affairs is properly imputable to the corporation").

marketplace; such a rule would allow wrongdoers to commit fraud by simply causing others to be the public face of their fraudulent activities.[48]  Here, consistent with *Nordstrom*, *Southland* and *Tellabs II*, Plaintiffs may plead IRF's scienter via Defendants Grant, Jurek and Esaka (as well as Lidow and McGee).

*Third,* while Plaintiffs are not relying on notions of "collective scienter" – namely, the collective knowledge of the Company's employees – to establish IRF's liability under §10(b), Plaintiffs need *not* identify the individual IRF employee(s) who acted with scienter to plead a claim as to IRF.  Numerous courts have held that scienter can be pled against the corporation directly.  *See Press v. Chemical Inv. Servs. Corp.*, 166 F.3d 529, 538 (2d Cir. 1999); *In re Dynex Capital, Inc. Secs. Litig.*, 2006 U.S. Dist. LEXIS 4988 at *31 (S.D.N.Y. Feb. 10, 2006) ("A plaintiff may, and in this case has, alleged scienter on the part of a corporate defendant without pleading scienter against any particular employees of the corporation."); *In re Sonus Networks Sec. Litig.*, 2006 U.S. Dist. LEXIS 28272 at *83 (D. Mass. May 10, 2006) (*Nordstrom* in no way rejected "the idea that a corporation may be liable for the fraud of an individual officer who is not a defendant").  The sound policy reasons and clear text of §10(b), which expressly authorizes direct corporate liability[49], has caused numerous circuit and district courts to conclude that corporate entities such as IRF that have committed fraud may be liable under §10(b) even if plaintiffs cannot identify the specific corporate officers who committed the

---

[48]  *Apple* is entirely dependent upon and misreads the holding in *Nordstrom*. *Nordstom* does not support *Apple*'s conclusion that it "is not enough to establish fraud on the part of a corporation that one corporate officer makes a false statement that another officer knows to be false." 243 F.Supp.2d at 1023.  At page 12 of its motion to dismiss, IRF misleadingly asserts that *Southland* is in accord with this holding of *Apple*, without pointing out that *Southland* looks "to the state of mind of the individual corporate official or officials who...*furnish information or language for inclusion*" in a false and misleading statement.  *Southland*, 365 F.3d at 366.

[49]  Under Rule 10b-5, 17 C.F.R. §240.10b-5, it is unlawful for "any person" to make an untrue statement of material fact in connection with the purchase or sale of a security.   Under the Exchange Act, the term "person" means "a natural person, *company*, government, or political subdivision, agency, or instrumentality of a government." 15 U.S.C. §78c(a)(9).

fraudulent conduct.[50]   As *Marsh* recognized, to hold otherwise would "foreclose[] liability in situations where institutional fraud is readily perceivable but plaintiffs have yet to match a culpable employee with a public misstatement."  501 F.Supp.2d at 481.   Here, IRF has repeatedly admitted that employees at the Company purposefully falsified the Company's financial statements issued to the public.  And, most recently, the Company admitted that management manipulated the Company's financial statements for the purposes of meeting analysts' earnings expectations.  *See* Pl. RJN Ex. A.  IRF has admitted to committing fraud prohibited by §10(b).  This is sufficient to establish its scienter.

### E.   Defendant Grant Is Liable Under §10(b) Regardless of Whether He Personally Issued A False and Misleading Statement to the Public

Defendant Grant asserts that he cannot be liable under §10(b) because he did not personally make any of the false and misleading statements issued by the Company during the Class Period.  Grant Br. at 6-9.  Grant's argument misconstrues both the applicable law and Plaintiffs' allegations.  Grant indirectly "made" the false and misleading statements, had a duty to correct other Defendants' statements, participated in the creation of the false and misleading statements, and may be held liable for participating in Defendants' fraudulent scheme.

Throughout the Class Period, Grant was IRF's EVP of Global Sales and Marketing and was identified by the Company's SEC filings as one of its Executive Officers.   ¶31.   Grant personally authorized purposeful manipulation of the Company's recorded revenues and earnings by the bogus "shipment" of product to sit in the Company's parking lot or in an offsite warehouse.  ¶49.  As the Company has admitted, these practices caused the Company's financial statements to be false.

---

[50] *See, e.g., Monroe Emples.*, 399 F.3d at 686; *Dynex*, 2006 U.S. Dist. LEXIS 4988 at **29-33; *In re Worldcom Inc. Sec. Litig.*, 352 F.Supp.2d 472, 497 (S.D.N.Y. 2005); *In re BISYS Sec. Lit.*, 397 F.Supp.2d 430, 442-443 (S.D.N.Y. 2005); *In re Motorola Sec. Litig.*, 2004 U.S. Dist. LEXIS 18250 at *104 (N.D. Ill. Sept. 9, 2004); *In re Interpublic Sec. Litig.*, 2003 U.S. Dist. LEXIS 8844 at **32-42 (S.D.N.Y. May 29, 2003); *In re Ikon Office Solutions, Inc.*, 66 F.Supp.2d 622, 628 (E.D. Pa. 1999).

1    Grant knew about and authorized the admittedly improper shipping and accounting
2    practices conducted by the Company's Japan unit.  ¶¶49, 59-60.

3          Corporate employees are liable as primary violators of §10(b) when they
4    authorize sham transactions or engage in fraudulent accounting activities that result
5    in their employer issuing false and misleading financial results.  *See* Argument at
6    §III.D, *supra.*  The text of the statute makes it illegal to "directly *or indirectly*...use
7    or employ, in connection with the purchase or sale of any security…any
8    manipulative or deceptive device or contrivance...."  15 U.S.C. §78j(b).  Here, Grant
9    *indirectly* made false and misleading statements by causing IRF to engage in sham
10   transactions that caused the Company's financial statements to be false and
11   misleading.  ¶¶49, 55, 59-60.

12         As set forth in §III.D, *supra*, corporate defendants are liable for the conduct of
13   officers or other employees that, with scienter, "furnish information" causing the
14   company to issue false or misleading statements or who "failed to stop misleading
15   statements."  Here, the well-pleaded allegations establish that Grant furnished false
16   and misleading information to be included in the Company's financial statements
17   and that Grant failed to stop the Company from publishing statements to the public
18   he knew to be false and misleading because he had caused the Company to engage
19   in sham transactions.  *Id.*  Accordingly, under *Nordstrom*, *Southland* and *Tellabs II*,
20   Grant's scienter is attributable to IRF, and IRF is liable for the false and misleading
21   statements issued because of Grant's conduct.  To hold IRF liable for Grant's
22   conduct, but that Grant cannot be liable for his own conduct, would be a perverse
23   result indeed and is not countenanced by the law.

24         The holding of *SEC v. Power*, 525 F.Supp.2d 415 (S.D.N.Y. 2007), is
25   squarely on point.  In that case, defendant Power allegedly devised sham
26   transactions and recommended improper accounting entries that resulted in Tyco
27   International issuing false and misleading statements in its SEC filings.  *Id.* at 420.
28   Power argued that the complaint did not allege "that he made or caused any false and

57

1  misleading statements in Tyco's public filings."  *Id.*  The Honorable Robert W.
2  Sweet rejected Power's argument, holding:

3  > Primary liability for a company's false statements is proper where
4  > the SEC is able to show that the defendant was sufficiently
5  > responsible for the statement – in effect caused the statement to be
6  > made – and knew or had reason to know that the statement would
7  > be disseminated to investors....  Here the allegations include that:
8  > as a result of the fraudulent DCF Sham Transaction that Power
9  > devised, Tyco periodic reports...contained false and misleading
10 > statements....

11 *Id.*  Here, as in *Power*, defendant Grant authorized sham transactions for the purpose
12 of falsifying the Company's financial statements issued to the public.  ¶¶49, 55, 59-
13 60.  This is more than enough to plead securities fraud.[51]

14     Moreover, it is presumed that Grant – as a senior officer of the Company –
15 participated in making the false statements at issue here.  "In cases of corporate
16 fraud where the false or misleading information is conveyed in prospectuses,
17 registration statements, annual reports, press releases, or other 'group-published
18 information,' it is reasonable to presume that these are the collective actions of the
19 officers."  *Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1441-42 (9th Cir. 1987).
20 *See also Atlas v. Accredited Home Lenders Holding Co.*, 2008 U.S. Dist. LEXIS
21 3863 at **27-28 (S.D. Cal. Jan. 4, 2008) (same); *In re BP Prudhoe Bay Royalty*

---

[51]  The SEC regularly brings civil actions, and the DOJ regularly brings criminal actions, under §10(b) against employees who participated in designing a deceptive transaction that caused a company's financial statements to be false – but who never themselves directly made a false statement to the public.  For instance, Jamie Olis was a mid-level officer of Dynegy who never made a public statement but was criminally convicted of securities fraud for designing a transaction to falsify his employer's cash flows.  *See U.S. v. Olis*, 429 F.3d 540 (5th Cir. Tex. 2005).  For this Court to adopt defendant Grant's interpretation of §10(b) would substantially handcuff the SEC and DOJ's ability to prosecute actions against employees who have acted to commit fraud but have not directly made a false statement.  Moreover, the SEC's interpretation of §10(b) commands substantial judicial deference such that it "becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation."  *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945).

1  *Trust Sec. Litig.*, 2007 U.S. Dist. LEXIS 83007 at *22 (W.D. Wash. Oct. 26, 2007)

2  (finding a majority of district courts within the Ninth Circuit have concluded that

3  group pleading survives the PSLRA); *In re Real Estate Assoc. Ltd. P'ship Litig.*, 223

4  F.Supp.2d 1142, 1149-51 (C.D. Cal. 2002).[52]

5          Grant's cited authorities are easily distinguished.  In *Cylink*, the "allegations

6  relating to [the defendant] simply show[ed] that he engaged in his job – making sales

7  for the company."   178 F.Supp.2d at 1084.  Here, Grant's job description did not

8  include authorizing bogus shipments for the purposes of falsifying the Company's

9  financial statements.  In *Siemers v. Wells Fargo & Co*, 2006 WL 3041090 at *11

10 (N.D. Cal. Oct. 24, 2006), the defendants who did not make any statements *were*

11 *separate legal entities* who – unlike defendant Grant – in no way furnished any

12 information that was included in the allegedly false and misleading statements made

13 by others.  In *Hansen*, 527 F.Supp.2d at 1153, this Court granted a motion to dismiss

14 where there were "no specific allegations that [the defendants] played any role

15 whatsoever in the preparation or dissemination of any allegedly false statements" or

16 furnished any false information causing the company's statements to the public to be

17 misleading.[53]

18

19

---

20 [52] Notably, Plaintiffs do not attempt to establish scienter vis-à-vis the group pleading doctrine – only that the statements issued by the Company are statements made by the Company's senior officers including Grant.   The cases rejecting the group pleading doctrine as inconsistent with the PSLRA have done so primarily with regard to attempts to draw a strong inference of scienter.

22 [53] Grant contends that he is only liable if Plaintiffs establish he engaged in "substantial participation or intricate involvement in the preparation of the misleading statements."  Grant Br. at 7.  *Id.* at 9.  Grant misconstrues the applicable law.   This language originates from the holding in *In re Software Toolworks Inc. Sec. Litig.*, 50 F.3d 615, 628-29 n.3 (9th Cir. 1995), which concerned the liability of a third-party auditor and was therefore not an officer of the Company issuing the false statement.  *The Ninth Circuit has never applied this standard to determine whether an individual officer of a company is liable for statements issued by the Company.*  District courts applying this standard have done so in error.  Nonetheless, Grant's authorization and approval of the sham transactions to falsify IRF's accounting and financial results establishes that he substantially participated in causing the issuance of the Company's false and misleading financial statements to the public.

Even assuming Grant did not "make" a materially false and misleading statement (which he did), the Ninth Circuit and district courts in this circuit recognize that defendants who have made no false statements may still be liable for "participat[ing] in [a] scheme to defraud investors." *In re Petco Animal Supplies Inc., Sec. Litig.,* No. 05-CV-0823-H (RBB), Order at 23 (S.D. Cal. July 31, 2006) (denying motion to dismiss filed by defendants who "participated in the scheme to defraud investors by causing or permitting [the company] to overstate its earnings by recklessly disregarding proper accounting procedures"). A copy of this opinion is attached as Exhibit C to the Bai Declaration.[54] Grant participated in the scheme to defraud and is liable under §10(b).[55]

### F.    Plaintiffs Have Properly Alleged Loss Causation

Loss causation requires that a complaint allege that the "defendant's misrepresentation ... proximately caused the plaintiff's economic loss." *Dura Pharms.*, 544 U.S. at 346. All that is required is that the Complaint provide defendants with "some indication that the drop in [IRF's] stock price was causally related" to defendants' false statements or omissions. *Daou*, 411 F.3d at 1026. The requirement is "not meant to impose a great burden upon a plaintiff" and, in accordance with Rule 8(a)(2), requires only a short and plain statement giving "notice of what the relevant economic loss might be or of what the causal connection might be between the loss and misrepresentation." *Dura Pharms.,* 544 U.S. at 347.

---

[54] Defendants' reliance on *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.,* 128 S.Ct. 761 (2008), is misplaced. In *Stoneridge*, unlike defendant Grant here, the defendants "had no role in preparing or disseminating [the company's] financial statements" but were merely "suppliers" and "customers" of the company that issued the false and misleading financial statements. *Id.* at 766, 774.

[55] Grant is also liable for illegally selling $7.1 million of his personal IRF stock while in possession of material, non-public information about the Company. *See* ¶291. Even assuming Grant did not make "any of the allegedly misleading statements," this "does not shield [Grant] from liability" because "a person who trades for personal profit, using confidential information misappropriated in the breach of a fiduciary duty, is guilty of violating Section 10(b)." *Am. West*, 320 F.3d at 937.

*See also Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 649 (7th Cir. 1997).[56]

Here, the Complaint details how, when the truth was revealed to the market through a series of partial disclosures, the inflation that had been caused by Defendants' misrepresentations and omissions was eliminated from the stock price and investors, including Plaintiffs, suffered losses. *See, e.g.*, ¶¶295-302.

IRF concedes that Plaintiffs have properly alleged loss causation with respect to certain of Plaintiffs' allegations. Plaintiffs plead the Company's financial statements for the periods ended September 30, 2003 to December 31, 2006 were false and misleading. ¶40. Defendants do not dispute that Plaintiffs plead loss causation for the false and misleading financial statements issued after December 27, 2005. *See* IRF Br. at 20-21.

IRF is the only Defendant to challenge loss causation, and it makes two flawed arguments.[57] In the first of IRF's arguments, it erroneously asserts: "Plaintiffs acknowledge that the Company disclosed *for the first time* that the

---

[56] Citing a Second Circuit authority that pre-dates *Dura* by almost a decade, IRF asserts that loss causation "must be pleaded with particularity under Rule 9(b)." IRF Br. at 8. To the contrary, Rule 8 notice pleading is the proper standard. *See, e.g. In re Dura Pharms., Inc. Secs. Litig.*, 452 F.Supp.2d 1005, 1021 (S.D. Cal. 2006) ("The Supreme Court's decision did not create a heightened pleading standard for loss causation: the Court noted its holding did not affect Rule 8(a)(2)'s applicability."). *See also Ong v. Sears, Roebuck & Co.*, 459 F.Supp.2d 729, 741 (N.D. Ill. 2006) ("Although the PSLRA requires a plaintiff to 'allege and prove the traditional elements of causation and loss' for a securities fraud claim, neither the Rules nor the PSLRA imposes more than the requirement set forth in Rule 8(a)(2)."); *Hunt v. Enzo Biochem, Inc.*, 471 F.Supp.2d 390, 409 n.120 (S.D.N.Y. 2006) (collecting post-*Dura* cases applying Rule 8 to allegations of loss causation).

[57] While Defendant McGee asserts there is a "significant issue concerning Plaintiffs' ability to establish the required element of 'loss causation'" the entirety of his argument is relegated to one footnote devoid of any substantial analysis and entirely unsupported by pertinent legal authority. *See* McGee Br. at 5 n.2. As set forth herein, contrary to McGee's contention, loss causation is not vitiated by post-Class Period disclosures of certain specific facts concerning Defendants' conduct. To adopt McGee's reading of the law would be to ignore the realities of the stock market and would enable Defendants to insulate themselves from §10(b) liability by leaking information to the market, neither of which is supported by *Dura. See, e.g. Freeland v. Iridium World Communs., Ltd.*, 233 F.R.D. 40, 47 (D.D.C. 2006) ("Indeed, reading *Dura* to require proof of a complete, corrective disclosure would allow wrongdoers to immunize themselves with a protracted series of partial disclosures.").

financials for [July 31, 2003 – December 27, 2005] could not be relied upon in a press release issued on August 31, 2007." IRF Br. at 20-21. That is not true. IRF disclosed on April 9, 2007 and May 11, 2007 that investors should not rely upon the financial results released March 31, 2005 through December 31, 2006. ¶¶266, 272. *See also* ¶¶298-298. Moreover, both the April 9, 2007 and May 11, 2007 disclosures warned investors that earlier periods may have been affected by the false accounting uncovered by the Company's investigation. ¶¶266, 272. The Company's stock price dropped in response to these disclosures. ¶¶267-271, 273-274. *See also* ¶¶295-299. Contrary to IRF's argument, these disclosures – not the Company's August 31, 2007 press release – revealed to investors potential impropriety with regard to the Company's accounting. Defendants have no basis for asserting that improprieties in the financial statements released during 2005 were not revealed until August 31, 2007.

In addition to ignoring the April 9, 2007 and May 11, 2007 disclosures, Defendants ignore the August 30, 2007 resignation of CEO Alex Lidow. Alex Lidow's resignation was a clear indication to the marketplace that the investigation had uncovered substantial improprieties conducted by or with the approval of the Company's most senior executives – resulting in the elimination of artificial inflation in the prices for the Company's securities. ¶300. Resignation by a senior officer under such circumstances – i.e., a forced resignation announced on the day before the Company revealed a wide array of fraudulent conduct spanning years that had been uncovered by an independent investigation (¶¶279-286) – is sufficient to establish loss causation.[58]

---

[58] *See, e.g., In re Flag Telecom Hldgs., Ltd. Sec. Litig.*, 245 F.R.D. 147, 171 (S.D.N.Y. 2007) ("the market may learn of possible fraud [from] a number of sources: *e.g.*, from whistleblowers, analysts' questioning financial results, *resignation of CFOs or auditors*, announcements by the company of changes in accounting treatment going forward, newspapers and journals, etc."). *See also In re Enron Corp. Secs.*, 2005 U.S. Dist. LEXIS 41240 at *71 (S.D. Tex. Dec. 22, 2005) (resignation of Jeff Skilling, Enron's CEO, constituted a partial disclosure for loss causation purposes).

1       IRF ignores the disclosures on April 9, 2007 (¶298), May 11, 2007 (¶299) and

2   August 30, 2007 (¶300) – all of which partially revealed the truth concerning

3   Defendants' wrongful conduct and resulted in large stock drops – to focus on an

4   August 31, 2007 disclosure made after the Class Period ended and after investors

5   had already priced into IRF securities the fact that Defendants had committed

6   wrongdoing.  IRF Br. at 20-21.  IRF cites no authority supporting its contention that

7   the upward stock price movement after the August 31, 2007 press release vitiates a

8   finding of loss causation.  *Id.*  Here, because the August 31, 2007 press release

9   followed a number of disclosures partially revealing the fraud and which precipitated

10  a negative market reaction, the price movement on August 31, 2007 is irrelevant to

11  pleading loss causation.[59]

12      The only other loss causation argument that IRF asserts is specific to

13  Plaintiffs' allegations in section IV.E. of the Complaint, which concern accounting

14  for cash flows associated with stock options.  IRF Br. at 21.  IRF contends that the

15  3.3% drop resulting from the May 15, 2006 disclosure was not sufficient to plead

16  loss causation.  *Id.*  Under *Dura*, there is no obligation that Plaintiffs establish the

---

[59] *See, e.g, Impax,* 2007 U.S. Dist. LEXIS 52356 at **5, 17-18 (loss causation adequately pleaded despite fact "stock increased in value" when restatement was issued after the class period); *In re Seitel, Inc. Sec. Litig.,* 447 F.Supp.2d 693, 711-12 (S.D. Tex. 2006) (rejecting contention that plaintiffs could not plead loss causation because stock price increased upon announcing restatement, noting that "in *Dura,* the Supreme Court did not adopt the argument that a plaintiff must show that the stock price declined due to a specific corrective disclosure or financial restatement" and that the market was conditioned to problems with company's accounting by the time of the restatement); *In re Bradley Pharms., Inc. Sec. Litig.,* 421 F.Supp.2d 822, 829 (D.N.J. 2006) ("A comparison of the price and trading volume reactions surrounding both the February 28 and the April 27 disclosures thus suggest that the market corrected the price of Bradley's stock price when the truth began to leak out on February 28, 2005 and that by the time Bradley announced its restatement of earnings in April 2005, the market had already incorporated that the previously released financial statements could not be relied upon."); *Montalvo v. Tripos,* 2005 U.S. Dist. LEXIS 22752 at *25-31 (plaintiffs adequately pleaded loss causation despite lack of negative impact on price of stock following post class period disclosure of restated financials); *In re Parmalat Sec. Litig.,* 375 F.Supp.2d 278, 307 (S.D.N.Y. 2005) ("That the true extent [of] the fraud was not revealed to the public until February – after Parmalat shares were worthless and after the close of the Class Period – is immaterial where, as here, the risk allegedly concealed by defendants materialized during that time and arguably caused the decline in shareholder and bondholder value.").

statistical significance of a particular price drop at the pleading stage – and IRF cites no authority supporting any such proposition.   Indeed, calculating damages in securities fraud cases is the well-recognized bailiwick of experts qualified to opine on such matters.   *See, e.g., In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 459 (S.D.N.Y. 2004) ("'Proof of damages in securities cases is always difficult and invariably requires expert testimony'").   Here, Plaintiffs more than sufficiently put Defendants on notice of Plaintiffs' theory of loss causation; the sufficiency of Plaintiffs' loss causation theory will be properly subject to a battle of experts.[60]

## G.   Defendants Are Liable Under Section 20(a)

Plaintiffs allege that the individual defendants are liable as "control persons" of International Rectifier and that IRF is liable as a control entity of its wholly owned subsidiaries, including its Japanese subsidiary.   *See* ¶¶334-341.   While Defendants move to dismiss these claims, their motions are based on both erroneous legal standards and an utter disregard of Plaintiffs' factual allegations.

As a legal matter and contrary to defendants' assertions, *there is no "confusion"* regarding the standards for alleging a control person *in the Ninth Circuit.*   Control person liability lies where there exists (i) a primary violation of

---

[60]   IRF's authorities do not support its assertion that this Court can presently determine that a 3.3% stock drop is insufficient to establish loss causation.   In *In re Acterna Corp. Sec. Litig.*, 378 F.Supp.2d 561 (D. Md. 2005), the plaintiffs' complaint established that plaintiffs' losses were attributable to a "severe economic slowdown" in "the global communications industry" and plaintiffs had "alleged no facts which, if proven, would show that their economic loss, i.e., the decline in the value of their purchased stocks, was caused by the alleged misstatements of Defendants, as opposed to an alternative intervening event."   *Id.* at 588.   Moreover, in *Acterna*, on "the day the 'truth' was revealed, the share price hit a high of $ 0.43, well above the closing price the previous day, ultimately closing at $ 0.32, only a penny below the previous day's closing price."   *Id.*   Here, Plaintiffs' losses were not caused by market forces and the Company's stock dropped by far more than one penny when the truth was revealed.   ¶¶295-302.   In *D.E. & J L.P. v. Conaway*, 284 F.Supp.2d 719 (D. Mich. 2003), *aff'd*, 133 Fed.Appx. 994 (6th Cir. 2005), plaintiffs took "the position that to allege loss causation, a plaintiff need only show that he or she purchased a stock at a price that was artificially inflated by Defendants' misrepresentations."   *Id.* at 749.   Moreover, the stock at issued declined only $0.05 on the day the truth was disclosed, which was a trivial amount in light of the company's volatility.   *Id.* at 749 n.46.   This case is much different than both the authorities cited by IRF.

federal securities law and (ii) the defendant possessed, directly or indirectly, power or control over the primary violator.  *Howard v. Everex,* 228 F.3d at 1065.  The Ninth Circuit has repeatedly confirmed that a plaintiff "need not show the controlling person's scienter or that they 'culpably participated' in the alleged wrongdoing."  *Paracor Fin., Inc. v. G.E. Capital Corp.*, 96 F.3d 1151, 1161 (9th Cir. 1996); *Howard*, 228 F.3d at 1065 (citing *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1575 (9th Cir. 1990)).  *See also Cylink*, 178 F.Supp.2d at 1089 ("[P]laintiffs need not allege that the individual defendants actually participated in the wrongful conduct or exercised actual power to be derivatively liable under section 20(a).").

In the Ninth Circuit that it is not even "necessary to show actual participation or the exercise of actual power" to make a prima facie case of control person liability.  *Howard,* 228 F.3d at 1065.  *See also Am. West*, 320 F.3d at 945; *Cylink*, 178 F.Supp.2d at 1089.  Rather, once the plaintiff "establishes that the defendant is a 'controlling person,' *then the defendant bears the burden of proving he 'acted in good faith....'*" *Paracor*, 96 F.3d at 1161, good faith can be demonstrated if a defendant can show no scienter and an effective lack of participation.  *Howard,* 228 F.3d at 1065.  Thus, while Alex Lidow is correct that mere negligence may not give rise to §20(a) liability, he misstates the burden of proof.  A. Lidow Br. at 14.

While there is "no concrete test for establishing whether a defendant is a control person,"[61] the Ninth Circuit has explained that the inquiry revolves around the "'management and policies' of the corporation, not around discrete transactions." *Paracor*, 96 F.3d at 1162.  That is, the allegedly controlling person need not have been actively involved in the underlying fraudulent scheme.  *See*, *e.g.*, *In re Splash Tech. Hldgs Sec. Litig.*, 2000 U.S. Dist. LEXIS 15370 at *51 (N.D. Cal. Sept. 29, 2000).  Rather, the question is "whether the defendant, acting alone or as a member of an identifiable group, had the power or influence to direct significant aspects of the management of the corporation."  *Id.*

---

[61] *Howard v. Hui*, 2001 U.S. Dist. LEXIS 15443 at **9-10 (N.D. Cal. 2001).

The ultimate question of whether a defendant was, in fact, a controlling person "is an intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions." *Am. West*, 320 F.3d at 945.  Accordingly, the issue of "control" is best suited for the finder of fact and should not be resolved here.

### 1.    The Individual Defendants Controlled The Company

According to the Company's own DEF 14As, defendants Eric Lidow, Alex Lidow, McGee and Grant were the top four senior executives of IRF (Chairman, CEO, CFO and Executive Vice President, Global Sales and Corporate Marketing, respectively).  ¶¶28-31; A. Lidow RJN Exs. A, B; McGee RJN Ex. T; Costley Decl. Exs F, K.  While an officer or director "is not automatically liable as a controlling person," officer or director status is a "red light" to the court.  *In re Entropin, Inc., Sec. Litig.*, 487 F.Supp.2d 1141, 1154 (C.D. Cal. 2007) (citing *Kaplan v. Rose,* 49 F.3d 1363, 1382 (9th Cir. 1994)); *Arthur Children's Trust v. Keim*, 994 F.2d 1390, 1396-97 (9th Cir. 1993).[62]

Moreover, while neither position alone nor the signing of SEC filings is necessarily sufficient to establish control, they are sufficient where, as here, the executive in question controls the matters that lie at the heart of the fraud.  *See*, *e.g.*, *Howard*, 228 F.3d at 1066 (upheld §20(a) claims against officer who had direct authority over the false financial statements on summary judgment motion); *Adaptive Broadband*, 2002 U.S. Dist. LEXIS 5887 at **58-59 ("[T]he fact that the named individual defendants held important positions in the company *is sufficient at the pleading stage*."); *Cylink*, 178 F.Supp.2d at 1089; *Wool*, 818 F.2d at 1441; *In re LaBranche Sec. Litig.*, 405 F.Supp.2d 333, 363-64 (S.D.N.Y. 2005); *Network Assocs.*, 2003 U.S. Dist. LEXIS 14442 at *48.

In any event, Plaintiffs allege far more than defendants' mere executive status:

---

[62] "The statute is remedial and is to be construed liberally.  It has been interpreted as requiring only some indirect means of discipline or influence short of actual direction to hold a controlling person liable."  *Immune Response, supra* at 1031.

### a.   Alex Lidow

Alex Lidow is billed as the second executive officer of IRF and was the CEO during the Class Period.   ¶27.   He was responsible for participating in or directly making false and misleading statements in filings, conference calls, interviews and press releases, and was involved in the underlying decisions and business matters at the heart of the fraud.[63]   Alex Lidow (i) was a hands-on manager who, for example, exercised "tight control over the whole company" ¶310(a); (ii) was personally involved in setting sales forecasts for the Company (¶49); (iii) authorized shipments of products to meet revenue goals (¶49); (iv) managed daily sales figures (¶53); and (v) made public statements.   (*See e.g.*, ¶¶113, 129, 146, 155, 164, 174, 183, 217-19). Alex Lidow also directly supervised the Company's executives, including defendant Jurek and the Company's VP of Operations.   ¶¶48, 98.   Alex Lidow had power, either directly or indirectly, to direct or cause the direction of the management and policies.   In addition, Alex Lidow signed inaccurate external documents during the Class Period, including SEC filings and Sarbanes-Oxley certifications.   *See e.g.*, ¶¶37, 103, 115, 117, 124.   Such allegations more than suffice.   *In re Homestore.com, Inc. Sec. Litig.*, 347 F.Supp.2d 769, 790 (C.D. Cal. 2004) ("Defendant Wolff [CEO] was a hands-on manager with personal involvement in setting yearly revenue goals, implementing and enforcing deals to meet those revenue goals each quarter, and making public statements."); *Cylink*, 178 F.Supp.2d at 1089 ("by virtue of their executive and managerial positions had the power to control and influence [the company], which they exercised" were sufficient).

### b.   Michael McGee

McGee's argument that he was not a control person despite the fact that he was the CFO who signed and certified the very financial statements that will be the subject of IRF's massive restatement defies credulity.   *See e.g.*, ¶¶37, 103, 115, 117, 123-24.   Nevertheless, Plaintiffs also allege a variety of additional facts establishing

---

[63] *See e.g.*, ¶¶112-13, 119, 124, 146, 148, 150, 174, 183, 214, 217-19.

McGee's actual participation in the fraud: (i) as the decision-maker regarding transfer pricing methodology, he directly participated in the Company's overstatement of net income in violation of tax laws by illegally transferring income from higher tax jurisdictions to lower tax jurisdictions (¶¶16, 92-100); and (ii) had the ability to, but failed to, control the Company's compliance with GAAP to properly account for operating and restructuring expenses[64] (¶¶74-91).

### c. Robert Grant

Grant's assertion that he was a mere "sales executive" is disingenuous given that the Company's DEF 14As list him as the fourth top executive at IRF. *See* A. Lidow RJN Exs. A, B. Moreover, unlike the allegations in *Hansen*, Plaintiffs do not rest their allegations on his position as a top executive. Rather, Plaintiffs allege detailed facts, based in part on statements of former employees, that demonstrate his actual participation over the matters at hand: (i) he participated in regular quarterly sales meetings, with participant including defendants Esaka and Jurek, in Japan (¶50); (ii) he actively participated in internal conference calls in which discussions on "pulling in of orders from future quarters to meet current quarter financial forecasts" was discussed as well as how the Company oversaw and managed the subsidiaries' business (¶¶59-60, 308(a)); (iii) he specifically told Esaka that he had to meet forecasts (¶59); (iv) he set sales forecasts for the Company's automotive

---

[64] For example, McGee supervised, on a daily basis, the Company's Director of Finance for the automotive division, Mike Love, who assisted in the implementation of Jurek's accounting manipulations of the operating and restructuring expenses for the Company. ¶¶88, 90. *See also* other examples of McGee's participation in day-to-day affairs of the Company and his power or influence to control corporate actions: (i) McGee received revenue reports and had access to Vision (¶53); (ii) he supervised key employees, including but limited to Love and (¶90) CW3 (¶98); (iii) he was responsible for the matrix of profit allocation (¶100); (iv) he was responsible for the internal control evaluation disclosure in the Company's 10-Q (¶305); (v) he collected the Company's Japanese subsidiary rolled up numbers (¶306(a)); and (vi) he was also responsible for participating in or directly making false and misleading statements in filings, conference calls, and was involved in the underlying decisions and business matters at the heart of the fraud. *See e.g.*, ¶¶112, 121, 128, 196, 242.

1    division (¶49); and (v) he authorized "bogus shipment of products" (¶49).[65]

2        In addition to these allegations supporting Grant's exercise of control over the

3    "management and policies" of the Company, the Complaint contains specific

4    allegations of Grant's direct participation and actual control over the day-to-day

5    affairs of the Company: (i) "Grant had absolute control over global sales and

6    marketing and directed the subsidiaries with any adjustments to the forecasts"

7    (¶306(c)); (ii) Grant was directly in charge of the Company's monthly "demand

8    creation calls" during which "Grant wanted to know how the participants would

9    meet their forecasts. (¶308(c)); (iii) "Grant organized all sales regions in all

10   segments under one global system, the Global Sales Operations group." (¶308(d)).

11   Moreover, Grant also supervised defendant Jurek.  ¶48.

12               **d.    Eric Lidow**

13       Eric Lidow (i) was the founder of the Company and its CEO during the first

14   part of the Class Period (¶28); (ii) was the Chairman of the Board throughout the

15   Class Period; (iii) remains the first listed executive officer in IRF's DEF 14As

16   (A. Lidow RJN Exs. A, B) and is apparently its fifth largest shareholder (¶28); and

17   (iv) he signed certain of the false and misleading statements (¶¶28, 115, 148, 187,

18   234, 334).  Such allegations are sufficient to state a control person claim.  *See*, *e.g.*,

19   *Jacobs v. Coopers & Lybrand, L.L.P.*, 1999 U.S. Dist. LEXIS 2102 at *52 (S.D.N.Y.

20   Mar. 1, 1999) ("[i]t does comport with common sense to presume that a person who

21   signs his name to a report has some measure of control over those who write the

22   report."); *Howard*, 228 F.3d at 1065-66 (Prima facie case of a §20(a) violation found

23   for an officer "authorized to participate in the release of the financial statements and

24

25   ────────────────────
     [65] Defendant Grant provides no legal support for his claim that, "[w]ithout specific
26   allegations that Grant supervised the preparation of the Company's financial
     statements, Plaintiffs' control-person claim against him necessarily fails."  Grant Br.
     at 19.  Grant misinterprets the court in *Howard*.  Grant Br. at 19.  The court in
27   *Howard* held that defendant Wong was not a control person because "there is no
     showing that Wong [defendant] was *active in the day-to-day affairs* of Everex
28   [Company] *or* that he exercised any specific control over the preparation and release
     of the financial statements."  *Howard,* 228 F.3d at 1067 n.13.

signed off on the statements as correct").[66]

## 2. IRF Controlled Its Japanese Unit

IRF's power to control its Japanese unit is obvious given the express language of the statute, which provides control can stem from ownership.[67]   Moreover, Plaintiffs here allege a significant number of facts describing IRF's actual exercise of control over its Japanese subsidiary.  *See generally* ¶¶266, 272, 281, 288, 299, 305-310.[68]  In such circumstances, control is firmly established.  *See*, *e.g.*, *In re BP Prudhoe Bay*, 2007 U.S. Dist. LEXIS 83007 at *24 (allegations that the parent company "oversaw the operations of BPXA [wholly owned subsidiary], made decisions about maintenance and production issues at Prudhoe Bay [subsidiary was responsible for operations at Prudhoe Bay], and issued press releases about the conditions of the Prudhoe Bay pipeline" were sufficient to support an inference of "control" under Section 20(a)).  *See also In re Enron Corp. Secs., Deriv. & ERISA Litig.*, 2004 U.S. Dist. LEXIS 7495 at **7-8 (S.D. Tex. Apr. 8, 2004); *In re Global Crossing, Ltd., Sec. Litig.*, 2005 U.S. Dist. LEXIS 16232 (S.D.N.Y. Aug. 8, 2005).

Thus, it is not surprising that IRF does not and cannot dispute the sufficiency of the control person allegations.  Instead, IRF seeks dismissal on grounds that Plaintiffs fail to allege a primary violation by the Japanese subsidiary.  However,

---

[66] Eric Lidow's reliance on the ultimate holding in *Howard*, is misplaced since that was a summary judgment case.  E. Lidow Br. at 3-4.

[67] "Control" is defined as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting securities, by contract, or otherwise." 17 C.F.R. §230.405; *Paracor,* 96 F.3d at 1162.

[68] For example, Plaintiffs allege how IRF (i) evaluated the internal controls for its subsidiaries, ¶305; (ii) set up and maintained information systems and made public statements regarding activity at the Japanese subsidiary, ¶306; (iii) established and regulated the Japanese units' employees through corporate policies, ¶307; (iv) oversaw operations of its Japanese subsidiary, ¶308; (v) required employees of its Japanese subsidiary to report directly to IRF employees, ¶¶309-310; (vi) implemented a "philosophy of centralization" whereby the parent directly supervised the operations of its subsidiaries, ¶310; (vii) managed its Japanese subsidiary's marketing efforts, ¶310; and (viii) issued public statements regarding its Japanese subsidiary, ¶¶266, 272, 281, 288, 299.

70

they offer no arguments regarding how or why the Complaint fails to establish that the Japanese unit violated §10(b).[69]

The Japanese subsidiary was the original and knowing source of part of the material misrepresentation and it knew or should have known that the misrepresentation would be communicated to investors.  As the court in *Kidder Peabody* stated, "if plaintiffs can show that defendants [subsidiary] were the original and knowing source of a misrepresentation and that defendants [subsidiary] knew or should have known that that misrepresentation would be communicated to investors [of the parent company], primary liability should attach."  10 F.Supp.2d at 407.  *See also* §III.E. above.  Here, the Japan unit provided IRF with financial data which was rolled up into IRF's financial statements and quarterly and annual reports.  ¶306.  Moreover, the Japanese unit's scienter is established by the allegations that Esaka, VP of IRF's Japan subsidiary, knowingly participated in the manipulation of the Japan subsidiary's financial results, which were consolidated with the Company's financial results and reported to the investing public, and controlled the Japan subsidiary's business operations with IRF.[70]  The facts alleged in the Complaint more than establish Esaka's knowledge and reckless disregard for the truth.[71]

---

[69] IRF does not – and cannot - dispute the fact that it may be held liable under §20(a) even if Plaintiffs do not prosecute claims against its Japanese subsidiary.  *See, e.g., In re Citisource, Inc. Sec. Litig.*, 694 F.Supp. 1069, 1077 (S.D.N.Y. 1988) (Court held that the "liability of the primary violator is simply an element of proof of a section 20(a) claim, and that liability need not be actually visited upon the primary violator before a controlling person may be held liable for the primary violator's wrong."); *Kemmerer v. Weaver*, 445 F.2d 76, 78-79 (7th Cir. 1971) (individual defendants liable under §20(a) even though entity defendant had not been served and was unavailable because it was dissolved.)

[70] *See Nursing Home v. Oracle,* 380 F.3d at 1234-35 (10b-5 cause of action against executives creates a cause of action against the company itself).

[71] For example, (i) Esaka and other senior officers authorized bogus shipments of product, which IRF would recognize revenue at the time of the bogus shipments (¶49); (ii) Esaka attended monthly sales meetings and participated in conference calls where sales were discussed (¶¶50, 59, 308); (iii) Esaka used his close relationship to some distributors to manipulate IRF's Japan Subsidiary's revenue by booking sales for products that Esaka knew would be returned in the next quarter (¶¶55-56); and (iv) Esaka furnished false and misleading information to be included in the Company's SEC filings, press releases and other false statements issued during the Class Period (¶306).

71

### H.   The Complaint Properly Extends The Class Period, And The Court Need Not Revisit The Appointment Of Lead Plaintiff

IRF erroneously argues that the Court should dismiss the Complaint because Plaintiffs expanded the Class Period without requesting that the Court re-open the appointment of lead plaintiff and authorize the newly appointed lead plaintiff to represent Plaintiffs in this new, extended Class Period.  IRF Br. at 22-25.  This argument is misguided on two levels.

First, if courts were forced to reevaluate lead plaintiff appointments every time discovery of additional information merited expanding a class period, there would be an unjustified and unnecessary delay of the administration of justice stemming from a quagmire of repeated lead plaintiff hearings.  For this reason, IRF's position has been rejected repeatedly.  It is well-recognized that the "appointed lead plaintiffs can decide how to frame their amended complaint in terms of an appropriate class period in their best judgment."  *In re Star Gas Sec. Litig.*, 2005 U.S. Dist. LEXIS 5827 at *19 (D. Conn. April 8, 2005).

Plaintiffs here have expanded the Class Period in good faith upon their extensive investigation of Defendants' conduct and consistent with Defendants' own admissions of issuing false and misleading financial statements caused by intentional conduct at IRF.  Plaintiffs' Complaint is not radically different than the original complaints filed filed by other plaintiffs, and the Complaint does not allege new causes of action or involve new securities.  Under such circumstances, the vast weight of the authority does not require this Court to re-visit the appointment of lead plaintiff.  *See, e.g., Thomas v. Metro. Life Ins. Co.*, 2007 U.S. Dist. LEXIS 74789 at *8 (W.D. Okla. 2007) ("courts have not generally required new notice where [a change in the class period] is the only change in the claims").[72]

---

[72] *See also In re Synovis Life Tech., Inc. Sec. Litig.*, 2005 U.S. Dist. LEXIS 18187 at *4 n.3 (D. Minn. 2005) ("weight of the case law" holds publishing a new notice not required upon filing an amended complaint with a longer class period); *Cheney v. Cyberguard Corp.*, 213 F.R.D. 484 (S.D. Fla. 2003) (new notice not required when class period extended by eleven months); *In re Telxon Corp. Sec. Litig.*, 67

1    Indeed, even IRF's own authorities recognize that Plaintiffs may alter the

2  Class Period without forcing the Court to go back to the beginning of the PSLRA

3  process and re-appoint lead plaintiffs.  *See, e.g. Teamsters Local 445 Freight Div.*

4  *Pension Fund v. Bombardier Inc.*, 2005 U.S. Dist. LEXIS 10780 at *5 (S.D.N.Y.

5  June 1, 2005) ("Courts have generally disfavored republication of notice when a

6  complaint is amended, even where the amendment alters the class period."); *In re*

7  *Cyberonics Inc. Sec. Litig.*, 468 F.Supp.2d 936, 938 (S.D. Tex. 2006) (same).

8    These opinions make sense since the PSLRA details a process for

9  appointment of lead plaintiff at a very specific stage of the litigation and does not

10  provide any mechanism for reevaluation at a later date.

11    Second, IRF fails to offer any authority or argument why a change in class

12  period would provide a basis for *dismissal of otherwise valid claims*.  While IRF

13  erroneously asserts that "[c]ourts have dismissed amended complaints in which a

14  lead plaintiff sought to expand the class period" (IRF Br. at 24), not surprisingly, it

15  offers no actual support for this bold statement.  It defies credulity to allow

16  defendants to escape liability for securities fraud claims that are asserted well within

17  the statute of limitations simply because the full scope of their fraud was disclosed

18  only after the filing of an initial preliminary complaint.  While IRF cites *In re Select*

19  *Comfort Corp. Sec. Litig.*, 2000 U.S. Dist. LEXIS 22697 (D. Minn. Jan. 27, 2000),

20  *Select Comfort* does not support IRF's argument but rather, recognizes that (as here)

21  court-appointed lead plaintiffs may expand a class period without having to publish

22  notice pursuant to the PSLRA.

23    In *Select Comfort*, plaintiffs filed an amended consolidated class action

24  complaint that included two "new claims" under Sections 11 and 15 of the Securities

25

26  F.Supp.2d 803, 819 (N.D. Ohio 1999) ("Courts have held that new notices need not
    be filed when an amended complaint asserting a different class period is filed."); *Lax*
27  *v. First Merchants Acceptance Corp.*, 1997 U.S. Dist. LEXIS 11866 at *12 (N.D. Ill.
    Aug. 11, 1997) ("The fact that a later filed complaint alleges a different class period
28  would not bring that complaint out of the aegis of § 21D(a)(3)(A)(ii)....  [N]o new
    notice is required.").

Act of 1933, whereas plaintiffs previously brought only Section 10(b) and 20(a) claims, and which also had a new class period and new lead plaintiffs not appointed by the court. *Id.* **21-22, 24.   Both the Magistrate Judge and the District Court Judge upheld the Section 10(b) and 20(a) claims, *including the extended class period.  See id.* at *67; *In re Select Comfort Corp. Sec. Litig.*, 2000 U.S. Dist. LEXIS 22696 at **7-8 (D. Minn. May 12, 2000).   The court expressly recognized that plaintiffs could expand the class period with respect to preexisting Section 10(b) and 20(a) claims, but – due to unique concerns about standing not present here – plaintiffs should publish notice before asserting additional claims under Sections 11 and 15.  *Id.* at **12-13.[73]   Here, as in *Select Comfort*, extending the Class Period is appropriate.   No notice need be published pursuant to the PSLRA because, unlike *Select Comfort*, Plaintiffs here do not plead additional legal claims and do not face unique standing issues.   Defendants' remaining legal authorities do not support, nor require, the Court to revisit its order appointing Lead Plaintiffs in this action.   IRF asserts that "courts have recognized the *unfairness* of allowing a lead plaintiff to expand a class period without providing new notice to members of the enlarged putative class."   IRF Br. at 25.   The "unfairness" to which IRF refers, however, pertains to other possible lead plaintiffs and not to defendants.  *See Cyberonics*, 468 F.Supp.2d at 939 (motion to intervene filed by plaintiff institutional investor because "new claims" in amended complaint affected intervenor, whereas "violations claimed in the original complaint [did] not"); *In re Leapfrog Enters. Sec. Litig.*, 2005 U.S. Dist. LEXIS 44899 at *10 (N.D. Cal. July 5, 2005) (institutional investor with losses of over $10 million moved to become lead plaintiff where the original lead

---

[73] The court held: "The lead plaintiffs have cited to sound authority that lead plaintiffs are not automatically required under the PSLRA to republish notice where a consolidated complaint is amended to allege new, closely related claims or a different class period....   Given these uncertainties about the standing of the lead plaintiffs to bring claims under Section 11 and 15, the court agrees with the magistrate judge that it is appropriate to dismiss Counts I and II of the consolidated complaint in their present posture and form. However, the court also believes that the lead plaintiffs should be given leave to amend, once again, their consolidated class action complaint with respect to their claims under Sections 11 and 15." *Id.*

plaintiffs, with losses of only $36,000, had attempted to "dramatically alter[] the contours of the lawsuit").  Here, no other potential lead plaintiff is expressing any interest in serving as lead plaintiff.  Rather, IRF, much like the fox guarding the hen house, is proclaiming to protect the interests of the proposed Class by asking the Court to dismiss Plaintiffs' claims.  IRF's position is unsupported by any legal authority and should be rejected.

## IV.    CONCLUSION

For these reasons, Defendants' motions to dismiss should be denied.[74]

Dated:  April 11, 2008                    Respectfully submitted,

**BERMAN DeVALERIO PEASE
    TABACCO BURT & PUCILLO**

By:   /s/ Nicole Lavallee
            Nicole Lavallee

Julie J. Bai
425 California Street, Suite 2100
San Francisco, CA  94104-2205
Telephone: (415) 433-3200
Facsimile:  (415) 433-6382

Dated:  April 11, 2008                    **BERNSTEIN LITOWITZ BERGER
    & GROSSMANN LLP**

By:   /s/ Blair A. Nicholas
            Blair A. Nicholas
Matthew P. Siben
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Telephone: (858) 793-0070
Facsimile:  (858) 793-0323

*Attorneys for Co-Lead Plaintiff General
Retirement System of the City of Detroit and
Co-Lead Counsel for the Class*

---

[74] Should this Court conclude, however, that the Complaint should be dismissed, Plaintiffs request that dismissal be without prejudice and that Plaintiffs be given leave to amend the Complaint to correct any deficiencies found, particularly given the fact that (1) the Company's Investigation is ongoing, (2) additional revelations of accounting improprieties continue to come to light, and (3) the Company has yet to restate its financial statements.  *See* Fed. R. Civ. P. 15(a)(2) (leave to amend shall be freely granted when justice requires); *Eminence Capital, LLC v. Aspeon, Inc.,* 316 F.3d 1048, 1052 (9th Cir. 2003) (dismissal with prejudice and without leave to amend is not appropriate unless it is clear that the complaint could not be saved by amendment).  *See also* additional cases cited in Pl. RJN at 4.

75