BERNSTEIN LITOWITZ BERGER
    & GROSSMANN LLP
BLAIR A. NICHOLAS   (Bar No. 178428)
(blairn@blbglaw.com)
NIKI L. MENDOZA (Bar No. 214646)
(nikim@blbglaw.com)
BENJAMIN GALDSTON   (Bar No. 211114)
(beng@blbglaw.com)
JON F. WORM   (Bar No. 248260)
(jonw@blbglaw.com)
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel:   (858) 793-0070
Fax:   (858) 793-0323

BERMAN DeVALERIO
JOSEPH J. TABACCO, JR. (Bar No. 75484)
(jtabacco@bermandevalerio.com)
NICOLE LAVALLEE (Bar No. 165755)
(nlavallee@bermandevalerio.com)
KRISTIN J. MOODY (Bar No. 206326)
(kmoody@bermandevalerio.com)
JULIE J. BAI (Bar No. 227047)
(jbai@bermandevalerio.com)
One California Street, Suite 900
San Francisco, CA 94111
Tel:   (415) 433-3200
Fax:   (415) 433-6382

*Attorneys for Co-Lead Plaintiffs General Retirement
System of the City of Detroit and Massachusetts
Laborers' Pension Fund*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE INTERNATIONAL RECTIFIER CORPORATION SECURITIES LITIGATION | Case No. CV 07-02544-JFW (VBKx)<br><br>JOINT DECLARATION OF BLAIR A. NICHOLAS AND NICOLE LAVALLEE IN SUPPORT OF MOTION FOR FINAL APPROVAL OF SETTLEMENT AND PLAN OF ALLOCATION, AND MOTION FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES<br><br>Date: February 8, 2010<br>Time: 1:30 p.m.<br>Courtroom: 16 |

1    We, Blair A. Nicholas and Nicole Lavallee, under penalty of perjury, declare
2    as follows:
3        1.    Blair A. Nicholas is a member of Bernstein Litowitz Berger &
4    Grossmann LLP ("Bernstein Litowitz"), and Nicole Lavallee is a member of
5    Berman DeValerio ("Berman DeValerio") (collectively "Lead Counsel"), counsel
6    to Lead Plaintiffs the General Retirement System of the City of Detroit ("Detroit
7    General") and Massachusetts Laborers Pension Fund ("Mass Laborers")
8    (collectively "Lead Plaintiffs") in the above-captioned class action (the "Action").
9    We have personal knowledge of the matters set forth below based on our active
10   participation in all aspects of the prosecution and settlement of this Action.  We
11   submit this declaration in support of the proposed Settlement that will resolve all
12   the claims in this Action as against defendants International Rectifier Corporation
13   ("IRF" or the "Company"), Alexander Lidow ("Alex Lidow"), Michael P. McGee
14   ("McGee") and Eric Lidow (the "Individual Defendants" and, together with IRF,
15   the "Defendants"), and their related parties.
16       2.    The Settlement was made on behalf of the Class of all persons and
17   entities who purchased or acquired the publicly traded securities of IRF from
18   July 31, 2003 through February 11, 2008, inclusive (the "Class Period"), and who
19   suffered damages as a result.[1]  This declaration is also submitted in support of the
20   proposed Plan of Allocation of the Settlement Fund to the Class Members (the

___

[1]  Excluded from the Class are:  (i) the Defendants; (ii) members of the immediate
family of each Individual Defendant; (iii) any person who was an officer or
director of the Company during the Class Period; (iv) the legal representatives,
agents, affiliates, heirs, successors-in-interest or assigns of any excluded parties;
and (v) any firm, trust, corporation, officer or other entity in which any Defendant
has a controlling interest.  Also excluded from the Class are any persons who
exclude themselves by filing a request for exclusion in accordance with the
requirements set forth in the Notice.  All capitalized terms not herein defined have
the meaning as stated in the Stipulation of Settlement dated September 22, 2009.

"Plan of Allocation") and in support of Lead Counsel's application for an award of attorneys' fees and reimbursement of litigation expenses.

## I.    INTRODUCTION AND OVERVIEW

3.    After more than two years of litigation, Lead Plaintiffs' efforts have achieved an outstanding recovery for the Class. The Settlement provides for the payment of $90,000,000.00 in cash (the "Settlement Amount" or "Settlement Fund") plus earned interest. Given the size of the Settlement and the significant risks that Lead Plaintiffs faced in establishing liability and damages, the Settlement is in the best interests of the Class. Rather than proceed with this litigation and risk obtaining little or nothing from Defendants, the Settlement provides the Class with the very substantial recovery of $90,000,000 in cash – an amount that was deposited into escrow by October 9, 2009 and, since that date, has been earning interest for the benefit of the Class.

4.    As demonstrated below and in the accompanying Lead Plaintiffs' Memorandum of Law in Support of Lead Plaintiffs' Motion for Final Approval of Class Action Settlement and Approval of Plan of Allocation (the "Settlement Brief"), the proposed Settlement is fair, reasonable, and adequate, and should be approved by this Court. Additionally, the proposed Plan of Allocation is a fair and reasonable method for distributing the proceeds of the Settlement to the members of the Class and, therefore, also should be approved.

5.    Lead Plaintiffs have entered into the Settlement with a thorough understanding of the strengths and weaknesses of the claims asserted in the action. As explained in greater detail below, this understanding is based on Lead Counsel's prosecution of the action for more than two years, which has included, among other things: (1) drafting detailed complaints after extensive investigation and witness interviews, review and analysis of the Company's SEC filings, press releases, other public statements issued by Defendants, media and news reports about the Company, and publicly available trading data relating to the price and

1  volume of IRF common stock; (2) extensive briefing on Defendants' multiple

2  motions to dismiss the Consolidated Class Action Complaint ("CAC") and Second

3  Amended Complaint ("SAC"); (3) reviewing and analyzing over 2.6 million pages

4  of documents produced by Defendants and third-parties; (4) the depositions of

5  representatives of Lead Plaintiffs, Lead Plaintiffs' investment advisors, and Lead

6  Plaintiffs' expert in connection with Lead Plaintiffs' motion for class certification;

7  (5) consulting with experts on issues relating to liability, damages, materiality, and

8  class certification; (6) briefing on Lead Plaintiffs' motion for class certification and

9  discovery disputes; (7) exchanging confidential mediation statements with

10  Defendants; and (8) preparing for, and participating in, mediation before an

11  experienced mediator and extensive negotiations following the formal mediation

12  session.

13      6.    The Settlement was reached only after hard-fought and protracted

14  settlement negotiations, including an in-person mediation with the Honorable Layn

15  R. Phillips (Ret.) and extensive negotiations following mediation conducted with

16  the mediator's assistance, all culminating in the parties' agreement to settle the

17  matter for $90,000,000. *See* Declaration of Layn R. Phillips, attached hereto as

18  Exhibit ("Ex.") B ("Phillips Decl."). Lead Plaintiffs believe that the $90,000,000

19  cash recovery for the Class is an outstanding result, particularly when viewed in

20  connection with the total potential damages as well as the risks Lead Plaintiffs and

21  the Class faced going forward in this action, including those relating to establishing

22  liability and damages. *See* Joint Declaration of Walter Stampor and Barry C.

23  McAnarney in Support of Class Action Settlement ("Lead Plaintiff Decl."), ¶¶15-

24  18, attached hereto as Ex. A

25      7.    As discussed in more detail below, Lead Plaintiffs faced significant

26  risks going forward, including, among others, that the Court would not certify a

27  class or would shorten the proposed class period (and, correspondingly, reduce

28  recoverable damages) or that Lead Plaintiffs would not be able to prove the

1    scienter of the Individual Defendants or, correspondingly, IRF. In addition, even if

2    Lead Plaintiffs were to prevail on the merits, there was a risk that the damages

3    determined to be attributable to the alleged misrepresentations and omissions

4    would be less than the Settlement Amount. Accordingly, while Lead Plaintiffs

5    believe that all of their claims have merit, one or more of these arguments or issues

6    may have ultimately proved insurmountable and the Class may have ended up with

7    little or no recovery. In light of these risks, the Settlement provides the Class with

8    an excellent result.

9         8.    The Settlement is the result of a comprehensive investigation,

10   extensive litigation, and hard-fought negotiations by experienced counsel. For

11   creating this substantial benefit, Lead Counsel seeks a fee of 25% of the Settlement

12   Amount, and reimbursement of litigation expenses, with interest on such fees and

13   expenses at the same rate as earned by the Settlement Fund. This requested fee has

14   been reviewed and approved by Lead Plaintiffs, Detroit General and Mass

15   Laborers, which are both sophisticated institutional investors with experience in

16   securities class actions after the Settlement and its precise terms were known and

17   notice was provided to the Class. *See* Lead Plaintiff Decl. ¶¶16-17. As set forth

18   below and in the accompanying Lead Counsel's Memorandum of Law in Support

19   of Lead Counsel's Application for Attorneys' Fees and Reimbursement of

20   Litigation Expenses ("Fee Brief"), Lead Counsel's request is justified by the work

21   performed and the result obtained.

22        9.    The favorable reaction of the members of the Class further supports

23   the reasonableness of the Settlement, Plan of Allocation, and the fee and expense

24   request. The Notice of Pendency of Class Action and Proposed Settlement,

25   Settlement Fairness Hearing, and Motion for Attorney's Fees and Reimbursement

26   of Litigation Expenses (the "Notice") was sent to more than 208,000 potential

27   Class Members or their nominees. *See* Declaration of Jennifer M. Keough

28   Regarding Notice and Claims Administration ("Keough Decl."), ¶¶3-9, attached

JOINT DECLARATION OF BLAIR A. NICHOLAS &
NICOLE LAVALLEE
Case No. CV 07-02544-JFW (VBKx)

1  hereto as Ex. C.  The Notice (attached as Exhibit A to the Keough Decl.) advised
2  Class Members of the proposed Settlement, the proposed Plan of Allocation, and
3  the request for an award of attorneys' fees and reimbursement of expenses.  The
4  Notice further advised Class Members of their right to object or request exclusion
5  from the Class, and it explained that this right needed to be exercised by
6  January 25, 2010.  Additionally, a summary notice was published in the national
7  edition of *The Investor's Business Daily* on October 20, 2009.  *Id.* ¶10.  Finally,
8  Lead Counsel posted the Notice and Proof of Claim form on its website, as did the
9  Court-appointed Claims Administrator.  *Id.* ¶11.

10      10.    While the deadline for opting out of the Settlement or objecting to any
11  aspect of the Settlement, the Plan of Allocation or the request for attorney's fees
12  and expenses will expire on January 25, 2010, to date, no Class Member has
13  submitted any objection, and only seven exclusion requests have been received.[2]
14  By contrast, although the deadline for submitting claims will not expire until
15  February 6, 2010, already the claims administrator has received approximately
16  7,500 claims representing a total of approximately 77 million shares purchased
17  during the Class Period.  *See* Keough Decl. ¶14.

18  **II.    THE ALLEGATIONS OF THE ACTION**

19      **A.    Defendants**

20      11.    International Rectifier, headquartered in El Segundo, California,
21  engages in the design, manufacture and marketing of power management products.
22  SAC ¶35.

23
24  _____
25  [2]  *Id.* ¶13.  As stated in the Keough Declaration, as of the execution of that
    Declaration, six exclusion requests had been received.  An additional exclusion
26  request by an individual was received following execution of the Keough
    Declaration, resulting in seven total exclusion requests to date.  Those seeking
27  exclusion will also be listed in Ex. 1 to the Proposed Judgment which will be
28  submitted to the Court following expiration of the deadline for seeking exclusion.

1    12.    Defendant Eric Lidow served as IRF Chief Executive Officer

2 ("CEO") until March 1995 and was IRF's Chairman of the Board until his

3 resignation in May 2008. *Id.* ¶36. He was also employed at IRF and was one of

4 the highest paid officers until his resignation. *Id.*; ¶¶367, 369. Eric Lidow signed

5 certain of the Company's false and misleading SEC filings, including the Forms

6 10-K from 2003 through 2006. *Id.* The SAC alleges a claim against Eric Lidow

7 under § 20(a) of the Exchange Act, but does not allege that Eric Lidow participated

8 in the fraud.

9    13.    Defendant Alex Lidow succeeded his father as CEO in 1995 and also

10 served on the Company's Board. *Id.* ¶37. He remained in those positions until

11 resigning at the Company's request on October 2, 2007, during the course of the

12 Company's investigation of the alleged fraud. *Id.* The SAC alleges that Alex

13 Lidow made false statements in the Company's press releases, analysts' conference

14 calls, and SEC filings (including Forms 10-K from 2003 through 2006 and its

15 Forms 10-Q). *Id.*

16    14.    Defendant McGee was IRF's Executive Vice President and Chief

17 Financial Officer ("CFO"), serving as CFO from 1993 until his termination on July

18 2, 2007. *Id.* ¶38. The SAC alleges that McGee made false statements in the

19 Company's press releases, analysts' conference calls, and SEC filings (including

20 the 2003-2006 Forms 10-K and the Company's Forms 10-Q). *Id.*

21    **B.    Overview of the Alleged Fraud**

22    15.    The SAC alleges that Defendants Alex Lidow, McGee, and IRF

23 repeatedly violated accounting rules to artificially inflate the Company's financial

24 results throughout the Class Period. Rather than report the Company's actual

25 financial results, the SAC alleges that they engaged in a host of improper practices

26 so that they could report desired financial results and misled investors regarding

27 IRF's internal controls and compliance with tax laws.

28

JOINT DECLARATION OF BLAIR A. NICHOLAS &
NICOLE LAVALLEE
Case No. CV 07-02544-JFW (VBKx)

16.    According to IRF's restatement, filed with the SEC on August 1, 2008, during the Class Period "accounting adjustments were viewed at times as an acceptable device to compensate for operational shortfalls, which in certain instances led to inappropriate accounting decisions and entries that resulted in desired accounting and income tax reporting results." SAC ¶333. Further, the restatement stated that "we did not maintain an environment that consistently emphasized an attitude of integrity, accountability and strict adherence to [Generally Accepted Accounting Principles]." *Id.* As alleged in the SAC, Defendants engaged in various practices to inflate IRF's reported results.

17.    First, the SAC alleges that the Individual Defendants and IRF misclassified normal operating expenses as "restructuring" costs, which allowed them to report inflated pro forma earnings and gross margins.  "Pro forma" financial statements exclude "unusual and nonrecurring" expenses when reporting a company's earnings and are issued, at least ostensibly, to present a more accurate view of a Company's ongoing value. *Id.* ¶82. Restructuring costs, however, are viewed as one-time charges and are often discounted by the market as nonrecurring expenses. *Id.* ¶83. As the Company's restatement explained, IRF inflated its pro forma earnings and its gross margins by improperly classifying normal operating expenses as "restructuring" costs for fiscal year 2003 through the first two quarters of 2007, overstating restructuring costs by 98% in 2005 and 82% in 2006. *Id.* ¶¶95, 96. By shifting normal operating expenses to "restructuring" costs, IRF reported reduced expenses and increased profits in the Company's pro forma financial statements. *Id.* ¶97. Similarly, the SAC alleges that reclassifying operating expenses as non-recurring restructuring costs permitted Defendants to reduce the cost of goods sold, which in turn allowed IRF to report inflated gross margins for both pro forma and GAAP purposes. *Id.*

18.    Second, the SAC alleges that IRF engaged in a variety of improper revenue recognition practices Company-wide from 2003 through the first two

JOINT DECLARATION OF BLAIR A. NICHOLAS &
NICOLE LAVALLEE
Case No. CV 07-02544-JFW (VBKx)

1    quarters of 2007 to manipulate financial results. *Id.* ¶¶103, 333. The restatement

2    characterizes IRF's improper revenue recognition practices as errors and

3    irregularities, which indicate that actions were taken intentionally to render

4    financial statements misleading. *Id.* ¶¶105, 333. According to the restatement,

5    IRF's Japanese subsidiary improperly recognized revenue from "fictitious

6    customer orders." *Id.* ¶333. The Company shipped products from its

7    manufacturing sites to Japan, where they were diverted to multiple third-party

8    warehouses and stored until: (1) the customer listed on the fictitious order actually

9    placed an order; (2) the inventory could be sold to a different customer; or (3) the

10    inventory was returned to the manufacturing sites. *Id.* The restatement also

11    indicated that IRF improperly recognized revenue on shipment of products in

12    Japan by entering into oral agreements with certain distributors at quarter end to

13    accept delivery of product with unusual or unauthorized conditions, including

14    extended payment terms and special return privileges. *Id.* As the Company first

15    revealed on February 11, 2008, it identified analogous improper revenue

16    recognition practices in its Aerospace and Defense ("A&D") segment. *Id.* ¶329.

17    The SAC also alleges that IRF improperly recognized revenue by accelerating

18    shipping dates – without the acknowledgement of the customer – to recognize

19    revenue in earlier reporting periods. *Id.* ¶¶103, 333. Further, the SAC alleges that

20    IRF improperly recognized revenue in violation of the customer's contract or

21    stated delivery terms, and it recognized revenue on shipments to distributors that

22    acted as fulfillment houses before the inventory was sold through to the end

23    customer. *Id.* Finally, as IRF disclosed in its restatement, "[i]n certain instances,

24    the premature recognition of revenue was the result of management override of

25    controls and an environment that permitted accounting decisions that resulted in

26    desired accounting results." *Id.* ¶¶109, 333.

27      19. Third, the SAC alleges that IRF inflated its cash levels during the

28    Class Period by selling or "factoring" accounts receivable generated by the

1    fictitious customer orders described above. *Id.* ¶¶ 332, 333.

2        20.    Fourth, the SAC alleges that, prior to and during the Class Period,

3    Defendants manipulated the Company's tax accounting to understate IRF's tax

4    liability, which inflated its earnings by over $140 million during the Class Period.

5    *Id.* ¶¶115-18, 333.   As described in the SAC, the adjustments centered on

6    improperly allocating income earned in various jurisdictions for tax purposes. *Id.*

7    For example, IRF underpaid taxes by shifting the recognition of earnings from

8    high-tax jurisdictions to lower-tax jurisdictions. *Id.* ¶¶18, 122, 333. According to

9    the restatement, the improper tax accounting adjustments were taken to achieve

10   "desired" results, and management was directly involved:   "[I]nappropriate

11   accounting decisions and entries . . . resulted in desired accounting and income tax

12   reporting results and, in some instances, involved management override of

13   controls." *Id.* ¶333.   The income tax manipulations led IRF to significantly

14   overstate its net income during the Class Period.   Due to tax accounting

15   manipulations, IRF's net income was inflated by $51.5 million in fiscal 2005,

16   $55.7 million in 2006, and $33.62 million for the first two quarters of 2007. *Id.*

17   ¶16.

18       21.    Fifth, the SAC alleges that IRF understated its accounts payable and

19   accrued liability balances during the Class Period. *Id.* ¶¶133, 134, 333.

20       22.    As alleged in the SAC, as a result of Defendants' systematic

21   misstatements of IRF's financial results and other material misstatements, IRF's

22   stock price was artificially inflated during the Class Period, causing it to trade as

23   high as $56.25. *Id.* ¶28. The SAC alleges that the artificial inflation in IRF's stock

24   price was removed through a series of partial disclosures beginning on

25   April 9, 2007.

26       23.    Before the market opened on April 9, 2007, IRF disclosed for the first

27   time that it had filed financial statements with the SEC that were false and

28   misleading when filed. *Id.* ¶304. The Company also stated that the wrongdoing

-9-

1  included "premature revenue recognition of product sales" and other accounting
2  violations at an IRF foreign subsidiary as well as material weaknesses in the
3  subsidiary's internal controls over financial reporting. *Id.* Following this
4  announcement, IRF's stock price fell from $38.80 on the prior trading day to a
5  close of $35.97 on April 9, 2007. *Id.* ¶307.

6      24.  Similarly, before the market opened on August 30, 2007, IRF
7  announced that Defendant Alex Lidow, the Company's long-time CEO and
8  Director, would take a "leave of absence" pending resolution of an internal
9  investigation. *Id.* ¶317. IRF's common stock price fell from a close of $38.39 on
10  August 29, 2007 to a close of $34.87 on August 30, 2007 – a drop of 9.2%. *Id.*

11      25.  On February 11, 2008, the last day of the Class Period, after the
12  market closed, IRF provided additional new information regarding the
13  investigation, including the existence of additional revenue recognition issues at its
14  A&D segment and errors regarding income tax accounting for fiscal years 2001
15  through 2007. *Id.* ¶329. The Company's stock price dropped from a close of
16  $27.27 on February 11, 2008 to $25.88 on February 12, 2008. *Id.* ¶330. In short,
17  the SAC alleges that the removal of artificial inflation through declines in the
18  Company's stock price following revelations of additional details of the fraud
19  caused Class members to suffer damages. *Id.* ¶379.

20      26.  Following an 18-month, $105 million investigation by the Audit
21  Committee of IRF's Board of Directors, the Company's restatement eliminated
22  large amounts of IRF's previously reported net income. *Id.* ¶¶3, 149-51; Ex. C. to
23  SAC  According to the restatement, IRF's net income for the first and second
24  quarters of 2007, previously reported as $106 million, was overstated by $44
25  million (or 41%). Ex. C. to SAC. For the fiscal year ended June 30, 2006, the
26  Company's previously reported net income of $107 million was overstated by $71
27  million (or 66%). *Id.* Similarly, net income was overstated by $52 million (or
28  38%) in fiscal 2005, $14 million (or 15%) in fiscal 2004, and $23 million (or 26%)

JOINT DECLARATION OF BLAIR A. NICHOLAS &
NICOLE LAVALLEE
Case No. CV 07-02544-JFW (VBKx)

1    in fiscal 2003. *Id.* Following revelations of the fraud, the SEC, the Internal

2    Revenue   Service, and the Office of the United States Attorney initiated

3    investigations.

4    **III.    HISTORY OF THE ACTION**

5         27.    Beginning on or about April 17, 2007, plaintiffs filed class actions

6    against Defendants and others in the Central District of California (Case Nos. CV-

7    07-02544 JFW (VBKx); CV-07-03123 JFW (PJWx)).    The complaints alleged,

8    among other things, that defendants made false statements and omitted material

9    information concerning IRF's reported financial results, gross margins, sales, and

10   business conditions. As required by the Private Securities Litigation Reform Act of

11   1995 ("PSLRA"), notice to potential putative class members was published on

12   April 18, 2007, informing them that any motions to be appointed lead plaintiff

13   were due by June 18, 2007.

14        28.    By Order dated May 17, 2007, the Court consolidated the actions then

15   before it and all related actions subsequently filed under the caption *In re*

16   *International Rectifier Corporation Securities Litigation*, Case No. CV-07-2544

17   JFW (VBKx). [Docket No. 6].

18        29.    Based on the information that Bernstein Litowitz's and Berman

19   DeValerio's investigations had uncovered, Detroit General and Mass Laborers

20   determined to move for appointment as Lead Plaintiffs, which they did on June 18,

21   2007. [Docket No. 22]. Under the PSLRA, Detroit General and Mass Laborers

22   were presumptively the "most adequate" movants because, compared to other

23   movants, they had the greatest loss from their investments in IRF during the

24   proposed class period.    In their motion to be appointed Lead Plaintiffs, Detroit

25   General and Mass Laborers submitted to the Court their choice of Bernstein

26   Litowitz and Berman DeValerio as Lead Counsel.

27

28

JOINT DECLARATION OF BLAIR A. NICHOLAS &
NICOLE LAVALLEE
Case No. CV 07-02544-JFW (VBKx)

30.   On July 23, 2007, this Court appointed Detroit General and Mass Laborers as Lead Plaintiffs and approved their selection of Bernstein Litowitz and Berman DeValerio as Lead Counsel for the Class. [Docket No. 34].

31.   Even before their appointment as Lead Counsel, Bernstein Litowitz and Berman DeValerio had begun an intensive investigation into the facts of this case. For example, Lead Counsel had already reviewed relevant publicly-available filings and other documents and reviewed news reports and analyst reports concerning IRF.

32.   Upon their appointment as Lead Counsel, Bernstein Litowitz and Berman DeValerio undertook a hard-fought prosecution that lasted until the Settlement was reached. As described more fully below, Lead Counsel vigorously litigated this action by, among other things: (1) conducting an extensive investigation into Defendants' alleged wrongful conduct; (2) drafting detailed, particularized consolidated complaints; (3) contesting Defendants' two rounds of motions to dismiss; (4) engaging in extensive discovery, including obtaining and analyzing more than 2.6 million pages of documents; (5) filing a motion for class certification and engaging in class certification-related discovery; (6) preparing for an intensive schedule of fact depositions; and (7) participating in hard fought, arm's-length settlement negotiations, including mediation before an experienced mediator.

### A.   Lead Plaintiffs' Investigation, Filing Of Complaints, And Briefing On Defendants' Motions To Dismiss

33.   Lead Counsel engaged in an intensive investigation to satisfy the requirements of Rule 9(b) of the Federal Rules of Civil Procedure and the heightened pleading standards imposed by the PSLRA. Lead Counsel thoroughly reviewed and analyzed all publicly available information regarding IRF (including, but not limited to, its SEC filings and financial statements, press releases, reports about the Company in the media, and analyst reports), and interviewed more than

50 former employees and other witnesses. Lead Counsel's investigation uncovered substantial information about the events discussed above, which formed the basis for Lead Plaintiffs' allegations.

34. On January 14, 2008, Lead Plaintiffs filed a consolidated class action complaint ("CAC") asserting claims under §§ 10(b) and 20(a) of the Exchange Act and Rule 10b-5 against Defendants and others. [Docket No. 55].

35. On March 6, 2008, Defendants IRF, Eric Lidow, Alex Lidow, and McGee, as well as former defendant Robert Grant (IRF's former Executive Vice President for Global Sales and Marketing), each moved separately to dismiss the claims asserted against them, collectively submitting over 90 pages of briefing (in addition to extensive requests for judicial notice). [Docket Nos. 74, 65, 71, 64, & 67].

36. On April 11, 2008, Lead Plaintiffs filed a single 75 page brief in opposition to the five motions to dismiss, as well as a response to the requests for judicial notice. [Docket No. 96].

37. Defendants filed their replies in support of their motions on April 30, 2008. [Docket Nos. 97, 98, 100, 101, & 102].

38. On May 23, 2008, the Court dismissed the CAC without prejudice, concluding that, among other things, the allegations did not create a strong inference of Defendants' scienter. [Docket No. 108].

39. Following the Court's May 23, 2008 Order, Lead Counsel conducted further investigation to remedy the deficiencies in the CAC noted by the Court in its May 23, 2008 Order. Among other things, Lead Counsel reviewed additional public statements of Defendants, including IRF's indication that it would be restating its earnings by June 17, 2008. Following IRF's disclosure, Lead Counsel requested, and the Court granted, an extension of time so that Lead Counsel could review IRF's forthcoming restatement. [Docket No. 119]. Similarly, when IRF indicated that it would not file its restatement until September 17, 2008, the Court

1  granted Lead Plaintiffs until October 17, 2008 to file their amended complaint.
2  [Docket No. 125].

3      40.    On August 8, 2008, Defendant IRF filed an ex parte application
4  requesting that the Court require Lead Plaintiffs to file their amended complaint by
5  September 2, 2008 on the grounds that IRF had filed its restatement on
6  August 1, 2008 – earlier than it had previously indicated. [Docket No. 128]. Lead
7  Plaintiffs filed an opposition on August 11, 2008. [Docket No. 133]. On August
8  12, 2008, the Court denied IRF's ex parte application. [Docket No. 136].

9      41.    To prepare an amended complaint, Lead Counsel conducted further
10  investigation, including interviewing additional witnesses, reviewing filings in
11  related cases, and conducting a detailed analysis of IRF's public filings since the
12  CAC (including its August 1, 2008 restatement).

13      42.    On October 17, 2008, Lead Plaintiffs filed their 201 page SAC,
14  including allegations based on the accounts of 26 confidential sources. The SAC
15  asserts claims under §§ 10(b) and 20(a) of the Exchange Act and Rule 10b-5
16  against Defendants and Robert Grant. [Docket No. 140].

17      43.    On November 10, 2008, IRF, Eric Lidow, Alex Lidow, McGee, and
18  Robert Grant each moved separately to dismiss the claims asserted against them,
19  collectively submitting over 80 pages of briefing (in addition to requests for
20  judicial notice). [Docket Nos. 156, 151, 155, 153, & 158]. Defendants raised
21  numerous arguments. Among other things, IRF contended that the SAC did not
22  plead a strong inference that the Company acted with scienter. IRF also challenged
23  the strength of the confidential source allegations and asserted that the sources
24  were not described with sufficient particularity. Further, IRF moved to strike
25  certain allegations, arguing that the Class Period should end on May 11, 2007, and
26  that investors did not suffer any loss as a result of many of the alleged false
27  statements. Alex Lidow argued that the allegations, whether viewed separately or
28  in combination, did not raise a strong inference of his scienter. Similarly, McGee

1  argued that the allegations did not raise a strong inference that he acted with
2  scienter, focusing particularly on the confidential source accounts. Eric Lidow
3  submitted that the SAC did not allege a primary violation and, thus, he could not
4  be held liable as a control person. Finally, Grant contended that the SAC did not
5  contain a false or misleading public statement that could be attributed to him, as he
6  did not literally make any of the challenged statements. Further, he contended that
7  the SAC failed to allege sufficiently that he acted with scienter.

8      44.    On November 17, 2008, Lead Plaintiffs submitted their 75 page
9  omnibus opposition to Defendants' motions to dismiss, as well as a request for
10 judicial notice. [Docket No. 167]. First, Lead Plaintiffs explained why the
11 confidential source allegations were pleaded sufficiently under Ninth Circuit law
12 and why the accounts supported a strong inference of Defendants' scienter.
13 Second, Lead Plaintiffs explained why they had sufficiently alleged the false and
14 misleading statements attributed to Defendants. As to Grant, Lead Plaintiffs
15 contended that the allegations demonstrated that he participated substantially in the
16 false statements at issue. Third, Lead Plaintiffs explained in detail why the various
17 categories of allegations in the SAC – including the admissions in the restatement,
18 the accounts provided by the confidential sources, and the pervasiveness and
19 magnitude of the accounting violations – individually and collectively raised a
20 strong inference that each Defendant acted with scienter. Lead Plaintiffs also
21 argued that the SAC pleaded IRF's scienter sufficiently under Ninth Circuit law
22 and that the Company's scienter was not limited to the scienter of Alex Lidow or
23 McGee. Finally, Lead Plaintiffs contended that the SAC pleaded loss causation
24 under the standards set forth by the Supreme Court of the United States and
25 explained that IRF did not satisfy any of the requirements for striking allegations
26 from a pleading.

27     45.    On November 24, 2008, Defendants submitted their replies in support
28 of their motions, reiterating the arguments they raised in their opening papers, and

-15-

JOINT DECLARATION OF BLAIR A. NICHOLAS &
NICOLE LAVALLEE
Case No. CV 07-02544-JFW (VBKx)

1    Alex Lidow requested judicial notice of certain SEC filings.  [Docket Nos. 174,
2    176, 178, & 182].

3         46.    On November 26, 2008, Defendant IRF submitted a notice of new
4    authority, attaching the Ninth Circuit's decision in *Glazer Capital Management, LP*
5    *v. Magistri*, Case No. 06-16899 (9th Cir. Nov. 26, 2009).  [Docket No. 185].  On
6    December 3, 2008, Lead Plaintiffs submitted a response to IRF's notice of new
7    authority.  In their response, Lead Plaintiffs explained why *Glazer* supported the
8    arguments raised by Lead Plaintiffs in their opposition papers. [Docket No. 189].

9         47.    On December 1, 2008, Lead Plaintiffs submitted an opposition to Alex
10   Lidow's request for judicial notice, contending that the filings could not be
11   considered for the truth of the matters asserted within the filings.  [Docket No.
12   186].  Additionally, Lead Plaintiffs submitted a reply in support of their request for
13   judicial notice. [Docket No. 187].

14        48.    On December 31, 2008, the Court granted in part and denied in part
15   the motions to dismiss the SAC, upholding the majority of the claims therein.
16   [Docket No. 194].  First, the Court determined that the SAC pleaded a strong
17   inference of scienter on the part of Alex Lidow, McGee, and IRF.  The Court
18   denied IRF's motion to strike and redefine the class period, determining that Lead
19   Plaintiffs had alleged loss causation adequately.  The Court dismissed the claims
20   against Robert Grant with prejudice, finding that the SAC did not plead that he
21   substantially participated or was intricately involved in the preparation of allegedly
22   fraudulent statements.  Additionally, the Court granted IRF's motion to dismiss the
23   claim asserting that it was liable for its control over its Japanese subsidiary.

24        49.    Defendants answered the SAC on January 15, 2009.  [Docket Nos.
25   203, 205, 207, 208].

26   **B.    Discovery**

27        50.    Pursuant to the PSLRA's automatic discovery stay, prior to the Court's
28   Order sustaining the SAC, Lead Plaintiffs were not able to pursue discovery.  Once

the Court entered its Order on December 31, 2008, however, Lead Counsel pursued extensive discovery from Defendants and relevant non-parties.  Such discovery included, for example: (1) preparing and serving document requests and interrogatories on Defendants; (2) preparing and serving subpoenas on non-party witnesses, including IRF's former accountants, customers, and distributors and securities analysts; (3) negotiating a protective order to govern the treatment of confidential information; (4) meeting and conferring with recipients of document requests and subpoenas and engaging in extensive correspondence regarding objections and productions; (5) obtaining, organizing, and analyzing over 2.6 million pages of documents produced by Defendants and third parties; and (6) preparing extensively for fact depositions, including creating witness files and preparing memoranda.

51.    Lead Counsel engaged in numerous meet and confer discussions with each of the Defendants and most of the subpoenaed third parties to discuss objections to the requests, interrogatories, and subpoenas, to negotiate the scope of the discovery requests, and to arrange for the production of responsive documents. Further, Lead Counsel engaged in extensive correspondence related to objections and production.

52.    Ultimately, Lead Counsel obtained over 2.6 million documents (including some documents in Japanese) through document requests and subpoenas directed to Defendants and numerous third parties.  Further, Lead Counsel secured informative responses to interrogatories.

53.    Lead Counsel undertook a diligent and extensive process of reviewing and analyzing the document productions in order to prepare the case for trial in January 2010 in accordance with the expedited pretrial schedule ordered by the Court in the case.  The documents were coded into various categories pertinent to the action, including witness and issue files, to prepare for depositions, summary judgment briefing, and trial.  Lead Counsel engaged in weekly document review

1  meetings to discuss the progress of the review and any highly relevant documents
2  discovered during the preceding week.  Lead Counsel summarized documents on
3  their computer databases and implemented a sophisticated system to search for and
4  locate relevant documents.

### 1.  Document Discovery

6  54.    Immediately following the Court's entry of a scheduling order on
7  January 7, 2009 (setting trial for January 12, 2010), Lead Plaintiffs served their
8  first requests for production on Defendants on January 12, 2009.  Among other
9  things, these requests sought documents turned over to any government agency
10 investigating IRF, documents related to IRF's internal investigation, and
11 documents relating to the Individual Defendants' compensation, insider trading,
12 and separation from IRF.

13 55.    On January 23, 2009, Lead Plaintiffs served their second request for
14 production on each of the Defendants.  Among the 60 requests, Lead Plaintiffs
15 requested documents concerning, for example, various admissions in IRF's public
16 filings, internal and external investigations into actions at IRF, IRF's sales and
17 revenue recognition policies, internal reports, communications with analysts,
18 restructuring, and personnel files of employees believed to be involved in the
19 alleged fraud.

20 56.    On January 30, 2009, Lead Plaintiffs and Defendants exchanged their
21 initial disclosures.

22 57.    To facilitate the production of documents in a timely manner and to
23 protect confidentiality where appropriate, Lead Counsel negotiated a protective
24 order with defense counsel, which the Court ultimately entered on March 11, 2009.
25 [Docket No. 214].

26 58.    Beginning on February 5, 2009 and continuing through the time the
27 parties reached an agreement in principle to settle the action, Lead Plaintiffs
28 obtained documents from IRF and the other Defendants on a rolling basis.

1   Ultimately, through numerous meet and confer discussions and extensive

2   correspondence regarding various disputes, Lead Plaintiffs obtained over 2 million

3   documents from Defendants.

4       59.    IRF objected on privilege and other grounds to producing certain

5   documents connected to, or produced during, its internal investigation into the

6   same accounting issues at the heart of the SAC.    Further, IRF objected to

7   producing any of its correspondence with government agencies concerning the

8   agencies' investigations into accounting misconduct at IRF.  Lead Counsel believed

9   that these documents were highly relevant and would be extremely helpful to the

10  prosecution of this action. Accordingly, Lead Counsel conducted extensive factual

11  and legal research regarding the documents and IRF's objections, and all of the

12  parties engaged in extensive meet and confer discussions and exchanged numerous

13  letters concerning the dispute.  Through these negotiations, Lead Counsel obtained

14  certain of the disputed documents.   Ultimately, however, Lead Plaintiffs were

15  forced to move the Court to compel IRF to produce many of the documents at

16  issue.   The parties ultimately drafted two joint stipulations setting forth their

17  positions regarding the disputed documents, in accord with the Court's local rules.

18  Lead Plaintiffs and IRF filed the joint stipulations on June 25, 2009.  [Docket Nos.

19  226, 227].

20      60.    In its motion to compel, Lead Plaintiffs discussed the history of the

21  disputes and the documents at issue and the importance of the discovery at issue.

22  Lead Plaintiffs contended that the investigation documents were ordinary business

23  documents and were never protected by the attorney-client privilege or attorney

24  work product doctrine.  Lead Plaintiffs also argued that IRF had waived any

25  privilege or protection by providing certain of the documents to Alex Lidow in

26  connection with his separation from IRF and by providing information to

27  government investigators.  Further, Lead Plaintiffs explained that it would be a

28  tremendous waste of resources to require Lead Plaintiffs to re-conduct an

JOINT DECLARATION OF BLAIR A. NICHOLAS &
NICOLE LAVALLEE
Case No. CV 07-02544-JFW (VBKx)

investigation that was already performed at a cost of over $100 million. As to the communications with the government, Lead Plaintiffs explained that IRF had failed to support its objections and that it did not have standing to assert any "law enforcement" privilege.

61.    In support of its position regarding the disputed documents, IRF submitted a declaration from an attorney who worked on its internal investigation, David Geneson. Lead Plaintiffs disputed certain of the conclusions stated in Mr. Geneson's declaration. Accordingly, Lead Plaintiffs noticed the deposition of Mr. Geneson in Washington, D.C. IRF, however, filed a motion for protective order in the District Court for the District of Columbia. Lead Plaintiffs filed their opposition on July 24, 2009. IRF's motion remained unresolved at the time the parties reached an agreement in principle to settle this matter.

62.    On July 21, 2009, Lead Plaintiffs submitted supplemental briefs in support of their positions in the joint stipulations. Lead Plaintiffs reiterated that IRF had not supported its privilege claims and that any privilege had been waived. Further, Lead Plaintiffs highlighted contemporaneous documents that refuted any claims of privilege and suggested that in camera review would confirm Lead Plaintiffs' position. [Docket Nos. 249, 252].

63.    On July 29, 2009, Magistrate Judge Victor B. Kenton issued a tentative ruling essentially agreeing with Lead Plaintiffs' arguments and indicating that he would conduct an in camera review of a sample of the disputed documents in an abundance of caution. [Docket No. 259]. In light of the agreement in principle to settle the matter, the parties stipulated to continue the matter, which the Court ordered on July 31, 2009. [Docket No. 262].

64.    Beginning in January 2009, Lead Plaintiffs issued document subpoenas to various non-parties believed to have documents relevant to the allegations in the SAC. Lead Plaintiffs issued subpoenas to the following non-parties:

| Subpoenaed Entity | Relevance | Issue Date |
|---|---|---|
| Pricewaterhouse Coopers | IRF's Former Auditor | 1/23/09 |
| Vishay Intertechnology Inc. | Acquired IRF's Power Control Division; Potential Merger Partner | 1/23/09 |
| Arrow Electronics | IRF Distributor/Contract Manufacturer/Customer | 1/29/09 |
| Flextronics International | IRF Distributor/Contract Manufacturer/Customer | 1/29/09 |
| Future Electronics | IRF Distributor/Contract Manufacturer/Customer | 1/29/09 |
| Jabil Circuit | IRF Distributor/Contract Manufacturer/Customer | 1/29/09 |
| Kaga Electronics | IRF Distributor/Contract Manufacturer/Customer | 1/29/09 |
| Marubun Corp. | IRF Distributor/Contract Manufacturer/Customer | 1/29/09 |
| Sanmina-SCI | IRF Distributor/Contract Manufacturer/Customer | 1/29/09 |
| Celestica | IRF Distributor/Contract Manufacturer/Customer | 1/30/09 |
| Avnet, Inc. | IRF Distributor/Contract Manufacturer/Customer | 2/6/09 |
| Citigroup Global Markets, Inc. | Securities Analyst | 2/5/09 |
| Goldman Sachs | Securities Analyst | 2/5/09 |
| Morgan Stanley & Co. | Securities Analyst | 2/5/09; 3/20/09 |
| Global Crown Capital | Securities Analyst | 2/5/09 |
| Nollenberger Capital Partners | Securities Analyst | 2/5/09 |
| Thomas Weisel Partners | Securities Analyst | 2/5/09 |
| Piper Jaffray | Securities Analyst | 2/5/09 |
| UBS Securities LLC | Securities Analyst | 2/6/09 |

JOINT DECLARATION OF BLAIR A. NICHOLAS & NICOLE LAVALLEE
Case No. CV 07-02544-JFW (VBKx)

| Subpoenaed Entity | Relevance | Issue Date |
|---|---|---|
| Barclays Capital | Securities Analyst | 2/6/09 |
| JP Morgan Chase & Co. | Securities Analyst | 2/6/09 |
| Stephens Inc. | Securities Analyst | 2/6/09 |
| Wedbush Morgan Securities | Securities Analyst | 2/6/09 |
| Wachovia Capital Markets LLC | Securities Analyst | 2/6/09 |
| Sanders Morris Harris Group Inc. | Securities Analyst | 2/6/09 |
| Ernst & Young LLP | Accountants | 2/18/09 |
| Fitch Ratings Ltd. | Rating Agency | 2/19/09 |
| Moody's Investors Service, Inc. | Rating Agency | 2/19/09 |
| Standard & Poor's | Rating Agency | 2/19/09 |
| Grant, Robert | IRF's Former Executive Vice President | 2/23/09 |
| Lehman Brothers | Securities Analyst | 2/25/09 |
| Glass Lewis & Co. LLC | Securities Analyst | 3/4/09 |
| Kaplowitz, Carl | Former Employee | 6/18/09 |
| Protiviti | Provided Consulting Services to IRF | 6/26/09 |
| KPMG | Accountant | 7/15/09 |
| Sawada, Yukari | Former Employee | 6/8/09; 7/17/09 |
| Adhikari, Grace | Former Employee | 6/8/09 |
| Lazar, Bel | Former Employee | 6/8/09 |
| Tsujigaki, Hanna | Former Employee | 7/16/09 |
| Bjorklund, Holly | Former Employee | 7/16/09 |

After extensive negotiations, including meet and confer discussions and correspondence between Lead Counsel and counsel for each of these non-parties

1    over the course of several months, the vast majority of these parties provided

2    responsive documents in their possession.

3        **2.    Experts**

4        65.    Lead Counsel worked extensively with experts and consultants at

5    different stages of the case to prepare the complaints, analyze documents, prepare

6    for class certification and summary judgment briefing, prepare for mediation,

7    prepare for depositions and trial, and negotiate the Settlement

8        66.    Lead Counsel negotiated competitive fee rates for these experts, each

9    of whom played a significant part in the prosecution of this Action.

10       67.    For example, Lead Counsel retained Dr. Gregg A. Jarrell, a professor

11   of finance and economics in the Simon Graduate School of Business at the

12   University of Rochester. He is an expert on financial-economic issues in business

13   litigation. Lead Counsel retained Dr. Jarrell to analyze and opine on the efficiency

14   of the market for IRF's common stock in connection with Lead Plaintiffs' motion

15   for class certification. Further, Lead Counsel retained Dr. Jarrell to offer an

16   opinion on issues relating to the materiality of, and the losses caused by, alleged

17   misstatements and omissions made by Defendants during the Class Period. Dr.

18   Jarrell submitted a declaration and was deposed in connection with Lead Plaintiffs'

19   class certification motion. Lead Counsel also retained Forensic Economics, Inc.

20   ("Forensic Economics") and Howard J. Mulcahey, a Vice President at Forensic

21   Economics. Mr. Mulcahey is an expert on issues pertaining to financial valuations

22   and economic analyses, including securities class actions and analyzing the

23   response of stock prices to public information in securities lawsuits. Lead Counsel

24   retained Mr. Mulcahey to consult regarding class damages and on the development

25   of the Plan of Allocation. *See* Declaration of Howard J. Mulcahey, attached hereto

26   as Ex. D.

27       68.    Consultants from Hemming Morse, Inc., a forensic accounting and

28   consulting firm, also assisted Lead Counsel in understanding the various complex

JOINT DECLARATION OF BLAIR A. NICHOLAS &
NICOLE LAVALLEE
Case No. CV 07-02544-JFW (VBKx)

accounting issues and assisting in reviewing and understanding the discovery in this case.

69.    Pursuant to the Court-ordered pretrial schedule, Lead Plaintiffs were prepared to proceed with expert reports and expert discovery when the parties agreed to settle this action.

### 3.    Depositions

70.    Given the complexity of this case, Lead Plaintiffs negotiated with Defendants to increase the number of depositions the parties could take from the presumptive limits included in Rule 30 of the Federal Rules of Civil Procedure.

71.    At the time the parties agreed to settle, Lead Counsel had noticed and scheduled, or were in the process of scheduling, the depositions of 19 witnesses to be taken beginning on August 5, 2009.  Given the pretrial schedule in this matter, Lead Counsel were in the process of prioritizing key deponents and noticing additional depositions.  For example, Lead Plaintiffs planned to depose Defendants Alex Lidow and McGee, as well as many other key current and former employees of IRF, including former defendant Robert Grant.

72.    At the time of the settlement, the following 19 depositions of former and current employees were already scheduled:

| NAME | TITLE | DATE |
|---|---|---|
| Adhikari, Grace | Corporate Controller | 8/5/09 |
| Sawada, Yukari | Audit Specialist, Corporate Assurance | 8/11/09 |
| Tsujigaki, Hanna | Japanese translator for Japanese automotive customers | 8/12/09 |
| Lazar, Bel | Former Aerospace & Defense VP | 8/13/09 |
| Bjorklund, Holly | Director of R&D, Sales and Marketing | 8/14/09 |
| Love, Mike | Director of Finance for Automotive Division | 8/18/09 |
| Kaplowitz, Carl | Former Tax Director | 8/21/09 |
| King, Linda | Director of Project Management/ Engineering | 8/24/09 |
| Lifsey, Walter | Executive VP of Operations | 8/26/09 |
| Pahl, Linda | VP, Corporate Finance | 8/28/09 |

JOINT DECLARATION OF BLAIR A. NICHOLAS &
NICOLE LAVALLEE
Case No. CV 07-02544-JFW (VBKx)

| Sakai, Mina | IRF Japan Subsidiary Customer Service Manager | 9/10-9/11/09 |
| Insley, Julie | Director of Corporate Assurance | 9/14/09 |
| Allen, Jeff | Corporate Controller | 9/15/09 |
| Rolls, Paul | VP Sales & eCommerce & Customer Service for North America | 9/22/09 |
| Herold, Joe | Former VP of Global Human Resources | 9/18/09 |
| Takasaki, Keisuke | IRF Japan Customer Service Representative | 10/7-10/8/09 |
| Hoya, Keiko | IRF Japan Customer Service Representative, Kaga | 10/9/09; 10/19/09 |
| Tanaka, Aya | IRF Japan Customer Service Representative, Marubun and Hinet | 10/22-10/23/09 |
| Ando, Orie | IRF Japan Manager of Customer Service | 10/20-10/21/09 |

73.   The week prior to the first scheduled fact deposition, the parties reached an agreement in principle to settle this matter. Prior to that agreement, Lead Counsel had prepared extensively for the above-scheduled depositions. Had the parties not reached an agreement, Lead Counsel was prepared to proceed with the depositions.

### 4.   Class Certification

74.   On March 17, 2009, Lead Plaintiffs filed their motion for class certification pursuant to Rule 23 of the Federal Rules of Civil Procedure. [Docket No. 217]. Along with their memorandum explaining why certification was appropriate, Lead Plaintiffs submitted the affidavit of Dr. Jarrell supporting certification. [*See* Docket No. 216, Ex. A]. Dr. Jarrell conducted a detailed analysis and opined that: (1) IRF's common stock traded in an efficient market; (2) several of IRF's disclosures partially corrected alleged misstatements and omissions concerning IRF's financial statements; (3) the alleged misrepresentations and omissions were material to investors; and (4) several of the misrepresentations and omissions caused losses for shareholders who purchased common stock during the class period and held the shares through at least one of the partially corrective disclosures.

1    75.    In connection with Lead Plaintiffs' motion, IRF deposed Dr. Jarrell,
2  representatives from Lead Plaintiffs' investment advisors, and representatives of
3  each of the Lead Plaintiffs.

4    76.    On June 29, 2009, Defendants filed their oppositions to class
5  certification. [Docket Nos. 237, 241, 242, 243]. Among other things, Defendants
6  contended that the class should exclude anyone who purchased shares after the first
7  corrective disclosure.

8    77.    Lead Plaintiffs were in the midst of finalizing their reply brief in
9  support of certification when the parties reached an agreement in principle to settle
10 this matter.

11           **C.    The Risks Faced by Plaintiffs**

12   78.    If the litigation had continued, Lead Plaintiffs faced substantial risks,
13 including establishing Defendants' liability and the Class' full amount of damages
14 at summary judgment or trial. Lead Plaintiffs and Lead Counsel took into account
15 the Court's ruling dismissing the CAC in its entirety and the Court's ruling
16 dismissing certain of the claims alleged in the SAC and dismissing all claims
17 alleged against Robert Grant with prejudice. Further, they considered that certain
18 contested issues would have been decided by a jury in the event of a trial,
19 including whether Defendants acted with an intent to mislead investors, whether
20 the alleged misrepresentations or omissions were false and material to investors,
21 whether all of Class Members' losses were caused by the alleged
22 misrepresentations or omissions, and the amount of damages. Defendants argued
23 throughout the litigation that Lead Plaintiffs would be unable to prove that
24 Defendants' statements were false or that they were made with scienter. In
25 particular, Defendants contended that proving the scienter of IRF would require
26 Lead Plaintiffs to demonstrate that either Alex Lidow or McGee acted with the
27 requisite state of mind. Defendants also argued that the Class Period should be
28 shortened, which could have significantly reduced recoverable damages.

1  Defendants undoubtedly would have continued to argue that their statements were
2  not false and they lacked scienter. While Lead Plaintiffs believe that their case is
3  meritorious and that they have strong evidence, if the Court at summary judgment
4  or trier of fact at trial agreed with Defendants, any recovery could have been
5  substantially reduced or eliminated altogether.

6      79.   Even if Lead Plaintiffs prevailed through summary judgment, risks to
7  the Class would remain. Even a meritorious case can be lost at trial. *See, e.g., In
8  re JDS Uniphase Corp. Sec. Litig.*, 2007 WL 4788556 (N.D. Cal. Nov. 27, 2007)
9  (after a lengthy trial, jury returned a verdict against plaintiffs, the action was
10 dismissed and Plaintiffs were ordered to pay defendants the costs of defending the
11 action). Even success at trial does not eliminate the risk.[3]

12     80.   If the Settlement had not been reached, the litigation (including any
13 appeals) would have likely continued for years and the ultimate result of further
14 litigation cannot be foreseen. Given the stakes involved in this litigation, an appeal
15 is virtually assured regardless of the result of trial. Instead of the lengthy, costly,
16 and uncertain course of further litigation with Defendants, the Settlement provides
17 an immediate and certain recovery for the Class. Lead Counsel believe that the
18 Settlement clearly outweighs the substantial risks associated with lengthy
19 continued litigation.

20     81.   Lead Plaintiffs and Lead Counsel also considered that, even if Lead
21 Plaintiffs were to prevail on the merits, the ability to recover as much as the

22 _____

23 [3] For example, following a verdict in favor of plaintiffs in *In re Apollo Group, Inc.*
24 *Sec. Litig.*, the court overturned the verdict and granted defendants motion for
   judgment as a matter of law. 2008 WL 3072731 (D. Ariz. Aug 4, 2008). In *In re*
25 *Apple Computer Sec. Litig.*, 1991 WL 238298 (N.D. Cal. Sept. 6, 1991), the jury
26 rendered a verdict for plaintiffs after an extended trial. The court, however,
   overturned the verdict, entered judgment notwithstanding the verdict for the
27 individual defendants, and ordered a new trial with respect to the corporate
28 defendant.

1  Settlement Amount on a judgment, much less more than the $90 million Settlement

2  Amount, was far from certain.  In sum, given the extensive investigation and

3  litigation in this matter, Lead Plaintiffs were able to carefully weigh the risks and

4  benefits to settlement in a fully informed manner before finally agreeing to a

5  settlement on behalf of the Class.

6            **D.    The Negotiation of the Settlement**

7        82.    The Settlement is the result of intense, arm's-length negotiations

8  between informed parties, and involved a formal in-person mediation session with

9  all parties present, as well as further negotiations following mediation.  All

10 settlement negotiations occurred while discovery and pretrial matters were

11 ongoing, and, as described above, Lead Plaintiffs were in the process of, among

12 other things, completing the review of millions of pages of documents and

13 preparing for depositions and completing briefing on their class certification

14 motion.

15       83.    On April 30, 2009, Lead Plaintiffs, Defendants, and Defendants'

16 insurance carriers participated in a mediation session with the Honorable Layn R.

17 Phillips (Ret.) in Newport Beach, California.  The parties reached an impasse

18 during the in-person mediation, however, and did not agree to a settlement.  *See*

19 Phillips Decl., attached hereto as Ex. B.

20       84.    Following the in-person mediation, Judge Phillips continued

21 mediation discussions with the parties and insurance carriers in an effort to

22 negotiate a settlement.  On July 29, 2009, after considerable additional negotiations

23 supervised by Judge Phillips, and just six months prior to the Court's scheduled

24 trial date, the parties agreed to a proposed settlement for $90 million in cash to be

25 paid by IRF and its insurance carriers.

26       85.    On September 25, 2009, the Court entered an Order granting

27 preliminary approval and authorizing the Notice to be sent to Class Members.  [the

28 "Preliminary Approval Order," Docket No. 293].  Following entry of the Court's

1   Preliminary Approval Order, the $90 million Settlement Fund was deposited into
2   an interest-bearing escrow account.

3   **IV.   CLASS NOTICE**

4       86.   Pursuant to the Court's Preliminary Approval Order, this Court
5   granted preliminary approval of the Settlement, preliminarily certified the Class,
6   ordered that notice be disseminated to the Class, and set January 25, 2010, as the
7   date by which all objections to the Settlement, the Plan of Allocation and/or the
8   request for attorneys' fees and reimbursement of expenses, or requests for
9   exclusion from the Class, must be received.

10      87.   Lead Plaintiffs, with the Court's approval, retained The Garden City
11  Group, Inc. ("GCG") as the Claims Administrator for the Settlement.  GCG was
12  selected following a competitive bidding process.

13      88.   Pursuant to the Preliminary Approval Order, Lead Plaintiffs, through
14  GCG, disseminated copies of the Notice and the Proof of Claim and Release (the
15  "Notice Packet") to potential Class Members.  A copy of the Notice Packet is
16  attached as Exhibit A to the Keough Declaration.  The Notice contains a thorough
17  description of the Settlement, the Plan of Allocation, and Class Members' rights to
18  participate in and object to the Settlement, or to exclude themselves from the Class.
19  *Id.* As detailed in the Keough Declaration, GCG obtained the names and addresses
20  of potential Class Members, and used GCG's proprietary database of names of
21  brokerage firms, banks, institutions and other nominees that it maintains, as well as
22  names provided by banks, brokers and nominees pursuant to the Preliminary
23  Approval Order for purposes of its initial mailing.  *Id.* at ¶¶5-9.

24      89.   GCG began disseminating the Notice Packet to potential Class
25  Members on October 9, 2009.  In total, over 208,000 copies of the Notice Packet
26  have been disseminated to potential Class Members.  *Id.*

27      90.   In addition, the Summary Notice ("Publication Notice") was
28  published once each in the national edition of *The Investor's Business Daily* on

1    October 20, 2009. *Id.* ¶10.    Information regarding the Settlement, including

2    downloadable copies of the Notice and Claim Form, was posted on the website

3    established by the Claims Administrator for this action (www.irfsettlement.com),

4    *id.* ¶11, as well as on Lead Counsel's website (www.blbglaw.com) and

5    (www.bermandevalerio.com).

6         91.    As ordered by the Court and stated in the Notice, all objections to the

7    Settlement, Plan of Allocation, or request for attorneys' fees and reimbursement of

8    expenses and/or requests for exclusion from the Settlement are due to be received

9    by no later than January 25, 2010.    To date, there are no objections to the

10   Settlement, the Plan of Allocation, or request for attorneys' fees and reimbursement

11   of expenses.

12        92.    GCG has received only seven requests for exclusion, purporting to

13   represent only 650 shares. *See* Keough Decl. ¶13.    By comparison, while the

14   deadline for submitting claims will not expire until February 6, 2010,

15   approximately 7,500 claims have already been submitted, representing

16   approximately 77 million shares. *See id.* ¶14.

17   **V.    PLAN OF ALLOCATION**

18        93.    Pursuant to the Preliminary Approval Order, and as set forth in the

19   Notice, all Class Members who wish to participate in the distribution of the

20   Settlement Fund must submit a Claim Form no later than February 6, 2010. As

21   provided in the Notice, after deducting all appropriate taxes, administrative costs,

22   attorneys' fees, and reimbursement of litigation expenses, the balance of the

23   Settlement Fund (the "Net Settlement Fund") will be distributed according to the

24   Plan of Allocation.

25        94.    If approved, the Plan of Allocation will govern how the proceeds of

26   the Net Settlement Fund will be distributed among Class Members who submit

27   valid Claim Forms.    The Plan of Allocation is designed to achieve an equitable

28   distribution of the Net Settlement Fund.

95.     The Plan of Allocation is the product of Lead Counsel's investigation and analysis in this Action, as well as their consultation with Forensic Economics. As discussed in detail in the Mulcahey Declaration, a "Recognized Loss" will be calculated for each purchase or acquisition of IRF securities during the Class Period as reflected on the Claim Forms timely submitted by Class Members.

96.     GCG, as the Claims Administrator for the Settlement, will determine each Authorized Claimant's *pro rata* share of the Net Settlement Fund based upon each Authorized Claimant's Recognized Loss, calculated in accordance with the Plan of Allocation. Calculation of the Recognized Loss will depend upon several factors, including when the shares were purchased or acquired, and whether they were held until the conclusion of the Class Period or sold during the Class Period, and if so, when they were sold.

97.     The Plan of Allocation, developed in consultation with Lead Plaintiffs' independent expert, was designed to fairly and rationally allocate the proceeds of the Settlement among Class Members based on the corrective disclosures and resulting estimated damages throughout the Class Period, and was fully explained in the Notice to the Class. *See* Mulcahey Decl., attached as Ex. D hereto. There have been no objections to the Plan of Allocation. Accordingly, Lead Counsel respectfully submit that the Plan of Allocation is fair and reasonable and should be approved.

## VI.    THE FEE APPLICATION

98.     The Notice informed Class Members of Lead Counsel's intent to apply for an award of attorneys' fees in an amount not to exceed 25% of the Settlement Fund, and for reimbursement of litigation expenses in an amount not to exceed $1 million, plus interest on such fees and expenses at the same rate as earned by the Settlement Fund.

99.     The requested fee of 25% of the Settlement Amount is equal to the "benchmark" fee in the Ninth Circuit and was reviewed and approved by Lead

Plaintiffs Detroit General and Mass Laborers, sophisticated institutional investors with experience prosecuting securities violations on behalf of investors and serving as the lead plaintiff in actions governed by the PSLRA. *See* Lead Plaintiff Decl. ¶16.

100.    As discussed in the Fee Brief, fee awards equal to or greater than the "benchmark" fee award of 25% of the Settlement Amount are frequently approved by courts both within the Ninth Circuit and outside of this Circuit.

101.    The fee requested is also fair, adequate, and reasonable because of the significant risks faced by Lead Counsel in pursuing this action. Most obviously, this litigation was undertaken by Lead Counsel on a wholly contingent basis. Lead Counsel understood that they were embarking on a complex, lengthy, and expensive litigation with no guarantee of ever being compensated for their investment of time and money in the prosecution of this matter. Indeed, Lead Counsel are aware of numerous cases where plaintiffs' counsel in contingent cases such as this, after expending thousands of hours, have received no compensation for various reasons. Thus, commencement of a class action does not guarantee a settlement and fee award. Nevertheless, Lead Counsel understood that they were obligated to ensure that sufficient attorney resources were dedicated to the prosecution of this case and that sufficient funds were available to cover the significant expenses required to litigate this matter. As discussed above, liability here was far from assured and there were significant risks concerning the damages recoverable even if liability were established. As just one example of the litigation risks faced by Lead Counsel, the Court initially dismissed all of the claims alleged in the CAC. The Court upheld the majority of claims only after Lead Counsel conducted additional investigation in preparation for the SAC and engaged in extensive briefing on Defendants' motions to dismiss.

102.    Courts have repeatedly recognized that it is in the public interest to have experienced and able counsel enforce the securities laws. As recognized by

1  Congress through the passage of the PSLRA, vigorous private enforcement of the

2  federal securities laws can only occur if private plaintiffs – particularly

3  institutional investors – take an active role in protecting the interests of securities

4  purchasers and obtain representation comparable to that available to large

5  corporate interests. If this important public policy is to be carried out, plaintiffs'

6  counsel must be adequately compensated, taking into account the enormous risks

7  undertaken in prosecuting securities class actions.

8      103. The expertise and experience of Lead Counsel is another important

9  factor in setting a fair fee. Lead Counsel are among the most experienced and

10  skilled practitioners in the securities litigation field, and have long and successful

11  track records in such cases. The challenges posed by the size and complexity of

12  this case, the relatively short discovery and pretrial schedule, and the underlying

13  subject matter were enormous. This $90 million Settlement was in large part the

14  result of Lead Counsel's specialized skills, their hard work, and their persistence.

15  Moreover, the fact that Lead Counsel have demonstrated a willingness and ability

16  to prosecute complex cases such as this was undoubtedly a factor that encouraged

17  Defendants to engage in settlement discussions and to settle this matter. Copies of

18  our firm's respective resumes are attached as Ex. 5 to the Declaration Of Blair A.

19  Nicholas In Support Of Lead Counsel's Application For Attorneys' Fees And

20  Reimbursement Of Litigation Expenses Filed On Behalf Of BLB&G ("Nicholas

21  Decl.") (attached hereto as Ex. E); and as Ex. 3 to the Declaration Of Nicole

22  Lavallee In Support Of Lead Counsel's Application For Attorneys' Fees And

23  Reimbursement Of Litigation Expenses Filed On Behalf Of Berman DeValerio

24  (attached hereto as Ex. F) (collectively "Fee Declarations").

25      104. As reflected in the attached Fee Declarations, Lead Counsel expended

26  over 25,846.30 hours in the prosecution and investigation of this litigation. The

27  hours invested by Lead Counsel are a testament not only to the large scale of the

28  case, but also to Lead Counsel's commitment and professional sacrifice to obtain

1   the best possible result for the Class. Lead Plaintiffs respectfully submit that Lead

2   Counsel obtained an outstanding result for them and the Class and that their fee

3   request is fair and reasonable given the quality of the work performed and the

4   result obtained. *See* Lead Plaintiffs Decl. ¶16. Thus, the fee requested fairly and

5   reasonably rewards Lead Counsel's performance.

6       105. The quality of the work performed by Lead Counsel in attaining the

7   Settlement should also be evaluated in light of the quality of opposing counsel.

8   Counsel for Defendants consisted of top-tier national firms, each of which

9   mounted a formidable defense. In the face of this knowledgeable and formidable

10  defense, Lead Counsel was nonetheless able to develop a case that was sufficiently

11  strong to persuade the Defendants to settle the litigation on terms that are favorable

12  to the Class

13      106. Additionally, this action required Lead Counsel to spend over two

14  years intensively litigating this matter, requiring the attorneys to forego work on

15  other matters and requiring Lead Counsel to incur significant expenses. Courts

16  have noted that these circumstances are relevant to the fee determination. *See, e.g.,*

17  *Vizcaino v. Microsoft Corp.,* 290 F.3d 1043, 1050 (9th Cir. 2002).

18      107. The fee is also fair, adequate and reasonable when measured based on

19  a lodestar multiplier. The lodestar multiplier is calculated by (i) dividing the fee

20  requested by (ii) the number of hours counsel billed to the case multiplied by the

21  counsel's standard hourly rate. The lodestar for the services performed by all Lead

22  Counsel here was $9,502,492.25. This represents a multiplier of less than 2.4.

23  Courts have frequently approved higher multipliers in securities cases. *See, e.g.,*

24  *Vizcaino,* 290 F.3d at 1047 (upholding a multiplier of 3.65 on a $96.885 million

25  settlement); *In re Infospace, Inc.,* 330 F. Supp. 2d 1203 (W.D. Wash. 2004)

26  (awarding multiplier of 3.5 on a $34.4 million settlement fund); *see also In re*

27  *NASDAQ Market-Makers Anti-Trust Litigation,* 187 F.R.D. 465, 489 (S.D.N.Y.

28  1999) (awarding a 3.97 multiplier on a $1.0 billion settlement and finding fee

JOINT DECLARATION OF BLAIR A. NICHOLAS &
NICOLE LAVALLEE
Case No. CV 07-02544-JFW (VBKx)

1    awards of 3 to 4.5 to be "common"). This case was prosecuted on a fully

2    contingent basis, with no assurance of success, and litigated for two years without

3    any compensation at all.

4        108.  In addition, in response to over 208,000 Notices being mailed, to date

5    there are no objections to Lead Counsel's fee request.

6    **VII.  REIMBURSEMENT OF THE REQUESTED**
     **EXPENSES AND COSTS IS FAIR AND REASONABLE**

7

8        109.  Lead Counsel seeks reimbursement of $680,339.03 in litigation

9    expenses reasonably and actually incurred by Lead Counsel in connection with

10   commencing and prosecuting the claims against the Defendants, with interest

11   incurred at the same rate earned by the Settlement Fund. *See* Fee Declarations,

12   attached as Exhibits E and F hereto. A summary of all requested expenses is

13   attached as Ex. 2 to the Nicholas Decl.

14       110.  From the beginning of the case, Lead Counsel was aware that they

15   might not recover any of its expenses, and, at the very least, would not recover

16   anything until the action was successfully resolved. Lead Counsel also understood

17   that, even assuming that the case was ultimately successful, reimbursement for

18   expenses would not compensate them for the lost use of the funds advanced by

19   them to prosecute this action. Therefore, Lead Counsel was motivated to, and did,

20   take significant steps to minimize expenses whenever practicable without

21   jeopardizing the vigorous and efficient prosecution of the case.

22       111.  As detailed in the Fee Declarations, Lead Counsel requests a total of

23   $680,339.03 in unreimbursed litigation expenses in connection with the

24   prosecution of this action. As set forth in the Fee Declarations, these expenses are

25   reflected on the books and records maintained by Lead Counsel and are prepared

26   from expense vouchers, check records, and other source materials, and are an

27   accurate record of the expenses incurred. The expenses of Lead Counsel for which

28   reimbursement is sought are set forth in detail in the respective firms' Fee

---

-35-

JOINT DECLARATION OF BLAIR A. NICHOLAS &
NICOLE LAVALLEE
Case No. CV 07-02544-JFW (VBKx)

1    Declarations, which identify the specific category of expense, *e.g.*, experts' fees,

2    travel costs, photocopying, telephone, fax and postage expenses, and other costs

3    actually incurred.

4         112.   A large portion of the litigation expenses for which reimbursement is

5    sought were incurred for professional expert fees.  Of the total amount of expenses,

6    $449,914.56, or over 66%, was expended on investigators and experts in the areas

7    of liability, loss causation, market efficiency, damages, and to assist with the Plan

8    of Allocation.   The expertise and assistance provided by these investigators and

9    experts was critical to the prosecution and successful resolution of this action.

10        113.   The expenses also include the costs of on-line legal and factual

11   research in the amount of $76,737.64. These are the charges for computerized

12   factual and legal research services such as Lexis-Nexis and Westlaw.  It is standard

13   practice for attorneys to use Lexis-Nexis and Westlaw to assist them in researching

14   legal and factual issues, and, indeed, courts recognize that these tools create

15   efficiencies in litigation and, ultimately, save clients and the class money.

16        114.   In addition, Lead Counsel were required to travel in connection with

17   prosecuting and mediating this matter and, thus, incurred the related costs of travel

18   tickets, meals, and lodging.  Included in the expense request above is $26,346.77

19   for out-of-town travel expenses necessarily incurred for the prosecution of this

20   Litigation.

21        115.   The other expenses for which reimbursement is sought are the types

22   of expenses that are necessarily incurred in litigation and routinely charged to

23   clients billed by the hour.  These expenses include, among others, long distance

24   telephone and facsimile charges, postage and delivery expenses, filing fees,

25   photocopying, and document management.

26        116.   All of Lead Counsel's litigation expenses for which reimbursement is

27   being sought were necessary to the successful prosecution and resolution of the

28   claims against Defendants.  Lead Plaintiffs have approved Lead Counsel's request

-36-

JOINT DECLARATION OF BLAIR A. NICHOLAS &
NICOLE LAVALLEE
Case No. CV 07-02544-JFW (VBKx)

1   for reimbursement of expenses.  In addition, the Notice apprised potential Class

2   Members that Lead Counsel would seek reimbursement of expenses in an amount

3   not to exceed $1 million.  The amount now sought – $680,339.03 – is substantially

4   less than the amount stated in the Notice.  To date, there are no objections to the

5   request for reimbursement of expenses.

6   117.  In view of the complex nature of the action, the litigation expenses

7   incurred were reasonable and necessary to pursue the interests of the Class.

8   Accordingly, Lead Counsel respectfully submits that the expenses are reasonable in

9   amount and should be reimbursed in full.

10  **VIII.  CONCLUSION**

11  118.  In view of the substantial recovery to the Class, the risks of this

12  action, the enormous efforts of Lead Plaintiffs and Lead Counsel, the quality of

13  work performed, the contingent nature of the fee, the complexity of the case, and

14  the standing and experience of Lead Counsel, Lead Counsel respectfully submits

15  that the Settlement of $90,000,000.00 should be approved as fair, reasonable and

16  adequate; that the Plan of Allocation should be approved as fair and reasonable;

17  that a fee in the amount of 25% of the Settlement Fund, and expenses in the

18  amount of $680,339.03, with interest thereon at the same rate as earned by the

19  Settlement Fund, should be awarded to Lead Counsel.

20  We declare under penalty of perjury that the foregoing is true and correct

21  and that this declaration was executed on this 19th day of January, 2010.

22

23      _/s/ Blair A. Nicholas_
        BLAIR A. NICHOLAS
24

25

26      _/s/ Nicole Lavallee_
        NICOLE LAVALLEE
27

28

-37-

JOINT DECLARATION OF BLAIR A. NICHOLAS &
NICOLE LAVALLEE
Case No. CV 07-02544-JFW (VBKx)

## TABLE OF CONTENTS TO EXHIBITS

| EXHIBIT | TITLE |
|---------|-------|
| A | Joint Declaration of Walter Stampor and Barry C. McAnarney in Support of Class Action Settlement |
| B | Declaration of Layn R. Phillips |
| C | Declaration of Jennifer M. Keough Regarding Notice and Claims Administration |
| D | Declaration of Howard J. Mulcahey |
| E | Declaration of Blair A. Nicholas in Support of Lead Counsel's Application for Attorneys' Fees and Reimbursement of Litigation Expenses Filed on Behalf of BLB&G |
| F | Declaration of Nicole Lavallee in Support of Petition for Attorneys' and Reimbursement of Expenses Filed on Behalf of Berman DeValerio |