# EXHIBIT D

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

IN RE: INTERNATIONAL
RECTIFIER
CORPORATION SECURITIES
LITIGATION

Case No. CV 07-02544-JFW
(VBKx)

This Document Relates to: All Cases

## DECLARATION OF HOWARD J. MULCAHEY

I, HOWARD J. MULCAHEY, declare as follows:

1.    I am a Vice President of Forensic Economics, Inc. ("Forensic Economics") located in Rochester, NY. I have consulted on numerous occasions on issues pertaining to financial valuations and financial - economic analyses, including securities class actions and analyzing the response of stock prices to public information in securities lawsuits.

2.    I was retained by the Lead Counsel on behalf of General Retirement System of the City of Detroit and Massachusetts Laborers' Pension Fund ("Lead Plaintiffs") to consult on the development of the Plan of Allocation, which is included on the Notice Of Pendency Of Class Action And Proposed Settlement

("Notice") on pages 6 – 8.[1]

3.    In my opinion, the Plan of Allocation is a fair, reasonable and adequate method of distributing the Net Settlement Fund to Authorized Claimants.  The Plan of Allocation allows recovery for losses that are measurable directly from International Rectifier Corporation ("International Rectifier," "IRF" or the "Company") excess common stock price declines associated with the alleged wrongdoing, and not for losses due to general market or industry movements or other Company-specific reasons that are unrelated to the alleged wrongdoing, during the period July 31, 2003 and February 11, 2008 ("Class Period").[2]

## QUALIFICATIONS AND COMPENSATION

4.    I am a Vice President of Forensic Economics located in Rochester, New York.  I have performed analyses for, and consulted on issues pertaining to, financial valuations and financial - economic analyses, securities class actions, and analyzing the response of stock prices to public information in securities lawsuits for approximately eight years.  I have performed financial analysis as part of my work while at Forensic Economics as well as in various positions I held in jobs prior to joining Forensic Economics, including as a financial analyst, CFO and COO of

---

[1] Notice Of Pendency Of Class Action And Proposed Settlement, Final Approval Hearing, And Motion For Attorneys' Fees And Reimbursement Of Litigation Expenses, In Re: International Rectifier Corporation Securities Litigation, United States District Court, Central District Of California, Case No. CV 07-02544 JFW (VBKx).

[2] The Plan does not allow for recovery for investors who purchased shares during the Class Period and sold shares before the first corrective disclosure, which are not damaged by the alleged wrongdoing.

EXHIBIT _D_
PAGE _88_

different companies. I hold an MBA in Finance (1994) from the University of Rochester's William E. Simon Graduate School of Business Administration. Forensic Economics has been retained by both plaintiffs and defendants in such securities cases.

5.    I have testified at trial, and by way of expert report and deposition on damages in federal and state courts. I have co-authored an article about the stock-price effects of options backdating titled "The Effect of the Options Backdating Scandal on the Stockprice Performance of 110 Accused Companies" with Dr. Genarro Bernile and Dr. Gregg A. Jarrell.[3] I have consulted on damages in numerous securities lawsuits and for numerous plans of allocation of class-action settlement funds, including: Openwave Systems Securities Litigation, American Tower Corporation Securities Litigation, Xerox Securities Litigation,[4] Monster Worldwide, Inc. Securities Litigation, American Tower Corporation Securities Litigation, Mercury Interactive Corporation Securities Litigation, and KLA-Tencor Corp. Securities Litigation among others. My resume is attached as Exhibit 1.

---

[3] G. Bernile, G. Jarrell, and H. Mulcahey, "The Effect of the Options Backdating Scandal on the Stock Price Performance of 110 Accused Companies," Social Science Research Network, December 21, 2006.

[4] Russell Carlson, Individually And On Behalf Of All Others Similarly Situated v. Xerox Corporation, KPMG LLP, Paul A. Allaire, G. Richard Thoman, Anne Mulcahy, Barry D. Romeril, Gregory Tayler And Philip Fishbach.

EXHIBIT __D__
PAGE __89__

## MATERIALS REVIEWED

6.      In the course of my assignment, I reviewed numerous case documents, including the Complaint, various SEC filings, market prices and trading volume of IRF common stock, news stories, press releases, analyst reports, as well as institutional holdings and short interest in IRF common stock, and consensus analyst earnings estimates for IRF. I cite in the text of this Declaration the specific documents and information on which I have relied in reaching my opinions.

## ANALYSIS AND BASIS FOR OPINIONS

7.      The Plan of Allocation provides for the distribution of the "Net Settlement Fund" ($90 million plus interest, minus attorneys' fees and expenses, as well as administration costs and fees) to persons who purchased IRF common stock during the Class Period based upon their respective "Recognized Losses." [5] Recognized Losses were determined by an analysis of the amount of artificial inflation in the prices of IRF's common stock during the Class Period attributable to defendants' false and misleading statements as alleged in the Complaint.

8.      The basis for calculations of "Recognized Loss Amounts" presented in the Plan of Allocation is an analysis of artificial inflation during the Class Period that I performed at the request of Lead Plaintiff's Counsel. The artificial inflation I

---

[5] The Notice at p. 1 and 6.

4

EXHIBIT _D_
PAGE _90_

calculated is based on an event study analysis of IRF's stock prices. For the event study, I relied on the analysis of Dr. Gregg A. Jarrell submitted in an Affidavit in this action dated March 17, 2009 (the "Jarrell Affidavit").

9.    Using event study methodology, I conducted an analysis of the new information disclosed to the market and the resulting price change in IRF's common stock price. The price change in a security caused by a disclosure correcting prior false or misleading statements is a good estimate of the change in the amount of artificial inflation because it removes the artificial inflation from the market price of a security. Event studies also assess the probability that a security-price movement was due to new information disclosed on a particular date and not due to chance. Thus, the event study can objectively quantify the market price movements associated with disclosures of new information.

10.    Based on the new information released to the market, and the market's reaction to that news, I identified certain dates where the alleged misstatements or omissions were revealed. I then analyzed the stock price reaction to the public disclosures that revealed or described the information that corrected the alleged misrepresentations and omissions, or their effects, and measured the dollar price decline associated with each particular disclosure.[6] I separated the excess stock

---

[6] During the Class Period, numerous news stories about IRF appeared in leading financial publications, including Barron's, Forbes, The Wall Street Journal, The Los Angeles Times, The New York Times, Financial Times, Dow Jones News Service, Associated Press Newswires, Reuters and Bloomberg News.

EXHIBIT _D_
PAGE _91_

price change, net of market and industry effects, to eliminate the effects, if any, attributable to general market or industry conditions and confounding news. I used standard statistical techniques to ensure that the price reaction was statistically significant (i.e., greater than the normal variation in the price).[7] I then calculated a dollar amount of alleged inflation in the price of IRF common stock for those dates and each day in the Class Period that, in my opinion, was attributable to the alleged wrongdoing.

11. I determined that the reasonable amount of artificial inflation in the market price of IRF common stock is based on the excess price changes on April 9, 2007 (the first partial disclosure of the alleged fraud), on August 30, 2007 (the second partial disclosure) and on February 11, 2008 (the final partial disclosure and the last day of the Class Period). Using those partially corrective disclosures, I was then able to determine the amount of artificial inflation in the market price of IRF common stock during the Class Period. The Recognized Loss amounts in the Plan of Allocation are based upon the artificial inflation calculated by my event study analysis.

---

[7] I rely on the indexes and market model regression that Professor Jarrell cited in his Affidavit.

6

EXHIBIT __D__
PAGE __92__

12.    Beginning on April 9, 2007, several revelations and disclosures were made that corrected the alleged misrepresentations and omissions. I discuss each of these disclosures in more detail below.

*April 9, 2007*

13.    On April 9, 2007, IRF publicly announced that it had been conducting an internal investigation of certain accounting irregularities, that the investigation's interim findings found "material weaknesses in the internal control over financial reporting" and accounting irregularities at a foreign subsidiary that included "among other things, premature revenue recognition of product sales."[8]    IRF's announcement stated that its Board of Directors initiated the investigation and that other accounting areas were being investigated, including "accounts receivable, revenues and possibly other entries in the financial statements may have been misstated in any given accounting period, including possibly periods preceding the year ended June 30, 2006."[9] IRF stated that it would "be unable to file within the required time period, its Quarterly Report on Form 10-Q for the period ending March 31, 2007 until the investigation is completed, identified errors quantified, and previously issued financial statements revised as may be necessary."[10]  During the

---

[8] "International Rectifier Announces Internal Investigation of Accounting Irregularities at Foreign Subsidiary and Cautions on Reliance on Prior Financial Statements," Business Wire, 4/9/2007, 8:00am.

[9] *Ibid.*

[10] *Ibid.*

ΓXHIBIT  D
PAGE    93

trading day, Reuters carried the news of an analyst rating cut and Standard & Poor's issued a ratings warning for the Company.[11] There was no other negative and economically material confounding news that would have caused IRF's stock price to decline.

14.    IRF's stock price declined to $35.97 on April 9, 2007, down from the previous day's closing price of $38.80, a decline of 6.60%, or $2.56 per share net of market and industry effects, and is statistically significant at the 99% level of confidence.

### *August 30, 2007*

15.    On Thursday, August 30, 2007, before the start of trading, IRF announced that its CEO, Alex Lidow, had left the Company on a leave of absence pending the outcome of the accounting investigation conducted by the Board of the Company, and that it would not file its report on year end results through June 30, 2007 with the SEC on time.[12] The news report was carried on several newswires.[13] Another news report quoted an analyst's negative reaction to the news, including a

---

[11] "UPDATE 1-Int'l Rectifier says probe finds accounting errors," 4/9/2007, 8:18am; and "S&P Puts Rtgs For International Rectifier Corp. On Watch Neg," Capital Markets Report, 4/9/2007, 2:01pm.

[12] "International Rectifier Announces Management Changes," Business Wire, 8/30/2007, 8:36am.

[13] Other newswires and services carrying the news includes: Dow Jones News Service, Bloomberg News, Associated Press Newswires, Reuters News, Wireless News, Electronic News, CFO.com, and the Los Angeles Times.

8



EXHIBIT _D_
PAGE _94_

ratings downgrade.[14]   There was no other negative and economically material confounding information disseminated to the market about IRF on August 30, 2007.

16.    International Rectifier's stock price declined to $34.87 on August 30, 2007, down from the previous day's closing price of $38.39, a decline of 9.55%, or $3.67 per share net of market and industry effects, and is statistically significant at the 99% level of confidence.

*February 12, 2008*

17.    On February 11, 2008, the last day of the Class Period, after the market closed, IRF filed Form NT 10-Q with the SEC indicating that it would not file its quarterly report.[15]   In the filing, IRF revealed that it discovered even more accounting irregularities not previously revealed to investors, including: improper capitalization of intangible assets; additional improper revenue recognition practices, which included a different segment of its business (Aerospace and Defense); understated accounts payable and accrued expenses; practices that may have included the judgmental adjustment of quarterly financial results in an effort to meet quarterly earnings targets; other tax-related adjustments; and investigations by

---

[14] International Rectifier's Lidow Steps Down Amid Probe (Update3)," BLOOMBERG News, 8/30/2007, 4:36pm; "International Rectifier-IRF downgraded to Underperform from Market Perform@RAJA," Bloomberg, 8/30/2007, 2:19pm; "International Rectifier's Lidow Steps Down Amid Probe (Update3), BLOOMBERG News, 8/30/2007, 4:36pm.

[15] "International Rectifier Delays 10Q," Dow Jones Corporate Filings Alert, 2/11/2008, 5:14pm.


EXHIBIT   D
PAGE   95

the SEC, the U.S. Attorney's Office and the Internal Revenue Service.[16] There was no other negative and economically material confounding information disseminated to the market about IRF on February 12, 2008.

18.    On February 12, 2008, International Rectifier's stock price closed at $25.88, down from the previous day's closing price of $27.27, a decline of 3.98%, or $1.08 per share net of market and industry effects, which is statistically significant at the 95% level of confidence.

**Determination of Artificial Inflation**

19.    In order to determine the amount of artificial inflation in IRF's stock price, it is necessary to first calculate the true value of the security in question throughout the Class Period.  Artificial inflation equals the stock price minus the stock's true value.  I computed the true value based on the stock price decline, net of market and industry movements, beginning with the start of the Class Period on July 31, 2003.  Because the allegations in this matter relate to misrepresentations and omissions in IRF's reported financial results, it is likely that the alleged artificial inflation entered IRF's stock price during the Class Period.  Therefore, I used disclosure-dates during the Class Period that arguably increased artificial inflation in the stock price.  Specifically, I identified four days when IRF announced its earnings

---

[16] IRF's Form NT 10-Q, filed with the SEC on February 11, 2008.  Also see Jarrell Affidavit, pp. 35-38.

EXHIBIT  D
PAGE  96

and guidance, which was accompanied by statistically significant stock price increases that I attribute to increasing artificial inflation in IRF's stock price: August 1, 2003, January 30, 2004, July 30, 2004, and April 28, 2006 (inflationary disclosures).[17]

20.    From the event study analysis of the corrective disclosure days discussed above (April 9, 2007, August 30, 2007 and February 12, 2008), I determined the dollar amount of stock price declines attributable to the alleged omissions and misrepresentations, and used these price decreases to estimate the artificial inflation throughout the Class Period.    The table below shows the disclosures, price reaction, and the amount of artificial inflation entering and exiting the stock price during the Class Period, which is also attached as Exhibit A to the Class Notice explaining the Plan of Allocation.

| Date Range | Artificial Inflation |
| --- | --- |
| 7/31/03 to 1/29/04 | $0.66 |
| 1/30/04 to 7/29/04 | $2.34 |
| 7/30/04 to 4/27/06 | $4.56 |
| 4/28/06 to 4/8/07 | $7.31 |
| 4/9/07 to 8/29/07 | $4.75 |
| 8/30/07 to 2/11/08 | $1.08 |
| 2/12/08 | $0.00 |

---

[17] In the interest of simplicity and ease of administration of the Plan of Allocation, I assume that the artificial inflation on July 31, 2003 is equal to the artificial inflation on August 1, 2003.

EXHIBIT D
PAGE 97

**Conclusion**

21.    Based on the event study analysis above and the Jarrell Affidavit, there is a causal relation between the information disclosed that revealed the alleged misrepresentations or revealed the consequences of such misrepresentations and the losses suffered by members of the Class.    In addition, the losses caused by the misrepresentations were economically material based on the statistical significance of the price reactions.    I conclude that the excess price declines described resulting from the net of market and industry movements for IRF's stock on April 9, 2007, August 30, 2007 and February 12, 2008 of $2.56, $3.67 and $1.08, respectively, corrected the Company's stock price for the alleged misrepresentations and omissions set out in the Complaint and caused losses for investors in IRF's common stock.

**FAIRNESS AND REASONABLENESS OF THE PLAN OF ALLOCATION**

22.    In my opinion, the Plan of Allocation is a fair and reasonable method of distributing the Net Settlement Fund to Authorized Claimants.    The calculation of Recognized Loss nets gains against losses for each matched purchase and sale transactions.    Further, to the extent a claimant had a gain from his, her or its overall transactions in IRF common stock during the Class Period, no loss is recognized under the Plan.

EXHIBIT    D
PAGE    98

23.    Additionally, the Plan of Allocation allows recovery for losses that are measurable directly from corrections of the alleged wrongdoing, and not for losses due to general market or industry movements or other Company-specific reasons that are assumed to be unrelated to the alleged wrongdoing.


I declare, under penalty of perjury, that the foregoing facts are true and correct.

Executed this 5th day of January, 2010.


Howard J. Mulcahey

EXHIBIT 1

EXHIBIT ___D___
PAGE ___160___

# Howard J. Mulcahey

16 Hurlingham Drive, Honeoye Falls, NY 14472 Office (585) 385-7440, Home (585) 624-4690

## SUMMARY

❑ Participated in numerous Business and Professional Practice, Licensee and Small Business valuations, financial / accounting forensic investigations, securities class action litigation support (valuations and damages), breech of contract damages, and economic support for various legal proceedings

❑ Expert witness in Federal and New York State Court regarding the calculation of commercial contract damages, and liability and damages testimony for breach of fiduciary duty

❑ Participated in the economics support of numerous federal and state litigation actions

❑ Masters of Business Administration in Finance with Corporate Accounting course work, William E. Simon Graduate School of Business Administration, University of Rochester, Rochester, NY

❑ Guest Lecturer, University of Rochester, Rochester, NY (2002), LeMoyne College (2007, and 2008)

❑ Seminar Expert for finance, economics and valuations, Freddie Mac, McLean, VA  (2002 and 2003)

## EMPLOYMENT

**FORENSIC ECONOMICS, INC.**, Rochester, NY                    *January 2002 - Present*
   *Vice President*
   Provide financial expertise for litigation support and expert testimony for commercial litigation, prepare business valuations, conduct finance seminars, and advise businesses and business owners. Requires analysis employing accounting, finance and economics expertise, including studies of general economic, business, and financial conditions, to litigation and arbitration cases, mergers and acquisitions, buy-sell agreements, intellectual property and other intangible assets, breach of contract litigation and other situations as needed. Prepare economic damage assessments, stock and option valuations, and other financial and business consulting services.

**ANAEROBICS, INC.**, Aurora, NY                    *May 1999 - January 2002*
   *Vice President-Finance and Chief Financial Officer*
   A start-up company with new environmental/energy technology.  Responsible for developing, leading and managing all financial management functions, including accounting, budgeting, financial and operational analysis/reporting, tax, treasury, risk management/insurance, human resource, information technology, purchasing and corporate legal functions.  Led or actively participated in the strategy, plans and execution for relations with institutional and individual investors and financial analysts including venture capitalists.  Regularly met with investment banks, venture capitalists, large and small individual investors and commercial banks.  Developed terms, Offering Memorandum, roadshow and launched offering in 2000 raising $5 million in equity.  Developed new commercial bank relationship and closed and funded $1.2 million in senior debt.  Developed, implemented and managed the Company's finance strategy, capital structure, internal control systems, pricing and IT infrastructure.  Designed, sourced and installed new network and computing platform for all employees.  Responsible for developing the annual business plan, projections and valuation analysis, planning and analysis of financial and operational performance and the financial aspects of strategic partner opportunities.  Successfully negotiated price and contract terms with largest customer.  Developed processes, controls, checks and balances as revenues increased from $432,000 in 1999 to $1.4 million in 2001.Managed annual audit with big 5 accounting firm.  Report to CEO/Chairman.  Participate quarterly in Board meetings.

EXHIBIT    D
PAGE    101

**EASTMAN KODAK CO., BUSINESS IMAGING SYSTEMS DIVISION (BIS), Rochester, NY**

*Aug 1994 - May 1999*

### *Director, Worldwide Financial Reporting and Analysis*

A $700 million division focused on providing imaging solutions to the commercial market. Division experienced declining revenues and declining profitability. Hired as part of a turnaround effort. Responsible for analyzing, understanding and communicating worldwide business issues, plans, and past and future performance to division President, Board of Directors, Senior/Middle Managers worldwide as well as corporate finance and senior management. Participated in implementing a radical restructuring plan which drove worldwide improvement in pre-tax earnings from -2.2% to 15% of revenues with Economic Profit of over $108 million. Actively led measurement, analysis and reporting of improvement initiatives. Developed and managed new worldwide processes to gauge progress and performance to goal after restructuring. Recommended and implemented corrective actions to ensure continued progress. Developed worldwide annual operating plan & process. Developed monthly revenue and operating forecasts and reporting of results for Division COO and President, and Kodak's CFO and other Senior Management. Participated in restructuring product portfolio and change in distribution model from direct sales to indirect distribution channels. Led continuing efforts to define and track standard costs, and optimize manufacturing costs, inventories, and monthly analysis of overall worldwide operating performance and improvement action plans. Led Division efforts for corporate worldwide implementation of ERP/SAP financial systems and reengineering of financial reporting. Led successful implementation of worldwide Economic Profit performance measurement systems including training key worldwide finance staff. Reported to COO.

### *Various Other Positions*

Participated in Division M&A activity. Co-authored business plan for new worldwide hardware, software, services strategy leading to $260 million investment and $50 million revenue growth. Successfully led deployment of technology, automation and processes which led to improved forecasting, lower costs ($1M) and higher quarterly revenues. Designed and developed PC-based modeling tools successfully applied to compensation and performance measurement. Designed, deployed and managed a new sales pipeline tool and forecasting process. Awarded Division's only "MVP" honors in 1997 for high performance.

**VISUAL NUMERICS, INC., Boulder, CO**

*June 1993-Sept. 1993*

### *Finance Consultant*

Hired by turnaround consultant to work with a software client with $30 million in annual revenues. Reported to CFO. Co-developed and implemented policies increasing cash flow. Cash increased to $1 million from under $178,000 in seven weeks. Jointly authored a private placement document and road show. Implemented TQM processes. Performed financial benchmarking with similar firms to establish credible performance criteria. Developed a quantitative model to predict sales opportunities in foreign countries. Initiated a cross-functional reengineering project to improve the order and fulfillment processes. Contributed to turnaround success.

**BOMBARDIER CAPITAL INC., Burlington, VT (sub. of Bombardier, Inc.)**    *Sept. 1981-Oct. 1991*

EXHIBIT _D_

PAGE _102_

One of three original managers and corporate officers of this start-up business offering inventory, open account, and retail financing, leasing services and a captive insurance subsidiary. Over ten years, grew business from $3 million in assets to over $500 million in assets with 300 employees, eight branches and annual financing volume of $800 million. Grew OEM client base from one to 560. Achieved average profitability of 22% ROE. Led effort to being ranked 5th in North America in inventory financing in 1991.

### *Vice-President, Product Groups*                                                    *Oct. 1990-Oct. 1991*
P&L responsibility for $270 million in assets and $28 million in revenues. Directed 85 employees in sales, service, operations, MIS, data entry and accounting. Reduced cost by $1 million and obtained $65 million in new business through TQM project including mainframe systems development and process reengineering. Led diversification process resulting in $40 million asset growth after first year.

### *Vice-President, Operations, and COO*                                             *July 1989-Sept. 1990*
Responsible for turnaround of internal operations. Total assets over $400 million, revenues of $34 million. Reengineered policies, procedures and organization structure resulting in improved processes and reduced finance risks. Directed M&A activity for portfolio acquisitions leading to three acquisitions. Contributed to raising $500 million in capital with group of international banks.

### *Vice-President, Marketing*                                                        *Oct. 1987-June 1989*
Directed all sales and marketing. Staff of 40. Planned, staffed and launched sales, marketing, telemarketing and customer service. Opened three new offices. Increased customer base by 121%, assets by 210%, and margin by 11%. Successfully managed 100% annual growth rate. Contributed to raising $400 million in capital.

### *Various Other Positions*                                                          *Oct. 1987-June 1989*
Initiated portfolio diversification efforts. Recruited, hired and trained additional staff. Created and implemented control processes. Led mainframe systems design and development efforts.

### FORD MOTOR CREDIT CO., Houston and Beaumont, TX                          *Feb. 1979-Aug. 1981*

Hired for turnaround of branch operation offering retail and wholesale auto, truck and equipment financing. Promoted three times in two years after demonstrating exemplary performance.

---

### *Education and Career Enhancement*

### WILLIAM E. SIMON GRADUATE SCHOOL OF BUSINESS, U of R, Rochester, NY
                                                                             *Sept. 1992-June 1994*
MBA in Corporate Finance. Chair & founding member of **VISION** program. Awarded Dean's Leadership Award.

### HOBART COLLEGE, Geneva, NY                                                        *Sept. 1974-June 1978*
Bachelor of Science degree in Liberal Arts, Football Captain, National Scholarship/Leadership Award.

                                                                             *June 2008-Present*
President and member of Board of Directors, Statesmen Athletic Association, Hobart College

                                                                             *June 2001-June 2008*
Vice-President and member of Board of Directors, Statesmen Athletic Association, Hobart College

### EXECUTIVE DEVELOPMENT

3

EXHIBIT D
PAGE 103

Skilled user of Access, Excel, Word, PowerPoint and other PC-based analysis tools. Several seminars and other formal training classes in Access and Excel. Experience with Hyperion, SAP, JD Edwards financial systems and reporting tools. Trained in, and experienced with, TQM/Quality programs and Hoshin Planning Process. Various seminars and programs in management, finance and strategic planning. Toastmasters.

---

### Publications

"The Effect of the Options Backdating Scandal on the Stock Price Performance of 110 Accused Companies," with Genarro Bernile and Gregg A. Jarrell, The Social Science Research Network, December 21, 2006.

---

### Expert Reports, Testimony and Consulting Expert Experience

Consulting Expert In re: Maxim Integrated, Inc. Securities Litigation, in the United States District Court, Northern District of California, San Jose Division, Case No. C-08-00832-JW (December 2009).

Expert Report of Howard Mulcahey In re: United States Securities And Exchange Commission v Raj P. Sabhlok and Michael C. Pattison, in the United States District Court for the Northern District Of California, San Jose Division, Case No. CV 08-4238 (BZ) (December 2009).

Deposition of Howard Mulcahey in In re: United States Securities And Exchange Commission v Carl W. Jasper, in the United States District Court for the Northern District Of California, San Jose Division, Case No. CV 07-6122 (JW) (October 2009).

Expert Report of Howard Mulcahey In re: United States Securities And Exchange Commission v Carl W. Jasper, in the United States District Court for the Northern District Of California, San Jose Division, Case No. CV 07-6122 (JW) (August 2009).

Trial Testimony of Howard Mulcahey in The Matter of the Judicial Settlement of Estate of Eleanor G. Kopec, in the State Of New York Surrogate's Court, Monroe County, File No. 2001 DT 01229 (May, 2009).

Consulting Expert In re: In re: Smith & Wesson Holding Securities Litigation, in the United States District Court, District Of Massachusetts, Civil Action No. 07-CV-30238-MAP) (March 2009).

Declaration Of Howard J. Mulcahey for the Plan of Allocation In re: Openwave Systems Securities Litigation, in the United States District Court for the Southern District of New York, Case Number 07-CV-1309 (DLC) (Judge Cote) (February 2009).

Consulting Expert In re: Cbeyond, Inc. Securities Litigation, in the United States District Court for the Northern District Of Georgia (Atlanta Division) Civil Action No. 1:08-cv-1666 (CC) (February 2009).

EXHIBIT  D
PAGE   104

Consulting Expert In re: Amkor Technology, Inc.Securities Litigation, in the United States District Court for the Eastern District Of Pennsylvania, Civil Action No. 2:06-CV-298 (LP) (November 2008).

Consulting Expert In re: International Rectifier Corporation Securities Litigation, in the United States District Court for the Central District Of California, Case No. CV 07-02544-JFW (October 2008).

Consulting Expert In re: Lehman Brothers Holdings, Inc.Securities Litigation, in the United States District Court for the Southern District of New York, Civil Action No. 08-CV-5523(LAK) (October 2008).

Consulting Expert In re: Force Protection, Inc.,Securities Litigation, in the United States District Court for the District Of South Carolina, Charleston Division, Civil Action No. 2:08-1207-CWH (September 2008).

Consulting Expert In re: Washington Mutual, Inc. Securities Litigation, in the United States District Court for the Western District Of Washington at Seattle, Lead Case No. C08-387 MJP (August 2008).

Expert for the Plan of Allocation In re: American Tower Corporation Securities Litigation, in the United States District Court for the Northern District of Massachusetts, Case Number 06-CV-10933 (MLW) (Judge Mark L. Wolf) (April 2008).

Consulting Expert In re: Countrywide Financial, Inc. Securities Litigation, in the United States District Court for the Central District of California, Western Division, Case Number CV08-00492ODW (Judge Pfaelzer) (March 2008).

Expert for the Plan Of Allocation In re: Russell Carlson, Individually And On Behalf Of All Others Similarly Situated v. Xerox Corporation, KPMG LLP, Paul A. Allaire, G. Richard Thoman, Anne Mulcahy, Barry D. Romeril, Gregory Tayler And Philip Fishbach in the United States District Court District of Connecticut, 3:00-CV-1621 (AWT) (March 2008)

Consulting Expert In re: Russell Carlson, Individually And On Behalf Of All Others Similarly Situated v. Xerox Corporation, KPMG LLP, Paul A. Allaire, G. Richard Thoman, Anne Mulcahy, Barry D. Romeril, Gregory Tayler And Philip Fishbach in the United States District Court District of Connecticut, 3:00-CV-1621 (AWT) (March 2008)

Consulting Expert In re: International Business Machines Corp. Securities litigation in the United States District Court for the Southern District of New York, Case Number 1:05-cv--6279 (AKH) (Judge Hellerstein) (March 2008).

Consulting Expert In re: Freddie Mac F.k.a. Federal Home Loan Mortgage Corporation in the United States District Court for the Southern District of New York, Case 1:07-cv-10526-JFK (January, 2008).

Consulting Expert In re: Freddie Mac F.k.a. Federal Home Loan Mortgage Corporation in the United States District Court for the Northernd Istricto F Ohio, Easternd Ohio (Youngstown), Civil Action , 4:08-cv-00160-PCE (January, 2008).

EXHIBIT ___D___
PAGE ___105___

Consulting Expert In re: Openwave Systems Securities Litigation, in the United States District Court for the Southern District of New York, Case Number 07-CV-1309 (DLC) (Judge Cote) (January 2008).

Consulting Expert In re: Monster Worldwide, Inc. Securities Litigation, in the United States District Court for the Southern District of New York, Case Number 07 CV 2237 (Judge Rakoff) (November 2007).

Consulting Expert In re: HCC Insurance Holdings, Inc. Securities Litigation, in the United States District Court for the Southern District of Texas Houston Division, Case Number 07-CV-00801 (KPE) (Judge Keith P. Ellison) (November, 2007).

Consulting Expert In re: American Tower Corporation Securities Litigation, in the United States District Court for the Northern District of Massachusetts, Case Number 06-CV-10933 (MLW) (Judge Mark L. Wolf) (October, 2007).

Consulting Expert In re: Sunrise Equity Partners, L.P., et. al. v. Workstream, Inc. et. al.. in the United States District Court for the Southern District of New York, Civil Action No. 06-Civ-7754 (CLB) (MDF) (October 9, 2007).

Consulting Expert In re: Mercury Interactive Corporation Securities Litigation, in the United States District Court for the Northern District of California San Jose Division, Case Number C 05-3395 JF (PVT) (Judge Jeremy Fogel) (September, 2007).

Consulting Expert In re: KLA-Tencor Corp. Securities Litigation, in the United States District Court for the Northern District of California, Case Number 06-cv-04065-MJJ (KPE) (Judge Martin J. Jenkins) (August, 2007).

Consulting Expert In re: UnitedHealth Group Incorporated PSLRA Litigation, in the United States District Court for the District of Minnesota, Civ. No. 0:06-cv-01691-JMR-FLN (July 2007).

Consulting Expert In re: Donna Conrad, Plaintiff, v. Arthur M. Blank, Basil L. Anderson, Brenda C. Barnes, John B. Wilson, John C. Bingleman, John J. Mahoney, Joseph S. Vassalluzzo, Louis R. Pepi, Martin E. Hanaka, Martin Rust, Mary E. Burton, Paul F. Walsh, Robert C. Nakasone, Ronald L. Sargent, Rowland T. Moriarty, Susan S. Hoyt, Thomas G. Stemberg, James E. Flavin, Robert K. Mayerson, Patrick A. Hickey, Jack A. Van Woerkom, and Jeffrey E. Nachbor, Defendants, and Staples, Inc., a Derivative Action Complaint, Nominal Defendant, in the Court of Chancery of the State of Delaware in and for New Castle County, C.A. No. 2611-VCL (July 2007).

Consulting Expert In re: Ruth Rosenberg, Individually and on Behalf of All Others Similarly Situated, vs. David B. Gould, Nicholas Discombe, William Evans, Joel G Katz, Thomas J . Crotty, Loren Wimpfheimer and Witness Systems, Inc., Civil Action Number 1-06 CV-1894 (March 2007).

Consulting Expert In re: Ohio Public Employees Retirement System, State Teachers Retirement System of Ohio, and Ohio Bureau of Workers' Compensation v. Federal National Mortgage Association (operating as Fannie Mae), Franklin Raines, J. Timothy Howard and Leanne G. Spencer in The United States District Court For The Southern District of Ohio Eastern Division, Civil Action No. C2-04-1106 (March 2007)

EXHIBIT __D__
PAGE __106__

Consulting Expert In re: Vitesse Semiconductor Corporation Securities Litigation, in the United States District Court for the Central District of California, Case Number CV06-2639 RGK(PLAx) (March 7, 2007).

Consulting Expert In re: A Review of the Draft Environmental Impact Statement For the Oneida Nation of New York Conveyance of Lands into Trust before the United States Department of Interior (February 21, 2007).

Consulting Expert in re: Keri Evans v. John F. Akers, et al., and Lawrence W. Bunch, et al. v. W. R. Grace & Co., et al. in the United States District Court For the District of Massachusetts, Consolidated Case No. 04-11380-WAY (February 16, 2007).

Consulting Expert In re: Russell Carlson, Individually And On Behalf Of All Others Similarly Situated v. Xerox Corporation, KPMG LLP, Paul A. Allaire, G. Richard Thoman, Anne Mulcahy, Barry D. Romeril, Gregory Tayler And Philip Fishbach in the United States District Court District of Connecticut, 3:00-CV-1621 (AWT) (January 2007)

Consulting Expert In re: Freddie Mac F.k.a. Federal Home Loan Mortgage Corporation in the United States District Court for the Southern District of New York, Civil Action , MDL – 1584, Lead Case No. 03-CV-4261 (JES) (October 2, 2006).

Consulting Expert In re: Take It Away, Inc. v. Home Depot, Inc. before the United States District Court for the District of Massachusetts, Civil Action No. 05-12484-DPW (September 29, 2006).

Consulting Expert In re: Lumenis, Ltd. Securities Litigation, in the United States District Court Southern District of New York, Case Number 02-CV-1989 (DAB) (Judge Deborah A. Batts) (September 2006).

Expert Report of Howard J. Mulcahey in Cathy Louise Maney v. CDI Technical Services/CDI Corporation, Corning, Incorporated, And Supervisor Phillip Huber as aider and abettor, in the United States District Court Western District of New York, Case Number 04CV6480 (June 30, 2006).

Consulting Expert In re: PMA Capital Corp. Securities Litigation before the United States District Court, Eastern District of Pennsylvania, File No. 03-CV-6121 (April 28, 2006).

Declaration of Howard Mulcahey In Support of Plaintiff Bunch's Memorandum In Opposition To State Street Bank And Trust Company's Motion To Dismiss Plaintiffs' Amended Consolidated Complaint, in the United States District Court For The District Of Massachusetts, Civil Action Consolidated Case No. 04-11380-WGY (February 21, 2006).

Expert Report of Howard J. Mulcahey in re Valuation of Robert J. Cummings Interests In Ecovation, Inc. (formerly known as AnAerobics, Inc.) as of January 1, 2005 by Howard J. Mulcahey (December 30, 2005).

Consulting Expert In re: The Matter of the Judicial Settlement of the Intermediate Accounting of Proceedings of Glenns Falls National Banks And Trust Company and Samual P. Hoopes as Trustees under the Will of Charlotte P. Hyde, Deceased, Article Ninth Trust (for Louis H. Whitney, and The Matter of the Judicial Settlement of the Intermediate Accounting of Proceedings of BankNorth, N.A and Byron R. Lapham, Jr., as Co-Trustees under the Trust created by Nell Pruyn Cunningham, in the

EXHIBIT ___D___
PAGE ___107___

Surrogate's Court of the State of New York, County of Warren, File Nos. 16,241 and 26,916 (October 12, 2005).

Consulting Expert In re: 7-Eleven, Inc. Shareholder Litigation, Cause No. 05-08944-M; Gillespie v. Suzuki, et al., Cause No. CC-05-11878-C and Alaska Laborers Employers Retirement Fund v. Seven-Eleven Japan Co., et al., Cause No. CC-05-12893-D (2005).

Consulting Expert In re: Safeguard Scientifics Civil Action before the United States District Court for the Eastern District of Pennsylvania, Civil Action No. 01-3208 (April 19, 2004).

Consulting Expert In re: Eaton Vance Corporation Securities Litigation, in the United States District Court, District of Massachusetts, Civil Action No. 01CV10911 EFH (April 2004).

Expert Report of Howard J. Mulcahey in re An Evaluation Of The Cruther's Interests in Manchester Sports and Clothing, Inc. & Cruthers & Munro Reality, LLC (November 25, 2003).

Consulting Expert In re: Safety-Kleen Corp. Bondholders Litigation, in the United States District Court for the District of South Carolina, Consol. Case No. 3:00-1145 17 (July 2003).

Consulting Expert In re: Harold Hicks, on behalf of himself and all others similarly situated v. Morgan Stanley & Co., Morgan Stanley Dean Witter Prime Income Trust, Charles A. Fiumefreddo, Mitchell M. Merin, Michael Bozic, Edwin J. Garn, Wayne E. Hedien, Manuel H. Johnson, Michael E. Nugent, Sheila A. Finnerty and Peter Gewirtz, in the United States District Court, Southern District of New York, No. 01 Civ.10071 (HB) (July 2003).

Consulting Expert In re: Dresser, Inc., v. Mark Langenhan, Barbara Langenhan, Daryl Piontek, and Total Piping Solutions, Inc., before the United States District Court for the Western District of New York, Case No. 02-CV-0163S(Sc) (April 17, 2003).

Consulting Expert In re: Irene Abrams v. Van Kampen Funds, Inc. et al., in the United States District Court, Northern District of Illinois Eastern Division, Case No. 01 C 7538 (Judge William T. Hart) (March 2003).

Deposition of Howard J. Mulcahey in Nettech Solutions, L.L.C. and ePARK, L.L.C., v. Zippark.com, et al., in the United States District Court Southern District of New York, 01 Civ. 2683 (SAS) (July 23, 2002).

Expert Report of Howard J. Mulcahey in Nettech Solutions, L.L.C. and ePARK, L.L.C., v. Zippark.com, et al., in the United States District Court Southern District of New York, 01 Civ. 2683 (SAS) (July 16, 2002).

Consulting Expert In re: Expert Report of Gregg Jarrell to determine Fair Royalty Rates for the use of licensed trademarks owned by for the SWIMC, Inc. and DIMC: Inc., subsidiaries of The Sherwin-Williams Company (June 7, 2002).

EXHIBIT D
PAGE 108